# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| LORI RAVENSCROFT GEARE and ROBERT J. CASEY, II, derivatively for the benefit of Hospira, Inc.,<br><br>        Plaintiffs,<br><br>  vs<br><br>CHRISTOPHER B. BEGLEY, F. MICHAEL BALL, THOMAS E. WERNER, SUMANT RAMACHANDRA, IRVING W. BAILEY, II, JACQUE J. SOKOLOV, BARBARA L. BOWLES, ROGER W. HALE, JOHN C. STALEY, CONNIE R. CURRAN, HEINO VON PRONDZYNSKI, MARK F. WHEELER, TERRENCE C. KEARNEY, RONALD A. MATRICARIA, and BRIAN J. SMITH,<br><br>        Defendants,<br>  and<br><br>HOSPIRA, INC., a Delaware Corporation<br><br>        Nominal Defendant. | Case No. 11-cv-09074 (JJT)<br><br><br>CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT |

Plaintiffs Lori Ravenscroft Geare ("Geare") and Robert J. Casey, II ("Casey") (collectively, "Plaintiffs"), by and through their undersigned counsel, allege upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, as follows:

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Hospira, Inc. ("Hospira" or the "Company") against certain of its current and former officers and directors for breach of fiduciary duties, corporate waste, and unjust enrichment, all of which have caused and

continue to cause substantial damage to the Company. Plaintiffs are long-time Hospira shareholders.

2. Hospira is a public company that serves as a contract manufacturer for injectable drugs used in hospitals, dialysis clinics, and outpatient settings. Because Hospira's officers and directors are entrusted with protecting public health and safety, they must take every reasonable measure to ensure that the Company's short-term concerns do not adversely impact the safety of its products. As detailed herein, however, Hospira's fiduciaries failed miserably in their duties. Beginning in early 2009, Hospira's Board of Directors (the "Board") approved a reckless cost-cutting program called "Project Fuel" without a sufficient review of the impact this program would have on the Company's quality controls and compliance with mandatory regulations. During Project Fuel's thirty-two month existence, necessary safety measures were ignored, key quality control personnel were cut, adulterated products were shipped out, and plants already in need of a major overhaul to meet federal requirements deteriorated. Even increased scrutiny from the U.S. Food and Drug Administration ("FDA"), including the receipt of two "Warning Letters" from the FDA that discussed the Company's deficient quality controls and serious violations of FDA regulations and Current Good Manufacturing Practices ("CGMP"), could not spur the Individual Defendants (as defined herein) to act in accordance with their duties. Rather, the Individual Defendants continued to promote Project Fuel, while making or causing the Company to make improper statements that, among other things, failed to disclose the extensive quality control issues that undermined the viability of the supposed financial savings that could be generated by Project Fuel. The profitability promised by the Project Fuel campaign was actually nothing more than a façade, intended to divert attention from the true health of the Company.

3. The key impetus for this wrongdoing was the Individual Defendants' frustration with Hospira's stock price "stagnation." Hospira began its corporate life as a public company when it was "spun off" from Abbott Laboratories ("Abbott") in 2004 under the leadership of then-Chief Executive Officer ("CEO"), defendant Christopher B. Begley ("Begley"). From 2004 through 2008, revenues soared from $2.4 billion to $3.6 billion. Likewise, earnings were robust. Hospira ended 2008 with working capital (current assets minus current liabilities) at $1.1 billion. In the first quarter of 2009, business slowed somewhat due to the economic recession affecting all companies, but revenues and earnings were still healthy. Hospira's stock price, however, hit new lows due to market factors.

4. In an attempt to boost the stock price, in or about January 2009, the Individual Defendants adopted the aforementioned Project Fuel program to slash spending throughout the Company and "fuel" growth. The two-year program was designed to eliminate 1,400 jobs, and result in costs savings of $110 to $140 million per year. But these cost-cutting initiatives were disastrous to Hospira's controls over product quality and safety, which were already severely deficient even prior to the implementation of Project Fuel.

5. As fiduciaries charged with adhering to the laws concerning safe manufacturing practices, it was incumbent on the Individual Defendants to determine on a fully-informed basis that Hospira was in substantial compliance with all FDA rules and regulations at the time it adopted such a severe cost-cutting program, that the contemplated cuts would not adversely affect mandatory quality controls and safety measures and that the Company maintained sufficient quality controls and adhered to mandatory FDA regulations throughout the existence of Project Fuel. Unfortunately, it later became clear that the Company's controls over "product quality and safety" were severely lacking, and had been since at least 2007.

6.     During the course of Project Fuel, the FDA expressed increasing concern to Hospira about its lack of legal compliance, its lack of adherence to necessary safety procedures, and to particulate matter found in medicinal products Hospira manufactured.  In August 2009 and April 2010, the FDA issued Warning Letters which contained findings that would have alarmed any fiduciary acting in good faith.[1]  Despite the Individual Defendants' heightened and specialized duties to identify and address Hospira's regulatory and compliance risks, however, these fiduciaries consciously disregarded the continuous and pervasive misconduct for ten consecutive financial quarters.  The Individual Defendants had already committed to Project Fuel, and refused to take immediate and comprehensive remedial actions which could undo all of the savings Project Fuel had achieved.  Instead, the Individual Defendants caused or allowed Hospira to downplay its regulatory issues (and to exaggerate the steps taken to address those issues) so that the stock price could remain high.  Meanwhile, the Board authorized Hospira to repurchase hundreds of millions of dollars of stock at inflated prices (following receipt of the Warning Letters), knowing that Hospira had not fully assessed or addressed its regulatory problems.[2]  Further, certain of the Individual Defendants took advantage of the artificial spike in

_____

[1] FDA inspections may result in: (i) a clean bill of health; (ii) observations as to significant problems that should be remedied (known as a Form 483); or (iii) a Warning Letter.  A Warning Letter reflects a finding that a company has significantly violated FDA regulations.  The Warning Letter identifies the violation, such as poor manufacturing practices.  The letter also makes clear that the company must correct the problem and provides directions and a timeframe for the company to inform the FDA of its plans for correction.  In the same month the FDA issued its second Warning Letter to Hospira, the Company recalled two drugs – Propofol, an anesthetic, and Liposyn, an intravenous nutritional product – for a second time in six months because of manufacturing defects. The drugs had been contaminated by particulates during manufacturing.  These recalls, however, *did not* spur the Board to undertake a Company-wide review of production methods.

[2] Based on the price to which Hospira stock fell once adverse material facts were known, this reckless repurchase plan damaged Hospira in the amount of roughly *$140 million*.

Hospira's stock by collectively selling over $54 million worth of their personally held Hospira stock on the basis of non-public information.

7.     While Project Fuel allowed Hospira to claim improved financial results, which greatly boosted its stock price, this was just a mirage.  By September 2011, Hospira could no longer hide the disastrous deterioration of its quality and safety programs.[3]  At that point, Project Fuel was undone, and the Company admitted that emergency remediation measures were needed. In fact, the Individual Defendants disclosed the serious extent of their mismanagement by also revealing that an ongoing FDA investigation was the cause for a production slowdown affecting approximately 25% of the Company's sales.  Hospira's stock price plummeted.  Remediation costs were estimated to reach as high as $375 million.[4]  At the end of the day, the actions of Hospira's officers and directors have left Hospira with these staggering remediation costs, and struggling with FDA issues, plant slowdowns, contract penalties, and repeated product recalls. Hospira also faces a securities fraud class action lawsuit,[5] which may cost the Company

---

[3] The "Relevant Period" extends to **at least** October 2011 because it appears that even to the present time Hospira is not able to ensure that its plants are producing medicinal products in a safe manner. As discussed *infra*, on August 23, 2012, Hospira received yet another Warning Letter from the FDA regarding production of "adulterated" products at its Costa Rica plant and noting that Hospira was in violation of federal regulations due to its: "Failure to identify the actions needed to correct and prevent recurrence of nonconforming product and other quality problems…."  This comes on the heels of a July 16, 2012 recall of four cancer drugs.  As *Reuters* reported: "Hospira Inc said it has issued a nationwide recall of four of its injectable cancer drugs because of particles embedded in the glass at the neck of the vial…. Injury could result if the solution were injected into a patient, the FDA said. Signs and symptoms might include bleeding, bruising, inflammation, itching, rash, chest pain and respiratory symptoms."  Yet another drug was recalled on August 16, 2012, due to an "overdose risk."

[4] As of September 30, 2011, cash on Hospira's balance sheet only amounted to $527 million. Thus, the announced remediation efforts were projected to consume up to 70% of Hospira's then-available cash.

[5] The securities fraud class action is entitled *City of Sterling Heights General Employees' Ret. Sys. v. Hospira, Inc., et al.*, Case No. 11-cv-08332-AJS ("Federal Securities Action").  As alleged below, Hospira has a claim for contribution over and against certain of the Individual

hundreds of millions in damages (or lead it to pay out a significant sum in settlement). In addition, Hospira faces a broad FDA review, which may lead to an onerous Consent Order. Such a Consent Order would likely involve significant further costs and put Hospira under third party supervision for a number of years.

8. Indeed, the situation was so bad that, in January 2012, Hospira's CEO at an industry healthcare conference analogized remediation efforts to "draining the swamp." As many as 150 third-party consultants needed to be hired to help Hospira repair the damage Project Fuel had done. Even as recently as August 1, 2012, Hospira's CEO stated in a conference call that "additional issues keep bubbling up" and "much work remains to be done." Events throughout 2012, including recalls and a new Warning Letter from the FDA regarding the production of "adulterated" products at Hospira's Costa Rica plant, evidence the magnitude of Hospira's compliance issues.

9. Project Fuel caused damage from which Hospira may not recover for many years, if ever. Hospira's stock price was considerably boosted by Project Fuel (and the concealment of Hospira's true problems) to a high of roughly $57 per share. It now trades at roughly $35 per share. Indeed, the two-year stock performance of Hospira's shares has been dismal: a decline of approximately 40% between September 21, 2010 and September 12, 2012, during which other companies in the Drug Delivery & Accessories sector have experienced very substantial stock price growth. Worse, there is no sign of a recovery for Hospira.

10. Because it would be grossly unfair for Hospira to suffer all the damages incurred as a result of the Individual Defendants' wrongdoing, Plaintiffs seek to recover these damages

Defendants (the Class Action Individual Defendants, as defined below), under section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") by way of section 21D of the Private Securities Litigation Reform Act, 15 U.S.C. §78u-4, and against all of the Individual Defendants under state law for breach of fiduciary duty.

derivatively from the responsible fiduciaries. Such a derivative recovery will serve the dual goals of compensation and deterrence.[6] This derivative action may be prosecuted by Plaintiffs because Plaintiffs adequately allege that that the majority of the Board failed to exercise reasonable business judgment and/or face a substantial likelihood of liability – standards that are sufficient to survive the preliminary showing that making a demand on the Board would have been a futile and useless act.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C §1331 (federal question jurisdiction) insofar as this action arises under both section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution, and section 21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

12.      Prior to Congress having enacted an express provision for contribution under section 21D of the Exchange Act, the United States Supreme Court recognized that a federal cause of action existed for contribution pursuant to section 10(b) of the Exchange Act and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5. *See Musick, Peeler & Garnett v. Employers Ins. of Wausau*, 508 U.S. 286 (1993). Thus, pursuant to federal statutory law and Supreme Court authority, this Court has original federal question jurisdiction over the federal contribution claim alleged herein.

13.      In addition, to the extent Hospira was caused to repurchase its own securities at fraudulently inflated prices, it has a claim under section 10(b) of the Exchange Act for resultant damages, and such claim is asserted herein.

---

[6] In addition to the financial harm and the loss of management credibility Hospira has endured, the Company has lost its sterling reputation as manufacturer of products of impeccable quality.

14.     This Court also has subject matter jurisdiction over the pendent state law claims asserted herein pursuant to 28 U.S.C. §1367 (supplemental jurisdiction), since this statute provides that the district court has supplemental jurisdiction over all other claims where, as here, they are so related to claims in the action within the original jurisdiction of the Court, that they form part of the same case or controversy.

15.     This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332 in that complete diversity exists between Plaintiff Casey and each of the defendants and the amount in controversy exceeds $75,000 exclusive of interests and costs.

16.     This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

17.     The Court has personal jurisdiction over each defendant because each either is a corporation that conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because acts and offenses pertinent to the causes of action stated herein were committed in part in this jurisdiction.

## THE PARTIES

**Plaintiffs**

19.     Plaintiff Geare was a shareholder of Hospira at the time of the wrongdoing complained of, has continuously been a Hospira shareholder since the Company's 2004 spin off from Abbott.  Geare is a citizen of Arizona.

20.     Plaintiff Casey was a shareholder of Hospira at the time of the wrongdoing complained of, has continuously been a Hospira shareholder since May 4, 2004. Casey is a citizen of Pennsylvania.

**Nominal Defendant**

21.     Nominal Defendant Hospira is a Delaware corporation with its principal executive offices located at 275 North Field Drive, Lake Forest, Illinois. Hospira a global specialty pharmaceutical and medication delivery company that develops, manufactures, and markets products that help improve the safety, cost, and productivity of patient care. Hospira is also the world's leading provider of injectable drugs and infusion technologies, with a portfolio ranging from generic acute-care and oncology injectables to integrated infusion therapy and medication management products. Hospira's products are used by hospitals and alternate site providers, such as clinics, home healthcare providers, and long-term care facilities. The Company has thirteen manufacturing facilities, including facilities in Rocky Mount ("Rocky Mount") and Clayton, North Carolina ("Clayton"), Morgan Hill, California ("Morgan Hill"), and Costa Rica. Rocky Mount is one of its largest facilities, accounting for about 25% of the Company's annual revenues.

**Individual Defendants**

22.     Defendant Begley was Hospira's Executive Chairman of the Board from March 2011 to January 2012 and a Hospira director from 2004 to January 2012. Begley was also Hospira's CEO from 2004 to March 2011 and Chairman of the Board from May 2007 to March 2011. Begley was a member of Hospira's Science, Technology and Quality Committee from at least March 2008 to at least December 2011. As the Company's founding CEO, Begley oversaw Hospira's 2004 spin-off from Abbott. Begley either knowingly, recklessly, or in conscious disregard of the truth: (i) made or authorized improper statements regarding the nature of the

Company's remediation efforts in response to the FDA investigation; and (ii) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process. While in possession of material, non-public information concerning Hospira's jeopardized business health, Begley sold 386,112 shares of his stock for $22,008,384 in proceeds. Hospira paid Begley the following compensation as an executive:

| Year | Salary | Option Awards | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|---------------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2010 | $1,086,538 | $1,999,998 | $3,000,001 | $1,189,759 | $486,866 | $76,057 | $7,839,219 |
| 2009 | $1,050,000 | $1,422,353 | $2,478,790 | $2,100,000 | $420,374 | $94,500 | $7,566,017 |

Begley is a citizen of Illinois.

23. Defendant F. Michael Ball ("Ball") is the CEO and a director of Hospira. Ball was appointed as CEO and director in March 2011, succeeding the Company's founding CEO, defendant Begley. Ball is also a member of Hospira's Science, Technology and Quality Committee and has been since March 2011. Ball either knowingly, recklessly, or in conscious disregard of the truth: (i) made or authorized improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation; and (ii) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process. Ball is a citizen of Illinois.

24. Defendant Thomas E. Werner ("Werner") is Senior Vice President, Finance, and the Chief Operating Officer ("COO") of Hospira. Werner either knowingly, recklessly, or in conscious disregard of the truth: (i) made or authorized improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation; and (ii) failed to

maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process. While in possession of material, non-public information concerning Hospira's jeopardized business health, Werner sold 85,849 shares of his stock for $4,901,269.76 in proceeds. Hospira paid Werner the following compensation as an executive:

| Year | Salary | Option Awards | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|---------------|--------------|----------------------------------------|------------------------|-------|
| 2010 | $444,999 | $700,013 | $707,484 | $311,856 | $30,960 | $2,195,312 |
| 2009 | $445,000 | $559,331 | $648,231 | $712,000 | $25,673 | $2,390,235 |

Werner is a citizen of Illinois.

25.     Defendant Sumant Ramachandra ("Ramachandra") is Hospira's Senior Vice President, Research & Development, Medical and Regulatory Affairs and Chief Scientific Officer and has been since July 2008. Ramachandra either knowingly, recklessly, or in conscious disregard of the truth failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process. While in possession of material, non-public information concerning Hospira's jeopardized business health, Ramachandra sold 99,462 shares of his stock for $5,334,912.92 in proceeds. Hospira paid Ramachandra the following compensation as an executive:

| Year | Salary | Option Awards | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|---------------|--------------|----------------------------------------|------------------------|-------|
| 2010 | $485,596 | $1,000,006 | $1,000,000 | $340,306 | $33,991 | $2,859,899 |
| 2009 | $475,000 | $745,879 | $866,182 | $760,000 | $210,409 | $3,057,470 |

Ramachandra is a citizen of Illinois.

26.     Defendant Irving W. Bailey, II ("Bailey") has served as a Hospira director since the Company's spin-off from Abbott in 2004.   Bailey was also Hospira's Lead Director from 2007 to May 2011.  Bailey is a member of Hospira's Audit Committee and has been since at least December 2011 and a member of the Science, Technology and Quality Committee and has been since at least March 2011.  Bailey was also a member of Hospira's Governance and Public Policy Committee from at least March 2008 to at least March 2011.  Additionally, Bailey served as a Managing Director of Chrysalis Ventures, a private equity management firm, from June 2001 to January 2005, and has served as a Senior Advisor to Chrysalis Ventures since January 2005. Bailey also served as President of Bailey Capital Corporation, a private equity management firm, from January 1998 to June 2001, and as CEO of Providian Corporation, an insurance and diversified financial services company, from 1988 to 1997.  Bailey also serves as Vice Chairman of Aegon, N.V. and as a director of Computer Sciences Corporation.   Bailey knowingly or recklessly or in conscious disregard of the truth: (i) made or authorized improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation; (ii) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process; and (iii) reviewed and approved improper statements regarding the extent of the Company's manufacturing deficiencies and the remediation necessary to get manufacturing operations up to the FDA's CGMP requirement. Hospira paid Bailey the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2010 | $125,125 | $150,000 | $275,125 |
| 2009 | $87,000 | $150,000 | $237,000 |

Bailey is a citizen of Florida.

27.     Defendant Jacque J. Sokolov ("Sokolov") has served as a Hospira director since the Company's spin-off from Abbott in 2004.  Sokolov is also a member of Hospira's Science, Technology and Quality Committee and has been since at least March 2008 and was Chairman of that committee from at least March 2008 to at least March 2010.  Additionally, Sokolov has served since 1997 as the Chairman and Managing Partner of SSB Solutions, Inc., a national healthcare management consulting, project development and investment firm.  From 1987 to 1992, Sokolov served as the Vice President of Healthcare for Southern California Edison.  In 1992, Sokolov became CEO of Advanced Health Plans Inc., which was acquired in 1994 by Coastal Physicians Group Inc.  From 1994 to 1997, Sokolov served as Chairman of the Board, Chairman of the Executive Committee, and Chairman of the Management Action Committee of Coastal Physician Group, Inc., which later became PhyAmerica Physician Group, Inc.  Sokolov also serves on the board of directors of MedCath.  Sokolov knowingly or recklessly or in conscious disregard of the truth: (i) made or authorized improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation; and (ii) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process.  Hospira paid Sokolov the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2010 | $86,688 | $150,000 | $1,000 | $237,688 |
| 2009 | $82,500 | $150,000 | - | $232,500 |

Sokolov is a citizen of California.

28.     Defendant Barbara L. Bowles ("Bowles") has served as a Hospira director since her election to the Board in May 2008.  Bowles is also Chair of Hospira's Audit Committee and

has been since at least March 2011 and a member of that committee since at least March 2009. Bowles is a member of Hospira's Governance and Public Policy Committee and a member of the Science, Technology and Quality Committee and has been since at least March 2011. Additionally, Bowles served as the Vice Chair of Profit Investment Management, an equity investment advisory firm, from January 2006 until retiring on December 31, 2007. Bowles was also the founder and served as Chairman (2000 to 2006) and CEO (1989 to 2005) of the Kenwood Group, Inc., an equity investment firm until The Kenwood Group was acquired by Profit Investment Management. From 1984 to 1989, Bowles was Corporate Vice President and Director, Investor Relations, for Kraft, Inc., a diversified packaged food and beverage company. Bowles also serves as a director of Wisconsin Energy Corporation, Children's Memorial Hospital, the Chicago Urban League, the Museum of Science and Industry, Chicago, and Hyde Park Bank. Bowles is a trustee of Fisk University and also serves on the University of Chicago, Booth School of Business Advisory Council. Within the past five years, Bowles also has served as a director of Black & Decker Corporation (from 1993 to 2010), Dollar General Corporation (from 2000 to 2007), and Georgia Pacific Corporation (from 2000 to 2005). Bowles knowingly or recklessly or in conscious disregard of the truth: (i) made or authorized improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation; (ii) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process; and (iii) reviewed and approved improper statements regarding the extent of the Company's manufacturing deficiencies and the remediation necessary to get manufacturing operations up to the FDA's CGMP requirement. Hospira paid Bowles the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2010 | $95,438 | $150,000 | $245,438 |
| 2009 | $72,000 | $150,000 | $222,000 |

Bowles is a citizen of Illinois.

29.     Defendant Roger W. Hale ("Hale") has served as a Hospira director since his election to the Board in October 2006.  Hale is also a member of Hospira's Governance and Public Policy Committee and has been since at least March 2008 and a member of the Science, Technology and Quality Committee and has been since at least March 2011.  Additionally, Hale has served as Chairman of the Board and CEO of LG&E Energy Corporation, a diversified energy services company, from August 1990 until retiring in April 2001.  Prior to joining LG&E Energy Corporation, Hale was Executive Vice President of BellSouth Corporation, a communications services company.  From 1966 to 1986, Hale held several executive positions with AT&T Co., a communications services company, including Vice President, Southern Region from 1983 to 1986.  Hale is also a director of Ashland, Inc.  Within the past five years, Hale also has served as a director of H&R Block, Inc. (from 1991 to 2008).  Hale knowingly or recklessly or in conscious disregard of the truth: (i) made or authorized improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation; and (ii) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process.  Hospira paid Hale the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2010 | $92,000 | $150,000 | $242,000 |
| 2009 | $68,500 | $150,000 | $218,500 |

Hale is a citizen of Kentucky.

30.     Defendant John C. Staley ("Staley") has served as a Hospira director since the Company's spin-off from Abbott in 2004, and has served as Lead Director since May 2011 and Chairman since January 2012.  Staley is also a member of Hospira's Governance and Public Policy Committee and has been since at least December 2011 and a member of the Science, Technology and Quality Committee and has been since at least March 2011.  Staley was a member of Hospira's Audit Committee from at least March 2008 to March 2011 and was Chairman of that committee from at least March 2008 to at least March 2010.  Additionally, Staley served as the Managing Partner of the Lake Michigan Area of Ernst & Young LLP, a public accounting firm, a position that he held from 1985 to his retirement in June 2001.  Staley also serves as a director of eLoyalty Corporation and Nicor Inc.  Staley is also a member of, and the former Chairman of, the Board of Trustees of DePaul University.  Within the past five years, Staley has also served as a director of Centerpoint Corporation (from 2002 to 2006).  Staley knowingly or recklessly or in conscious disregard of the truth: (i) made or authorized improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation; (ii) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process; and (iii) reviewed and approved improper statements regarding the extent of the Company's manufacturing deficiencies and the remediation necessary to get manufacturing operations up to the FDA's CGMP requirement.  Hospira paid Staley the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2010 | $90,854 | $150,000 | $240,854 |
| 2009 | $84,000 | $150,000 | $234,000 |

Staley is a citizen of Florida.

31.    Defendant Connie R. Curran ("Curran") has served as a Hospira director since the Company's spin-off from Abbott in 2004.  Curran is also Chair of Hospira's Governance and Public Policy Committee and a member of the Science, Technology and Quality Committee and has been since at least March 2008.  Curran was a member of Hospira's Audit Committee from at least March 2008 to at least March 2011.  Additionally, Curran has served as the president of Curran Associates, a healthcare consulting firm, since July 2006.  Curran also previously served as the Executive Director of C-Change, formerly the National Dialogue on Cancer, a health advocacy organization, from 2003 to July 2006.  From 1995 to 2000, Curran served as President and CEO of CurranCare, LLC, a healthcare consulting company.  Upon the acquisition of CurranCare by Cardinal Health Consulting Services in November 2000, Curran served as President of Cardinal Health Consulting Services, a consulting company with expertise in surgical services, hospital operations and case management, and home care, until February 2002.  Curran has previously served as Vice President of the American Hospital Association and Dean of the College of Nursing at the Medical College of Wisconsin.  Curran also serves as a director of DeVry, Inc. and Volcano Corporation.  Within the past five years, Curran also has served as a director of CardioDynamics International Corp. (from 2000 to 2006) and IDX Systems Corporation (from 2002 to 2006).  Curran knowingly or recklessly or in conscious disregard of the truth: (i) made or authorized improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation; (ii) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process; and (iii) reviewed and approved improper statements regarding the extent of the Company's manufacturing deficiencies and the remediation necessary to get

manufacturing operations up to the FDA's CGMP requirement. Hospira paid Curran the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|-------------------|--------------|------------------------|-------|
| 2010 | $106,688 | $150,000 | $2,000 | $258,688 |
| 2009 | $90,500 | $150,000 | - | $240,500 |

Curran is a citizen of California.

32.     Defendant Heino von Prondzynski ("von Prondzynski") has served as a Hospira director since March 2009. von Prondzynski is also a member of Hospira's Science, Technology and Quality Committee and has been since March 2009. Additionally, von Prondzynski has served as CEO of Roche Diagnostics and as a member of the Executive Committee of F. Hoffman-La Roche Ltd., a Swiss-based healthcare company that develops diagnostic and therapeutic products, from early 2000 to 2005, retiring from Roche at the end of 2006. From 1996 to 2000, von Prondzynski held several executive positions at Chiron Corporation, a multinational biotechnology firm that develops biopharmaceuticals, vaccines, and blood testing products, and from 1976 to 1996 at Bayer AG, a German-based maker of healthcare products, specialty materials, and agricultural products. von Prondzynski also serves as chairman of the board of Nobel Biocare Holding AG, Switzerland. von Prondzynski also serves on the board of Qiagen NV and Koninklijke Philips Electronics NV. Within the past five years, von Prondzynski also has served as a director of Epigenomics AG (from 2007 to 2010). von Prondzynski knowingly or recklessly or in conscious disregard of the truth: (i) made or authorized improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation; and (ii) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures

regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process. Hospira paid von Prondzynski the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2010 | $90,000 | $150,000 | $240,000 |
| 2009 | $59,250 | $162,492 | $221,742 |

von Prondzynski is a citizen of Switzerland.

33.     Defendant Mark F. Wheeler ("Wheeler") has served as a Hospira director since his election to the Board at the 2006 annual meeting. Wheeler is also Chairman of Hospira's Science, Technology and Quality Committee and has been since at least March 2011 and a member of that committee and has been since at least March 2008. Wheeler is a member of Hospira's Audit Committee and has been since at least March 2008. Since September 2010, Wheeler has also served as the System Vice President, Chief Information Officer, and Chief Medical Information Officer for PeaceHealth, an integrated delivery network of hospitals in the Pacific Northwest. From January 2007 to September 2010, Wheeler served as the Director of Clinical Informatics for PeaceHealth. Wheeler previously served as Acting Vice President Engineering, Centricity Enterprise Business Unit of General Electric Company, a diversified technology, media, and financial services company, from February 2006 to January 2007. Wheeler also served as Chief Technical Architect of IDX Systems Corporation, a healthcare information technology services provider, from 1997 until December 2005, when IDX was acquired by General Electric, and served on IDX's board of directors from 1999 through 2005. Wheeler knowingly or recklessly or in conscious disregard of the truth: (i) made or authorized improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation; (ii) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the

remediation necessary to fix deficiencies in the Company's manufacturing process; and (iii) reviewed and approved improper statements regarding the extent of the Company's manufacturing deficiencies and the remediation necessary to get manufacturing operations up to the FDA's CGMP requirement.  Hospira paid Wheeler the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2010 | $96,063 | $150,000 | $246,063 |
| 2009 | $81,500 | $150,000 | $231,500 |

Wheeler is a citizen of Washington.

34.     Defendant Terrence C. Kearney ("Kearney") was Hospira's COO from April 2006 to January 2011.  Kearney was also Hospira's Acting Chief Financial Officer ("CFO") from April 2006 to August 2006.  Kearney either knowingly, recklessly, or in conscious disregard for the truth failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process.  While in possession of material, non-public information concerning Hospira's jeopardized business health, Kearney sold 300,640 shares of his stock for $17,197,411.42 in proceeds.   Hospira paid Kearney the following compensation as an executive:

| Year | Salary | Option Awards | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|---------------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2010 | $639,615 | $2,740,662 | $1,049,990 | $448,242 | $250,776 | $44,773 | $5,174,058 |
| 2009 | $625,000 | $1,419,016 | $917,391 | $1,000,000 | $214,132 | $56,250 | $4,231,789 |

Kearney is a citizen of Illinois.

35.     Defendant Ronald A. Matricaria ("Matricaria") was a Hospira director from 2006 to June 2010.  Matricaria was also a member of Hospira's Science, Technology and Quality Committee from at least March 2008 to at least March 2010.  Matricaria knowingly or recklessly

or in conscious disregard of the truth: (i) made or authorized improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation; and (ii) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process. Hospira paid Matricaria the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $45,000 | - | $45,000 |
| 2009 | $82,500 | $150,000 | $232,500 |

Matricaria is a citizen of Arizona.

36. Defendant Brian J. Smith ("Smith") is Hospira's Senior Vice President, General Counsel, and Secretary and has been since 2004. As the Company's attorney, Smith had the unique legal knowledge to counsel the Company about its regulatory requirements, including the minimum CGMP standards that were ultimately violated. While in possession of material, non-public information concerning Hospira's jeopardized business health, Smith sold 80,000 shares of his stock for $4.6 million in proceeds. Smith is a citizen of Illinois.

37. The defendants identified in ¶¶22-25, 34, 36 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶22-23, 26-33, 35 are referred to herein as the "Director Defendants." The defendants identified in ¶¶26, 28-31 are referred to herein as the "Governance and Public Policy Committee Defendants." The defendants identified in ¶¶26, 28, 30-31, 33 are referred to herein as the "Audit Committee Defendants." The defendants identified in ¶¶22-23, 26-33, 35 are referred to herein as the Science, Technology and Quality Committee Defendants." The defendants identified in ¶¶22, 24-25, 34, 36 are referred to herein as the

"Insider Selling Defendants."  Collectively, the defendants identified in ¶¶22-36 are referred to herein as the "Individual Defendants."

## THE INDIVIDUAL DEFENDANTS' DUTIES

**Specific Duties in These Circumstances**

38.    By reason of their positions as officers, directors, and fiduciaries of Hospira and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owe Hospira and its shareholders fiduciary obligations of good faith, loyalty, fair dealing, and candor, and were and are required to use their utmost ability to control and manage Hospira in a fair, just, honest, legal, and equitable manner and to ensure that the Company maintained adequate internal controls.

39.    Certain of the Individual Defendants' duties were heightened through their obligations either as executives or members of various Board Committees:

(a)    Defendants Begley and Ball both served as CEOs during the Relevant Period.  As such, they had the greatest access to non-public information, and significant control over Hospira's day-to-day operations, and its long-range plans.  They were each required, as Hospira's top executives, to ensure compliance with the law, and that all public statements were full, truthful  and complete, and did not conceal or misrepresent any material information;

(b)    Defendants Bailey, Ball, Begley, Bowles, Curran, Hale, Matricaria, Sokolov, Staley, Prondzynski, and Wheeler served on Hospira's Science, Technology and Quality Committee during the Relevant Period.  This Committee is obligated to ensure adequate controls exist as to "product quality and safety."  As members of this Committee, each of these defendants were required to review the Company's "overall quality strategy and internal quality processes [and] the results of, and responses to, product quality and quality system assessments

by the Company and external regulators (i.e., the FDA) and other national and international regulatory bodies; and … important product quality and field actions."  Given these responsibilities, these defendants had intimate knowledge of Hospira's FDA issues and compliance deficiencies, yet chose to defer any adequate response until after the completion of Project Fuel.  In addition, they knowingly or recklessly permitted false statements to be made during the Relevant Period, exposing Hospira to huge damages for securities fraud.  The Science, Technology and Quality Committee met five times per year between 2008 and 2011.

(c)    Defendants Bailey, Bowles, Curran, Staley and Wheeler served on Hospira's Audit Committee during the Relevant Period.  Their responsibilities as Audit Committee members included assisting the Board with respect to its internal controls over "the integrity of the Company's financial statements" and "the Company's compliance with legal and regulatory requirements."  Further, these Audit Committee members were responsible for "reviewing and discussing [the Company's] financial statements and financial press releases with [the Company's] management."  By dint of such responsibilities, these defendants had intimate knowledge of Hospira's FDA issues and compliance deficiencies, yet chose to defer any adequate remedial response until after the completion of Project Fuel.  In addition, they knowingly or recklessly permitted false statements to be made during the Relevant Period, exposing Hospira to material damages for securities fraud.  The Audit Committee met eleven times, twelve times, eleven times, and twelve times, in 2008, 2009, 2010, and 2011, respectively.

(d)    Defendants Bailey, Bowles, Curran, Hale and Staley served on Hospira's Governance and Public Policy Committee during the Relevant Period.  As members of the Governance and Public Policy Committee, these defendants were responsible for overseeing and making recommendations to the Board on "[t]he Company's environmental, health and safety

compliance programs" as well as "[t]he Company's enterprise risk management in areas affecting the Company's public policy, compliance and government affairs activities or programs." By dint of such responsibilities, these defendants had intimate knowledge of Hospira's FDA issues and compliance deficiencies, yet chose to defer any adequate response until after the completion of Project Fuel. In addition, they knowingly or recklessly permitted false statements to be made during the Relevant Period, exposing Hospira to huge damages for securities fraud. The Governance and Public Policy Committee met five times, two times, seven times, and five times, in 2008, 2009, 2010, and 2011, respectively.

40.     Additionally, The Company has in place a Code of Business Conduct (the "Code") which applies to all officers, employees, contractors, and agents of Hospira. Further, the Corporate Governance Guidelines state that "[d]irectors shall adhere to the Company's Code." The Code states that the Company expects these individuals to "provide full, accurate, fair, timely and understandable disclosures when making public communications or in reports and documents filed with government agencies, such as the [SEC] and the [FDA]."

41.     Additionally, Project Fuel was a major corporate undertaking requiring the Individual Defendants' closest attention, both at the time of its initiation and throughout its existence. Prior to implementing the cost-cutting initiatives of Project Fuel, these fiduciaries had a duty to obtain a sufficient independent comprehensive review of Hospira's current compliance with FDA rules, and any effects Project Fuel would have on the Company's compliance. The Individual Defendants also had a duty to ensure that the Company had adequate internal and quality controls and adhered to mandatory FDA regulations and CGMP.

**General Duties as to All Matters**

42. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or that of a company or entity with which they are associated.

43. Each director and officer of the Company owes to Hospira and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

**Control, Access, and Authority**

44. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over Hospira and its policies, and were able to effect the wrongful acts complained of herein.

45. Because of their advisory, executive, managerial, and directorial positions with Hospira, each of the Individual Defendants had access to material, non-public information regarding the Company which they were obligated not to use for their personal benefit, and which they were required to use in the best interests of the Company.

46. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Hospira, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

47. To discharge their duties, the officers and directors of Hospira were required to

exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Hospira were required to, among other things:

(a) Exercise good faith, to consciously adhere to their obligations and known duties to act, and to ensure that the affairs of the Company were conducted in an efficient, business-like and legal manner so as to make it possible to provide the highest quality performance of their business;

(b) Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, internal policies and standards set by the Company, and all contractual obligations, including acting only within the scope of its legal authority;[7]

(c) Refrain from selling stock based upon insider information;

(d) Properly, fairly, and accurately guide investors and analysts as to the true financial condition of the Company at any given time; and

(e) When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate and necessary action to correct the misconduct and prevent its recurrence.

**Breaches of Duties**

48. Each of the Individual Defendants, by virtue of his or her position as an officer and/or director, owed to the Company the fiduciary duty of loyalty and the exercise of due care in the management and administration of the affairs of the Company, as well as in the use and

---

[7] A fiduciary must never allow profits to take precedence over adherence to the law. *See Metro Commc'n Corp. BVI v. Advanced MobileComm Techs., Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004) ("Under Delaware law, a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity.").

preservation of its property and assets.  The conduct of the Individual Defendants complained of

herein involves a knowing and culpable violation of their obligations as officers and directors of

Hospira, and a reckless disregard for their duties to the Company that the Individual Defendants

were aware or consciously disregarded and posed a risk of serious injury to the Company.  The

conduct of the Individual Defendants who were also officers and/or directors of the Company

have been ratified by the remaining Individual Defendants who collectively made up Hospira's

Board.

## SUBSTANTIVE ALLEGATIONS

**The Individual Defendants Adopt the Reckless Project Fuel and Issue Misleading Statements**

49.     On February 17, 2009, Hospira management held a conference call to discuss

2008's fourth quarter and full year financial results.   CEO defendant Begley stated he was

pleased with Hospira's "solid revenue and strong profit growth," but displeased with the

Company's "average" performance when measured against its peers.   The solution he announced

was a cost-cutting program dubbed, "Project Fuel."   Begley stated:

> To provide a little history on this project, we spent a good deal of time in 2008 measuring our financial progress and related metrics against our peers. We have made significant progress over the past five years. We transformed Hospira from an under invested, no-growth business with declining margins to a Company with top line growth and improving margins. Our gross margin increased by over 1000 basis points and our operating margin increased by approximately 400 basis points. But as far as we have come our analysis told us we still only measure as average against our peers from operating margins to return on invested capital. ***We are certainly not satisfied with being in the middle and we know we can do better.***
>
> ***This compelled us to move forward with a project we call FUEL which is aligned with our overall strategy to improve margins and cash flow and drive sustained growth for Hospira.*** In January we announced to our employees the first of what will be several phases of Project FUEL. In addition to the cost containment measures I mentioned previously, the first phase includes streamlining our organizational structure to optimize operational effectiveness. To reduce complexity we have dissolved the Global Pharma and Global Device

strategic business unit structure centralizing our global marketing, strategy and business development activities to best meet the needs of the overall Company and better support the geographic regions. We have also streamlined our senior leadership team to more effectively enable change and focus the business. These actions will drive further efficiencies and better enable us to take advantage of growth opportunities.

The next phases of Project FUEL will include streamlining processes, reducing product line complexity, and aggressively managing low product lines. In addition, we believe there is opportunity to improve efficiency and performance in several departments such as global procurement, finance, IT, U.S. sales force and R&D. We are in the midst of a detailed review of those particular areas.

50.    On March 24, 2009, the Individual Defendants caused the Company to begin what would turn into a two-and-a-half year long deception by issuing a press release entitled "Hospira Announces Plans to Optimize Operations, Increase Shareholder Value."  Project Fuel, the plan that the Company was referring to, was not increasing shareholder value and operational efficiency as claimed.  In fact, as later admitted, Project Fuel's cost-cutting priorities were responsible for taking focus off the manufacturing quality issues that are causing the Company widespread production breakdowns today. The press release provided, in pertinent part, as follows:

Hospira, Inc. (NYSE: HSP), a leading global specialty pharmaceutical and medication delivery company, today announced details regarding Project Fuel, a multi-phased initiative to improve the company's margins and fuel its growth. Project Fuel will capitalize on the company's potential to increase shareholder value and improve operational efficiency by optimizing its product line, evaluating non-strategic assets and streamlining its organizational structure.

In conjunction with these actions, which are slated to occur over the next 24 months, Hospira expects to reduce its global workforce by approximately 10 percent and deliver annual cost savings of approximately $110 million to $140 million.

"To maximize our opportunities for growth and sustainable shareholder value, Hospira is taking a number of important steps to simplify our business, strengthen our financial position and establish a strong foundation for our future," said Christopher B. Begley, chairman and chief executive officer, Hospira. "By reducing costs and improving efficiencies, we can free up more dollars to invest for profitable growth and shareholder returns. And with a streamlined, focused

organization, we will reduce complexity, improve performance and be better positioned to advance our significant opportunities."

**Optimizing the product line**

Hospira's global product line encompasses thousands of list numbers, or SKUs, many of which represent multiple presentations of the same drug compound and serve the same medical need. By simplifying presentation choices, Hospira can better meet the needs of its customers with a focused, yet robust, portfolio. In addition to improving inventory management and manufacturing efficiency, Hospira expects the streamlined product line to produce indirect cost reductions through associated decreases in functional support. Importantly, customers will also realize enhanced service levels and value, while continuing to benefit from product choice across the continuum of care.

\* \* \*

**Workforce impact**

The net projected reduction associated with these collective actions represents approximately 10 percent of the company's global workforce, with the majority of reductions occurring in the next 12 months. Hospira will help prepare employees for the transitions through the provision of assistance packages.

51.     As a result of this announcement, the price of Hospira's common stock increased by 7.4%.  The day after the Company issued the press release, Leerink Swann & Co. raised Hospira's rating to "outperform" and Hospira's stock price rose an additional 5.6% as the market reacted favorably to the positive news.

52.     On April 28, 2009, the Company issued a press release reporting its first quarter financial results for the three months ended March 31, 2009, touting "improved manufacturing efficiency."  The press release stated, in part:

"Hospira delivered on its commitments in the first quarter, generating solid sales and earnings growth in a period marked by continued economic uncertainty," said Christopher B. Begley, chairman and chief executive officer.  "***Looking forward, we believe the results of our strategic investments and our focus on execution position us well to deliver our financial commitments for 2009.  In addition, we are driving operational excellence through our optimization initiatives under Project Fuel, which will create long-term, sustainable growth and increased shareholder value***."

Adjusted* operating income increased 3.2 percent to $150 million in the first quarter of 2009, compared to $145 million in the first quarter of 2008. ***Driving the majority of the increase was improved manufacturing efficiency***, with a contribution from favorable volume/mix.

53.     On July 29, 2009, the Company issued a press release reporting its second quarter financial results for the three months ended June 30, 2009. Defendant Begley announced that the Company was making "significant progress toward [its] Project Fuel initiatives." The press release stated, in part:

> "***Hospira delivered a very good second quarter, marked by strong sales and earnings, and significant progress toward our Project Fuel initiatives***," said Christopher B. Begley, chairman and chief executive officer. "***Based on our results for the first half of the year and our expectations for the remainder of 2009, we have increased our full-year adjusted earnings guidance. We remain committed to improving shareholder value through sustainable top- and bottom-line growth***."

54.     Also on July 29, 2009, the Company filed with the SEC its quarterly report on Form 10-Q for the three months ended June 30, 2009. The Company's Form 10-Q, which reiterated the Company's financial results, was signed by defendant Werner, and contained the required Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by defendants Werner and Begley. The Form 10-Q discussed Project Fuel and stated, in part:

> *In March 2009, Hospira announced details of a multi-stage restructuring and optimization plan ("Project Fuel") which will occur over the next two years. Project Fuel includes the following activities: optimizing the product portfolio, evaluating non-strategic assets, and streamlining the organizational structure.*

**The Company Receives the FDA's August 2009 Warning Letter**

55.     On August 14, 2009, Hospira filed a Form 8-K with the SEC announcing that the Company had received what would be the first of two Warning Letters from the FDA (the "August 2009 Warning Letter"). The August 2009 Warning Letter, which followed an April 2009 FDA investigation, was summarized in the Form 8-K as follows:

- 30 -

On August 13, 2009, the Company received a warning letter, dated August 12, 2009, from the FDA related to the Company's corrective action plans with respect to the failure of certain AC power cords manufactured by a third party. The affected power cords are used on certain of the Company's infusion pumps and related products. The Company takes this matter seriously and intends to respond fully, and in a timely manner, to the FDA's warning letter. There can be no assurance that the FDA will be satisfied with the Company's response. The Company is initiating a voluntary recall of the affected power cords.

***The Company does not expect either of these events to adversely impact the Company's ability to achieve the 2009 financial projections communicated with the second quarter 2009 earnings release.***

56.     Hospira's Form 8-K announcing the Company's receipt of the August 2009 Warning Letter was materially misleading and failed to disclose important information concerning Hospira's significant operational, manufacturing, and quality control deficiencies, as well as the fact that Hospira was selling adulterated power cords as part of its infusion products, in violation of FDA regulations and CGMP requirements.

57.     In fact, the August 2009 Warning Letter stated, among other things, that the FDA had inspected the Company's Morgan Hill facility between April 21, 2009 through May 22, 2009 and had determined that the Company "manufactures infusion pumps ... [which] are adulterated ... in that the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation are not in conformity with the CGMP requirements of the Quality System (QS) regulation found at Title 21, Code of Federal Regulations (C.F.R.), Part 820." The August 2009 Warning Letter also stated that Hospira's violations included a "[f]ailure to identify the actions needed to correct and prevent the recurrence of nonconforming product and other quality problems." Despite the Company creating a "Correct and Preventative Action report" to "investigate reports of failing AC power cords," the Company "***continue[d] to distribute the old AC power cords as replacement parts***." Specifically, the August 2009 Warning Letter provided as follows:

**WARNING LETTER**
VIA FEDERAL EXPRESS
August 12, 2009
Joseph A. Bellah
General Manager, Global Electro-Mechanical Device Operations
Hospira, Inc.
755 Jarvis Drive
Morgan Hill, California 95037

Dear Mr. Bellah:

During an inspection of your firm located in Morgan Hill, California on April 21, 2009 through May 22, 2009, an investigator from the United States Food and Drug Administration (FDA) determined that your firm manufactures infusion pumps (including the Plum Family line, LifeCare PCA3, and Symbiq). Under section 201(h) of the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. 321(h), these products are devices because they are intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, or are, intended to affect the structure or function of the body.

This inspection revealed that these devices are adulterated within the meaning of section 501(h) of the Act (21 U.S.C. 351(h)), in that the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation are not in conformity with the Current Good Manufacturing Practice (CGMP) requirements of the Quality System (QS) regulation found at Title 21, Code of Federal Regulations (C.F.R.), Part 820. We received a response to the Form FDA 483, List of Inspectional Observations, that was issued to you. We address this response below. The noted violations include, but are not limited to, the following:

Failure to identify the actions needed to correct and prevent the recurrence of nonconforming product and other quality problems, as required by 21 C.F.R. ,820.100(a)(3). Specifically, your firm created a Correct and Preventative Action report [REDACTED] on [REDACTED] to investigate reports of failing AC power cords. Your firm performed a risk assessment on [REDACTED] and determined the Risk Priority Number (RPN) for the AC power cord to be in the category "As Low As Reasonable Practicable." Based on this risk assessment, your firm decided to phase-out the then current AC power cords while using up the remaining stock, and to begin to distribute newly designed AC power cords by [REDACTED]. Although you are currently distributing the

newly designed AC power cords, your firm continues to distribute the old AC power cords as replacement parts.[8]

***Since [REDACTED] your firm has received the following reports of failures involving the old AC power cords***:

• On [REDACTED] a user filed a report of flames discarding from the Plum 1.6 pump, 8-12 inches in height. No injury was reported for this event. This event was to you through your internal complaint handling system, [REDACTED]

• On July 5, 2008, a user sustained electric stock from your Plum XLMD Pump and required medical treatment. Your firm reported this event to the FDA on October 16, 2008 under MDR Number 2921482-2008-00337.

• On June 3, 2008, a user received electrical stock from your Plum A+ Pump and required medical treatment. Your firm reported this event to the FDA on June 30, 2008 under MDR Number 2921482-2008-00201.

Your firm's procedure titled "Rev. W, Guideline for Risk Management" [REDACTED] addresses the use of previously approved risk assessment reports for nonconformities that have already been investigated. Specifically, your procedure [REDACTED] states that [REDACTED] (emphasis in original). During our inspection, no documents were provided to the FDA investigator to demonstrate that a new RPN was generated based upon a re-evaluation of reported complaints associated with old AC power cords received after [REDACTED] as required by your firm's procedure. By failing to generate an updated RPN for the AC power cord issue, your firm failed to determine whether additional corrective and preventive action is warranted to address the continuous shipment of the old AC power cord design.

We have reviewed your response to the FDA-483 Inspectional Observations in which your firm states that [REDACTED] will be required to assure that corrections are adequate.

You should take prompt action to correct the violation(s) addressed in this letter. Failure to promptly correct these violation(s) may result in regulatory action being initiated by the Food and Drug Administration without further notice. These actions include, but are not limited to, seizure, injunction, and/or civil money penalties. Also, federal agencies are advised of the issuance of all Warning Letters about devices so that

---

[8] Redactions were made by the FDA before public release of the August 2009 Warning Letter, and not by Plaintiffs herein.

they may take this information into account when considering the award of contracts. Additionally, premarket approval applications for Class III devices to which the Quality System regulation deviations are reasonably related will not be approved until the violations have been corrected. Requests for Certificates to Foreign Governments will not be granted until the violations related to the subject devices have been corrected.

Please notify this office in writing within fifteen (15) working days from the date you receive this letter of the specific steps you have taken to correct the noted violations, including an explanation of how you plan to prevent these violation(s), or similar violation(s), from occurring again. Include documentation of the corrective action you have taken. If your planned corrections will occur over time, please include a timetable for implementation of those corrections. If corrective action cannot be completed within 15 working days, state the reason for the delay and the time within which the corrections will be completed.

\* \* \*

Finally, you should know that this letter is not intended to be an all-inclusive list of the violations at your facility. It is your responsibility to ensure compliance with applicable laws and regulations administered by FDA. The specific violation noted in this letter and in the Inspectional Observations, Form FDA 483, issued at the closeout of the inspection may be symptomatic of serious problems in your firm's manufacturing and quality assurance systems. You should investigate and determine the causes of the violations, and take prompt actions to correct the violations and to bring your products into compliance.

Sincerely yours,
/S/
Barbara J. Cassens
District Director

58.     The August 2009 Warning Letter, a summary of which the Company made publicly available, served as a red flag to the Individual Defendants that at least the Morgan Hill facility was producing adulterated goods in violation of FDA regulations.

59.     At about the same time, the FDA made further observations about the state of the Company's manufacturing facilities in Rocky Mount and Clayton, which the Company chose not to disclose, including that Hospira's Clayton facility suffered from severe quality control issues and that certain of the drugs produced there, such as Liposyn, Propofol, and Cleviprex emulsion

products, were contaminated with stainless steel particles.  The Individual Defendants, however, failed to take appropriate steps to rectify these problems.

**Notwithstanding the August 2009 Warning Letter, the Individual Defendants Continue to Make or Allow False and Misleading Statements**

60.    On October 27, 2009, the Company issued a press release reporting its third quarter financial results for the three months ended September 30, 2009.  The press release once again touted progress toward the Company's Project Fuel initiatives.   In the press release, defendant Begley stated:

> "***Hospira delivered strong results in the third quarter, aided by the launch of the generic oncolytic oxaliplatin and additional progress toward our Project Fuel initiatives***," said Christopher B. Begley, chairman and chief executive officer. "***We continued to position Hospira for future success in this milestone quarter,*** during which we surpassed the billion dollar revenue mark for the first time and generated strong double-digit earnings per share growth.  We remain confident in our projections for full-year sales and are increasing our earnings per share guidance."

61.    Also on October 27, 2009, the Company filed with the SEC its quarterly report on Form 10-Q for the three months ended September 30, 2009.   The Company's Form 10-Q explained that the gross profit increase brought by manufacturing efficiency gains associated with Project Fuel were only partially offset by the impact of certain quality control costs.  The Form 10-Q was signed by defendant Werner and contained the required SOX certifications signed by defendants Werner and Begley.  The Form 10-Q stated, in part:

> ***The gross profit increase is primarily the result of higher sales volume and favorable product mix including the U.S. product launch of generic oxaliplatin and manufacturing efficiency gains associated with Project Fuel, partially offset by the impact of certain product recall related costs*** and changes in foreign exchange.

**Hospira Recalls Lyposyn and Propofol**

62.    On November 6, 2009, Hospira issued a nationwide recall of certain lots of Liposyn and Propofol products because they were contaminated with particulate matter. In a

press release to the market, ***which misleadingly claimed that Hospira had identified the "root cause" of the problem and implemented "corrective actions***," the Company stated, in part:

> Hospira, Inc. (NYSE: HSP), a global specialty pharmaceutical and medication delivery company, is voluntarily recalling 85 lots of Liposyn™ II 10%, Liposyn II 20%, Liposyn III 10%, Liposyn III 20%, Liposyn III 30% and 73 lots of Propofol Injectable Emulsion 1% products that begin with the lot numbers 79 and 80 because some of the containers may contain particulate matter. ***The source of the particulate matter has been identified as stainless steel equipment used in the manufacturing process. The affected lots were distributed between July 2009 and October 2009, and no other lots are affected by this recall***.

> Hospira is undertaking this recall in consideration of the potential for safety issues if the products are administered to patients. Since these particulate contaminants do not dissolve in blood they could potentially act as emboli and impede blood flow. Particulates may also cause mechanical damage to the body and may escalate damage through the Systemic Inflammatory Response Syndrome (SIRS). Restriction in blood supply to tissues could lead to stroke, respiratory failure, kidney failure, liver failure, heart attack and/or death.

> Hospira has not received any reports of adverse events related to this issue. ***Hospira has identified the root cause and corrective actions have been implemented.*** Hospira has made the U.S. Food and Drug Administration (FDA) aware of the situation.

Contrary to these representations, Hospira had not identified the root cause of its particulate contamination. In fact, Hospira has failed to fully identify all of its issues even to this day.

**Bullish Statements on Project Fuel Continue Post-Recall**

63.    On February 4, 2010, Hospira issued a press release entitled, "Hospira Reports Fourth-Quarter and Full-Year 2009 Results."[9]   The press release touted the Company's fourth quarter and full-year financial results for the three and twelve months ended December 31, 2009, crediting Project Fuel for the positive news.  The press release stated, in part:

---

[9]   The Class Period in the Federal Securities Action runs from the date of this press release, February 4, 2010, and continues through October 17, 2011 ("Securities Action Class Period").

"*Driven by double-digit revenue and adjusted earnings growth, the fourth quarter concluded a year of transformation for Hospira. In addition to our strong financial performance, we made significant progress on many fronts, including augmenting our biogenerics program, launching a generic version of a blockbuster oncology drug, and advancing Project Fuel, our corporate-wide optimization initiative,*" said Christopher B. Begley, chairman and chief executive officer. "*Looking forward, we expect 2010 to be another good year of growth for Hospira. Backed by our commitment to strong execution and focus on sustained operational improvement, we continue to position Hospira for sustainable, long-term growth and increased shareholder value.*"

\* \* \*

*Adjusted\* income from operations increased 8.5 percent to $204 million in the fourth quarter of 2009*, compared to $188 million in the fourth quarter of 2008. *Driving the majority of the increase were* higher net sales, more favorable product mix and *improvements resulting from the company's Project Fuel optimization initiatives*.

\* \* \*

"The significant momentum we generated in 2009 has paved the way for continued progress in 2010," said Begley. "With our robust product pipeline, *anticipated advancements in* both Specialty Injectable Pharmaceuticals and *Medication Management Systems, combined with our focus on operational optimization through Project Fuel, Hospira is on track for another good year*."

64.     On February 18, 2010, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2009. In the Form 10-K, defendants Begley, Werner, Bailey, Bowles, Curran, Hale, Matricaria, Sokolov, Staley, Wheeler, and von Prondzynski reiterated that the FDA investigation had not materially impacted Hospira's ability to market and sell its products. In addition, the Form 10-K once again underplayed the significance and scope of the FDA's August 2009 Warning Letter, instead emphasizing the strength of the Company's quality control. It provided, in pertinent part, as follows:

Hospira has developed and implemented quality systems and concepts throughout its organization. Hospira is actively involved in setting quality policies and managing internal and external quality performance. *Its quality assurance department provides quality leadership and supervises its quality systems. An active audit program, utilizing both internal and external auditors, monitors compliance with applicable regulations, standards and internal policies.* In

addition, Hospira's facilities are subject to periodic inspection by the FDA and other regulatory authorities. *Hospira has received notices from regulatory authorities alleging violations of applicable regulations and standards, and Hospira has developed definitive action plans, implemented remedial programs and modified its practices to address these issues*. During 2009, Hospira received a warning letter from the FDA related to Hospira's corrective action plans with respect to the failure of certain AC power cords manufactured by a third party. The affected power cords are used on certain infusion pumps and related products. Hospira initiated a voluntary recall of the affected power cords in August 2009. *Hospira has responded to the warning letter and is working closely with the FDA to conclude this matter. Hospira initiated other voluntary recalls of certain other products and initiated field corrections and other remedial actions with respect to those products. Hospira continues to have an ongoing dialogue with the FDA. These matters have not materially impacted Hospira's ability to market and sell its products*.

**The SEC Notifies the Individual Defendants that They Have Made Insufficient Public Disclosures**

65.     On April 13, 2010, the SEC sent a letter to Hospira concerning deficiencies in the Company's disclosures contained in its Form 10-K filed on February 18, 2010, regarding the August 2009 Warning Letter. Specifically, the SEC instructed Hospira to "revise to clarify" the disclosures concerning the FDA's August 2009 Warning Letter "to state the failures experienced by the AC power cords and to describe the contents of the FDA letter." Continuing, the SEC letter stated, in relevant part:

> Furthermore, you note on page 48 that you have recognized costs relating to the recall of the power cords "and certain other products." Please revise to clarify exactly what costs you have recognized, what other products experienced recall in the last fiscal year and the remediation efforts you have undertaken. *You should also expand your disclosure to state not only that these matters have not materially impacted your ability to market and sell your products but also, if true, that they have not materially impacted either your Company as a whole or your financial results.* If you believe there has been no material impact, please provide a basis for that opinion.

**The FDA Issues a Second Warning Letter Repeating Many of the Observations in Its First Warning Letter**

66.     On April 16, 2010, Hospira filed a Form 8-K with the SEC announcing that the Company had received a second Warning Letter from the FDA, dated April 12, 2010, "in

connection with the FDA's inspection of the Company's pharmaceutical and device manufacturing facilities located in Rocky Mount, North Carolina and Clayton, North Carolina." ("April 2010 Warning Letter"). The April 2010 Warning Letter identified many of the same *observations and violations that the FDA had informed Hospira about almost a year prior*, demonstrating that the Individual Defendants were on notice of the FDA violations at many of the Company's facilities but consciously disregarded them or failed to take sufficient steps to rectify them. For instance, the April 2010 Warning Letter indicated that the Company's November 6, 2009, voluntary recall of Propofol and Liposyn products involved lots that contained "*visible particle contamination*" and that, while these batches were manufactured in 2007, Hospira failed to detect the problem until November 2009. The Form 8-K did not contain a copy of the April 2010 Warning Letter, but summarized the FDA's instruction as follows:

> On April 13, 2010, Hospira, Inc. (the "Company") received a warning letter, dated April 12, 2010, from the U.S. Food and Drug Administration (FDA) in connection with the FDA's inspection of the Company's pharmaceutical and device manufacturing facilities located in Rocky Mount, North Carolina and Clayton, North Carolina.

> In the warning letter, the FDA cites Current Good Manufacturing Practice deficiencies related to particulate in certain emulsion products at the Clayton facility and the failure to adequately validate the processes used to manufacture the Company's products at the Rocky Mount facility. The letter also asserts other inadequacies, including the Company's procedures related to the Quality Control unit, investigations, and medical device reporting obligations. *The letter asserts that some of the deficiencies were repeat observations from a prior inspection conducted in April 2009, and include a similar violation cited in an August 12, 2009 warning letter to the Company's Morgan Hill, California facility*.

> *The Company will be undertaking a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations. The warning letter does not restrict production or shipment of the Company's products from these facilities, but the Company is holding shipment of certain products pending its further investigation and discussions with the FDA. The Company does not*

*anticipate that these matters will adversely impact the Company's ability to achieve the 2010 financial projections communicated with the full year 2009 earnings release.*

The Company takes this matter seriously and intends to respond fully, and in a timely manner, to the FDA's warning letter. Until the violations are corrected, the Company may be subject to additional regulatory action by the FDA, including the withholding of approval of new drug applications, seizure, injunction, and/or civil monetary penalties. Any such actions could significantly disrupt our ongoing business and operations and have a material adverse impact on our financial position and operating results. There can be no assurance that the FDA will be satisfied with the Company's response. The warning letter will be posted on the FDA's website at www.fda.gov and, once posted, will be available for viewing.

67.    Hospira's Form 8-K announcing the Company's receipt of the April 2010 Warning Letter was also materially misleading and failed to disclose important information concerning Hospira's significant operational, manufacturing, and quality control deficiencies. In addition, the promised "comprehensive review of [Hospira's] manufacturing operations to ensure compliance with applicable regulations" was not even initiated until eighteen months later. The Individual Defendants consciously failed to insist upon this comprehensive review because such a review would threaten Project Fuel.

68.    Further, the April 2010 Warning Letter indicated that there were additional problems with the Company's products involved in the November 2009 recall that were not disclosed to the public, and which were in addition to failures touched on in the FDA's August 2009 Warning Letter. The April 2010 Warning Letter provided as follows, in part:[10]

April 12, 2010
VIA FEDERAL EXPRESS
WARNING LETTER
Christopher B. Begley
Chief Executive Officer

---

[10]    The full text of the April 2010 Warning Letter is incorporated by reference herein, and may be viewed at: http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm208691.htm.

Hospira, Inc.
275 N. Field Drive
Bldg. 2
Lake Forest, Illinois  60045

Dear Mr. Begley:

During our January 12 - 19 and January 26 - February 23, 2010 inspection of your pharmaceutical and device manufacturing facilities located at 4285 North Wesleyan Boulevard, Rocky Mount, North Carolina, and at 8484 U.S. Highway 70 West, Clayton, North Carolina, respectively, investigators from the Food and Drug Administration (FDA) identified significant violations of Current Good Manufacturing Practice (CGMP) regulations for Finished Pharmaceuticals, Title 21, Code of Federal Regulations, Parts 210 and 211. These violations cause your drug products to be adulterated within the meaning of section 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (the Act) [21 U.S.C. § 351(a)(2)(B)], in that the methods used in, or the facilities or controls used for, their manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with, CGMP.

We reviewed your firm's responses of February 9 and March 16, 2010, and note that they lack sufficient corrective actions.

Specific violations observed during the inspection include, but are not limited, to the following:

**CGMP Violations**

A. Clayton facility

1. *Your firm does not have adequate written procedures for production and process controls designed to assure that the drug products you manufacture have the identity, strength, quality, and purity they purport or are represented to possess [21 C.F.R. § 211.100(a)].*

*For example, your firm failed to assure adequate process design and control of Liposyn, Propofol, and Cleviprex emulsion products to prevent objectionable particulate contamination (primarily stainless steel). Such controls would include, but are not limited, to appropriate component controls, equipment suitability, equipment maintenance, and filtration.*

*This particulate contamination problem has been a persistent and serious issue at your firm for multiple years. For example, 16 lots of*

- 41 -

*Propofol and Liposyn manufactured in 2007 contained visible particulate contamination. Your firm did not detect the particulate problem until November 2009 when you performed the second annual retain inspections, which were three to nine months overdue. By then, all 16 lots had expired. Further, substandard manufacturing practices led to three recent major recalls. These recalls were initiated due to excessive contamination with particulates (primarily stainless steel) and included 78 lots of Propofol, 121 lots of Liposyn, and 24 lots of Cleviprex. These lots were manufactured at your Clayton facility between January 2008 and February 2010.*

Your failure to follow written procedures, assure prompt investigation, determine root cause, and implement appropriate corrective action *resulted in exposure of patients to objectionably contaminated drugs.*

Your March 26, 2010 response states that you will enhance your monitoring program for particulates and complete revalidation activities for all products manufactured at the Clayton facility. The manufacturing processes for Liposyn, Propofol, and Cleviprex will now include a [REDACTED] prior to filling. *Your response is inadequate because it is unclear if your firm has determined the root cause of the problem and resolved it.* In addition, you have not provided an interim plan to ensure the quality of drug products that you continue to manufacture and distribute, prior to the completion of your corrective action and validation activities.

*This is a repeat observation from the April 2009 inspection.*

2. *Your firm has failed to ensure the responsibilities and procedures applicable to your quality control unit are in writing and are followed* [21 C.F.R. § 211.22(d)].

For example, your Quality Control Unit (QCD) failed to: (1) ensure that the manufacturing processes for your Liposyn, Propofol, and Cleviprex drug products are adequately designed, controlled, and monitored; (2) implement adequate corrective and preventive actions related to objectionable particulate contamination in Liposyn, Propofol, and Cleviprex drug products; and (3) complete and approve 178 manufacturing investigations within 30 days and issue NDA Field Alert Reports (FAR) in a timely manner.

Your March 16, 2010 response describes a number of improvements made to the QCU since the April 2009 inspection, including revising procedures and hiring personnel. However, the most recent inspection noted serious ongoing violations at this facility despite your efforts to

address manufacturing inconsistencies, enhance the monitoring program for particulates, and improve your exception reporting practices.

***This is a repeat observation from the April 2009 inspection.***

3. Your firm has not thoroughly investigated the failure of a batch or any of its components to meet its specifications, whether or not the batch has already been distributed, or extend investigations to other batches of drug product that may have been associated with the specific failure or discrepancy [21 C.F.R. § 211.192].

***For example, you failed to conduct adequate investigations that result in your implementation of corrective actions to prevent recurrence of the problems and evaluate other potentially affected lots.*** Specifically, particulates were identified during an inspection of retain samples for two partially distributed lots of Liposyn on January 21, 2010. Subsequently, an exception Report (ER) 1685 was opened on January 25, 2010, due to the particulate contamination. ***Although your firm recently experienced multiple serious particulate issues leading to product recalls, you failed to: 1) conduct testing to identify the foreign particulates (which were primarily stainless steel) until February 4, 2010; 2) place the remaining product from the two affected Liposyn lots on distribution hold until February 5, 2010; and 3) inspect retain samples from associated lots until February 10, 2010.***

Your March 16, 2010 response outlines new and revised procedures for investigations and corrective and preventive actions. However, your response is inadequate because you do not address the failure of the Clayton site to follow QAP-0012, "Exception Reports," or explain whether your review of the large number of open investigations indicates process related deficiencies.

***We also find your response inadequate because you have not explained why Liposyn and Propofol retain samples were not inspected (from the October 2009 corrective action implementation) to verify adequacy until January 2010. This verification was conducted three months after production resumed following the first of three recalls. Timely assessment of quality indicators, such as out-of-specification findings and complaints, is essential to detecting and determining the scope of product or process deficiencies.***

69.     This second April 2010 Warning Letter was highly significant, as it displays the

manner in which the Individual Defendants, in approving Project Fuel and continuing to adhere

to its draconian cost-cutting measures, failed to fulfill their duty, in bad faith. In sum the April 2010 Warning Letter reveals, among other things:

(a)     At the time of the adoption of Project Fuel, Hospira failed to perform required testing as scheduled so as to detect contamination by particulate matter. The annual retain inspection, in which samples are "retained" and inspected for foreign matter, were three to nine months overdue;

(b)     In April 2009, the FDA told Hospira that it was required to adopt an interim quality control plan before distributing medications found to be unsafe. For over a year, the Individual Defendants ignored this instruction;

(c)     Contaminated products were manufactured at the Clayton facility between January 2008 and February 2010. Particulates were found in a 2007 batch production. This means that, prior to and at the time Project Fuel was announced, and continuing thereafter, Hospira was producing contaminated medications. The Individual Defendants consciously and in bad faith disregarded its duty to ensure that such compliance failures were not already occurring when it adopted its reckless cost-cutting plan, and thereby recklessly endangered the public health and safety; and

(d)     When particulate matter was found, the Individual Defendants failed to test it to determine what it was or immediately place the affected medications on distribution hold.

70.     All of these red flags, among others identified in the April 2010 Warning Letter, would have prompted any fiduciary acting in good faith to immediately concentrate on a full-scale remediation review, and a comprehensive remediation program (based upon an independent assessment and review). Not only was this not done, but insiders were not halted

from selling shares based upon what they knew regarding the true extent (and cost) of these problems. The Board, although it had the authority to do so, imposed no "event-specific black out period" on stock sales pending a full review of the Company's legal compliance issues. Instead, it allowed CEO defendant Begley and others to sell significant percentages of their personally held Hospira stock on the market for ill-gotten proceeds equaling tens of millions of dollars.

71.    Throughout this Relevant Period, the Individual Defendants made a conscious decision to adhere to Project Fuel despite the ramifications. In fact, they did so even though they knew legal compliance and remediation needs had neither been adequately studied nor addressed, and that public safety was at risk.

**Hospira Recalls Liposyn and Propofol for the Second Time**

72.    Within weeks of receiving this correspondence from the FDA, Hospira faced another blow to its production efforts. The Company was forced to recall two drugs – Propofol and Liposyn -- for the second time in six months. Unsurprisingly, due to Hospira's poor manufacturing practices, the drugs had been contaminated by particulates during manufacturing.

73.    On April 27, 2010, Hospira filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2010. Hospira's Form 10-Q reiterated the Company's Project Fuel initiatives, was signed by defendant Werner, and contained the required SOX certifications signed by defendants Werner and Begley. The Form 10-Q discussed "Certain Quality and Product Related Matters," and revealed that Hospira had placed a "***voluntary hold***" on its line of Symbiq infusion pumps. It also revealed, without providing specifics, that Hospira was now ***withholding shipment of certain products*** from its offending facilities but that the Company has "***completed a substantial portion of the field corrections and other remediation activities***." The Form 10-Q improperly claimed that:

*Hospira has initiated and completed a substantial portion of the field corrections and other remediation activities with respect to the recalled products for which the related costs had been reserved for during 2009*. It is possible that additional costs related to this recall may be required in future periods, based on modifications to the current remediation plans and changes in estimates as a result of ongoing dialogue with the FDA.

In April 2010, Hospira placed a voluntary hold on all shipments of Symbiq$^{TM}$ pumps, a large volume infusion device, to new customers. Hospira initiated this hold after it received an unexplained increase in customer complaints related to the failure of the Symbiq$^{TM}$ pump to alarm at the end of infusion therapy under certain use conditions. Hospira cannot predict when it will lift this voluntary hold and is developing a comprehensive action plan to address this issue.

\* \* \*

*Hospira has recognized charges in Costs of goods sold for quality assessment and testing, materials, labor and freight to remediate the matters described above, which have not been significant to date to Hospira.*

74. On May 11, 2010, the Company responded to the SEC's April 13, 2010 letter. In its response, the Company purported that it would, in the future, describe "the failures experienced by the AC power cords" and would "provide more detail as to the contents of the Warning Letter." The Company's May 11, 2010 letter, provided additional details stating that Hospira was withholding shipments of Liposyn, Propofol, and Hospira's Symbiq infusion pump, but that the Company considered its remediation efforts to be "*part of the ordinary course of its business*." The letter stated, in relevant part:

Your comment further requests additional disclosure related to the recall costs that were recognized, the specific products subject to recall and the related remediation efforts. The costs incurred in 2009 in connection with the AC power cord recall were not significant to the Company, and were approximately $6 million pre-tax, which included costs primarily related to quality assessment and testing, materials, labor, and freight. The remediation activities related to the AC power cords are substantially complete, and the related costs were fully reserved for in 2009. This was disclosed in the Company's 2010 First Quarter Form 10-Q.

*The other voluntary product recalls in 2009 were limited in scope and not related to the AC power cord warning letter. The Company considered these*

*additional recalls to be part of the ordinary course of its business, namely the manufacture and sale of highly regulated pharmaceutical and device products*.

75.     On July 16, 2010, the SEC responded to Hospira's May 11, 2010 correspondence. The SEC instructed the Company to confirm that its disclosures regarding the August 2009 Warning Letter "describe[d] the deficiencies cited by the FDA regarding [the Company's] corrective action plans and specif[ied] the remediation activities that [the Company has] undertaken."

**The Individual Defendants Continue to Disseminate False and Misleading Statements Despite Two Warning Letters and Ongoing Remediation Efforts**

76.     On July 28, 2010, Hospira issued a press release reporting the Company's second quarter 2010 financial results for the three months ended June 30, 2010.  The press release touted the "*improved manufacturing efficiency from the company's Project Fuel optimization initiatives*" as one of the main forces driving growth, stating in pertinent part:

"*Hospira delivered another solid quarter, driven by strong performance in our Specialty Injectable Pharmaceuticals business and by continued momentum of our Project Fuel optimization initiatives*," said Christopher B. Begley, chairman and chief executive officer.  "*We made significant progress in advancing our business during the quarter,* launching our first product from Hospira India, commercializing our second biosimilar product in Europe and strengthening our position in acute-care proprietary pharmaceuticals.  *We are highly focused on executing our strategy of investing for growth and improving margins and cash flow, as well as on driving quality improvements across our global manufacturing organization.  We remain on track to achieve our full-year earnings projections*."

*      *      *

Adjusted* income from operations increased 20.6 percent to $213 million in the second quarter of 2010, compared to $177 million in the second quarter of 2009.  *Driving the majority of the increase were more favorable product mix and improved manufacturing efficiency from the company's Project Fuel optimization initiatives, offset by charges associated with certain quality and product-related matters*.

77.     Also on July 28, 2010, Hospira filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2010.  The Company's Form 10-Q reiterated the cost reductions and future benefits associated with Project Fuel initiatives, was signed by defendant Werner, and contained the required SOX certifications signed by defendants Werner and Begley. The Form 10-Q stated, in part:

> Gross profit increased $23.0 million, or 6.6%, for the three months ended June 30, 2010, compared with the same period in 2009.
>
> The gross profit increase was primarily the result of higher sales volume and favorable product mix including the impact of the U.S. oxaliplatin sales and continued higher sales of Precedex$^{TM}$.  *In addition, cost reductions associated with Project Fuel initiatives and the impact of foreign exchange contributed to the increase, partly offset by activities directly associated with the FDA's Warning Letter received in April 2010 and voluntary shipment holds on certain products, as previously described, as well as penalties for failure to supply customers and increased warranty charges on these and other products*.

78.     On October 26, 2010, Hospira issued a press release reporting the Company's third quarter 2010 financial results for the three months ended September 30, 2010.  The press release discussed the "continued contributions from Project Fuel" in helping the Company gain momentum, stating in pertinent part:

> "*Hospira delivered a solid third quarter, despite difficult year-over-year comparisons from the temporary discontinuation of U.S. oxaliplatin sales and the impact of several divestitures*," said Christopher B. Begley, chairman and chief executive officer. "*During the quarter, we gained momentum on several of our existing and newly launched specialty pharmaceuticals; we saw continued contributions from Project Fuel, our companywide optimization initiative; and we made good progress on our quality-improvement efforts. We believe the efforts and advancements we are making this year position Hospira for another good year and continued growth going forward*."

79.     On October 26, 2010, Hospira filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2010.  The Company's Form 10-Q reiterated the Company's financial results, was signed by defendant Werner, and contained the required SOX

certifications signed by defendants Werner and Begley. The Form 10-Q further discussed "Certain Quality and Product Related Matters," and stated, in part:

> ***Hospira has made significant progress on completing a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations***.
>
> Hospira has responded to the April 2010 Warning Letter and is working closely with the FDA to conclude these matters. As part of Hospira's response, Hospira took immediate actions to address the FDA's concerns, including recalling the propofol and liposyn products manufactured at the Clayton facility and the fosphenytoin sodium injection products manufactured at the Rocky Mount facility. ***Hospira is also working with several third party experts to assist with the ongoing activities at both facilities. Hospira has implemented certain interim controls, including third party oversight, to ensure products manufactured at both facilities meet their specifications prior to release. The Warning Letter does not restrict production or shipment of Hospira's products from these facilities but Hospira is holding shipment of certain products pending its further investigation and discussions with the FDA. Hospira resumed shipment of certain products placed on voluntary shipping hold, but cannot predict when all products on voluntary hold will be reintroduced to the market***.

80. Analysts responded positively to the Individual Defendants' statements. On October 26, 2010, analysts from JP Morgan Chase & Co. ("JP Morgan") stated that the Company was "[p]ositioned for [s]ignificant 2011 [g]rowth," pointing to Hospira's "good progress on the measures it is taking to improve manufacturing quality at its facilities in Clayton and Rocky Mount, North Carolina which were the subject of an FDA Warning Letter earlier this year" and that the Company "remains on track to complete most of the improvements by year-end." On October 27, 2010, Morgan Stanley & Co. LLC analysts stated that Hospira "delivered a solid quarter" and that Project Fuel was producing clear benefits. On October 27, 2010, The Buckingham Research Group stated that Hospira's 2011 outlook "should benefit from some ongoing Project Fuel (optimization program) results with incremental year-year synergies."

81. On February 2, 2011, Hospira issued a press release reporting the Company's fourth quarter and full-year 2010 financial results for the three and twelve months ended

December 31, 2010.  The press release stated that the Company not only "made substantial progress" with its quality initiatives, but did so while meeting its "commitments with Project Fuel."  This was an improper statement because in actuality, Project Fuel's cost-cutting measures were to blame for the Company's quality control manufacturing deficiencies.  The press release stated in pertinent part:

> "***2010 marked a year of progress for Hospira, despite several unanticipated challenges***," said Christopher B. Begley, chairman and chief executive officer.  "We launched gemcitabine, a large oncology drug, in the United States during the fourth quarter, the first generic version of the drug in the market; we expanded both our operations and portfolio geographically; ***we made substantial progress with our quality initiatives; and we met our commitments with Project Fuel, our corporate-wide optimization initiative. Looking forward, we expect a year of good growth in 2011, as we remain committed to transforming challenges into opportunities and driving continuous improvement across the organization***."

*  *  *

> 2011 Projections
>
> ***Hospira expects net sales growth for full-year 2011 to be approximately 5 to 7 percent*** on a constant-currency basis.  The company expects foreign exchange to provide a positive contribution of approximately 1 percent, based on current exchange rates.  The net sales projections assume U.S. launches during 2011 of two oncolytics, docetaxel and a solution presentation of gemcitabine.
>
> ***Adjusted\* diluted earnings per share for 2011 are expected to be in the range of $3.90 to $4.00, or year-over-year growth of 18 to 21 percent***.

82.     On February 16, 2011, Hospira filed with the SEC its annual report on Form 10-K for the fiscal year ending December 31, 2010.  Defendants Begley, Werner, Bailey, Bowles, Curran, Hale, Sokolov, Staley, Wheeler, and von Prondzynski  stated in the Company's Form 10-K that the cost reductions associated with the Company's Project Fuel initiatives were only partly offset by issues relating to the April 2010 Warning Letter.  This was an improper statement because shortly thereafter, the Individual Defendants would admit that remediation would take as much as three years and $375 million to complete, substantially more than offsetting any gains

achieved with Project Fuel.  Discussing the Company's financial performance, Begley, Werner,

Bailey, Bowles, Curran, Hale, Sokolov, Staley, Wheeler, and von Prondzynski stated, in relevant

part:

> Net sales in the Americas segment increased 2.4%, or 1.5% excluding the impact of changes in foreign exchange rates.  Net sales of Specialty Injectable Pharmaceuticals ("SIP") increased primarily due to increased volume for Precedex[TM], the launch of generic meropenem and gemcitabine and high-dose heparin introduced in late 2009. ***The increase was partially offset by a decrease in volume due to a voluntary hold on shipments of certain emulsion products***. Other Pharma net sales decreased primarily due to the dispositions noted above and lower volumes in nutritional products. ***Net sales in Medication Management were lower driven by decreased volumes related to the voluntary hold on shipments of Symbiq[TM] to new customers, decreased sales of Plum[TM]*** and the disposal of the critical care business, partly offset by increased sales of dedicated administration sets.

> \* \* \*

> Gross profit increased $58.0 million, or 4.0%, in 2010, compared to 2009.

> The gross profit increase was the result of higher sales volume primarily driven by growth in Precedex[TM] and new product launches.  ***In addition, cost reductions associated with Project Fuel initiatives*** and the impact of changes in foreign exchange rates contributed to the increase.  ***These were partly offset by activities and related charges directly associated with the 2010 Warning Letter received from the FDA and voluntary shipment holds on certain products as well as penalties for failure to supply customers*** and increased product correction charges on these and other products.

83.     On March 24, 2011, Hospira issued a press release updating its financial

projections and ***raising its outlook*** as a result of strong demand for its recently-FDA-approved

drug, Docetaxel.  The release also ***confirmed the Company's full year 2011 guidance***.

84.     On April 26, 2011, Hospira filed with the SEC its quarterly report on Form 10-Q

for the period ended March 31, 2011.  The Company's Form 10-Q reiterated that remediation

costs have not been significant for Hospira, was signed by defendant Werner, and contained the

required SOX certifications signed by defendants Werner and Ball.  The Form 10-Q further

discussed the Company's "Certain Quality and Product Related Matters," and stated in part:

*Symbiq*[TM] *Infusion Pumps*

In April 2010, Hospira placed a voluntary hold on all shipments to new customers of Symbiq[TM], a large volume infusion device. Hospira initiated this hold after it received an unexplained increase in customer complaints related to the failure of the Symbiq[TM] to alarm at the end of infusion therapy under certain use conditions. In June 2010, Hospira notified customers on interim steps to be taken by customers to mitigate this issue and to avoid the use conditions that can lead to the failure of the Symbiq[TM] to alarm at the end of infusion therapy. In August 2010, Hospira initiated a set recall related to the issue. Additionally, Hospira notified customers of reports of unrestricted flow when the Symbiq[TM] infusion set cassette is improperly removed from the pump before the pump's cassette door is fully opened. Hospira cautioned customers to allow the pump's cassette door to fully open before removing the infusion set as the pump may not alarm when the infusion set is improperly removed. The FDA has classified each of these actions as a Class I recall and Hospira is working closely with the FDA to conclude these matters. Hospira has not asked customers to return or cease using their Symbiq[TM] pumps. ***Hospira has recognized charges in Cost of products sold for quality assessment and testing, materials, and labor to remediate these matters, which have not been significant to date to Hospira.***

85.     Reacting positively to the Company's seemingly strong results and announced $1 billion stock repurchase program, analysts from JP Morgan issued a report titled "What a Difference a Qtr Makes; Solid Results Across Pharma And Medication Mgmt."  In the report, JP Morgan raised its yearend 2011 price target to $66 per share.

86.     On July 27, 2011, Hospira filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2011.  The Company's Form 10-Q reiterated the Company's financial results, was signed by defendant Werner, and contained the required SOX certifications signed by defendants Werner and Ball.  The Form 10-Q further discussed the Company's "Certain Quality and Product Related Matters," and stated in part:

Hospira has responded to the April 2010 Warning Letter and is working closely with the FDA to conclude these matters. As part of Hospira's response, Hospira took immediate actions to address the FDA's concerns, including recalling certain products manufactured at the Clayton and Rocky Mount facilities. Hospira has worked with several third party experts to assist with the activities at both facilities. Hospira had implemented certain interim controls, including third party oversight, to ensure products manufactured at both facilities meet their specifications prior to release. ***Hospira has completed a comprehensive review of***

*its manufacturing operations to ensure compliance with applicable regulations, and continues to ensure compliance with new regulations.* The Warning Letter does not restrict production or shipment of Hospira's products from these facilities but Hospira is holding shipment of certain products pending its further investigation and discussions with the FDA. Hospira resumed shipment of certain products placed on voluntary shipping hold, but cannot predict when all products on voluntary hold will be reintroduced to the market.

In January 2011, the FDA conducted a follow-up inspection at the Clayton facility to evaluate Hospira's corrective actions in response to items raised in the April 2010 Warning Letter. The FDA did not issue an Inspectional Observation ("Form 483") of any potentially objectionable conditions related to the Clayton inspection. *The FDA conducted a follow-up inspection at the Rocky Mount facility in May 2011. The FDA issued a Form 483 for the Rocky Mount inspection listing their observations related to certain quality systems, facilities, and operating procedures. Hospira has submitted a response to the FDA, and continues to interact and work with the FDA to resolve the matters identified in the Form 483.*

*During 2010, Hospira incurred charges of $54.3 million related to the activities associated with the matters cited above for the Clayton and Rocky Mount facilities as well as Hospira's assessment of the status of its quality operations on a holistic basis throughout its global manufacturing facilities. During 2011, Hospira continued to invest in quality operations throughout its global manufacturing facilities including at the Clayton and Rocky Mount facilities. However, to remediate the specific matters cited above, charges incurred were not significant during the three and six months ended June 30, 2011.*

87.     The true facts, which were known by defendants but concealed from the investing public, were as follows:

(a)     Hospira suffered from extensive quality control issues, which undermined both the viability of and the supposed financial savings that would be generated by Project Fuel;

(b)     Hospira was unable to comply with problems identified in FDA Warning Letters related to Hospira's infusion pumps, quality control deficiencies, and manufacturing weaknesses; and

(c)     Hospira's revenue guidance for 2011 was misstated and lacked a reasonable basis when made.

88.    Project Fuel was, according to defendant Werner, designed to produce "operational excellence."   In truth, it produced operational disaster.

89.    As detailed in the Federal Securities Action, the foregoing statements concerning the purported success of Project Fuel and the Company's financial stability were known to be false and misleading to Hospira's insiders for the following reasons:

(a)    The Individual Defendants knew or recklessly disregarded and omitted to disclose that Rocky Mount's manufacturing operations were nowhere near "operational excellence" but in fact suffered from serious issues with regard to quality control and the deterioration of its facilities and equipment. By early 2010, for example, necessary quality control staff had been cut through Project Fuel, the plant's Standard Operating Procedures had been diminished and ignored, in-process quality sampling was eliminated, and pharmaceutical mixing processes were relying on unsound science and could not be validated. These problems were not being fixed but were actually worsening as a result of cost cutting pursuant to Project Fuel;

(b)    The Company's facilities and equipment were not in "good operating condition" or "well maintained"[11] because, as former Senior Vice President of Operations James Hardy, Jr. ("Hardy") would later admit, Hospira had inherited "aged" facilities that were in need of a "facelift" and modernization that would cost millions of dollars, and they were further plagued with mold, equipment failures, antiquated and unusable DOS-based documentation systems, and other operational deficiencies;

(c)    The deficiencies at Rocky Mount and beyond were so substantial that, beginning in 2010, they resulted in widespread manufacturing disruptions and delays that caused

_____

[11]   As stated in Hospira's February 18, 2010 Form 10-K for the year ending December 31, 2009.

- 54 -

many of the Company's products to be on back order, which ultimately cost Hospira not only lost sales and revenues, but also tens of millions of dollars in hard costs each month as a result of "failure to supply" penalties;

(d)     In contrast to enjoying a "very good relationship" with the FDA, Hospira was, in fact, facing heightened scrutiny from the FDA as a result of its myriad production and quality control deficiencies, which scrutiny included an inspection of Rocky Mount in January 2010 that revealed problems so severe as to warrant the second April 2010 Warning Letter;

(e)     Rather than "working closely with the FDA" and adapting to any regulatory changes following the August 2009 Warning Letter, from then and up to well over a year thereafter, the Individual Defendants made no concerted effort nor any meaningful commitment in dollars to address the FDA's concerns, particularly at Rocky Mount, as revealed by the issuance of the June 2011 and August 2011 Form 483s identifying even more problems at the plant;

(f)     The Company was not "actively involved in setting quality policies"[12] but actually had encouraged a shift in corporate culture to reward "quantity over quality," which would take significant time and effort to reverse; and

(g)     The Individual Defendants hid from the market the devastating effects of Project Fuel on Hospira's manufacturing and quality assurance efforts, particularly at Rocky Mount. Instead of driving "sustainable," "long-term" profitability, in reality, Project Fuel's short-term savings would be eclipsed by the long-term costs of the sacrifices in quality resulting from the initiative, which costs would include a remediation bill topping $300 million, the need to hire additional quality control personnel to ensure the safety of Hospira's products, and the eventual

---

[12]  *See id.*

impacts to the Company's revenues as quality-related production slowdowns resulted in decreased sales.

90.    In addition to the above, during the Relevant Period, the Individual Defendants never revealed that Project Fuel was adopted without first conducting a sufficient operational study to determine whether its cost-cutting measures would adversely affect Hospira and its internal and quality controls. Such an analysis would have been aimed first and foremost at safeguarding the public, and ensuring that Hospira was in compliance with FDA regulations and CGMP requirements. Rather, as defendant Begley admitted in February 2009, the impetus for Project Fuel was the Board's desire not to post operating results that were "average" for its industry. The Board members, being sophisticated business people, would have known that Hospira performed in line with its peers because all companies faced the same issues and costs. There was simply no "magic wand" they could wave that would allow Hospira to abruptly spend so much less than its peers on safety procedures, and still maintain adequate quality control.

## DISCLOSURE OF THE TRUTH

91.    The truth about Hospira's business and operations began to emerge on September 7, 2011, when the Company hosted its annual "Investor Day" event to discuss, among other things, the state of Hospira's operations. The Company finally revealed that the Individual Defendants affirmatively adopted, implemented, and condoned a business strategy that turned a blind eye to widespread deficient manufacturing practices and failed to implement adequate internal controls to assure safety and quality in the factories. As Hardy, Hospira's Senior Vice President of Operations admitted, "I believe *we got a little lazy*. I believe that the bar was changing, the puck was moving, you pick the analogy, *but we were kind of skating behind the puck*." The Company specifically disclosed that its "aged" facilities were in need of a "facelift" and extensive remediation, particularly at Rocky Mount, to bring the Company's operations up to

FDA standards, and, as a result, Hospira would be spending $200 million to $250 million to improve operational efficiencies. During the presentation, Hardy stated, in part:

> Fixing the foundation is mission critical. Well, if there's two areas of fixing the foundation that are mission critical times two, it's the next two remediation areas that I'm going to talk to you about. The first is our Rocky Mount facility. And let me talk to you a little bit about Rocky Mount. Rocky Mount is a gem of a plant. It has been the crown jewel of Hospira and [the] hospital product division for many years.

> \* \* \*

> So what we don't – what we have in Rocky Mount isn't a problem with how to do this business. But I believe *we got a little lazy*. I believe that the bar was changing, the puck was moving, you pick the analogy, *but we were kind of skating behind the puck and it was time for us to get caught up and it was time for us to take on a new mentality and a different approach*.

> \* \* \*

> We're fighting a different animal. It's a very complex plant. *We're trying to drive remediation at the same time we're trying to drive very robust cost-savings programs. And we found those things competing with each other. There was a lack of clear focus in Rocky Mount. And the FDA though, and we subsequently received, additional Form 483 observations in our most recent audit*.

> \* \* \*

> The next area is our comprehensive MMS remediation.... *And we see this as being a two to three-year process between our pharma remediation at Rocky Mount, as well as our MMC remediation, we think this will take us two to three years and be in the neighborhood of $200 million to $250 million*.

92. The Individual Defendants nevertheless attempted to offset this news by offering the market false assurances that they had "the right team in place" to fix the Company's operational issues, and that "Quality and operations" were on the same page "to accelerate our progress to fixing the foundation." In addition, the Individual Defendants further tempered the revelation by touting generally positive news throughout the rest of the day, including updates on

Hospira's products in development and an overview of the Company's great potential for business development overseas.

93.     Responding to the statements made during the Investor Day, on September 8, 2011, analysts from The Buckingham Research Group stated, "While Hospira indicated that it believes that the FDA is working on a collaborative basis with the Company, its remediation of Rocky Mount is a work in progress and the Company did admit that Project Fuel cost-cutting priorities were partly responsible for taking focus off manufacturing quality issues." Likewise, JP Morgan analysts stated:

> While some significant initial improvements will take place over the next 6 months, Hospira anticipates it will take 2-3 years to fully remediate the issues at Rocky Mount. From a cost perspective, between Rocky Mount and the MMS fixes, these improvements are expected to cost $200-$250 mm, of which roughly 70%-75% is expected to be one-time in nature. While this is clearly necessary spend and hopefully will address the company's manufacturing challenges, today's updates reflect a significant increase in cost and time associated with remediation.

94.     The decline in Hospira's stock price by approximately 13% from September 7, 2011, through September 13, 2011,[13] was the direct result of the nature and extent of the revelations made to investors regarding the Company's extensive manufacturing deficiencies that had been concealed or misrepresented by the Individual Defendants. This decline would have been even more significant had the Individual Defendants disclosed the full truth of the remediation's impact on the Company's ongoing operations.

95.     More details of significant problems at Hospira were disclosed beginning on October 18, 2011. On this date, Hospira issued a press release entitled, "Hospira Announces Certain Preliminary Third-Quarter 2011 Results." This press release and subsequent releases and

---

[13] Hospira's stock dropped $6.10 a share, or approximately 13%, from a close of $45.61 on September 7, 2011, to a close of $39.51 on September 13, 2011, on abnormally high trading volume.

press reports fully disclosed to the public for the first time that: (i) Hospira was experiencing long term and significant issues with regard to its manufacturing facilities and its quality controls; (ii) these issues were much more serious and wide-spread than Hospira had been representing; (iii) the issues could not be offset by the steps the Company was taking pursuant to its "Project Fuel"; (iv) the Company had already incurred over $90 million in expenses for the limited efforts that it had taken to make its facilities compliant with FDA regulations, and would have to spend over $300 million more in the next two to three years to order to take the appropriate steps; (v) the cost of remediation would materially impact the Company financially; and (vi) the steps the Company had taken up to that point were inadequate. The press release provided in pertinent part as follows:

> Hospira, Inc. (NYSE: HSP), the world's leading provider of injectable drugs and infusion technologies, today announced that its preliminary third-quarter 2011 net sales, adjusted* income from operations and adjusted* earnings per share are lower than anticipated primarily due to certain quality actions taken in response to a U.S. Food and Drug Administration (FDA) 2010 warning letter and subsequent observations related to the company's manufacturing facility in Rocky Mount, North Carolina, and device quality and supply-related issues.
>
> "While recently launched product sales continue to drive top-line growth, we were extremely disappointed in the third quarter by developments related to our quality-improvement initiatives that resulted in a significant slowdown of production and an associated impact on our operating performance," said F. Michael Ball, chief executive officer. "As I indicated at our Investor Day in early September, addressing these issues is Hospira's top priority, and our organization is committed to full resolution. I remain confident that Hospira will emerge from this process a stronger, more competitive global company that is optimally positioned to serve the needs of our customers and patients, and deliver strong value to our shareholders."

96.     On this news, the Company's stock price plummeted $7.85 per share to close at $29.51 on October 18, 2011 — a plunge of over 20% — on heavy trading volume. Analysts also

reacted negatively as Citigroup and JP Morgan, among others, published negative recommendations on the stock.

97.    Market commentators also reacted to the Company's preliminary financial results. On October 18, 2011, the *Financial Times* published an article entitled "Hospira hit by production disruption."  The article, which discussed its surprise learning about the impact of the FDA's investigation on Hospira's business after relying on previous improper statements regarding improved service levels and higher productivity, explained that the turn of events raises "credibility issues for the management."  The article stated, in relevant part:

> More than $1 [billion] was wiped off the market capitalization [sic] of pharmaceutical company Hospira on Tuesday, after the firm said [an FDA] investigation is affecting output from its main manufacturing plant.

> The Illinois-based firm, which provides hospitals with ready-made injections, saw shares fall 21 per cent to $29.51, after Hospira said "production slowed significantly" at its Rocky Mount, North Carolina plant.

> ***On a specially arranged conference call, the company said its service level – the percentage of customer orders it meets – fell from the mid 90s to the high 80s during the quarter to the end of September, resulting in lost sales.***

> ***As recently as September 7, Hospira had said service levels were improving as a result of higher productivity at the Rocky Mount site***.

> "***This raises significant new credibility issues for the management***," said Gregory Hertz, healthcare analyst at Citibank.

> * * *

> Michael Ball, Hospira's chief executive, told analysts on Tuesday's call that he had changed management and hired consultants to resolve issues at the facility. But the resulting new production-line and final product checks have significantly slowed output, while several batches of output have been written off because of quality concerns.

> "Until there is more clarity around how big this issue is and when we might see a resolution, the share price will stay depressed and may even fall lower," said Matthew Taylor, healthcare analyst at Barclays Capital.

> * * *

But Mr. Hertz warned output may not recover to previous levels: "***My interpretation, having read the correspondence, is that the FDA thinks the Rocky Mount plant has reached the end of its useful life, which would have serious long-term consequences for Hospira.***"

Analysts also warned that the firm's focus on the Rocky Mount plant has distracted from a multiyear efficiency drive across the company, which had delivered significant savings in the last two years.

The production problems mean revenue in the three months to the end of September is likely to be barely higher than the same quarter last year. Earnings per share are expected to fall 11 per cent from a year ago to 66 cents. Hospira also reduced guidance for full-year earnings to $3 from $3.95.

98.     Analysts reacted negatively as well. JP Morgan analysts pointed to the fact that the "[C]ompany offered little clarity on the timing of resolution of these issues" and stated "we are not expecting a near-term recovery in the stock." On October 25, 2011, Zacks Investment Research analysts downgraded Hospira to "underperform" from "neutral," stating:

Hospira's third quarter preliminary results were below expectations due to ***continued manufacturing problems at the company's Rocky Mountain facility.*** The facility is expected to continue functioning below full capacity through the remainder of 2011. The additional costs for manufacturing remediation resulted in lost sales, inventory loss and lower service levels. In addition, management cut its 2011 adjusted earnings guidance to $2.95-$3.05 from $3.90-$4.00. We have slashed our 2011 earnings estimate from $3.93 to $3.01 and our 2012 estimates from $4.47 to $2.85, in line with management's action. Moreover, the Symbiq and Plum pump issues remain matters of concern. We have, therefore, downgraded our rating on Hospira from Neutral to Underperform.

99.     The startling announcements concerning Hospira's true condition continued on October 26, 2011, when the Company issued a press release entitled, "Hospira Reports Third-Quarter 2011 Results." The press release provided, in pertinent part, as follows:

Hospira, Inc. (NYSE: HSP), the world's leading provider of injectable drugs and infusion technologies, today reported results for the third quarter ended Sept. 30, 2011. Net sales for the quarter were $977 million, and adjusted* diluted earnings per share were $0.66. (Adjusted* measures exclude certain specified items as described later in this press release and the attached schedules.)

"As we indicated in our Oct. 18 press release, despite the continued contribution of recently launched products to revenue growth, our third-quarter results were

significantly impacted by developments related to our quality-improvement initiatives," said F. Michael Ball, chief executive officer. "Addressing these issues is Hospira's top priority, and our organization is committed to full resolution. I remain confident that Hospira will emerge from this process a stronger, more competitive global company that is optimally positioned to serve the needs of our customers and patients, and deliver strong value to our shareholders."

\* \* \*

Net sales for the quarter were $977 million, an increase of 2.9 percent compared to $949 million in the third quarter of 2010, with the increase primarily driven by continued strong U.S. net sales of the oncolytic docetaxel. This was partially offset by the impact of certain quality actions taken in response to a U.S. Food and Drug Administration (FDA) 2010 warning letter and subsequent observations related to the company's manufacturing facility in Rocky Mount, N.C., and device quality and supply-related issues. On a constant-currency basis, third-quarter net sales increased slightly compared to the third quarter of 2010.

Adjusted\* income from operations for the third quarter of 2011 was $142 million compared to $189 million in the third quarter of 2010. The decline is primarily due to charges and costs associated with certain quality actions and related inventory losses.

\* \* \*

**2011 Projections**

As a result of the lower-than-expected third-quarter results, the company now projects net sales for full-year 2011 to increase approximately 1 to 2 percent on a constant-currency basis. On a reported basis, the company expects full-year 2011 net sales growth of 2 to 3 percent.

As the company announced on Oct. 18, 2011, adjusted\* diluted earnings per share for full-year 2011 are expected to range between $2.95 and $3.05.

\* \* \*

The company is revising its guidance for cash flow from operations, which is now projected to range between $350 million and $400 million. The company has also revised its projections for capital expenditures, which are now projected to range between $325 million and $350 million. Depreciation and amortization is projected to range between $230 million and $250 million.

100.    On this same date, Hospira filed its quarterly report on Form 10-Q with the SEC

for the three months ended September 30, 2011, which included the financial results provided in

the press release issued on October 26, 2011. The Form 10-Q was signed by defendant Werner,

included SOX certifications signed by defendants Werner and Ball, and provided, in pertinent part, the issues identified in the FDA Warning Letters as follows:

### Warning Letter

In April 2010, Hospira received a Warning Letter from the FDA (the FDA's Warning Letter is publicly available on the FDA's website) in connection with the FDA's inspection of Hospira's pharmaceutical and device manufacturing facilities located in Clayton, North Carolina and Rocky Mount, North Carolina. In the Warning Letter, the FDA cited Current Good Manufacturing Practice deficiencies related to particulate in certain emulsion products at the Clayton facility and the failure to adequately validate the processes used to manufacture products at the Rocky Mount facility. The Warning Letter also asserts other inadequacies, including procedures related to the Quality Control unit, investigations, and medical reporting obligations. Hospira responded to the Warning Letter in 2010, and as part of its response, took immediate actions to address the FDA's concerns, including recalling certain products manufactured at the Clayton and Rocky Mount facilities.

In January 2011, the FDA completed a follow-up inspection at the Clayton facility to evaluate Hospira's corrective actions in response to items raised in the Warning Letter. The FDA did not issue a Form 483 of any potentially objectionable conditions related to the Clayton inspection. The FDA completed a follow-up inspection at the Rocky Mount facility in June 2011, and issued a Form 483 listing observations related to certain quality systems, facilities, and operating procedures. In August 2011, the FDA completed an additional inspection at the Rocky Mount facility, which resulted in additional Form 483 observations that identified further areas for remediation and improvement. Hospira is implementing a comprehensive remediation plan, including obtaining the assistance of third party subject matter experts to help Hospira address the FDA's concerns. Hospira has implemented certain interim oversight controls, including third party oversight; product assessments; retrospective reviews of laboratory results related to out of specification findings and investigations; and the development and implementation of a comprehensive laboratory action plan. Hospira also has implemented significant management changes to the Rocky Mount facility's leadership team.

\* \* \*

### Symbiq™ Infusion Pumps

In April 2010, Hospira placed a voluntary hold on all shipments of Symbiq™ infusion pumps to new customers. Hospira initiated this hold

after it received an unexplained increase in customer complaints under certain use conditions related to the failure of Symbiq$^{TM}$ to alarm at the end of infusion therapy. In June 2010, Hospira notified customers of interim steps to be taken by customers to mitigate this issue and to avoid the use conditions that can lead to the failure of Symbiq$^{TM}$ to alarm at the end of infusion therapy. In August 2010, Hospira initiated a set recall related to the issue. Additionally, Hospira notified customers of reports of unrestricted flow when the Symbiq$^{TM}$ infusion set cassette is improperly removed from the pump before the pump's cassette door is fully opened. Hospira cautioned customers to allow the pump's cassette door to fully open before removing the infusion set as the pump may not alarm when the infusion set is improperly removed. The FDA has classified each of these actions as a Class I recall and Hospira is working closely with the FDA to conclude these matters. Hospira has not asked customers to return or cease using their Symbiq$^{TM}$ pumps. Hospira has recognized charges in Cost of products sold for quality assessment and testing, materials, and labor to remediate these matters, which were $5.0 million for the three and nine months ended September 30, 2010 and were $6.2 million in aggregate.

Hospira has submitted the appropriate applications for modifications to its Symbiq$^{TM}$ infusion system to regulatory agencies in various countries. On March 31, 2011, Hospira submitted a 510(k) application with the FDA, which included software updates to further enhance the reliability of the infusion system, and to correct the recall issues impacting the device. The FDA submitted questions on the 510(k) application. Hospira has responded to the first round of questions, and is preparing its response to the second round of questions received from the FDA. Hospira incurred charges of $1.7 million in the three months ended September 30, 2011 related to remediation actions associated with the application. New customer pump placements for Symbiq$^{TM}$ will remain on voluntary hold until Hospira receives the clearance from the applicable regulatory agencies. Hospira believes this 510(k) application is one of the first in the industry to be submitted under recent FDA draft guidance for 510(k) clearances of infusion pumps, which makes it difficult to project the prospects and timeline for FDA clearance.

*Plum$^{TM}$ Infusion Pumps*

In December 2010, Hospira informed the FDA that it had received a number of customer reports associated with the Plum A+ $^{TM}$ and XL family of infusion pumps regarding failure of the pump's audible alarm under certain conditions. Hospira notified customers of the corrective action plan to address this issue. For the Plum A+$^{TM}$ pumps, the alarm failures are associated with the alarm assembly. For the Plum XL$^{TM}$ pumps, the alarm failure is associated with fluid ingress and physical damage to the alarm assembly over time. Plum XL$^{TM}$ customers were

instructed to follow the proper cleaning procedure and inspect the alarm assembly for physical damage during routine maintenance. The Plum A+$^{TM}$ and Plum XL$^{TM}$ actions have been classified as a Class II field recall and the FDA is not requiring Hospira to remove any Plum$^{TM}$ pumps from the market or halt production. Hospira recognized a charge of $26.0 million for the estimated costs of the field recall at the end of 2010. Hospira is in the process of finalizing its recall plan and beginning the replacement of components for the Plum A+$^{TM}$ in the fourth quarter of 2011 and expects the remediation to extend through 2012.

*Comprehensive Medication Management Product Review*

In connection with the matters referenced above, Hospira committed to the FDA that it would engage in a comprehensive product review for each of Hospira's medication management products. The product reviews are designed to confirm compliance with current regulatory requirements and document safety and performance of the products. The product reviews will also include retrospective assessments of customer experiences with these products over the preceding two years. The product reviews will provide Hospira with important information for enhancing the reliability of these products and future products. The product reviews, related investigations and remediation are ongoing, and the initial reviews are focused on Plum$^{TM}$, patient controlled analgesia (PCA) devices, and GemStar$^{TM}$. Certain remediation actions, such as product recalls or corrective field actions, for Hospira's medication management products have been, and may be required upon finalization of the product reviews. Hospira expects that the product reviews will be completed by the end of 2012 and expects that the remediation actions resulting from these reviews could extend over the next two to three years.

In the three months ended September 30, 2011, Hospira incurred charges of $26.4 million for certain remediation actions, including recalls, related to outcomes of the product reviews and related investigations, primarily related to Plum$^{TM}$ products. As described in the section above captioned "Plum$^{TM}$ Infusion Pumps," this $26.4 million is in addition to a charge of $26.0 million recognized in 2010 for recall costs related to Plum$^{TM}$. These remediation charges are based on management's best estimate of the committed corrective actions and consist primarily of development costs to address any identified issues and costs for the roll-out or deployment to the impacted customer base.

*Financial Related Impact*

**For the historical period from the beginning of these matters through the period ended June 30, 2011, Hospira had incurred approximately $90.7 million of charges for these quality and product related matters**

*referenced above. In addition, beginning with the three months ended September 30 2011, Hospira expects to incur over the next two to three years, aggregate pre-tax charges related to these quality and product related matters in the range of $300 million to $375 million, of which Hospira incurred an aggregate of $52.4 million in the three months ended September 30, 2011.* The amount, timing and recognition of charges associated with these matters over this time period will be affected by the nature of spending and the occurrence of commitments and triggering events as defined under GAAP, among other factors. Further, costs for long-term solutions and product improvements will depend on various product development efforts and corresponding regulatory outcomes in connection therewith. ***Also, capital expenditures to remediate and/or enhance Hospira's existing facilities and operations may be required.*** *See* matters discussed in section "Facilities Optimization and Capacity Expansion" in Item 2.

101.     During a conference call held on this same day to discuss Hospira's financial results, the Company again disclosed that estimated costs for remediation are between $300 million and $375 million over the next three years.  Hospira also revealed that the issues identified in the FDA Warning Letters were far more widespread than had originally been revealed.  Hospira disclosed that the FDA was withholding approval of products emanating from the Company's Austin, Texas plant ("Austin"), not just its Rocky Mount facility, and that the manufacturing issues were being looked at for all of its plants.

## SUBSEQUENT REVELATIONS AND DEVELOPMENTS

102.     The scope of the Company's quality control and manufacturing deficiencies is wide-ranging, belying Hospira's optimistic statements during the Relevant Period concerning the Company's condition.   On November 29, 2011, *Bloomberg* published an article entitled, "Hospira May Face 'Widespread Production' Delays."   The article noted that Hospira faces "widespread" production breakdowns and manufacturing issues that are "far greater than investors realize," all of which "could take two to three years to correct."  The article reported in pertinent part as follows:

Hospira Inc., the maker of generic injectable drugs, may face "widespread" production breakdowns that could take two to three years to correct, an analyst at RBC Capital Markets LLC said.

Hospira, based in Lake Forest, Illinois, dropped 9.1 percent to $28.17 at the close of trading, the lowest price since March 23, 2009. The problems may indicate a systemic issue that will have to be rectified long term, Shibani Malhotra, an RBC analyst in New York, said in a note today. The shares' decline may leave the company vulnerable to a takeover, Malhotra said in an e-mail.

* * *

Interviews with consultants working with companies that are regulated by the Food and Drug Administration suggest the federal agency may obtain a consent decree to ensure violations at Hospira are fixed, Malhotra said. Hospira has been working to correct flaws that led to recalls of two drugs in 2009 and 2010.

Hospira's manufacturing issues are "far greater than investors realize," Malhotra said in the note. While she did not detail the flaws, she did say the violations were across "multiple facilities; perhaps even globally."

103. Due to these events, the credibility of Hospira management was called into question. "You feel a little duped, I guess," said Michael Meyer, an analyst and portfolio manager at Philadelphia-based investment firm Cooke & Bieler. On December 7, 2011, defendant Begley announced his retirement, with the Chairman position passing to defendant Staley.

104. On January 1, 2012, new Hospira CEO, defendant Ball, spoke at a JPMorgan Global Healthcare Conference Breakout Session. Ball compared identifying Hospira's quality issues to draining a "swamp." He stated:

It's going to take resources and it's going to take some time and we will find the odd gator along the way. But I think we can deal with them. So that's why I want to – **but I also don't want to mislead anybody to say this is – the swamp is completely drained and I see the way forward**. I do see the way forward but it will have some bumps associated with it in the near term. But again, I am taking the long-term view of this Company in saying **if we get through – when we get through these manufacturing issues we've got great opportunities in front of us** which

- 67 -

is why I want to keep the pedal to the metal on research and development and our remediation activities.

105.     Ball also admitted that third party comprehensive audits were just then being ordered (i.e., something that should have been done **before** Project Fuel was launched):  "I am currently sending out third party to do an audit of our QA facilities across the United States.  So I want to be able to say to the FDA that we are on top of these things and demonstrate not by our words but by our actions that we mean business."

106.     On February 13, 2012, Hospira announced that it had hired Zena Kaufman, former Vice President for Global Quality Systems at Abbott, to join the Company as Senior Vice President-Quality.  A press release issued that day stated:

> "Zena is a recognized global expert in pharmaceutical quality systems, and her proven experience will help establish quality as a strategic, competitive advantage across our global operations," said Mr. Ball. "***Hospira remains fully dedicated to restoring our long-established reputation for the highest-quality products*** and best possible service for our customers, and I'm confident we now have the right team in place to deliver against these imperatives."
>
> Under Ms. Kaufman's leadership, Hospira will advance its global quality and compliance strategies, ***drive the continuous improvement of established quality procedures to ensure that processes and products meet high internal standards and regulatory requirements, and ultimately deliver high-quality, cost-effective products to customers***.

107.     On February 14, 2012, Hospira held its annual conference call to discuss its 2011 fourth quarter results and results for the full calendar year.  CEO defendant Ball stated in his opening remarks:

> The most recent update we provided on our quality transformation was at the JP Morgan conference on January 10. I said at that time, and will reiterate on our call today, that reinforcing the foundation is our number one priority. I continue to be personally involved in discussions with the FDA, and am closely monitoring our progress. At JPMorgan, as you may recall, we discussed our headway to date at Rocky Mount, including submitting our comprehensive remediation plan to the FDA, closing out documentation more quickly to be able to more expeditiously release product, ramping up third-party assistance and oversight, and bringing in a new team of leadership at Rocky Mount to drive sustainable cultural change.

At the conference, we heard that there was some confusion regarding our planned maintenance shutdown of Rocky. Some investors had the impression that the shutdown was FDA-imposed. I want to clarify that this was not the case. Every December, Rocky shuts down for general preventive maintenance. We conducted our regularly scheduled maintenance shutdowns in late December as usual. We then elected to extend the amount of time the plant was shut down, as well as halted the release of product, to allow us to work on certain issues and advance some capital improvements. At JPMorgan, we indicated that we expected production and product releases to resume in a staged manner over the coming weeks.

So what has happened since our last update in January? Well, Rocky Mount completed its shutdown. In mid-January, the plant started producing product, and over the course of the following weeks began releasing product. Rocky's current production levels are returning to where they were prior to the shutdown, in the 60% to 70% range. We have continued our regular constructive dialogues with the agency regarding our current progress. We have not entered into any discussions with the agency regarding a consent decree. As we have mentioned numerous times in the past, we would tell you if this were to happen. We are scheduled to meet with the agency in the next couple of weeks, and expect that our remediation plan will be a topic of discussion at that meeting. In the interim, we are continuing to implement the remediation plan as submitted.

At our Austin plant, you may recall we indicated that we had signed on a third-party consulting firm, Lachman, to verify the status of our 483 commitments. Lachman finished their audit, and concluded that 100% of the commitments we made in our action plan have been fully addressed. At our McPherson plant, we submitted our response to the FDA regarding the 483 observations from the inspection that closed out in early January of this year. We will be meeting with the FDA shortly to discuss our response and are proceeding to work through that plan.

Finally, we continue to advance our efforts proactively and holistically across our manufacturing footprint to assess our readiness for future FDA inspections. I will reiterate that I remain firmly committed to reinforcing our foundation, and instilling a culture of high quality throughout this organization. I'm confident that as a result of our initiatives, Hospira will be even better positioned as the world's leading provider of the highest quality injectable drugs and infusion technologies.

    108.    On this same conference call, defendant Werner was asked about the possibility that Hospira would be saddled with an FDA Consent Decree. He responded: "All I know is that we are doing the best job possible of getting the situation fixed, continuing to dialogue with the FDA to ensure that they're on board, and know what when we are doing. And I think in that

respect, moving forward, I like our chances. ***But again, I don't think anybody ever really knows***."

109.　　Werner was also asked about the status of remediation efforts at Hospira's Austin facility. He stated:

> Austin is quite a bit smaller than our Rocky Mount facility. And from my standpoint, as you look at the 483s, in my view, Rocky Mount had a lot more work to do than the Austin facility. ***Having said that, the Austin 483, as we mentioned before, was not great.*** And so I was very pleased that the plant went through the remediation process. They indicated to us that they'd completed all their commitments. As I mentioned before, a couple days later then we sent in Lachman to get a third-party verification on that. So I was extremely happy that everything is 100% A-okay from their standpoint. And we're looking and continuing to look at third parties reviewing our plants to ensure that, A, we're living up to our commitments. But also, B, that we have a state of FDA readiness, as the FDA comes through with another round of reviews and inspections.

110.　　On April 11, 2012, Hospira named a veteran pharma industry executive as its new Vice President Operations.　This new Vice President was expected to "advance its plant remediation strategies."

111.　　On May 1, 2012, Hospira announced much diminished sales in profits for its first quarter as compared with the first quarter of the previous year.　It attributed these differences to ongoing remediation costs, and slowdowns.　As reported in the May 2, 2012 *Chicago Tribune*, Hospira was encountering "new" difficulties, while trying to address existing ones:

> ***Hospira Inc. said Tuesday that its first-quarter net income fell 73.2 percent, to $40.2 million, a decline the company blamed on costs associated with continuing remediation efforts at its manufacturing plants and a lower supply of some key products***.
>
> The Lake Forest-based maker of generic injectable drugs and intravenous pumps, battered by a string of quality-control problems cited by the U.S. Food and Drug Administration, said sales dropped 3.6 percent, to $965.9 million.
>
> Adjusted for one-time charges, earnings dropped 49 percent, to $104 million, or 47 cents a share, down from $203 million, or 93 cents a share, in the same quarter of 2011.

Analysts polled by Thomson Reuters expected earnings of 45 cents a share on revenue of $949.7 million.

Hospira shares finished up 1.1 percent, at $35.50.

The company, which has struggled with growing costs to address regulatory concerns at its giant Rocky Mount, N.C., plant, also said in a filing on Tuesday that it received additional FDA concerns about a another plant in Clayton, N.C.

In a call with analysts, Hospira Chief Executive F. Michael Ball said the company has spoken with the agency about its concerns at the Clayton plant and is making progress on addressing them.

Ball also said remediation efforts continue at the Rocky Mount plant, which has been under FDA scrutiny for more than two years for what the agency called subpar manufacturing processes.

The Rocky Mount plant, which manufactures injectable drugs, including anesthesia products, irrigation and intravenous solutions and renal and cardiovascular care products, produces nearly a quarter of Hospira's annual profit.

In response to the problems, the company has replaced several members of its management team, brought in teams of consultants and invested in manufacturing process improvements.

112.    On a May 1, 2012 conference call, defendant Ball provided an update which detailed Hospira's continuing struggles, which were so vast they required the attention of 150 consultants:

> Let's start with Rocky Mount. First, we remain on track with our remediation efforts at the plant. As we indicated on our fourth-quarter earnings call in February, we are currently maintaining our production and release levels in the 60% to 70% range, and anticipate that we will remain at these levels through at least mid-year.
>
> Second, we are also making progress with our hiring efforts at Rocky. **We have placed over 100 full-time employees at the plant since the beginning of the year. This is in addition to the more than 150 consultants we already have working on the plant floor with our employees, and assisting us with our remediation efforts. We expect these consultants to remain with us for most of the year, after which we expect to steadily ramp down as our internal staff takes over many of the roles and responsibilities the consultants have been performing for us**.

And finally, we have continued our regular constructive dialogues with the FDA regarding our current progress at Rocky, and continue to press forward with implementation of our remediation plan. The agency has told us they are willing to meet with us to discuss our plan, and we are communicating with them to finalize a date.

Moving to our other pharma facilities – at our Clayton plant, which is also cited under the warning letter with Rocky Mount, the FDA conducted an inspection in March. The inspection was not a full cGMP audit, but a limited inspection focused on a specific issue. The agency had one observation regarding how we conduct investigations, which we did not deem to be critical in nature. We have already addressed and completed the corrective action for this observation.

***In addition, during the month of March, we encountered some manufacturing issues at the plant, and elected to shut down production to investigate. This has created a temporary shortage situation with Propofol,*** and has also impacted certain contract manufacturing customers. Last week we completed the corrective action, which we believe addresses the issue. We have restarted production, and will begin a staged release of quarantined product in the coming weeks.

At our Austin plant – we discussed on our fourth-quarter earnings call that we had retained Lachman, a third-party consulting firm, to audit the completion of the plant's corrective actions. They concluded that all of the commitments we made to the agency in our action plan had been fully completed. In March, we received, from the FDA, what is referred to as an untitled letter. The letter clarified the agency's expectations regarding the scope of some of our corrective actions we took to resolve the observations in the 483 they issued last year. We have responded to the letter with our plan to address their concerns. And with the additional corrective actions in place, we'll be better prepared for their next inspection.

113.    On August 1, 2012, Hospira held a conference call to discuss second quarter 2012 results.  CEO defendant Ball again addressed persistent and difficult remediation issues:

[W]e continue to progress with our remediation efforts at Rocky Mount, our annual preventative maintenance shutdown went as planned and we are bringing the lines back into production.

*   *   *

***As our remediation program progresses across our plants, we have uprooted additional issues, some of which have unfortunately resulted in product recalls, inventory loss and production disruptions***. We are driving to root cause and

implementing corrective actions. As we have said in the past, we believe identifying and resolving these issues signifies that we are moving in the right direction on our journey to achieving sustainable compliance.

Let me provide additional details on some of these activities starting with Rocky Mount....we started the plant back up in a phased approach and are returning to the 60% to 70% production and release levels. We expect to remain at this level during the third quarter and then modestly increase through the end of the year.

\* \* \*

[I] know many of you are looking forward to an update on our interactions with the FDA, we have continued to have constructive and productive dialogue with the agency including two meetings on Rocky Mount during which we discussed our comprehensive action plan and our progress to date. One of the meetings was at the FDA's headquarters, or the center, and included representatives from districts as well as the Office of Compliance and the Office of Drug Shortage. While final minutes in the meeting are circulating at the agency for comments, we believe the FDA has accepted the work plan that we previously submitted. ***The agency acknowledged that we were moving in the right direction with the right level of commitment, but indicated they needed to see continued progress.*** We realize that much work remains to be done, but left the meeting encouraged.

As part of our continuing global quality efforts, we are reviewing our quality systems across all of our plants. ***Where there are gaps, we are bringing in third-party support on an interim basis as we improve the system. We've already started implementing this at Austin and Boulder and will be looking at the other plants as we proceed our assessments***.

\* \* \*

***At our Boulder plant, the FDA performed an inspection at the facility and issued seven observations. Boulder is a small oncolytic API plant and the observations centered around cleaning validation, process validation and laboratory investigations***. We have responded to the FDA with our plan to address the observations, and in a subsequent meeting, the agency did not object to the scope of our planned corrections.

\* \* \*

At Austin, just this Monday, the FDA began both a follow-up inspection and a general cGMP inspection of this site. We recognize that we are receiving heightened scrutiny from the FDA as the agency is interested in monitoring our progress and ensuring compliance across our manufacturing facilities. We support this ongoing interaction with the agency as we believe it will not only help ensure that our remediation efforts meet their expectations, but it also supports the holistic improvement initiatives we're committed to making across our manufacturing footprint.

* * *

So as you can see, we had a very busy quarter and continue to move forward with both our pharma and device remediation efforts. I realize that some of you are concerned about the length of time this is taking and that additional issues keep bubbling up. However, from my perspective, we are making progress and we are seeing encouraging signs of improvement.

* * *

***Using the swamp analogy I've referenced over the past several quarters, we are draining the swamp and dealing with the gators we have uncovered***. As I've reiterated numerous times, I am committed to resolving our quality issue and getting as much done in 2012 as possible. I believe the FDA understands, and I know that our employees do as well, my commitment in this respect. ***But, it is not a quick fix, it's complex, it takes time and money and there may be additional gators yet to be uncovered along the way***. That said, I know we will get through this, it's a matter of when not if, and when we do, we will be in a much stronger competitive position.

114. As CEO defendant Ball concedes, Hospira's problems are so severe and widespread that there is no assurance that can be given that they all have even been identified, let along rectified. In fact, more and more issues keep coming to light. On July 16, 2012, Hospira was forced to recall four cancer drugs. As *Reuters* reported in an article titled, "Hospira Recalls Four Cancer Drugs For Glass Particles": "Hospira Inc said it has issued a nationwide recall of four of its injectable cancer drugs because of particles embedded in the glass at the neck of the vial…. Injury could result if the solution were injected into a patient, the FDA said. Signs and symptoms might include bleeding, bruising, inflammation, itching, rash, chest pain and respiratory symptoms." On August 16, 2012, yet another drug was recalled due to an "overdose risk." And most recently, on August 26, 2012, Hospira received yet another Warning Letter, raising the possibility of an FDA Consent Order.

**The August 2012 Warning Letter**

115. On August 28, 2012, Hospira filed a Form 8-K with the SEC announcing that the Company had received yet another Warning Letter from the FDA, dated August 23, 2012 (the

"August 2012 Warning Letter"). The August 2012 Warning Letter was summarized in the Form

8-K as follows:

> On August 23, 2012, Hospira, Inc. (the "Company") received a warning letter from the U.S. Food and Drug Administration (FDA) related to an inspection of the Company's La Aurora de Heredia, Costa Rica device manufacturing facility from April 16, 2012 through April 19, 2012. The Costa Rica site manufactures most of the Company's infusion devices and sets. A copy of the FDA's warning letter is filed as Exhibit 99.1 to this Form 8-K and is incorporated herein by reference.

> The warning letter does not restrict production or shipment of the Company's products from this facility. The Company is still in the process of evaluating what corrective actions, and associated costs, are required to address the matters raised in this warning letter.

> The Company takes this matter seriously and intends to respond fully, and in a timely manner, to the FDA's warning letter. Until the violations are corrected, the Company may be subject to additional regulatory action by the FDA, including the withholding or delay of approval of applications, seizure, injunction, and/or civil monetary penalties. Any such actions could significantly disrupt our ongoing business and operations and have a material adverse impact on our financial position and operating results. There can be no assurance that the FDA will be satisfied with the Company's response.

> 116.    The August 2012 Warning Letter states in relevant part as follows:

> During an inspection of your firm located in La Aurora de Heredia, Costa Rica, on April 16, 2012, through April 19, 2012, an investigator from the United States Food and Drug Administration (FDA) determined that your firm manufactures Symbiq, Plum, Gemstar, and Lifecare PCA branded infusion pumps and intravascular administration sets. Under section 201(h) of the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. § 321(h), these products are devices because they are intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, or to affect the structure or function of the body.

> This inspection revealed that these devices are adulterated within the meaning of section 501(h) of the Act, 21 U.S.C. § 351(h), in that the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation are not in conformity with the current good manufacturing practice requirements of the Quality System regulation found at Title 21, Code of Federal Regulations (CFR), Part 820.

> We received a response from Messrs. Randall Obanda, Site Quality Director, and Pedro Castillo, Devices Serialized Plant Manager, dated May 8, 2012, concerning

our investigator's observations noted on the Form FDA 483 (FDA 483), List of Inspectional Observations, which was issued to your firm. We address this response below, in relation to each of the noted violations. These violations include, but are not limited to, the following:

1. ***Failure to identify the actions needed to correct and prevent recurrence of nonconforming product and other quality problems,*** as required by 21 CFR 820.100(a)(3).

For example, your firm initiated a recall in February 2011 due to a failure of audible alarms on Plum branded infusion pumps. A corrective action was initiated with the supplier, Projects Unlimited Incorporated (PUI), to correct defective components on the piezoelectric assembly. The original piezo alarm, Hospira part number 830-03329-005, was redesigned with new specifications and provided a new part number (830-03329-006) effective November 11, 2011. In March of 2012, your firm received multiple complaints of no audible alarms on Plum devices after the supplier corrective action was initiated.

Your firm did not respond specifically to this citation because it was not listed on the FDA 483 issued to your firm.

2. ***Failure to implement and record changes in methods and procedures needed to correct and prevent identified quality problems,*** as required by 21 CFR 820.100(a)(5). For example:

a) Your firm initiated a recall (Z-3284-2011) in September 2011 to correct an unrestricted free-flow condition on Plum branded infusion pumps. An investigation was conducted and corrective actions were implemented by Hospira to ensure that proper installation of the regulator closure (source of the failure) was completed during manufacturing. During review of the regulator closure installation, the investigator noted an obsolete instruction in procedure 502-95004-006, Mechanism Assembly Instructions PLUM A+, to insert the regulator closer with a flat-head screw driver. The corrective action for recall Z-3284-2011 calls for the regulator closer to be installed using a force gauge with an applied force of 20-25 pounds.

b) One of the corrective actions implemented for recall Z-3284-2011 was to perform a visual inspection after installation of the regulator closure. The Mechanism Assembly Instructions PLUM A+ procedure, 502-95004-006, requires a visual inspection of the assembly after installation of the regulator enclosure. ***During the observation of the regulator closure installation, the investigator noted that the visual inspection did not occur.***

The adequacy of your firm's response dated May 8, 2012, cannot be determined at this time. Your firm revised procedure 502-95004-006, Mechanism Assembly Instructions PLUM A+, to delete the instruction to install the regulator closure with a screw driver. However, no details of the consideration of a systemic

corrective action for all manufacturing procedures were provided. Your firm also provided training documentation for the visual inspection required during regulator closure installation. ***However, your firm did not provide documented evidence that the visual inspection is being performed in the manufacturing process.***

3. ***Failure to evaluate suppliers, contractors, and consultants on the basis of their ability to meet specified requirements, including quality requirements***. The evaluation shall be documented, as required by 21 CFR 820.50(a)(1).

For example:

a) Your firm initiated a recall in February 2011 due to the failure of audible alarms on Plum branded infusion pumps. The source of the failure was due to faulty components on the piezoelectric assembly. A supplier corrective action was initiated with PUI, the supplier of the piezoelectric assembly. PUI was classified as a Tier 2 supplier per Hospira's Supplier Quality Program Management document, 972-93069-002. In your firm's Supplier Evaluations Procedure, QSM.10.007, issue date August 31, 2011, Tier 2 suppliers require a For Cause Audit to identify root or probable causes of an identified issue. A Routine/Qualification Audit, performed on September 21, 2011, was the only supplier audit performed by Hospira for PUI.

The adequacy of your firm's response dated May 8, 2012, cannot be determined at this time. Your firm planned a For Cause audit of PUI; however, completion of the audit was not scheduled until June 30, 2012. Your firm also changed PUI's status from Tier 2 to Tier 1, increasing the risk-level classification, which would require an annual evaluation of the supplier. Additionally, your firm intends to conduct retrospective reviews of supplier-related adverse quality trends and reclassify all suppliers based on risk level. Your firm also indicated that it will evaluate Quality System metrics and determine if additional actions should be implemented to monitor suppliers. The Corporate Supplier Evaluation Procedure, QSM.10.007, was updated to establish performance of For Cause audits and to reclassify suppliers to Tier 1 if they have negative/significant quality trends. ***However, your firm did not address employee training on the new Supplier Evaluation procedure. Lastly, evidence of implementation of corrective actions and systemic corrective actions was not provided.***

b) Exception Report Record, PR ID: 41660, detailed a complaint of over-delivery by a Plum XLD pump. Your firm determined that the supplier, Benchmark Electronics, had installed the incorrect Y2 crystal board component, which had a frequency rating of 12 MHz instead of 16 MHz. The Y2 crystal sends signals to drive motors on the pump. In the exception report, the pump was programmed to deliver 1497 ml at a rate of 62 ml/hr. The device infused the entire dose 4 hours and 30 minutes early due to the incorrect Y2 crystal. Benchmark Electronics was classified as a Tier 2 supplier per Hospira's Supplier Quality Program Management document, 972-93069-002. In your firm's Supplier Evaluations

Procedure, QSM.10.007, issue date August 31, 2011, Tier 2 suppliers require a For Cause Audit to identify root or probable causes of an identified issue. *Hospira performed only three Routine Audits on May 9, 2011, February 20, 2009, and June 19-20, 2008, for Benchmark Electronics. There was no evidence that a For Cause Audit was conducted.*

Your firm did not respond specifically to this citation because it was not listed on the FDA 483 issued.

4. *Failure to establish adequate procedures for acceptance of incoming product*, as required by 820.80(b).

For example, your firm initiated a change to the piezo alarm, part number: 830-03329-005, due to a recall resulting from the failure of the audible alarm on the Plum branded infusion pumps. The corrective action was to implement changes to the printed circuit board and piezo alarm and have the supplier, PUI, perform Highly Accelerated Stress Surveillance (HASS) testing. *Since implementation of the corrective actions, 50 lots of the redesigned piezo alarm were received by your firm; however there was no documented inspection or testing of this critical component. Additionally, Hospira did not have any records of HASS testing results.*

The adequacy of your firm's response cannot be determined at this time. Your firm established a new requirement to include HASS testing results on the Certificates of Analysis (COA) for PUI. Your firm also indicated that it will determine if any other requirements are needed on PUI COAs. These actions are not scheduled for completion until July 30, 2012. Additionally, your firm indicated that it will assess all critical suppliers to assure compliance with COA requirements. Your firm also indicated that it will develop a process to ensure that all COAs and Certificates of Compliance are reviewed and approved prior to product acceptance and use. These actions are not scheduled for completion until August 30, 2012. *To date, no evidence of implementation of any completed corrective action or systemic corrective action was provided to FDA.*

5. *Failure to maintain device history records* (DHRs). The DHR shall include, or refer to the location of, acceptance records that demonstrate that the device is manufactured in accordance with the Device Master Record, as required by 21 CFRP 820.184(d).

For example, during the observation of the regulator closure installation for Plum A+Infusion Pump, serial numbers 4510593 and 4510594, the investigator identified that the associated DHRs did not include documentation of the visual inspection for successful installation. This observation was confirmed in a discussion with the Quality Manager of Hospira's Regulatory Compliance and Service Center. The visual inspection was identified as a corrective action for recall Z-3284-2011.

*We reviewed your firm's response and conclude that it is not adequate.* Your firm stated that local change management procedures will be revised to ensure that all necessary inspectional activities for the manufacturing process will be appropriately documented in the DHR. This activity, however, was not scheduled for completion until July 15, 2012. Additionally, your firm did not address plans for DHR training. Finally, no documentation of implemented corrective actions for Plum A+ Infusion Pump DHRs or systemic corrective actions for other infusion pump models was provided.

A follow-up inspection will be required to assure that corrections and/or corrective actions are adequate.

117.    The August 2012 Warning Letter details how, among other things, Hospira's initial responses to the FDA inspections were inadequate and that the Company has yet to make changes to correct its ongoing problems.

118.    The August 2012 Warning Letter further demonstrates that even after being apprised and having knowledge of the problems identified by the FDA concerning the Company's Costa Rica facility, as well as the two previous Warning Letters regarding the Company's other facilities, the Individual Defendants continue to fail to take appropriate steps to rectify the Company's serious internal control issues and ongoing FDA violations.

## INSIDER SELLING

119.    The Individual Defendants' knowledge of the true health of Hospira's business and the extent of the manufacturing defects and deficiencies is also shown in certain Hospira officers' and directors' sales of personally-held stock.  The Insider Selling Defendants, Werner, Begley, Kearney, Ramachandra, and Smith were privy to adverse, non-public information which they exploited for their own benefit, to the exclusion of other shareholders, by selling their Company stockholdings before the truth came to light.  While continuously making or causing the Company to make improper statements touting Hospira's purported manufacturing efficiency and positive growth, and effectively concealing the extent of remediation efforts needed to respond to

the FDA investigations, certain officers and directors sold massive amounts of Company stock in order to capitalize on the Company's inflated stock price they had helped create.[14]

120.    Hospira's susceptibility to insider trading stems from its compensation policies and lax insider trading restrictions.  Like many companies, Hospira grants incentive stock options to executives as part of its basic compensation package.  As stated in Hospira's Form DEF 14A filed on March 23, 2012, top executives are accorded annual salaries, but these are set "at or below" the median numbers paid by similar companies.  More compensation may be gained through the exercise of options issued at low strike prices, and the sale of acquired stock at higher prices, but this creates an incentive for insiders to artificially inflate the stock.  Most corporations attempt to prevent insider selling by imposing regularly scheduled "blackout periods," event-specific blackout periods, or "preclearance policies" (i.e., an insider must seek advance permission for sales from a compliance officer, who will determine if there is a peculiar risk of insider trading).  Experts in this area recommended that there be a time delay of at least one quarter between the initiation of a selling plan and actual selling, in order to prevent opportunism.

121.    In the spring of 2010, the Individual Defendants were aware that the Company had received two Warning Letters from the FDA discussing the Company's severe compliance and safety issues.  The receipt of such letters was unprecedented for Hospira — in its history as an independent Company it had never received a Warning Letter — and the Individual Defendants knew that these warnings coincided with the implementation of the aggressive Project Fuel cost-cutting program.  Instead of halting all insider sales pending an evaluation of

---

[14]    The period during which improper insider sales were made (the "Insider Selling Period") extends from the first insider sale on April 13, 2010 (a sale by defendant Smith) through the final sales on March 8, 2011 (sales by defendants Werner and Ramachandra).  This Insider Selling Period falls within the Securities Action Class Period alleged in the Federal Securities Action.

the impact of this serious situation, the Insider Selling Defendants went on a post-Warning Letter selling spree, all while touting the purported efficiencies that Project Fuel was supposed to generate. For example, CEO defendant Begley filed a "Rule 10b5-1" selling plan on June 4, 2010, scant weeks after the Company's receipt of the second Warning Letter, and soon thereafter sold over $22 million worth of stock on June 21-22, 2010, his only sales during the Relevant Period. The insider selling spree abruptly ended in March 2011, roughly six months before revelation that Project Fuel had failed, and that Hospira faced staggering remediation costs. Commentators and regulators have identified short-lived 10b5-1 plans as a potential red flag for illicit trading.

122.    As the CEO and a director of Hospira, defendant Begley was a member of the Company's management and Board. He was privy to material, non-public information about the extent of remediation efforts needed to respond to the FDA investigations. Begley was responsible for his statements in SEC financial statements, which included disclosures concerning Hospira's purported manufacturing efficiency and positive growth. Begley engaged in insider trading activity at a time when he knew adverse material, non-public information about the Company's impending costly remediation efforts.

123.    While in possession of this knowledge, defendant Begley sold 386,112 shares of his personally held Hospira stock for proceeds of $22,008,384.[15] Begley's sales were timed to maximize profit from Hospira's then artificially inflated stock price. Begley's sales are suspicious given that his stock sales represented 58.50% of his holdings as demonstrated by the chart below. Further adding to the suspicion, Begley did not sell any of his stock in the prior

---

[15] The cost basis of the shares sold by defendant Begley in June 2010 – based on the strike price of the stock options he exercised to obtain those shares – was $14,927,596.70; the total value Begley realized on the exercise of those options was $17,889,469.30.

two-and-a-half years before the wrongdoing and the resulting inflated stock price. Begley's stock sales are detailed below:

| | |
|---|---|
| Shares Sold During SP | 386,112 |
| Shares Remaining After Sales | 273,869 |
| Total Shares Before Sales | 659,981 |
| **Total Proceeds from Sales** | **$22,008,384.00** |
| **% of Total Ownership Sold During SP** | **58.50%** |

124.     As the Company's CFO and COO, defendant Kearney was a member of Company management. He was privy to material, non-public information about the extent of remediation efforts needed to respond to the FDA investigations. Kearney engaged in insider trading activity at a time when he knew adverse material, non-public information about the Company's impending costly remediation efforts.

125.     While in possession of this knowledge, defendant Kearney sold 300,640 shares of his personally held Hospira stock for proceeds of $17,197,411.42.[16] Kearney's sales were timed to maximize profit from Hospira's then artificially inflated stock price. Kearney's sales are suspicious given that his stock sales represented 85.44% of his holdings as demonstrated by the chart below. Further adding to the suspicion, Kearney only sold 11% of his stock in the prior

---

[16] The cost basis of the shares sold by defendant Kearney in November 2009 – based on the strike price of the stock options he exercised to obtain those shares – was $99,907.80; the total value Kearney realized on the exercise of those options was $5,018.20. The cost basis of the shares sold by Kearney in September 2010 – based on the strike price of the stock options he exercised to obtain those shares – was $3,523,116.57; the total value Kearney realized on the exercise of those options was $4,234,412.43. The cost basis of the shares sold by Kearney in October 2010 – based on the strike price of the stock options he exercised to obtain those shares – was $4,142,333.90; the total value Kearney realized on the exercise of those options was $730,389.17. The cost basis of 70,000 shares sold by Kearney in December 2010 – based on the strike price of the stock options he exercised to obtain those shares – was $2,272,900; the total value Kearney realized on the exercise of those options was $1,717,100. Kearney sold approximately 110,000 additional shares in December 2010, but the cost basis for those shares is not publicly available.

two-and-a-half years before the wrongdoing and the resulting inflated stock price. Kearney's stock sales are detailed below:

| | |
|---|---|
| Shares Sold During SP | 300,640 |
| Shares Remaining After Sales | 51,228 |
| Total Shares Before Sales | 351,868 |
| **Total Proceeds from Sales** | **$17,197,411.42** |
| **% of Total Ownership Sold During SP** | **85.44%** |

126. As the Chief Scientific Officer and Senior Vice President, defendant Ramachandra was a member of Company management. He was privy to material, non-public information about the extent of remediation efforts needed to respond to the FDA investigations. Ramachandra engaged in insider trading activity at a time when he knew adverse material, non-public information about the Company's impending costly remediation efforts.

127. While in possession of this knowledge, defendant Ramachandra sold 99,462 shares of his personally held Hospira stock for proceeds of $5,334,912.92.[17] Ramachandra's sales were timed to maximize profit from Hospira's then artificially inflated stock price. Ramachandra's sales are suspicious given that his stock sales represented 91.66% of his holdings as demonstrated by the chart below. Further adding to the suspicion, Ramachandra did not sell any of his stock in the prior two-and-a-half-years before the wrongdoing and the resulting inflated stock price. Ramachandra's stock sales are detailed below:

| | |
|---|---|
| Shares Sold During SP | 99,462 |
| Shares Remaining After Sales | 9,053 |
| Total Shares Before Sales | 108,515 |
| **Total Proceeds from Sales** | **$5,334,912.92** |
| **% of Total Ownership Sold During SP** | **91.66%** |

---

[17] The cost basis of 79,433 shares sold by defendant Ramachandra in March 2011 – based on the strike price of the stock options he exercised to obtain those shares – was $1,759,440.95; the total value Ramachandra realized on the exercise of those options was $2,501,162.47. Ramachandra sold approximately 20,029 additional shares in March 2011, but the cost basis for those shares is not publicly available.

128.    As the CFO, defendant Werner was a member of Company management.  He was privy to material, non-public information about the extent of remediation efforts needed to respond to the FDA investigations.  Werner was responsible for his statements in SEC financial statements, which included disclosures concerning Hospira's purported manufacturing efficiency and positive growth.  Werner engaged in insider trading activity at a time when he knew adverse material, non-public information about the Company's impending costly remediation efforts.

129.    While in possession of this knowledge, defendant Werner sold 85,849 shares of his personally held Hospira stock for proceeds of $4,901,269.76.[18]  Werner's sales were timed to maximize profit from Hospira's then artificially inflated stock price.  Werner's sales are suspicious given that his stock sales represented 86.66% of his holdings as demonstrated by the chart below.  Further adding to the suspicion, Werner did not sell any of his stock in the prior two and a half years before the wrongdoing and the resulting inflated stock price.  Werner's sales are detailed below:

| | |
|---|---|
| Shares Sold During SP | 85,849 |
| Shares Remaining After Sales | 13,216 |
| Total Shares Before Sales | 99,065 |
| **Total Proceeds from Sales** | **$4,901,269.76** |
| **% of Total Ownership Sold During SP** | **86.66%** |

130.    As the Company's General Counsel, defendant Smith was privy to material, non-public information about the extent of remediation efforts needed to respond to the FDA

---

[18] The cost basis of the shares sold by defendant Werner in June 2009 – based on the strike price of the stock options he exercised to obtain those shares – was $659,715.60; the total value Werner realized on the exercise of those options was $1,001,692.81.  The cost basis of the shares sold by Werner in September 2010 – based on the strike price of the stock options he exercised to obtain those shares – was $381,300; the total value Werner realized on the exercise of those options was $171,700.  The cost basis of the shares sold by Werner in November 2010 – based on the strike price of the stock options he exercised to obtain those shares – was $1,598,800; the total value Werner realized on the exercise of those options was $781,000.  Werner also sold approximately 15,181 shares in March 2011, but the cost basis for those shares is not publicly available.

investigations. Smith engaged in insider trading activity at a time when he knew adverse material, non-public information about the Company's impending costly remediation efforts.

131. While in possession of this knowledge, Defendant Smith sold 80,000 shares of his personally held Hospira stock for proceeds of $4.6 million.[19] Smith's sales were timed to maximize profit from Hospira's then artificially inflated stock price. Smith's sales are suspicious given that his stock sales represented 68.82% of his holdings as demonstrated by the chart below. Further adding to the suspicion, Smith did not sell any of his stock in the prior two-and-a-half years before the wrongdoing and the resulting inflated stock price. Smith's sales are detailed below:

| | |
|---|---:|
| Shares Sold During SP | 80,000 |
| Shares Remaining After Sales | 36,248 |
| Total Shares Before Sales | 116,248 |
| Total Proceeds from Sales | $4,600,000.00 |
| % of Total Ownership Sold During SP | 68.82% |

132. Defendants Werner, Begley, Kearney, Ramachandra, and Smith combined, sold over $55 million worth of their Company stock from the time the first improper statement was made by the Individual Defendants on March 24, 2009 to October 17, 2011, when the truth was fully revealed. The following is a table showing the total insider sales that occurred during the Insider Selling Period:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| BEGLEY | 6/21/2010 | 26,200 | $57.00 | $1,493,400.00 |
| | 6/22/2010 | 359,912 | $57.00 | $20,514,984.00 |
| | | **386,112** | | **$22,008,384.00** |
| | | | | |
| KEARNEY | 9/27/2010 | 91,334 | $57.00 | $5,206,038.00 |

---

[19] The cost basis of the shares sold by defendant Smith in April 2010 – based on the strike price of the stock options he exercised to obtain those shares – was $2,120,000; the total value Smith realized on the exercise of those options was $2,480,000.

| | | | | |
|---|---|---|---|---|
| | 10/21/2010 | 29,306 | $59.00 | $1,729,054.00 |
| | 12/15/2010 | 70,000 | $57.00 | $3,990,000.00 |
| | 12/15/2010 | 35,357 | $57.07 | $2,017,668.42 |
| | 12/16/2010 | 74,643 | $57.00 | $4,254,651.00 |
| | | **300,640** | | **$17,197,411.42** |
| | | | | |
| **RAMACHANDRA** | 3/8/2011 | 79,433 | $53.64 | $4,260,603.42 |
| | 3/8/2011 | 20,029 | $53.64 | $1,074,309.49 |
| | | **99,462** | | **$5,334,912.92** |
| | | | | |
| **SMITH** | 4/13/2010 | 80,000 | $57.50 | $4,600,000.00 |
| | | **80,000** | | **$4,600,000.00** |
| | | | | |
| **WERNER** | 6/16/2010 | 14,853 | $55.79 | $828,669.66 |
| | 6/16/2010 | 6,431 | $55.75 | $358,523.75 |
| | 9/15/2010 | 9,384 | $55.30 | $518,935.20 |
| | 11/2/2010 | 40,000 | $59.50 | $2,379,800.00 |
| | 3/8/2011 | 15,181 | $53.71 | $815,341.15 |
| | | **85,849** | | **$4,901,269.76** |
| | | | | |
| **TOTAL** | | **985,019** | | **$54,041,978.10** |

133.     While defendants Werner, Begley, Kearney, Ramachandra, and Smith sold their personally-held Company stock pursuant to 10b5-1 plans, these plans were adopted after the misconduct had already begun.  As such, Werner, Begley, Kearney, Ramachandra, and Smith knew that Hospira's stock was artificially inflated due to their improper statements when adopting the 10b5-1 plans and cannot avail themselves of any inference that they did not trade on the adverse material, non-public information.

134.     The insider selling coincided with the inflation in quarterly net operating income created by Project Fuel.  The effects of Project Fuel on operating profits (in millions) are shown below:

| Quarterly Net Operating Income by Year | | | | | |
|---|---|---|---|---|---|
| YEAR | Q1 | Q2 | Q3 | Q4 | TOTAL |
| 2008 | $145 | $152 | $162 | $188 | $647 |
| 2009 | $150 | $177 | $207 | $204 | $738 |
| 2010 | $240 | $213 | $189 | $142 | $864 |
| 2011 | $203 | $212 | $142 | $111 | $668 |

135.   Astoundingly, as late as the March 9, 2012 Proxy Statement, the Board asserted that Hospira's compensation policies, which allow for short bursts of unrestrained selling during periods of uncertainty, "do not encourage excessive risk taking and, thus, do not create risks that are reasonably likely to have a material adverse effect on the company."  It is unclear how the Board could credibly assert this in light of the Project Fuel debacle, and its attendant insider selling.  Tellingly, the Board has not announced the adoption of any policy which allows for a recoupment or "clawback" of profits made through insider sales, even if such sales were tainted by fraud.

**THE IMPROPER REPURCHASES**

136.   While the Individual Defendants authorized improper statements that had the effect of inflating the Company stock, defendants Begley, Ball, Staley, Bailey, Curran, Sokolov, Hale, Wheeler, Bowles and von Prondzynski authorized and implemented multiple repurchases of the Company's stock at these artificially inflated rates.  Despite knowingly or recklessly disregarding the fact that the value of the Company was inflated due to false, misleading, and improper statements regarding the Company's health and remediation efforts, these defendants either directed or permitted the Company to materially overpay for its own stock through the repurchases detailed herein.

137.    From August 2010 to September 2011, the Board caused the Company to repurchase approximately 5,472,028 shares of stock at a staggering aggregate cost to the Company of over $300 million.  Under defendants Begley, Ball, Staley, Bailey, Curran, Sokolov, Hale, Wheeler, Bowles and von Prondzynski's purview, the Company bought back its shares at a weighted average price of $55.19.   Tellingly, the weighted average repurchase price was substantially higher than Hospira's share price of $29.51 when the truth about the production slowdown caused by the FDA investigations, and the attendant costs and expense, was fully revealed on October 18, 2011.  The following chart illustrates the average prices paid for the Company's common stock during the repurchase period:

| Date of Board Authorization Repurchase Program | Type of Program | Authorized Amount of Repurchase | Period | Repurchased Shares[†] | Average Price Per Share | Weighted Average Calculation | Approximate Aggregate Cost | Source | File Date |
|---|---|---|---|---|---|---|---|---|---|
| February 28, 2006 | Repurchase | $400 million | | | | | | | |
| | | | August 2010 | 725,058 | $51.70 | $6.85 | $37,485,499 | 10-Q | 10/26/2010 |
| | | | September 2010 | - | - | - | - | 10-Q | 10/26/2010 |
| | | | October 2010 | - | - | - | - | 10-K | 2/16/2011 |
| | | | November 2010 | 169,344 | $58.55 | $1.81 | $9,915,091 | 10-K | 2/16/2011 |
| | | | December 2010 | 680,704 | $56.92 | $7.08 | $38,745,672 | 10-K | 2/16/2011 |
| | | | January 2011 | - | - | - | - | 10-Q | 4/26/2011 |
| | | | February 2011 | 220,931 | $54.28 | $2.19 | $11,992,135 | 10-Q | 4/26/2011 |
| | | | March 2011 | - | - | - | - | 10-Q | 4/26/2011 |
| April 25, 2011 | Repurchase | $1 billion | No Expiration Date | | | | | | |
| | | | April 2011 | 1,322,052 | $56.73 | $13.71 | $75,000,010 | 10-Q | 7/27/2011 |
| | | | May 2011 | 1,364,035 | $54.99 | $13.71 | $75,008,285 | 10-Q | 7/27/2011 |
| | | | June 2011 | 504,562 | $54.75 | $5.05 | $27,624,770 | 10-Q | 7/27/2011 |
| | | | July 2011 | 485,342 | $54.07 | $4.80 | $26,242,442 | 10-Q | 10/26/2011 |
| | | | August 2011 | - | - | - | - | 10-Q | 10/26/2011 |
| | | | September 2011 | - | - | - | - | 10-Q | 10/26/2011 |
| | | Total: | | 5,472,028 | | $55.19 | $302,013,902 | | |

138.    The repurchases were suspiciously timed shortly before the Insider Selling Defendants unloaded their own personally held Hospira stock into the market.  The repurchases had the effect of boosting the price of Hospira stock just in time for the Insider Selling Defendants to capitalize on their artificially inflated stock.

## DAMAGES TO HOSPIRA CAUSED BY THE INDIVIDUAL DEFENDANTS

139. As a result of the Individual Defendants' mismanagement and improprieties, Hospira engaged in inadequate manufacturing practices and was forced to deceive the market in order to protect the Individual Defendants who caused the Company harm in the first place. As a direct and proximate result of the Individual Defendants' actions, Hospira has expended and will continue to expend significant sums of money which include, but are not limited to:

(a) costs incurred in defending itself in the Federal Securities Action filed in the United States District Court for the Northern District of Illinois;

(b) costs incurred in cooperating and responding to the FDA investigations;

(c) financial losses from certain of Hospira's products not being produced due to the Company's obligations to remediate the flaws in its manufacturing practices;

(d) costs incurred from repurchasing over $300 million worth of artificially inflated stock; and

(e) costs incurred from compensation and benefits paid to the defendants who have breached their duties to the Company.

140. Hospira's business, and its goodwill and reputation have been severely damaged by the Company's scheme to conceal the truth about its financial health and business prospects. For at least the foreseeable future, Hospira will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the public, such that Hospira's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

141. Plaintiffs bring this action derivatively in the right and for the benefit of Hospira to redress injuries suffered, and to be suffered, by Hospira as a direct result of violations of the

securities laws, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment by the Individual Defendants. Hospira is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

142. Plaintiffs will fairly and adequately represent the interests of Hospira in enforcing and prosecuting its rights, and have retained competent counsel experienced in this type of litigation to prosecute this action.

143. Plaintiffs were shareholders of Hospira at the time of the wrongdoing complained of, have continuously been shareholders since that time, and are current Hospira shareholders.

144. The current Board of Hospira consists of the following eleven individuals: defendants Ball, Staley, Bailey, Curran, Wheeler, Sokolov, Bowles, Hale, von Prondzynski, and non-defendants William G. Dempsey ("Dempsey") and Dennis M. Fenton. Plaintiffs have not made any demand on the Board because such a demand would be a futile and useless act, particularly for the reasons stated below.

**Demand Is Excused Because the Board's Conduct Is Not a Valid Exercise of Business Judgment**

145. The Director Defendants knew that the existence of quality controls and systems to ensure legal compliance were crucial. Investors would not trust a company that did not have such controls in place. Indeed, in Hospira's annual report on Form 10-K filed on February 25, 2009 (just prior to the announcement of Project Fuel), the Company and its Board affirmatively assured the investing public that:

> Hospira has developed and implemented **quality systems** and concepts throughout its organization. Hospira is actively involved in setting quality policies and managing internal and external quality performance. Its **quality assurance department provides quality leadership and supervises its quality systems**. An **active audit program**, utilizing both internal and external auditors, monitors compliance with applicable regulations, standards and internal policies.

* * *

> Hospira believes that it is in material compliance with applicable laws and regulations, including those described below.

146.    As shown above in great detail, Hospira and its directors lacked a basis to state that Hospira was "in material compliance with applicable laws and regulations," or that it had "quality systems" and an "active audit program."  Indeed, Hospira was not even doing particulate testing on a scheduled basis; was manufacturing adulterated product; and had failed to document measures needed to ensure legal compliance.  Further, the Board failed to ensure that the Company conducted a sufficient review of its quality control systems, and whether these systems were adequate given Project Fuel's severe cost-cutting initiatives, and therefore had no reason to believe that these statements were true.  And by no later than 2009, when the FDA began its investigation and issued its August 2009 Warning Letter, the Director Defendants had every reason to know these statements were false.  Additional evidence that these statements were false, if any were needed, was provided by the April 2010 Warning Letter.  Nonetheless, the Board: (i) adopted Project Fuel without sufficient information; (ii) consciously disregarded their fiduciary obligations and stubbornly pressed ahead with Project Fuel despite red flags of its adverse effect on legal compliance and adverse effect on public health and safety; and (iii) made or caused the Company to make misleading public statements that concealed the true nature and extent of the compliance issues or, at best, consciously disregarded whether the public statements made were true or false.

147.    A director is **not** reasonably exercising business judgment and acts recklessly and in bad faith when the director:  knowingly makes a harmful decision; consciously makes decisions based on partial or incomplete information where such information could be obtained with reasonable time and effort; or makes a decision or adopts a plan and refuses to reverse it

once it becomes known to the director that: (i) the decision was a wrong one that is harming the Company, or (ii) alternatively, that the decision or plan was reasonable when adopted, but has since become harmful due to changed circumstances or newly-discovered facts, and (due to these factors) the directors knew the decision or plan should have been reversed.

148.     Here, the Director Defendants acted recklessly and in bad faith with regard to the adoption of Project Fuel, and in continuing to pursue Project Fuel once Hospira's severe compliance issues were identified by the FDA in its Warning Letters, and made known to them. It had become clear that Project Fuel and compliance with the law were in "conflict," a conflict which the directors recklessly allowed.  As one Hospira executive, Senior Vice President of Operations Hardy, frankly conceded in September 2011:

> ***We're trying to drive remediation at the same time we're trying to drive very robust cost-savings programs. And we found those things competing with each other***.

149.     Very robust cost savings operations may be needed at times but here: (i) no financial emergency required the Board to adopt Project Fuel when it did; and (ii) no time deadline prevented the Board from fully assessing the Company's quality controls and legal compliance prior to implementing Project Fuel and the affect such budget slashing would have on legal compliance and public safety.  The Board knew, even when adopting Project Fuel, that it was acting without all the necessary facts.  Despite Project Fuel's cost-cutting initiatives, no sufficient independent review of the Company's controls over product quality and safety or legal compliance had been done prior to the implementation of Project Fuel, or during the Relevant Period, as is evident from the extensive remediation efforts the Company has been forced to endure, including the hiring of more than 150 consultants to assist with remediation efforts.

150.	Rather than fulfilling their fiduciary duties, the Director Defendants made a conscious decision to allow the Company and its various manufacturing facilities to violate FDA regulations.

151.	The Director Defendants were aware, since at least the April 2009 FDA investigation, and because of the Warning Letters, that, among other things:  (i) there was adulteration in the facilities that produced the Company's infusion pumps and that this adulteration, in the form of steel filings, could cause embolisms or immune diseases in patients using these infusion products; (ii) there was adulteration in the replacement of AC power cords used by certain of the infusion products, particularly in the Morgan Hill facility; (iii) the appropriate measures were not taken to update the Company's risk assessment in light of reports of injuries from the adulterated power cords; (iv) the processes for the manufacture, packing, storage, and installation of certain of the Company's infusion pumps (including the Plum Family and Symbiq lines) did not comport with and violated then CGMP requirements of the Quality System regulation at Title 21, Code of Federal Regulations, Part 820; (v) appropriate steps were not taken in response to the FDA's warnings, which placed the Company in the position of potentially being fined, penalized, or enjoined, and jeopardized the Company's applications for Class III devices; (vi) the Clayton facility failed to maintain adequate written internal controls over Liposyn, Propofol, and Clevipex emulsion products, and certain lots of these drugs were seriously contaminated; (vii) the FDA did not believe that the Company had uncovered the root cause of this adulteration; (viii) the Clayton facility lacked quality controls since at least April 2009, and efforts to remedy these problems were insufficient; (ix) an adequate investigation was not conducted to determine whether any batches of Liposyn, Propofol or Clevipex were adulterated and failed to provide the FDA with certain required revised procedures; (x) the

Company's Rocky Mount facility suffered from similar quality control deficiencies, including a lack of written procedures; (xi) the Company's Rocky Mount and Clayton facilities had failed to adopt procedures which would provide a sufficiently high degree of assurance that the process used to produce the Company's heparin lock flush solutions were sufficient; and (xii) the Company failed to sufficiently track and report adverse events with regard to the heparin lock flush.

152. The Director Defendants were also aware that their efforts to implement global corrective actions in response to past regulatory actions by the FDA were inadequate, including failing to undertake a comprehensive evaluation of global manufacturing operations to ensure compliance with Good Manufacturing Practices and Quality System regulations, despite repeated warnings by the FDA.

153. In the face of this knowledge, however, the Director Defendants, among other things: (i) failed to ensure that the Company manufactured safe, quality drugs with integrity; (ii) consciously disregarded the systematic and sustained FDA violations occurring in at least three of its facilities, including one of its main facilities at Rocky Mount; and (iii) failed to undertake appropriate steps to remedy the Company's severe quality control deficiencies. Even worse, instead of actively trying to solve the problems that they had a duty to avoid in the first place, the Individual Defendants caused the Company to issue improper statements regarding the Company's health and remediation efforts. Then, despite the fact that the Director Defendants knew the value of the Company was inflated due to these improper statements, they authorized the repurchase of 5.4 million shares from August 2010 through September 2011 at a cost of over $300 million to the Company. These actions were in conscious disregard of the Director

Defendants' duties and responsibilities and were not the product of the valid exercise of business judgment.

154.    Had the Board acted rationally and with reasonable business judgment, it would have abandoned or severely curtailed Project Fuel in response to repeated red flags and the Company's systematic and sustained violations of FDA regulations.    For instance, the April 2010 Warning Letter's message was, in essence: *your systems have broken down; they broke down even prior to Project Fuel; you have no plan in place to fix them; public health and safety are in danger; written protocols do not exist; and complete and immediate action is required*.  These warnings would have been treated by any Board, acting in good faith, as an emergency situation, requiring the highest level of attention.

155.    Because the Board's decisions were not reasonable and rational, and were not taken on a fully informed basis, they are not protected under the business judgment rule and demand is accordingly futile.

**Demand Is Excused Because the Director Defendants Face a Substantial Likelihood of Liability for Their Misconduct**

156.    As alleged above, the Director Defendants breached their fiduciary duties of loyalty by:  (i) failing to ensure that the Company took adequate steps to rectify its violations of FDA regulations and Good Manufacturing Standards, in light of repeated red flags and the Company's systematic and sustained violations of FDA regulations over the course of over two years; (ii) making improper statements concerning the Company's health and remediation efforts in financial statements; (iii) failing to provide adequate internal and quality controls over the Company's manufacturing practices; (iv) concealing the consequences of their mismanagement, the true extent of the FDA's investigation, and the remediation necessary to bring Hospira's business up to CGMP standards; (v) selling their personally held Hospira stock on the basis of

non–public information; and (vi) authorizing the Company's repurchase of hundreds of millions of dollars' worth of Hospira stock at artificially inflated prices. The following is a summary of certain current directors' positions and the duties they failed to meet, exposing each of them to a substantial likelihood of liability:

(a) ***Defendant Ball*** made improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in multiple quarterly statements, including those filed on April 26, 2011 and July 27, 2011. Ball is on the Science, Technology and Quality Committee and has been since March 2011, and thus is subject to the Science, Technology and Quality Committee Charter. Importantly, Ball is responsible for reviewing "the Company's overall quality strategy and internal quality processes; … the results of, and responses to, product quality and quality system assessments by the Company and external regulators (including the [FDA] and other national and international regulatory bodies); and … important product quality issues and field actions." Ball either knew or was reckless in not knowing of the true nature and extent of the FDA's investigation over the Company's manufacturing deficiencies when he made improper statements downplaying the Company's remediation efforts in public filings. The Science, Technology and Quality Committee's Charter also requires its members to ensure the Company's "product quality and safety." The production breakdowns show a lack of internal controls by this committee and Ball, and as such, Ball faces a substantial likelihood of liability for his breach of fiduciary duty.

(b) ***Defendant Staley*** made improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in the Company's 2009 and 2010 Forms 10-K. Staley was a member of the Board when Hospira received both of its FDA Warning Letters, including the April 2010 Warning Letter apprising him of the previously

mentioned inadequate internal controls.  Staley is on the Science, Technology and Quality Committee and has been since March 2011, and thus is subject to the Science, Technology and Quality Committee Charter.  Importantly, Staley is responsible for reviewing "the Company's overall quality strategy and internal quality processes; … the results of, and responses to, product quality and quality system assessments by the Company and external regulators (including the [FDA] and other national and international regulatory bodies); and … important product quality issues and field actions."  Staley either knew or was reckless in not knowing of the true nature and extent of the FDA's investigation over the Company's manufacturing deficiencies when he made improper statements downplaying the Company's remediation efforts in public filings.  The Science, Technology and Quality Committee's Charter also requires its members to ensure the Company's "product quality and safety."  The production breakdowns show a lack of internal controls by this committee and Staley, and as such, Staley faces a substantial likelihood of liability for his breach of fiduciary duty.  Staley was a member of Hospira's Audit Committee from at least March 2008 to March 2011 and was Chairman of that committee from at least March 2008 to at least March 2010.  As a member of the Audit Committee, Staley had additional and heightened responsibility under its Charter to review "the integrity of the Company's financial statements" and "the Company's compliance with legal and regulatory requirements." Thus, Staley violated the Audit Committee's Charter by knowingly, recklessly, or in conscious disregard of his duties reviewed and approved improper statements regarding the Company's business health and remediation efforts in response to the FDA investigation.  Accordingly, Staley breached his fiduciary duty of loyalty because he participated in the wrongdoing described herein.

(c)      ***Defendant Bailey*** made improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in the Company's 2009 and 2010 Forms 10-K. Bailey was a member of the Board when Hospira received both of its FDA Warning Letters, including the April 2010 Warning Letter apprising him of the previously mentioned inadequate internal controls. Bailey is on the Science, Technology and Quality Committee and has been since March 2011, and thus is subject to the Science, Technology and Quality Committee Charter.  Importantly, Bailey is responsible for reviewing "the Company's overall quality strategy and internal quality processes; … the results of, and responses to, product quality and quality system assessments by the Company and external regulators (including the [FDA] and other national and international regulatory bodies); and … important product quality issues and field actions." Bailey either knew or was reckless in not knowing of the true nature and extent of the FDA's investigation over the Company's manufacturing deficiencies when he made improper statements downplaying the Company's remediation efforts in public filings.  The Science, Technology and Quality Committee's Charter also requires its members to ensure the Company's "product quality and safety."  The production breakdowns show a lack of internal controls by this committee and Bailey, and as such, Bailey faces a substantial likelihood of liability for his breach of fiduciary duty. Bailey was also on the Governance and Public Policy Committee between March 2008 and March 2011, and thus was subject to its Charter.  The Governance and Public Policy Committee was required to assist the Board with "compliance and government affairs matters that affect the Company."  Bailey failed in implementing the adequate internal controls and necessary supervision to maintain the Company's manufacturing operations at CGMP standard and avoid manufacturing flaws.

(d)     *Defendant Curran* made improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in the Company's 2009 and 2010 Forms 10-K. Curran was a member of the Board when Hospira received both of its FDA Warning Letters, including the April 2010 Warning Letter apprising her of the previously mentioned inadequate internal controls.  Curran is on the Science, Technology and Quality Committee and has been since March 2008, and thus is subject to the Science, Technology and Quality Committee Charter.  Importantly, Curran is responsible for reviewing "the Company's overall quality strategy and internal quality processes; … the results of, and responses to, product quality and quality system assessments by the Company and external regulators (including the [FDA] and other national and international regulatory bodies); and … important product quality issues field actions." Curran either knew or was reckless in not knowing of the true nature and extent of the FDA's investigation over the Company's manufacturing deficiencies when she made improper statements downplaying the Company's remediation efforts in public filings.  The Science, Technology and Quality Committee's Charter also requires its members to ensure the Company's "product quality and safety."  The production breakdowns show a lack of internal controls by this committee and Curran, and as such, Curran faces a substantial likelihood of liability for her breach of fiduciary duty.  Curran was also on the Audit Committee from at least March 2008 to at least March 2011.  As a member of the Audit Committee, Curran had additional and heightened responsibility under its Charter to review "the integrity of the Company's financial statements" and "the Company's compliance with legal and regulatory requirements."  Thus, Curran violated the Audit Committee Charter by knowingly, recklessly, or in conscious disregard of her duties reviewed and approved improper statements regarding the Company's business health and remediation efforts in response to the FDA investigation.

Accordingly, Curran breached her fiduciary duty of loyalty because she participated in the wrongdoing described herein. Curran is also Chair of the Governance and Public Policy Committee and has been since March 2008. The Governance and Public Policy Committee is required to assist the Board with "compliance and government affairs matters that affect the Company." Curran failed in implementing the adequate internal controls and necessary supervision to maintain the Company's manufacturing operations at CGMP standard and avoid manufacturing flaws.

(e)     ***Defendant Wheeler*** made improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in the Company's 2009 and 2010 Forms 10-K. Wheeler was a member of the Board when Hospira received both of its FDA Warning Letters, including the April 2010 Warning Letter apprising him of the previously mentioned inadequate internal controls. Wheeler is Chairman of Hospira's Science, Technology and Quality Committee and has been since at least March 2011 and a member of that committee and has been since at least March 2008, and thus is subject to the Science, Technology and Quality Committee Charter. Importantly, Wheeler is responsible for reviewing "the Company's overall quality strategy and internal quality processes; … the results of, and responses to, product quality and quality system assessments by the Company and external regulators (including the [FDA] and other national and international regulatory bodies); and … important product quality issues and field actions." Wheeler either knew or was reckless in not knowing of the true nature and extent of the FDA's investigation over the Company's manufacturing deficiencies when he made improper statements downplaying the Company's remediation efforts in public filings. The Science, Technology and Quality Committee's Charter also requires its members to ensure the Company's "product quality and safety." The production breakdowns show a lack of internal

controls by this committee and Wheeler, and as such, Wheeler faces a substantial likelihood of liability for his breach of fiduciary duty. Wheeler is also on the Audit Committee and has been since March 2008, and thus is subject to its Charter. As a member of the Audit Committee, Wheeler had additional and heightened responsibility under its Charter to review "the integrity of the Company's financial statements" and "the Company's compliance with legal and regulatory requirements." Thus, Wheeler violated the Audit Committee's Charter by knowingly or in conscious disregard of his duties reviewed and approved improper statements regarding the Company's business health and remediation efforts in response to the FDA investigation. Accordingly, Wheeler breached his fiduciary duty of loyalty because he participated in the wrongdoing described herein.

(f) *Defendant Sokolov* made improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in the Company's 2009 and 2010 Forms 10-K. Sokolov was a member of the Board when Hospira received both of its FDA Warning Letters, including the April 2010 Warning Letter apprising him of the previously mentioned inadequate internal controls. Sokolov is on the Science, Technology and Quality Committee and has been since March 2008 and was Chairman of that committee from at least March 2008 to at least March 2010, and thus is subject to the Science, Technology and Quality Committee Charter. Importantly, Sokolov is responsible for reviewing "the Company's overall quality strategy and internal quality processes; … the results of, and responses to, product quality and quality system assessments by the Company and external regulators (including the [FDA] and other national and international regulatory bodies); and … important product quality issues and field actions." Sokolov either knew or was reckless in not knowing of the true nature and extent of the FDA's investigation over the Company's manufacturing deficiencies when he made

improper statements downplaying the Company's remediation efforts in public filings. The Science, Technology and Quality Committee's Charter also requires its members to ensure the Company's "product quality and safety." The production breakdowns show a lack of internal controls by this committee and Sokolov, and as such, Sokolov faces a substantial likelihood of liability for his breach of fiduciary duty.

(g)     ***Defendant Bowles*** made improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in the Company's 2009 and 2010 Forms 10-K. Bowles was a member of the Board when Hospira received both of its FDA Warning Letters, including the April 2010 Warning Letter apprising her of the previously mentioned inadequate internal controls. Bowles is on the Science, Technology and Quality Committee and has been since March 2011, and thus is subject to the Science, Technology and Quality Committee Charter. Importantly, Bowles is responsible for reviewing "the Company's overall quality strategy and internal quality processes; … the results of, and responses to, product quality and quality system assessments by the Company and external regulators (including the [FDA] and other national and international regulatory bodies); and … important product quality issues and field actions." Bowles either knew or was reckless in not knowing of the true nature and extent of the FDA's investigation over the Company's manufacturing deficiencies when she made improper statements downplaying the Company's remediation efforts in public filings. The Science, Technology and Quality Committee's Charter also requires its members to ensure the Company's "product quality and safety." The production breakdowns show a lack of internal controls by this committee and Bowles, and as such, Bowles faces a substantial likelihood of liability for her breach of fiduciary duty. Bowles is also Chair of Hospira's Audit Committee and has been since at least March 2011 and a member of that committee since at least March 2009.

As a member of the Audit Committee, Bowles has additional and heightened responsibility under its Charter to review "the integrity of the Company's financial statements" and "the Company's compliance with legal and regulatory requirements." Thus, Bowles violated the Audit Committee Charter by knowingly, recklessly, or in conscious disregard of her duties reviewed and approved improper statements regarding the Company's business health and remediation efforts in response to the FDA investigation. Accordingly, Bowles breached her fiduciary duty of loyalty because she participated in the wrongdoing described herein. Bowles is also on the Governance and Public Policy Committee and has been since March 2011, and thus is subject to its Charter. The Governance and Public Policy Committee is required to assist the Board with "compliance and government affairs matters that affect the Company." Bowles failed in implementing the adequate internal controls and necessary supervision to maintain the Company's manufacturing operations at CGMP standard and avoid manufacturing flaws.

(h)     ***Defendant Hale*** made improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in the Company's 2009 and 2010 Forms 10-K. Hale was a member of the Board when Hospira received both of its FDA Warning Letters, including the April 2010 Warning Letter apprising him of the previously mentioned inadequate internal controls. Hale is on the Science, Technology and Quality Committee and has been since March 2011, and thus is subject to the Science, Technology and Quality Committee Charter. Importantly, Hale is responsible for reviewing "the Company's overall quality strategy and internal quality processes; … the results of, and responses to, product quality and quality system assessments by the Company and external regulators (including the [FDA] and other national and international regulatory bodies); and … important product quality issues and field actions." Hale either knew or was reckless in not knowing of the true nature and

extent of the FDA's investigation over the Company's manufacturing deficiencies when he made improper statements downplaying the Company's remediation efforts in public filings. The Science, Technology and Quality Committee's Charter also requires its members to ensure the Company's "product quality and safety." The production breakdowns show a lack of internal controls by this committee and Hale, and as such, Hale faces a substantial likelihood of liability for his breach of fiduciary duty. Hale is also on the Governance and Public Policy Committee and has been since March 2008. The Governance and Public Policy Committee is required to assist the Board with "compliance and government affairs matters that affect the Company." Hale failed in implementing the adequate internal controls and necessary supervision to maintain the Company's manufacturing operations at CGMP standard and avoid manufacturing flaws.

(i)      ***Defendant von Prondzynski*** made improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in the Company's 2009 and 2010 Forms 10-K. von Prondzynski was a member of the Board when Hospira received both of its FDA Warning Letters, including the April 2010 Warning Letter apprising him of the previously mentioned inadequate internal controls. von Prondzynski is on the Science, Technology and Quality Committee and has been since March 2009, and thus is subject to the Science, Technology and Quality Committee Charter. Importantly, von Prondzynski is responsible for reviewing "the Company's overall quality strategy and internal quality processes; … the results of, and responses to, product quality and quality system assessments by the Company and external regulators (including the [FDA] and other national and international regulatory bodies); and … important product quality issues and field actions." von Prondzynski either knew or was reckless in not knowing of the true nature and extent of the FDA's investigation over the Company's manufacturing deficiencies when he made improper

statements downplaying the Company's remediation efforts in public filings. The Science, Technology and Quality Committee's Charter also requires its members to ensure the Company's "product quality and safety." The production breakdowns show a lack of internal controls by this committee and von Prondzynski, and as such, von Prondzynski faces a substantial likelihood of liability for his breach of fiduciary duty.

**Demand Is Excused Because the Director Defendants Share Material Ties and Relationships that Hinder the Independence Necessary to Prosecute Suit**

157. Director Defendants Curran and Wheeler are not independent because their interrelated business, professional, and personal relations have developed to the point that they will not act to initiate litigation against one another or against the other Individual Defendants. For instance, Curran and Wheeler have a mutual interest in not bringing suit against each other as they served concurrently on the IDX Systems Corp. board of directors from December 2002 until January 2006. Curran and Wheeler lack the independence necessary to adequately prosecute an action against each other due to their previous working relationship and mutual interest in protecting each other from substantial liability for their breach of fiduciary duties.

158. Similarly, defendant Curran will not bring suit against defendant Matricaria because they served concurrently on the CardioDynamics International Corp. board of directors from May 2002 until July 2005 and on the Volcano Corp. board of directors from April 2007 until May 2011. Curran lacks the adequate independence necessary to prosecute a suit against Matricaria due to their extensive relationship prior to joining Hospira.

159. Hospira has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein. Despite the Individual Defendants having knowledge of the claims and causes of action raised by Plaintiffs, the Individual Defendants and the current Board have not filed any lawsuits against themselves or others who were responsible for the wrongful

conduct to attempt to recover for Hospira any part of the damages Hospira suffered and will suffer thereby. The Board's stubborn failure to investigate, correct, and commence legal action against those responsible for the misconduct alleged herein in the face of heavy investor scrutiny on the matter, demonstrates that the Board is hopelessly incapable of independently addressing any legitimate demand.

160.    Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the implementation of internal controls over the Company's manufacturing practices and the truth of the Company's public disclosures. Certain of the Individual Defendants' failure to maintain honest public disclosures is especially damaging not only because it was illegal but also because it was specifically against the Company's own Code. The Code states that the Company expects these individuals to "provide full, accurate, fair, timely and understandable disclosures when making public communications or in reports and documents filed with government agencies, such as the [SEC] and the [FDA]." Thus, each Individual Defendant faces a substantial likelihood of liability for the breach of fiduciary duties so any demand upon any of them is futile.

161.    Each of the Director Defendants of Hospira authorized and/or permitted the improper statements to endure and is a principal beneficiary of the wrongdoing alleged herein and thus could not fairly and fully prosecute such a suit even if such suit was instituted.

162.    Plaintiffs have not made any demand on the other shareholders of Hospira to institute this action since such demand would be a futile and useless act for at least the following reasons: (i) Hospira is a publicly held company with over 165 million shares outstanding and thousands of shareholders; (ii) making demand on such a number of shareholders would be

impossible for Plaintiffs who have no way of finding out the names, addresses, or phone numbers of shareholders; and (iii) making demand on all shareholders would force Plaintiffs to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

**(Derivatively Against Defendants Ball, Begley, and Werner for Violations of Section 10(b) of the Exchange Act Relating to the Share Repurchases)**

163.    Plaintiffs repeat and reallege all previous allegations, set forth above, as though fully set forth herein.

164.    During the Relevant Period, Class Action Individual Defendants Ball, Begley, and Werner at a minimum, knowingly and willfully made and caused the publication of misleading statements, and knowingly, willfully, and acting with scienter, caused Hospira to repurchase approximately 5,472,028 shares of its own stock at a weighted average price per share of $55.19, for a total cost to Hospira of over $300 million, when they knew that Hospira's stock price was substantially artificially inflated due to their misleading statements.

165.    These Class Action Individual Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Hospira in connection with the purchases of Hospira common stock during the Relevant Period.

166.    As a direct and proximate result of the wrongful conduct of the Class Action Individual Defendants, Hospira has and will suffer damages in connection with its Relevant Period purchases of Hospira common stock at prices that the Class Action Individual Defendants knew to be artificially inflated.

167.    But for the misconduct of the Class Action Individual Defendants, Hospira would not have repurchased its stock at artificially inflated prices.  Hospira reasonably relied on the diligence, loyalty, and good faith of the Class Action Individual Defendants in repurchasing its stock.

168.    The Class Action Individual Defendants' conduct proximately caused Hospira's loss.  Hospira's stock price fell in a series of drops following the publication of disclosures that revealed the truth about Hospira's health and the extent of its remediation efforts.  After the truth was revealed, Hospira's shares ultimately fell approximately 40%.

169.    The Class Action Individual Defendants are therefore liable to Hospira for damages in an amount to be determined at trial pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

**(Derivatively Against All Director Defendants for Violation of Section 20(a) of the Exchange Act and Against the Class Action Individual Defendants Under Sections 10(b) and 21D of the Exchange Act)**

170.    Plaintiffs repeat and reallege all previous allegations set forth above, as though fully set forth herein.

171.    The Director Defendants, as directors and as members of the Audit Committee, Science, Technology and Compliance Committee, and/or Governance and Public Policy Committee, had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public statements about Hospira and the

timing and amount of stock repurchases, and had the power and/or ability directly or indirectly to control or influence the Class Action Individual Defendants in connection with the specific corporate policies and conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

172.    Each of the Director Defendants is jointly and severally liable under section 20(a) of the Exchange Act to the same extent as the Class Action Individual Defendants for the primary violations of section 10(b) and Rule 10b-5 promulgated thereunder, as set forth herein. The Director Defendants did not act in good faith.  In addition, the Class Action Individual Defendants are liable under 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

## COUNT III

**(Against the Individual Defendants for Breach of Fiduciary Duty)**

173.    Plaintiffs repeat and reallege all previous allegations set forth above, as though fully set forth herein.

174.    As alleged in detail herein, the Individual Defendants, by reason of their positions as officers and directors of Hospira and because of their ability to control the business and corporate affairs of Hospira, owed the Company fiduciary obligations of due care, good faith, and loyalty, and were and are required to use their utmost ability to control and manage Hospira in a fair, just, honest, and equitable manner.

175.    The Individual Defendants approved Project Fuel without first obtaining an adequate independent, and comprehensive report on the state of Hospira's compliance systems, and the adverse effect Project Fuel would have on legal compliance, quality assurance, and safety.  The Individual Defendants also failed to ensure through the Relevant Period that Hospira

was in compliance with all applicable laws needed to protect the health and welfare of the public. In fact, the Individual Defendants caused the Company to continue Project Fuel, even after it became clear that Hospira was blatantly in violation of its legal obligations; did not understand the full and complete nature of all of its compliance issues; lacked appropriate written procedures needed to comply with the law; and had no idea of what remediation efforts would cost. Accordingly, the Individual Defendants breached their duty of care and loyalty to the Company.

176.    The Officer Defendants knowingly, recklessly, or with gross negligence caused or allowed the Company to engage in inadequate manufacturing practices and then made improper statements about the health of the Company and its remediation efforts.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) Hospira suffered from extensive quality control issues, which undermined both the viability of and the supposed financial savings that would be generated by Project Fuel; (ii) the extent of the Company's inability to comply with problems identified in FDA Warning Letters related to Hospira's infusion pumps, quality control deficiencies, and manufacturing weaknesses; and (iii) as a result of the foregoing, defendants' statements regarding the Company's financial performance and expected earnings were improper and lacked a reasonable basis when made.   Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

177.    The Director Defendants owed Hospira the highest duty of loyalty, and breached this duty when they made improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in the Company's 2009 and 2010 Forms 10-K.  These defendants knowingly or in conscious disregard of their duties, caused, authorized, or allowed Hospira to have inadequate manufacturing practices and attempted to cover up their mismanagement by approving improper statements about the health of the Company and its

remediation efforts. The Director Defendants knew or were reckless in not knowing that: (i) Hospira suffered from extensive quality control issues, which undermined both the viability of and the supposed financial savings that would be generated by Project Fuel; (ii) the extent of the Company's inability to comply with problems identified in FDA Warning Letters related to Hospira's infusion pumps, quality control deficiencies, and manufacturing weaknesses; and (iii) as a result of the foregoing, defendants' statements regarding the Company's financial performance and expected earnings were improper and lacked a reasonable basis when made. Accordingly, the Director Defendants breached their duty of loyalty to the Company.

178. The Science, Technology and Quality Committee Defendants breached their fiduciary duty of loyalty. Not only did they fail to implement adequate internal controls of the Company's "product quality and safety," they succeeded in concealing the extent of that mismanagement for ten financial quarters by knowingly or in conscious disregard of their duties allowing the Company to publicly disclose improper statements regarding the Company's business health and remediation efforts in response to the ongoing FDA investigation.

179. The Audit Committee Defendants breached their fiduciary duty of loyalty by knowingly or in conscious disregard of their duties allowing the Company to publicly disclose improper statements regarding the Company's business health and remediation efforts in response to the FDA investigation. As such, the Company violated various federal securities laws, including the Exchange Act. Additionally, this constituted a violation of the heightened and specialized duties of the members of the Audit Committee under its Charter.

180. The Governance and Public Policy Committee Defendants breached their fiduciary duty of loyalty by knowingly or in conscious disregard of their duties allowing the Company to publicly disclose improper statements regarding the Company's business health and

remediation efforts in response to the FDA investigation. The wrongdoing was extensive and widespread, and implicated the highest-levels of the Company's management. These defendants had heightened and specialized duties to identify and address regulatory and compliance risks present at the Company. This they did not do, as they failed to detect or prevent the continuous and pervasive misconduct for ten consecutive financial quarters. Additionally, this constituted a violation of the duties of the members of the Governance and Public Policy Committee.

181. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein. Such damages may be recovered derivatively for the benefit of Hospira.

182. Plaintiffs, on behalf of Hospira, have no adequate remedy at law.

### COUNT IV
**(Against the Individual Defendants for Breach of
Fiduciary Duty Relating to the Share Repurchases)**

183. Plaintiffs repeat and reallege all previous allegations set forth above, as though fully set forth herein.

184. An authorization by a Board to repurchase upwards of $300 million worth of stock must be made with due care, and by a Board that is thoroughly certain it is in possession of all material information regarding the Company's value.

185. The Director Defendants authorized share repurchases while fully aware, post the April 2010 Warning Letter, that Hospira was concealing adverse facts or, alternatively, that they did not have full and complete information to determine the full extent of Hospira's regulatory issues, the costs to remediate the problems sure to be uncovered, and the effects this would have on manufacturing and distribution.

186.    As a result of these actions, the Director Defendants breached their duties, caused Hospira to suffer damages, and wasted its assets.   These Defendants are accordingly liable to the Company.

187.    Plaintiffs, on behalf of Hospira, have no adequate remedy at law.

## COUNT V
### (Against Defendants Begley, Werner, Kearney, Ramachandra, and Smith for Disgorgement of Insider Trading Profits)

188.    Plaintiffs repeat and reallege all previous allegations set forth above, as though fully set forth herein.

189.    Corporate insiders, when in possession of material, non-public information, have a duty to disclose what they know, or abstain from trading.

190.    Here, following the receipt of non-public information regarding Hospira's true state of affairs, Insiders Selling Defendants Begley, Werner, Kearney, Ramachandra, and Smith seized the opportunity to sell of most of their shares at grossly inflated prices.  To the extent any such sales were made under SEC Rule 10b5-1 automatic trading plans, such plans provide no safe harbor as they were adopted in bad faith and with advance knowledge of adverse, non-public information.  Under the circumstances, these Insider Selling Defendants are not entitled to retain, and must disgorge, all trading profits to Hospira.

191.    Plaintiffs, on behalf of Hospira, have no adequate remedy at law.

## COUNT VI
### (Against the Individual Defendants for Waste of Corporate Assets)

192.    Plaintiffs repeat and reallege all previous allegations set forth above, as though fully set forth herein.

193.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in purchasing

artificially inflated Hospira stock and defending itself in the Federal Securities Action that they brought on with their improper statements. In addition, due to the Individual Defendants' mismanagement, the Company has been forced to interrupt production and dedicate it resources and attention to the FDA-mandated remediation efforts to comply with proper manufacturing practices. Finally, by failing to conduct proper supervision, the Individual Defendants have caused Hospira to waste its assets by paying improper compensation to certain of its executive officers and directors that breached their fiduciary duty.

194. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

195. Plaintiffs, on behalf of Hospira, have no adequate remedy at law.

**COUNT VII**
**(Against the Individual Defendants for Unjust Enrichment)**

196. Plaintiffs repeat and reallege all previous allegations set forth above, as though fully set forth herein.

197. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Hospira. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Hospira.

198. The Insider Selling Defendants used their knowledge of Hospira's material, non-public information to sell their personal holdings while the Company's stock was artificially inflated.

199. Plaintiffs, as shareholders and representatives of Hospira, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits,

benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

200.    Plaintiffs, on behalf of Hospira, have no adequate remedy at law.

<u>COUNT VIII</u>
**(Against the Individual Defendants for Indemnification and Contribution)**

201.    Plaintiffs repeat and reallege all previous allegations set forth above, as though fully set forth herein.

202.    The conduct of the Individual Defendants described above has exposed Hospira to significant liability under various federal and state laws by their disloyal acts.

203.    Hospira is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein.

204.    The Individual Defendants have caused Hospira to suffer substantial harm through their disloyal acts.

205.    Hospira is entitled to contribution and indemnification from the Individual Defendants in connection with all such claims that have been, are, or may be asserted against Hospira by virtue of the Class Action Individual Defendants' wrongdoing.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Declaring that the Class Action Individual Defendants are liable under section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and that the Director

Defendants are jointly and severally liable under section 20(a) of the Exchange Act, and awarding Hospira damages on these counts;

C.     Directing Hospira and the Board to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Hospira and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following proposals for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.     a provision to permit the shareholders of Hospira to nominate at least three candidates for election to the Board;

3.     a proposal to control insider sales;

4.     a proposal to ensure the establishment, maintenance, and internal controls of the Company's compliance with applicable federal and state laws and regulations concerning the manufacture of its products;

5.     a proposal to form a committee with the sole goal of assuring compliance with CGMP; and

6.     a proposal to strengthen the Company's controls over the accuracy of its public disclosures;

D.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a

constructive trust on, or otherwise restricting defendants' assets so as to assure that Plaintiffs on behalf of Hospira have an effective remedy;

E.      Awarding to Hospira restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by defendants;

F.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:  Chicago, Illinois
        September 21, 2012

**ROBBINS UMEDA LLP**

By: __/s/ George C. Aguilar_____
George C. Aguilar
Brian J. Robbins
Ashley R. Palmer
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
gaguilar@robbinsumeda.com
brobbins@robbinsumeda.com
apalmer@robbinsumeda.com

**THE PASKOWITZ LAW FIRM, P.C.**
Laurence D. Paskowitz
208 East 51st Street, Suite 380
New York, New York 10022
Telephone: (212) 685-0969
Facsimile: (212) 685-2306
lpaskowitz@pasklaw.com

**Co-Lead Counsel for Plaintiffs**

--and--

**LASKY & RIFKIND, LTD**.
Norman Rifkind
Leigh Lasky
Amelia S. Newton
351 West Hubbard Street, Suite 401
Chicago, IL  60654
Telephone: (312) 634-0057
Facsimile: (312) 634-0059
rifkind@laskyrifkind.com
newton@laskyrifkind.com

**Co-Liaison Counsel for Plaintiffs**

**Additional Counsel:**

**THEGRANTLAWFIRM, PLLC**
Lynda Grant
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone: (212) 292-4441
Facsimile: (212) 292-4442
lgrant@grantfirm.com

**ROY JACOBS & ASSOCIATES**
Roy L. Jacobs
60 East 42nd Street
46th Floor
New York, New York 10165
Telephone: (212) 867-1156
Facsimile:  (212) 504-8343
rljacobs@pipeline.com

**Additional Counsel for Plaintiff Lori
Ravenscroft Geare**

**THE LAW OFFICES OF EDWARD T.
JOYCE & ASSOCIATES, PC**
Edward T. Joyce
Rowena T. Parma
135 South LaSalle Street
Suite 2200
Chicago, IL 60603
Telephone: (312) 641-2600
Facsimile: (312) 641-0360
rparma@joycelaw.com

**Co-Liaison Counsel**

**LAW OFFICE OF ALFRED
G. YATES, JR., P.C.**
Alfred G. Yates, Jr.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone: (412) 391-5164
Facsimile: (412) 471-1033
yateslaw@aol.com

**Additional Counsel for Plaintiff Casey**

768698

## VERIFICATION

I, Lori Ravenscroft Geare, hereby declares as follows:

I am a plaintiff in the within entitled action. I have read the Consolidated Verified Shareholder Derivative Complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _Sept 21, 2012_

_____
Lori Ravenscroft Geare

## VERIFICATION

I, Robert J. Casey, II, hereby declare as follows:

I am a plaintiff in the within entitled action. I have read the Consolidated Verified Shareholder Derivative Complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _9/20/12_

_Robert J. Casey II_
ROBERT J. CASEY, II

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 21, 2012.

s/ George C. Aguilar
GEORGE C. AGUILAR

ROBBINS UMEDA LLP
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
gaguilar@robbinsumeda.com