## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| LORI RAVENSCROFT GEARE and ROBERT J. CASEY, II, Derivatively for the Benefit of HOSPIRA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> CHRISTOPHER B. BEGLEY, F. MICHAEL BALL,  THOMAS E. WERNER, IRVING W. BAILEY, II, JACQUE J. SOKOLOV, BARBARA L. BOWLES, ROGER W. HALE, JOHN C. STALEY, CONNIE R. CURRAN, HEINO VON PRONDZYNSKI, MARK F. WHEELER, TERRENCE C. KEARNEY, RONALD A. MATRICARIA, and BRIAN J. SMITH, <br><br> Defendants, <br>–and– <br><br> HOSPIRA, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No.  11-cv-09074 (JJT) <br><br><br> AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT |

**TABLE OF CONTENTS**

Page

I.     NATURE OF THE ACTION ........................................................................1

II.    JURISDICTION AND VENUE ...............................................................8

III.   THE PARTIES.........................................................................................10

      A.     Plaintiffs...........................................................................................10

      B.     Nominal Defendant.........................................................................10

      C.     Individual Defendants ....................................................................11

IV.   THE INDIVIDUAL DEFENDANTS' DUTIES ....................................26

      A.     Specific Duties in These Circumstances........................................26

      B.     Duties Prior to Initiating or Continuing a Major Cost-Cutting Project ................29

V.    SUBSTANTIVE ALLEGATIONS .......................................................32

      A.     The Individual Defendants Adopt the Reckless Project Fuel and Issue Misleading Statements ..............................................................32

      B.     The Company Receives the FDA's August 2009 Warning Letter ........................36

      C.     Notwithstanding the August 2009 Warning Letter, the Individual Defendants Continue Project Fuel ........................................38

      D.     Hospira Recalls Lyposyn and Propofol .........................................38

      E.     Bullish Statements on Project Fuel Continue Post-Recall...................................39

      F.     The FDA Issues a Second Warning Letter Repeating Many of the Observations in Its First Warning Letter ..............................................................44

      G.     Hospira Recalls Liposyn and Propofol for the Second Time ...............................50

      H.     The Individual Defendants Continue Project Fuel Despite Two Warning Letters and Ongoing Remediation Efforts ...........................................53

      I.     Hospira's Facilities and Touted Corrections Are Shown Not to Be as Represented..........................................................................................64

VI.   DISCLOSURE OF THE TRUTH........................................................76

VII.    SUBSEQUENT REVELATIONS AND DEVELOPMENTS ........................................... 86

       A.     The August 2012 Warning Letter ....................................................... 100

       B.     Hold on Shipments out of Costa Rica Facility .................................... 103

       C.     Regulatory Issues at Rocky Mount Continue ...................................... 106

       D.     Numerous Product Recalls .................................................................. 111

VIII.   INSIDER SELLING ..................................................................................... 111

IX.     THE IMPROPER REPURCHASES ............................................................. 118

X.      DAMAGES TO HOSPIRA CAUSED BY THE INDIVIDUAL DEFENDANTS ......... 120

XI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ..................................... 121

       A.     Demand Is Excused as to the Causes of Action Based on the Decisions to Approve Project Fuel and Continue It Because the Board's Decisions Were Uninformed, Irrational, Did Not Reflect a Valid Exercise of Business Judgment, and Present a Substantial Risk of Liability ......................... 122

       B.     Particular Actions of Each of the Individual Director Defendants Supporting Demand Futility ............................................................... 131

XII.   FURTHER DUTIES OWED BY THE INDIVIDUAL DEFENDANTS ....................... 141

       COUNT I .................................................................................................... 144

       COUNT II ................................................................................................... 145

       COUNT III .................................................................................................. 146

       COUNT IV .................................................................................................. 149

       COUNT V ................................................................................................... 150

       COUNT VI .................................................................................................. 150

       COUNT VII ................................................................................................. 151

       COUNT VIII ................................................................................................ 152

XIII.  PRAYER FOR RELIEF ............................................................................... 152

XIV.  JURY DEMAND ........................................................................................ 154

Plaintiffs Lori Ravenscroft Geare ("Geare") and Robert J. Casey, II ("Casey") (collectively, "Plaintiffs"), by and through their undersigned counsel, allege upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, as follows:

## I.    NATURE OF THE ACTION

1.    This is a shareholder derivative action brought on behalf of Hospira, Inc. ("Hospira" or the "Company") against certain of its current and former officers and directors for breach of fiduciary duties, corporate waste, and unjust enrichment, all of which have caused and continue to cause substantial damage to the Company. Plaintiffs are long-time Hospira shareholders.

2.    Hospira is a public company that serves as a contract manufacturer for injectable drugs used in hospitals, dialysis clinics, and outpatient settings. Because Hospira's officers and directors are entrusted with protecting public health and safety, they must take every reasonable measure to ensure that the Company's short-term concerns do not adversely impact the safety of its products. As detailed herein, however, Hospira's fiduciaries failed miserably in their duties. Beginning in early 2009, Hospira's Board of Directors (the "Board") approved a reckless cost-cutting program called "Project Fuel" at a time when the Company's operations were not in compliance with U.S. Food and Drug Administration ("FDA") regulations. At the time they approved Project Fuel, the Board could not have obtained a valid report that the Company was in compliance with safe manufacturing practices, although the Board knew it was its duty to assure this was the case. Instead, Project Fuel was approved and proceeded without regard to the impact this program would have on the Company's already deficient quality controls and its compliance with mandatory regulations. During Project Fuel's two-year existence, Hospira's

regulatory failures were multiplied and exacerbated. Necessary safety measures were ignored, key quality control personnel were cut, adulterated products were shipped out, and plants already in need of a major overhaul to meet federal requirements deteriorated. Even increased scrutiny from the FDA, including the receipt of two "Warning Letters" from the FDA that discussed the Company's deficient quality controls and serious violations of FDA regulations and Current Good Manufacturing Practices ("CGMP"), could not spur the Individual Defendants (as defined herein) to act in accordance with their duties. Rather, the Individual Defendants continued to promote Project Fuel, while making or permitting the Company to make improper statements that, among other things, failed to disclose the extensive quality control issues that undermined the viability of the supposed financial savings that could be generated by Project Fuel. The profitability promised by the Project Fuel campaign was actually nothing more than a façade, intended to divert attention from the true health of the Company. In truth, Hospira had underspent on FDA compliance for years, allowing it to "save" hundreds of millions of dollars. Such "savings" were illusory and short-term. The eventual remediation costs (including the pay of veritable armies of "consultants") substantially exceeded what Hospira would have paid on an "as you go" basis. Moreover, the cost of an FDA Consent Decree (which Hospira may soon face if it fails to move more quickly to repair its violations) would be devastating.

3.      The key impetus for this wrongdoing was the Individual Defendants' frustration with Hospira's stock price "stagnation." Hospira began its corporate life as a public company when it was "spun off" from Abbott Laboratories ("Abbott") in 2004 under the leadership of then-Chief Executive Officer ("CEO"), defendant Christopher B. Begley ("Begley").[1]  From

---

[1]  Abbott, like Hospira, had a history of regulatory problems with the FDA. Its historical attitude, which Hospira's Board apparently inherited, was to ignore FDA issues until they became an expensive emergency. The actions of the Abbott Board led to a derivative suit being

2004 through 2008, revenues soared from $2.4 billion to $3.6 billion. Likewise, earnings were robust. Hospira ended 2008 with working capital (current assets minus current liabilities) at $1.1 billion. In the first quarter of 2009, business slowed somewhat due to the economic recession affecting all companies, but revenues and earnings were still healthy. Hospira's stock price, however, hit new lows due to market factors.

4. In an attempt to boost the stock price, the Individual Defendants in or about January 2009 adopted the aforementioned Project Fuel program to slash spending throughout the Company and "fuel" growth. The two-year program was designed to eliminate 1,400 jobs, and result in costs savings of $110 to $140 million per year. But these cost-cutting initiatives were disastrous to Hospira's controls over product quality and safety, which were already severely deficient even prior to the implementation of Project Fuel. Project Fuel did, however, create the conditions under which key insiders were able to sell shocking amounts of stock at high prices. Remarkably, the Board permitted this selling spree to occur right after Hospira received notice of serious FDA violations that required remediation measures of a magnitude the public did not appreciate.

5. As fiduciaries charged with adhering to the laws concerning safe manufacturing practices, it was incumbent on the Individual Defendants to determine on a fully-informed basis that Hospira was in substantial compliance with all FDA rules and regulations at the time it adopted such a severe cost-cutting program, that the contemplated cuts would not adversely

upheld against its Board in *In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795 (7th Cir. 2001). In *Abbott*, the CEO embarked on a selling spree, dumping 30% of his stock, twenty-seven days after the company received an FDA Warning Letter. *Id*. at 800. As discussed *infra*, ¶168, Hospira CEO defendant Begley did exactly the same thing here, selling off more than 58% of his holdings within weeks of Hospira's receipt of a serious Warning Letter. Thus, Hospira's present actions, and those of its managers, are simply a "replay" of what occurred in *Abbott*. It is no coincidence that defendant Begley was also a top executive at Abbott during the time Abbott had its FDA troubles.

affect mandatory quality controls and safety measures and that the Company maintained

sufficient quality controls and adhered to mandatory FDA regulations throughout the existence

of Project Fuel. Unfortunately, at the time of the adoption of Project Fuel, the Company's

controls over "product quality and safety" were severely lacking, and had been since at least

2007.[2]

      6. During the course of Project Fuel, the FDA expressed increasing concern to

Hospira about its lack of legal compliance, its lack of adherence to necessary safety procedures,

and to particulate matter found in medicinal products Hospira manufactured. In August 2009

and April 2010, the FDA issued Warning Letters which contained findings that would have

alarmed any fiduciary acting in good faith.[3] The Warning Letters were publicly announced by

---

[2] For example Hospira's products were infiltrated by dangerous particulate matter, something which Hospira was required to test for on a scheduled basis. It failed to do so. In early 2010, FDA inspectors observed that these issues were known as far back as 2007, noting: "This particulate contamination problem has been a persistent and serious issue at your firm *for multiple years." See infra*, ¶70. FDA inspectors can only spend a short amount of time at any company. Thus, inspections of this sort unturn only a small fraction of the violations that actually exist, perhaps as little as 5%-10% of all infractions. Failures to detect particulate matter, and test for it on schedule, are attributable to a lack of adequate resources devoted to doing so, and a "compliance last" corporate culture established at the highest levels. As discussed herein, Hospira's Board refused to take responsibility for ensuring Quality Control at the Board level (as other companies have done) until Hospira had received two serious Warning Letters, and even then assigned Quality Control to a Board "committee of the whole" which, by definition, is not an effective, focused committee at all.

[3] FDA inspections may result in: (i) a clean bill of health; (ii) observations as to significant problems that should be remedied (known as a Form 483); or (iii) a Warning Letter. A Warning Letter reflects a finding that a company has significantly violated FDA regulations. The Warning Letter identifies the violations, such as poor manufacturing practices. The letter also makes clear that the company must correct the problem and provides directions and a timeframe for the company to inform the FDA of its plans for correction. In the same month the FDA issued its second Warning Letter to Hospira, the Company recalled two drugs – Propofol, an anesthetic, and Liposyn, an intravenous nutritional product – for a second time in six months because of manufacturing defects. The drugs had been contaminated by particulates during manufacturing. These recalls, however, *did not* spur the Board to undertake a Company-wide review of production methods. Instead, it permitted an immediate insider stock sell-off and launched a bizarrely-timed stock repurchase program.

Hospira, and known to the Board, whose members were sophisticated enough to appreciate their gravity. Despite the Individual Defendants' heightened and legally-defined duties to identify and address Hospira's regulatory and compliance risks, however, these fiduciaries consciously disregarded the continuous and pervasive misconduct for ten consecutive financial quarters. The Individual Defendants had already committed to Project Fuel, and refused to take sufficiently comprehensive remedial actions which would promptly undo all of the savings Project Fuel had achieved. Instead, the Individual Defendants caused or permitted Hospira to downplay its regulatory issues (and to exaggerate the steps taken to address those issues) so that the stock price could remain high. Meanwhile, the Board authorized Hospira to repurchase hundreds of millions of dollars of stock at inflated prices (following receipt of the Warning Letters), knowing that Hospira had not fully assessed or addressed its regulatory problems.[4] Further, certain of the Individual Defendants took advantage of the artificial spike in Hospira's stock by collectively selling over $54 million worth of their personally held Hospira stock on the basis of non-public information.

7. While Project Fuel allowed Hospira to claim improved financial results, which greatly boosted its stock price, this was just a mirage. By September 2011, Hospira could no longer hide the disastrous deterioration of its quality and safety programs.[5] At that point, with

---

[4]  Based on the price to which Hospira stock fell once adverse material facts were known, this reckless repurchase plan damaged Hospira in the amount of roughly ***$140 million***. As noted, the types of compliance issues Hospira experienced resulted from severe deficiencies in Hospira's quality controls. Every problem Hospira experienced has been faced before by others, and solved with the devotion of sufficient resources. The Board authorization of the buy backs indicates again that it adopted a "compliance last" philosophy, and was more focused on maintaining a high stock price than complying with its legal and fiduciary duties.

[5]  The "Relevant Period" extends to ***at least*** May 2013 because even to the present time Hospira is not able to ensure that its plants are producing medicinal products in a safe manner. As discussed *infra*, on August 23, 2012, Hospira received yet another Warning Letter from the FDA regarding production of "adulterated" products at its Costa Rica plant and noting that Hospira

Project Fuel "completed", the Company admitted that expensive emergency remediation measures were needed. In fact, the Individual Defendants disclosed the serious extent of their mismanagement by also revealing that an ongoing FDA investigation was the cause for a production slowdown affecting approximately 25% of the Company's sales. Hospira's stock price plummeted. Remediation costs to date have exceeded ***$460 million and Hospira expects to incur additional charges of approximately $100 million over the next one to two years***.[6] At the end of the day, the actions of Hospira's officers and directors have left Hospira with these staggering remediation costs, and struggling with FDA issues, plant slowdowns, contract penalties, and repeated product recalls. Hospira also faces a securities fraud class action lawsuit,[7] which may cost the Company hundreds of millions in damages (or lead it to pay out a

---

was in violation of federal regulations due to its: "Failure to identify the actions needed to correct and prevent recurrence of nonconforming product and other quality problems…." This comes on the heels of a July 16, 2012 recall of four cancer drugs. As *Reuters* reported: "Hospira Inc said it has issued a nationwide recall of four of its injectable cancer drugs because of particles embedded in the glass at the neck of the vial…. Injury could result if the solution were injected into a patient, the FDA said. Signs and symptoms might include bleeding, bruising, inflammation, itching, rash, chest pain and respiratory symptoms." Since July 2012, Hospira has conducted at least thirty-six additional recalls, including a March 29, 2013 recall of salt solution infiltrated with highly dangerous brass particles. Moreover, despite the tens of millions of dollars already invested in remediation and the numerous consultants hired to assist in those remediation efforts, the FDA's re-inspection of the Rocky Mount, North Carolina ("Rocky Mount"), facility resulted in another inspectional observation ("Form 483"), issued on March 1, 2013, with twenty observations, three of which were repeat violations.

[6] As of September 30, 2011, cash on Hospira's balance sheet only amounted to $527 million. Thus, the announced remediation efforts were projected to consume up to 70% of Hospira's then-available cash.

[7] The securities fraud class action is entitled *City of Sterling Heights General Employees' Ret. Sys. v. Hospira, Inc., et al.*, Case No. 11-cv-08332-AJS ("Federal Securities Action"). As alleged below, Hospira has a claim for contribution over and against certain of the Individual Defendants (the Class Action Individual Defendants, as defined herein), under section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") by way of section 21D of the Private Securities Litigation Reform Act of 1955 (the "PSLRA"), 15 U.S.C. §78u-4, and against all of the Individual Defendants under state law for breach of fiduciary duty. Significantly, on February 13, 2013, the claims for securities fraud were upheld almost in their entirety. *See City*

significant sum in settlement). In addition, Hospira faces a broad FDA review, which may lead to an onerous Consent Decree. Such a Consent Decree would likely involve significant further costs and put Hospira under third party supervision for a number of years.[8]

8. Indeed, the situation was so bad that, in January 2012, Hospira's CEO at an industry healthcare conference analogized remediation efforts to "drain[ing] the swamp." As many as 150 third-party consultants needed to be hired to help Hospira repair the damage Project Fuel had done. On August 1, 2012, Hospira's CEO stated in a conference call that "additional issues keep bubbling up" and "much work remains to be done." Events throughout 2012, including at least fifty product recalls, several Form 483s issued by the FDA on Hospira's facilities across the country, and a new Warning Letter from the FDA regarding the production of "adulterated" products at Hospira's Costa Rica plant, evidence the magnitude of Hospira's compliance issues. Even as recently as March 2013, the FDA issued a twenty-one page Form 483 on Hospira's Rocky Mount facility with twenty observations, noting, among other things, that the facility had substantial amounts of debris that could lead to drug contamination, written procedures were still nonexistent or not followed, and employees were unable to recognize defects or keep up with manual inspections. Nonetheless, the problems are capable of solution.

---

*of Sterling Heights Gen. Empls.' Ret. Sys.* v. *Hospira, Inc.*, No. 11C8332, 2013 WL 566805, at *1 (N.D. Ill. Feb. 13, 2013).

[8] A Consent Decree is the most serious risk faced by FDA-regulated companies. Cost-cutting by Schering-Plough led that company to enter a Consent Decree in 2002, which resulted in $500 million in fines, and required years of costly oversight. This followed an Abbott Consent Decree in 1999 that cost $100 million upfront, and likewise related to lack of quality controls. More recently, a Consent Decree was entered into by Genzyme in May 2010, where the company agreed to turn over $175 million to the federal government due to poor manufacturing quality. The FDA has cautioned that: "Manufacturers who choose to wait until FDA investigators find violations rather than policing themselves will find that they have made a poor and costly decision."

At the January 8, 2013 JPMorgan Healthcare Conference, CEO defendant F. Michael Ball ("Ball") said: "the feedback that I've got from the consultants is everything is fixable."

9.     Project Fuel caused financial damage from which Hospira may not recover for many years, if ever.  Hospira's stock price was considerably boosted by Project Fuel (and the concealment of Hospira's true problems) to a high of roughly $57 per share.  It now trades at roughly $32 per share.  Indeed, the two-year stock performance of Hospira's shares has been dismal:  a decline of approximately 43% between April 26, 2011 and April 26, 2013.  Worse, there is no sign of a recovery for Hospira.

10.    Because it would be grossly unfair for Hospira to suffer all the damages incurred as a result of the Individual Defendants' wrongdoing, Plaintiffs seek to recover these damages derivatively from the responsible fiduciaries.  Such a derivative recovery will serve the dual goals of compensation and deterrence.[9]  This derivative action may be prosecuted by Plaintiffs because Plaintiffs adequately allege that that the majority of the Board failed to exercise reasonable business judgment and/or face a substantial likelihood of liability – standards that are sufficient to survive the preliminary showing that making a demand on the Board would have been a futile and useless act.

## II.     JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to 28 U.S.C §1331 (federal question jurisdiction) insofar as this action arises under both section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution, and

---

[9]  In addition to the financial harm and the loss of management credibility Hospira has endured, the Company has lost its sterling reputation as a manufacturer of products of impeccable quality. It has even recently been sued by one of its product development partners, GlaxoSmithKline Biologicals, S.A., for failing to produce an influenza vaccine it promised to develop, due to "numerous quality problems." *See* Complaint, *GlaxoSmithKline Biologicals, S.A. v. Hospira Worldwide, Inc.*, No. 1:13-cv-01395 (S.D.N.Y. Feb. 28, 2013).

section 21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

12.     Prior to Congress having enacted an express provision for contribution under section 21D of the Exchange Act, the United States Supreme Court recognized that a federal cause of action existed for contribution pursuant to section 10(b) of the Exchange Act and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5.  *See Musick, Peeler & Garrnett v. Employers Ins. of Wausau*, 508 U.S. 286 (1993).  Thus, pursuant to federal statutory law and Supreme Court authority, this Court has original federal question jurisdiction over the federal contribution claim alleged herein.

13.     In addition, because Hospira was caused to repurchase its own securities at fraudulently inflated prices, it has a claim under section 10(b) of the Exchange Act for resultant damages, and such claim is asserted herein.

14.     This Court also has subject matter jurisdiction over the pendent state law claims asserted herein pursuant to 28 U.S.C. §1367 (supplemental jurisdiction), since this statute provides that the district court has supplemental jurisdiction over all other claims where, as here, they are so related to claims in the action within the original jurisdiction of the Court, that they form part of the same case or controversy.

15.     This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332 in that complete diversity exists between plaintiff Casey and each of the defendants and the amount in controversy exceeds $75,000 exclusive of interests and costs.

16.     This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

17.     The Court has personal jurisdiction over each defendant because each either is a corporation that conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because acts and offenses pertinent to the causes of action stated herein were committed in part in this jurisdiction.

## III.    THE PARTIES

### A.     Plaintiffs

19.     Plaintiff Geare was a shareholder of Hospira at the time of the wrongdoing complained of, and has continuously been a Hospira shareholder since the Company's 2004 spin-off from Abbott.  Plaintiff Geare is a citizen of Arizona.

20.     Plaintiff Casey was a shareholder of Hospira at the time of the wrongdoing complained of, and has continuously been a Hospira shareholder since May 4, 2004.  Plaintiff Casey is a citizen of Pennsylvania.

### B.     Nominal Defendant

21.     Nominal Defendant Hospira is a Delaware corporation with its principal executive offices located at 275 North Field Drive, Lake Forest, Illinois.  Hospira is a global specialty pharmaceutical and medication delivery company that develops, manufactures, and markets products that help improve the safety, cost, and productivity of patient care.  Hospira is also the world's leading provider of injectable drugs and infusion technologies, with a portfolio ranging from generic acute-care and oncology injectables to integrated infusion therapy and medication

management products.  Hospira's products are used by hospitals and alternate site providers, such as clinics, home healthcare providers, and long-term care facilities.  The Company has thirteen manufacturing facilities, including facilities in Rocky Mount and Clayton, North Carolina ("Clayton"), Morgan Hill, California ("Morgan Hill"), and Costa Rica.  Rocky Mount is one of its largest facilities, accounting for about 25% of the Company's annual revenues.

### C.  Individual Defendants

22.    Defendant Begley was Hospira's Executive Chairman of the Board from March 2011 to January 2012 and a Hospira director from 2004 to January 2012.  Defendant Begley was also Hospira's CEO from 2004 to March 2011 and Chairman of the Board from May 2007 to March 2011.  Defendant Begley was a member of Hospira's Science and Technology Committee and its successor, the Science, Technology and Quality Committee from at least March 2008 to January 2012.  As the Company's founding CEO, defendant Begley oversaw Hospira's 2004 spin-off from Abbott.  Defendant Begley knowingly, recklessly or in conscious disregard of his fiduciary duties: (i) decided to adopt and continue Project Fuel without assurance that Hospira was in full compliance with FDA regulations; (ii) decided to authorize a reckless and wasteful buy-back of Hospira shares at prices he knew or recklessly disregarded were materially inflated; (iii) caused or allowed Hospira to engage in inadequate manufacturing practices due to the inadequate provision of human and financial resources; (iv) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process; and (v) made or permitted improper statements regarding the health of the Company and the nature of the Company's remediation efforts in response to FDA findings. While in possession of material, non-public information concerning Hospira's jeopardized

business health, defendant Begley sold 386,112 shares of his stock for $22,008,384 in proceeds. Hospira paid defendant Begley the following compensation as an executive:

| Year | Salary | Option Awards | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|---------------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2011 | $1,100,000 | $2,000,000 | $3,000,000 | $137,500 | $899,630 | $76,381 | $7,213,511 |
| 2010 | $1,086,538 | $1,999,998 | $3,000,001 | $1,189,759 | $486,866 | $76,057 | $7,839,219 |
| 2009 | $1,050,000 | $1,422,353 | $2,478,790 | $2,100,000 | $420,374 | $94,500 | $7,566,017 |

Defendant Begley is a citizen of Illinois.

23. Defendant Ball is the CEO and a director of Hospira. Defendant Ball was appointed as CEO and director in March 2011, succeeding the Company's founding CEO, defendant Begley. Defendant Ball is also a member of Hospira's Science, Technology and Quality Committee and has been since March 2011. Defendant Ball knowingly, recklessly or in conscious disregard of his fiduciary duties: (i) caused or allowed Hospira to engage in inadequate manufacturing practices due to the inadequate provision of human and financial resources; (ii) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process; and (iii) made or permitted improper statements regarding the health of the Company and the nature of the Company's remediation efforts in response to the FDA findings.

| Year | Salary | Option Awards | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|---------------|--------------|----------------------------------------|------------------------|-------|
| 2012 | $993,269 | 3,715,801 | 3,480,019 | $518,486 | $73,976 | $8,781,551 |
| 2011 | $731,250 | $2,450,000 | $8,958,829 | $117,000 | $79,928 | $12,337,007 |

Defendant Ball is a citizen of Illinois.

24.     Defendant Thomas E. Werner ("Werner") is Senior Vice President, Finance, and the Chief Operating Officer ("COO") of Hospira, and has been since August 2006.  Defendant Werner knowingly, recklessly or in conscious disregard of his fiduciary duties: (i) caused or allowed Hospira to engage in inadequate manufacturing practices; (ii) made or permitted improper statements regarding the health of the Company and the nature of the Company's remediation efforts in response to the FDA investigation; and (iii) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process.  While in possession of material, non-public information concerning Hospira's jeopardized business health, defendant Werner sold 85,849 shares of his stock for $4,901,269.76 in proceeds.    Hospira paid defendant Werner the following compensation as an executive:

| Year | Salary | Option Awards | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|---------------|--------------|----------------------------------------|------------------------|-------|
| 2012 | $454,500 | 700,000 | 700,000 | $158,166 | $30,582 | $2,043,248 |
| 2011 | $445,000 | $500,000 | $500,000 | $35,600 | $30,960 | $1,511,560 |
| 2010 | $444,999 | $700,013 | $707,484 | $311,856 | $30,960 | $2,195,312 |
| 2009 | $445,000 | $559,331 | $648,231 | $712,000 | $25,673 | $2,390,235 |

Defendant Werner is a citizen of Illinois.

25.     Defendant Irving W. Bailey, II ("Bailey") has served as a Hospira director since the Company's spin-off from Abbott in 2004.  Defendant Bailey was also Hospira's Lead Director from 2007 to May 2011.  Defendant Bailey is a member of Hospira's Audit Committee and has been since at least December 2011 and a member of the Science, Technology and Quality Committee and has been since at least 2010.  Defendant Bailey was also a member of Hospira's Governance and Public Policy Committee from at least March 2008 to at least March 2011.  Additionally, defendant Bailey served as a Managing Director of Chrysalis Ventures

("Chrysalis"), a private equity management firm, from June 2001 to January 2005, and has served as a Senior Advisor to Chrysalis since January 2005. Defendant Bailey also served as President of Bailey Capital Corporation, a private equity management firm, from January 1998 to June 2001, and as CEO of Providian Corporation, an insurance and diversified financial services company, from 1988 to 1997. Defendant Bailey also serves as Vice Chairman of Aegon, N.V. and as a director of Computer Sciences Corporation. In addition, Chrysalis has reported on its website that, as a senior advisor for the company, defendant Bailey attends and "participates in deliberations of the firm's investment committee," which focus, in part, on "invest[ments] in businesses across the healthcare industry." Current Chrysalis investments include eighteen "healthcare" companies, all of which are regulated entities. These include a medical device company; a compounding pharmacy; and a diagnostic laboratory. Defendant Bailey knowingly, recklessly or in conscious disregard of his fiduciary duties: (i) decided to adopt and continue Project Fuel without assurance that Hospira was in full compliance with FDA regulations; (ii) decided to authorize a reckless and wasteful buy-back of Hospira shares at prices he knew or recklessly disregarded were materially inflated; (iii) caused or allowed Hospira to engage in inadequate manufacturing practices due to the inadequate provision of human and financial resources; (iv) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process; and (v) made or permitted improper statements regarding the health of the Company and the nature of the Company's remediation efforts in response to FDA findings. Hospira paid defendant Bailey the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2012 | $89,500 | $150,000 | $239,500 |

|      |           |           |           |
|------|-----------|-----------|-----------|
| 2011 | $103,563  | $150,000  | $253,563  |
| 2010 | $125,125  | $150,000  | $275,125  |
| 2009 | $87,000   | $150,000  | $237,000  |

Defendant Bailey is a citizen of Florida.

26. Defendant Jacque J. Sokolov ("Sokolov") has served as a Hospira director since the Company's spin-off from Abbott in 2004. Defendant Sokolov is also a member of Hospira's Science, Technology and Quality Committee (and its predecessor Science and Technology Committee) since at least March 2008 and was Chairman of that committee from at least March 2008 to at least March 2010. Additionally, defendant Sokolov has served since 1997 as the Chairman and Managing Partner of SSB Solutions, Inc., a national healthcare management consulting, project development and investment firm. From 1987 to 1992, defendant Sokolov served as the Vice President of Healthcare for Southern California Edison. In 1992, defendant Sokolov became CEO of Advanced Health Plans Inc., which was acquired in 1994 by Coastal Physicians Group Inc. From 1994 to 1997, defendant Sokolov served as Chairman of the Board, Chairman of the Executive Committee, and Chairman of the Management Action Committee of Coastal Physician Group, Inc., which later became PhyAmerica Physician Group, Inc. Defendant Sokolov also serves on the board of directors of MedCath. As set forth in presentations made by defendant Sokolov as Chairman and Managing Partner of SSB Solutions, Inc. (titled *Transforming the US Health Care System* (Sep. 2011); *Clinical Integration/Physical Alignment – CIO Models* (March 21, 2012)), defendant Sokolov is not only responsible for understanding and advising highly regulated enterprises, but has even lectured on the topic of regulatory compliance, including areas of legal and regulatory concern. Defendant Sokolov knowingly, recklessly or in conscious disregard of his fiduciary duties: (i) decided to adopt and continue Project Fuel without assurance that Hospira was in full compliance with FDA regulations; (ii) decided to authorize a reckless and wasteful buy-back of Hospira shares at prices

he knew or recklessly disregarded were materially inflated; (iii) caused or allowed Hospira to engage in inadequate manufacturing practices due to the inadequate provision of human and financial resources; (iv) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process; and (v) made or permitted improper statements regarding the health of the Company and the nature of the Company's remediation efforts in response to the FDA findings. Hospira paid defendant Sokolov the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2012 | $82,000 | $150,000 | - | $232,000 |
| 2011 | $83,250 | $150,000 | - | $233,250 |
| 2010 | $86,688 | $150,000 | $1,000 | $237,688 |
| 2009 | $82,500 | $150,000 | - | $232,500 |

Defendant Sokolov is a citizen of California.

27.     Defendant Barbara L. Bowles ("Bowles") has served as a Hospira director since her election to the Board in May 2008. Defendant Bowles is also Chair of Hospira's Audit Committee and has been since at least March 2011 and a member of that committee since at least March 2009. Defendant Bowles is a member of Hospira's Governance and Public Policy Committee and a member of the Science, Technology and Quality Committee and has been since at least 2010. Additionally, defendant Bowles served as the Vice Chair of Profit Investment Management, an equity investment advisory firm, from January 2006 until retiring on December 31, 2007. Defendant Bowles was also the founder and served as Chairman (2000 to 2006) and CEO (1989 to 2005) of the Kenwood Group, Inc., an equity investment firm until The Kenwood Group, Inc. was acquired by Profit Investment Management. From 1984 to 1989, defendant Bowles was Corporate Vice President and Director, Investor Relations, for Kraft, Inc., a

diversified packaged food and beverage company. Defendant Bowles also serves as a director of Wisconsin Energy Corporation, Children's Memorial Hospital, the Chicago Urban League, the Museum of Science and Industry, Chicago, and Hyde Park Bank. Defendant Bowles is a trustee of Fisk University and also serves on the University of Chicago, Booth School of Business Advisory Council. Within the past five years, defendant Bowles also has served as a director of Black & Decker Corporation (from 1993 to 2010), Dollar General Corporation (from 2000 to 2007), and Georgia Pacific Corporation (from 2000 to 2005). Defendant Bowles knowingly, recklessly or in conscious disregard of her fiduciary duties: (i) decided to adopt and continue Project Fuel without assurance that Hospira was in full compliance with FDA regulations; (ii) decided to authorize a reckless and wasteful buy-back of Hospira shares at prices she knew or recklessly disregarded were materially inflated; (iii) caused or allowed Hospira to engage in inadequate manufacturing practices due to the inadequate provision of human and financial resources; (iv) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process; and (v) made or permitted improper statements regarding the health of the Company and the nature of the Company's remediation efforts in response to the FDA findings. Hospira paid defendant Bowles the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2012 | $102,000 | $150,000 | - | $252,000 |
| 2011 | $102,000 | $150,000 | $1,000 | $253,000 |
| 2010 | $95,438 | $150,000 | - | $245,438 |
| 2009 | $72,000 | $150,000 | - | $222,000 |

Defendant Bowles is a citizen of Illinois.

28.     Defendant Roger W. Hale ("Hale") has served as a Hospira director since his election to the Board in October 2006.   Defendant Hale is also a member of Hospira's Governance and Public Policy Committee and has been since at least March 2008 and a member of the Science, Technology and Quality Committee and has been since at least 2010. Additionally, defendant Hale has served as Chairman of the Board and CEO of LG&E Energy Corporation, a diversified energy services company, from August 1990 until retiring in April 2001.   Prior to joining LG&E Energy Corporation, defendant Hale was Executive Vice President of BellSouth Corporation, a communications services company.   From 1966 to 1986, defendant Hale held several executive positions with AT&T Co., a communications services company, including Vice President, Southern Region from 1983 to 1986.   Defendant Hale is also a director of Ashland, Inc.   Within the past five years, defendant Hale also has served as a director of H&R Block, Inc. (from 1991 to 2008).   Defendant Hale knowingly, recklessly or in conscious disregard of his fiduciary duties: (i) decided to adopt and continue Project Fuel without assurance that Hospira was in full compliance with FDA regulations; (ii) decided to authorize a reckless and wasteful buy-back of Hospira shares at prices he knew or recklessly disregarded were materially inflated; (iii) caused or allowed Hospira to engage in inadequate manufacturing practices due to the inadequate provision of human and financial resources; (iv) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process; and (v) made or permitted improper statements regarding the health of the Company and the nature of the Company's remediation efforts in response to the FDA.   Hospira paid defendant Hale the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2012 | $97,000 | $150,000 | $247,000 |
| 2011 | $96,250 | $150,000 | $246,250 |
| 2010 | $92,000 | $150,000 | $242,000 |
| 2009 | $68,500 | $150,000 | $218,500 |

Defendant Hale is a citizen of Kentucky.

29.    Defendant John C. Staley ("Staley") has served as a Hospira director since the Company's spin-off from Abbott in 2004, and has served as Lead Director since May 2011 and Chairman since January 2012.  Defendant Staley is also a member of Hospira's Governance and Public Policy Committee and has been since at least December 2011 and a member of the Science, Technology and Quality Committee and has been since at least 2010.  Defendant Staley was a member of Hospira's Audit Committee from at least March 2008 to March 2011 and was Chairman of that committee from at least March 2008 to at least March 2010.  Additionally, defendant Staley served as the Managing Partner of the Lake Michigan Area of Ernst & Young LLP, a public accounting firm, a position that he held from 1985 to his retirement in June 2001. Defendant Staley also serves as a director of eLoyalty Corporation and Nicor Inc.  Defendant Staley is also a member of, and the former Chairman of, the Board of Trustees of DePaul University.  Within the past five years, defendant Staley has also served as a director of Centerpoint Corporation (from 2002 to 2006).  Defendant Staley knowingly, recklessly or in conscious disregard of his fiduciary duties: (i) decided to adopt and continue Project Fuel without assurance that Hospira was in full compliance with FDA regulations; (ii) decided to authorize a reckless and wasteful buy-back of Hospira shares at prices he knew or recklessly disregarded were materially inflated; (iii) caused or allowed Hospira to engage in inadequate manufacturing practices due to the inadequate provision of human and financial resources; (iv) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and

the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process; and (v) made or permitted improper statements regarding the health of the Company and the nature of the Company's remediation efforts in response to the FDA findings. Hospira paid defendant Staley the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2012 | $122,000 | $296,666 | $418,666 |
| 2011 | $114,188 | $150,000 | $264,188 |
| 2010 | $90,854 | $150,000 | $240,854 |
| 2009 | $84,000 | $150,000 | $234,000 |

Defendant Staley is a citizen of Florida.

30. Defendant Connie R. Curran ("Curran") has served as a Hospira director since the Company's spin-off from Abbott in 2004. Defendant Curran is also Chair of Hospira's Governance and Public Policy Committee and a member of the Science, Technology and Quality Committee (and its predecessor committee) and has been since at least March 2008. Defendant Curran was a member of Hospira's Audit Committee from at least March 2008 to at least March 2011. Additionally, defendant Curran has served as the president of Curran Associates, a healthcare consulting firm, since July 2006. Defendant Curran also previously served as the Executive Director of C-Change, formerly the National Dialogue on Cancer, a health advocacy organization, from 2003 to July 2006. From 1995 to 2000, defendant Curran served as President and CEO of CurranCare, LLC, a healthcare consulting company. Upon the acquisition of CurranCare by Cardinal Health Consulting Services in November 2000, defendant Curran served as President of Cardinal Health Consulting Services, a consulting company with expertise in surgical services, hospital operations and case management, and home care, until February 2002. Defendant Curran has previously served as Vice President of the American Hospital Association

and Dean of the College of Nursing at the Medical College of Wisconsin. Defendant Curran also serves as a director of DeVry, Inc. and Volcano Corporation. Within the past five years, defendant Curran also has served as a director of CardioDynamics International Corp. (from 2000 to 2006) and IDX Systems Corporation (from 2002 to 2006). Defendant Curran describes herself as a "healthcare leader" with expertise in "quality and patient safety." Defendant Curran knowingly, recklessly or in conscious disregard of her fiduciary duties: (i) decided to adopt and continue Project Fuel without assurance that Hospira was in full compliance with FDA regulations; (ii) decided to authorize a reckless and wasteful buy-back of Hospira shares at prices she knew or recklessly disregarded were materially inflated; (iii) caused or allowed Hospira to engage in inadequate manufacturing practices due to the inadequate provision of human and financial resources; (iv) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process; and (v) made or permitted improper statements regarding the health of the Company and the nature of the Company's remediation efforts in response to the FDA. Hospira paid defendant Curran the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|-------------------|--------------|------------------------|-------|
| 2012 | $94,500 | $150,000 | - | $244,500 |
| 2011 | $102,313 | $150,000 | - | $252,313 |
| 2010 | $106,688 | $150,000 | $2,000 | $258,688 |
| 2009 | $90,500 | $150,000 | - | $240,500 |

Defendant Curran is a citizen of California.

31.     Defendant Heino von Prondzynski ("von Prondzynski") has served as a Hospira director since March 2009. Defendant von Prondzynski is also a member of Hospira's Science, Technology and Quality Committee (and its predecessor) and has been since March 2009.

Additionally, defendant von Prondzynski has served as CEO of Roche Diagnostics and as a member of the Executive Committee of F. Hoffman-La Roche Ltd., a Swiss-based healthcare company that develops diagnostic and therapeutic products, from early 2000 to 2005, retiring from Roche at the end of 2006. From 1996 to 2000, defendant von Prondzynski held several executive positions at Chiron Corporation, a multinational biotechnology firm that develops biopharmaceuticals, vaccines, and blood testing products, and from 1976 to 1996 at Bayer AG, a German-based maker of healthcare products, specialty materials, and agricultural products. Defendant von Prondzynski also serves as chairman of the board of Nobel Biocare Holding AG, Switzerland. Defendant von Prondzynski also serves on the board of Qiagen NV and Koninklijke Philips Electronics NV. Within the past five years, defendant von Prondzynski also has served as a director of Epigenomics AG (from 2007 to 2010). Defendant von Prondzynski knowingly, recklessly or in conscious disregard of his fiduciary duties: (i) decided to continue Project Fuel without assurance that Hospira was in full compliance with FDA regulations; (ii) decided to authorize a reckless and wasteful buy-back of Hospira shares at prices he knew or recklessly disregarded were materially inflated; (iii) caused or allowed Hospira to engage in inadequate manufacturing practices due to the inadequate provision of human and financial resources; (iv) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process; and (v) made or authorized improper statements regarding the health of the Company and the nature of the Company's remediation efforts in response to the FDA findings. Hospira paid defendant von Prondzynski the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2012 | $88,000 | $150,000 | $238,000 |

| 2011 | $90,000 | $150,000 | $240,000 |
| 2010 | $90,000 | $150,000 | $240,000 |
| 2009 | $59,250 | $162,492 | $221,742 |

Defendant von Prondzynski is a citizen of Switzerland.

32. Defendant Mark F. Wheeler ("Wheeler") has served as a Hospira director since his election to the Board at the 2006 annual meeting. Defendant Wheeler is also Chairman of Hospira's Science, Technology and Quality Committee and has been since at least March 2011 and a member of that committee (or its predecessor committee) since at least March 2008. Defendant Wheeler is a member of Hospira's Audit Committee and has been since at least March 2008. Since September 2010, defendant Wheeler has also served as the System Vice President, Chief Information Officer, and Chief Medical Information Officer for PeaceHealth, an integrated delivery network of hospitals in the Pacific Northwest. From January 2007 to September 2010, defendant Wheeler served as the Director of Clinical Informatics for PeaceHealth. Defendant Wheeler previously served as Acting Vice President Engineering, Centricity Enterprise Business Unit of General Electric Company, a diversified technology, media, and financial services company, from February 2006 to January 2007. Defendant Wheeler also served as Chief Technical Architect of IDX Systems Corporation, a healthcare information technology services provider, from 1997 until December 2005, when IDX was acquired by General Electric, and served on IDX's board of directors from 1999 through 2005. Defendant Wheeler knowingly, recklessly or in conscious disregard of his fiduciary duties: (i) decided to adopt and continue Project Fuel without assurance that Hospira was in full compliance with FDA regulations; (ii) decided to authorize a reckless and wasteful buy-back of Hospira shares at prices he knew or recklessly disregarded were materially inflated; (iii) caused or allowed Hospira to engage in inadequate manufacturing practices due to the inadequate provision of human and financial resources; (iv) failed to maintain adequate internal controls concerning Hospira's manufacturing

practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process; and (v) made or authorized improper statements regarding the health of the Company and the nature of the Company's remediation efforts in response to the FDA findings. Hospira paid defendant Wheeler the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2012 | $97,000 | $150,000 | $247,000 |
| 2011 | $98,250 | $150,000 | $248,250 |
| 2010 | $96,063 | $150,000 | $246,063 |
| 2009 | $81,500 | $150,000 | $231,500 |

Defendant Wheeler is a citizen of Washington.

33. Defendant Terrence C. Kearney ("Kearney") was Hospira's COO from April 2006 to January 2011. Defendant Kearney was also Hospira's Acting Chief Financial Officer ("CFO") from April 2006 to August 2006. Defendant Kearney knowingly, recklessly or in conscious disregard of his fiduciary duties: (i) caused or allowed Hospira to engage in inadequate manufacturing practices; and (ii) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process. While in possession of material, non-public information concerning Hospira's jeopardized business health, defendant Kearney sold 300,640 shares of his stock for $17,197,411.42 in proceeds. Hospira paid defendant Kearney the following compensation as an executive:

| Year | Salary | Option Awards | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|------|------|------|------|------|------|------|
| 2010 | $639,615 | $2,740,662 | $1,049,990 | $448,242 | $250,776 | $44,773 | $5,174,058 |
| 2009 | $625,000 | $1,419,016 | $917,391 | $1,000,000 | $214,132 | $56,250 | $4,231,789 |

Defendant Kearney is a citizen of Illinois.

34.     Defendant Ronald A. Matricaria ("Matricaria") was a Hospira director from 2006 to June 2010.  Defendant Matricaria was also a member of Hospira's Science, Technology and Quality Committee (and/or its predecessor committee) from at least March 2008 to at least March 2010.  Defendant Matricaria knowingly, recklessly or in conscious disregard of his fiduciary duties: (i) decided to adopt and continue Project Fuel without assurance that Hospira was in full compliance with FDA regulations; (ii) caused or allowed Hospira to engage in inadequate manufacturing practices due to the inadequate provision of human and financial resources; (iii) failed to maintain adequate internal controls concerning Hospira's manufacturing practices and the accuracy of the public disclosures regarding the extent of the remediation necessary to fix deficiencies in the Company's manufacturing process; and (iv) made or authorized improper statements regarding the health of the Company and the nature of the Company's remediation efforts in response to the FDA findings.  Hospira paid defendant Matricaria the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2010 | $45,000 | - | $45,000 |
| 2009 | $82,500 | $150,000 | $232,500 |

Defendant Matricaria is a citizen of Arizona.

35.     Defendant Brian J. Smith ("Smith") is Hospira's Senior Vice President, General Counsel, and Secretary and has been since 2004.  As the Company's attorney, defendant Smith had the unique legal knowledge to counsel the Company about its regulatory requirements, including the minimum CGMP standards that were ultimately violated.  While in possession of material, non-public information concerning Hospira's jeopardized business health, defendant Smith sold 80,000 shares of his stock for $4.6 million in proceeds.  Defendant Smith is a citizen of Illinois.

36. The defendants identified in ¶¶22, 23-24, 33, 35 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶22-23, 25-32, 34 are referred to herein as the "Director Defendants." The defendants identified in ¶¶25, 27-30 are referred to herein as the "Governance and Public Policy Committee Defendants." The defendants identified in ¶¶25, 27, 29-30, 32 are referred to herein as the "Audit Committee Defendants." The defendants identified in ¶¶22-23, 25-32, 34 are referred to herein as the Science, Technology and Quality Committee Defendants." The defendants identified in ¶¶22, 24, 33, 35 are referred to herein as the "Insider Selling Defendants." The defendants identified in ¶¶22-24 are referred to herein as the "Class Action Individual Defendants." Collectively, the defendants identified in ¶¶22-35 are referred to herein as the "Individual Defendants."

## IV. THE INDIVIDUAL DEFENDANTS' DUTIES

### A. Specific Duties in These Circumstances

37. By reason of their positions as officers, directors, and fiduciaries of Hospira and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owe Hospira and its shareholders fiduciary obligations of good faith, loyalty, fair dealing, and candor, and were and are required to use their utmost ability to control and manage Hospira in a fair, just, honest, legal, and equitable manner and to ensure that the Company maintained adequate internal controls.

38. Certain of the Individual Defendants' duties were heightened through their obligations either as executives or members of various Board Committees:

(a) Defendants Begley and Ball both served as CEOs during the Relevant Period. As such, they had the greatest access to non-public information, and significant control over Hospira's day-to-day operations, and its long-range plans. They were each required, as

Hospira's top executives, to ensure compliance with the law, and that all public statements were full, truthful and complete, and did not conceal or misrepresent any material information;

(b)     Defendants Bailey, Ball, Begley, Bowles, Curran, Hale, Sokolov, Staley, Prondzynski, and Wheeler served on Hospira's Science, Technology and Quality Committee during the Relevant Period. The Committee was the Science and Technology Committee until in or around 2010, when it became the Science, Technology and Quality Committee. It adopted a new Charter on August 18, 2010.[10] This Committee, under the August 2010 Charter, is obligated to ensure adequate controls exist as to "product quality and safety." As members of this Committee, each of these defendants were required to review the Company's "overall quality strategy and internal quality processes [and] the results of, and responses to, product quality and quality system assessments by the Company and external regulators (i.e., the FDA) and other national and international regulatory bodies; and … important product quality and field actions." Given these responsibilities, these defendants had intimate knowledge of Hospira's FDA issues and compliance deficiencies, yet chose to defer any adequate response until after the completion of Project Fuel. In addition, they knowingly or recklessly permitted false statements to be made during the Relevant Period, exposing Hospira to huge damages for securities fraud. The Science, Technology and Quality Committee (or its predecessor) met five times per year between 2008 and 2011.

---

[10]    The Charter of the predecessor Science and Technology Committee had no mention whatsoever of quality oversight, which was not a specified Board oversight function. Rather, this crucial duty was knowingly left to the conflicted CEO, who had an interest in selling his shares at the highest possible prices. Even now, this "Committee" consists of **all** directors, and thus is not a true committee which can focus on quality issues. This structure conflicts with best practices of Board governance, and reflects the Board's continued refusal to devote sufficient time and resources to quality control, even at the Board level. Nonetheless, despite this lack of a focused working group, the "Committee" receives reports from both management and Hospira's Office of Ethics and Compliance.

(c)     Defendants Bailey, Bowles, Curran, Staley, and Wheeler served on Hospira's Audit Committee during the Relevant Period.   Their responsibilities as Audit Committee members included assisting the Board with respect to its internal controls over "the integrity of the Company's financial statements" and "the Company's compliance with legal and regulatory requirements."   Further, these Audit Committee members were responsible for "reviewing and discussing [the Company's] financial statements and financial press releases with [the Company's] management."   By dint of such responsibilities, these defendants had intimate knowledge of Hospira's FDA issues and compliance deficiencies, yet chose to defer any adequate remedial response until after the completion of Project Fuel.   In addition, they knowingly or recklessly permitted false statements to be made during the Relevant Period, exposing Hospira to material damages for securities fraud.   The Audit Committee met eleven times, twelve times, eleven times, and twelve times, in 2008, 2009, 2010, and 2011, respectively.

(d)     Defendants Bailey, Bowles, Curran, Hale, and Staley served on Hospira's Governance and Public Policy Committee during the Relevant Period.   As members of the Governance and Public Policy Committee, these defendants were responsible for overseeing and making recommendations to the Board on "[t]he Company's environmental, health and safety compliance programs" as well as "[t]he Company's enterprise risk management in areas affecting the Company's public policy, compliance and government affairs activities or programs."   By dint of such responsibilities, these defendants had intimate knowledge of Hospira's FDA issues and compliance deficiencies, yet chose to defer any adequate response until after the completion of Project Fuel.   In addition, they knowingly or recklessly permitted false statements to be made during the Relevant Period, exposing Hospira to huge damages for securities fraud.   The

Governance and Public Policy Committee met five times, two times, seven times, and five times, in 2008, 2009, 2010, and 2011, respectively.

39.     The Company also has in place a Code of Business Conduct (the "Code") which applies to all officers, employees, contractors, and agents of Hospira.   Further, the Corporate Governance Guidelines state that "[d]irectors shall adhere to the Company's Code."  The Code states that the Company expects these individuals to "provide full, accurate, fair, timely and understandable disclosures when making public communications or in reports and documents filed with government agencies, such as the [SEC] and the [FDA]."

**B.     Duties Prior to Initiating or Continuing a Major Cost-Cutting Project**

40.     Project Fuel was a major corporate undertaking requiring the Individual Defendants' closest attention, both at the time of its initiation and throughout its existence.  Prior to implementing the cost-cutting initiatives of Project Fuel, these fiduciaries had a duty to obtain a sufficient independent comprehensive review (via a "mock inspection" or its equivalent) of Hospira's current compliance with FDA rules, and any effects Project Fuel would have on the Company's compliance.   A desire to save money cannot trump compliance, especially in a company making medical products.[11]

41.     The Board should not have proceeded without independently verified assurance as to the adequacy of Hospira's Standard Operating Procedures (SOPs) including: (i) whether SOPs existed as to all necessary measures, and were documented in writing; (ii) whether those SOPs were sufficient to ensure FDA compliance if carefully followed; and (iii) whether SOPs were

---

[11]   Delaware law has repeatedly recognized that a fiduciary must never allow profits to take precedence over adherence to the law.   *See Metro Commc'n Corp. BVI v. Advanced MobileComm Techs., Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004).

being followed in a competent and timely manner.[12]  The inspection would also focus on finding violations, and the steps that were or could be taken to remediate them in a timely manner (along with an assessment of the resources need to do so adequately).

42.     Once FDA problems were detected and documented in the form of a Warning Letter, the Board should have immediately ordered a follow-up independent SOP review, as well as a review of Hospira's Corrective and Preventive Action ("CAPA") Programs.  These programs (which are not unique to Hospira) are usually triggered by complaints or the detection of violations and are collectively designed to address regulatory problems and avoid their recurrence.

43.     Given FDA findings as to multiple years of particulate contamination, lack of written SOP procedures, failures to review "retained" samples for problems, and failures to investigate violations, the Board could not have obtained a valid report that the SOPs were effectively followed before it launched Project Fuel, or a report as to the adequacy of CAPA Programs during the time the Board allowed Project Fuel to continue.[13]  Had the Board undertaken these obvious procedures (as noted, the Board is highly sophisticated regarding regulatory compliance), Hospira would have likely focused its attention on necessary remediation efforts rather than adopting a severe cost-cutting project that only served to worsen the Company's already-deficient quality controls.  Finally, these measures would have avoided the plant-level quality deterioration that accompanied Project Fuel, and which led to the very

_____

[12]  The FDA does not, in most cases, dictate the methods a company must use to comply with its regulations.  Compliance methods are left up to the regulated company to select.  Thus, SOPs are company-generated rules aimed at ensuring compliance.  Assuming they are adequate, they must be followed to avoid an adverse inspection report or warning letter.

[13]  That Hospira's SOPs were not being followed as of the time of the initiation of Project Fuel is indisputable.  *See infra*, fn. 33.

costly and disruptive measures that have been required to address a series of alarming FDA reports, and avoid (if possible) the issuance of a Consent Decree.

44.     Proof that the Board did not undertake these validation measures is shown by the very fact that it initiated Project Fuel (which contemplated material cutbacks in quality control personnel at a time when existing personnel were not sufficient to ensure SOP compliance) and by the fact that it did not apply sufficient remediation resources until well after Hospira was "caught out" by FDA inspectors.

45.     Indeed, the defendants admitted they did not do a pre-Project Fuel comprehensive review of compliance in the Company's Form 8-K filed with the SEC on April 16, 2010, stating that Hospira, after receiving two Warning letters finally: "***will be undertaking a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations.***" This comprehensive review was at least fifteen months too late.  The Board did not halt all insider selling pending the results of this comprehensive review; rather, it permitted a selling spree by panicked and greedy insiders.  Nor did the Board await the outcome of this crucial review to approve a stock-boosting repurchase program.   The actions of the Board reflect a willful refusal to exercise independent oversight.  The Board exhibited a stubborn refusal to reverse Board decisions that had proven to be ill-considered.  Regardless of whether the Board's refusal to reverse course was due to willful ignorance, or embarrassment, it could not have been the product of a reasonable exercise of business judgment, and is not protected by the business judgment rule.  Unlike many other companies that have experienced FDA problems, Hospira is unique: its woes are directly traceable to reckless (and often inexplicable) decisions of its Board.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    The Individual Defendants Adopt the Reckless Project Fuel and Issue Misleading Statements

46.    On February 17, 2009, Hospira management held a conference call to discuss 2008's fourth quarter and full year financial results.   CEO defendant Begley stated he was pleased with Hospira's "solid revenue and strong profit growth," but displeased with the Company's "average" performance when measured against its peers.   The solution he announced was a cost-cutting program dubbed, "Project Fuel."   Defendant Begley stated:

> To provide a little history on this project, we spent a good deal of time in 2008 measuring our financial progress and related metrics against our peers. We have made significant progress over the past five years. We transformed Hospira from an under invested, no-growth business with declining margins to a Company with top line growth and improving margins. Our gross margin increased by over 1000 basis points and our operating margin increased by approximately 400 basis points. But as far as we have come our analysis told us we still only measure as average against our peers from operating margins to return on invested capital. ***We are certainly not satisfied with being in the middle and we know we can do better.***

> ***This compelled us to move forward with a project we call FUEL which is aligned with our overall strategy to improve margins and cash flow and drive sustained growth for*** *Hospira*. In January we announced to our employees the first of what will be several phases of Project FUEL. In addition to the cost containment measures I mentioned previously, the first phase includes streamlining our organizational structure to optimize operational effectiveness. To reduce complexity we have dissolved the Global Pharma and Global Device strategic business unit structure centralizing our global marketing, strategy and business development activities to best meet the needs of the overall Company and better support the geographic regions. We have also streamlined our senior leadership team to more effectively enable change and focus the business. These actions will drive further efficiencies and better enable us to take advantage of growth opportunities.

> The next phases of Project FUEL will include streamlining processes, reducing product line complexity, and aggressively managing low product lines. In addition, we believe there is opportunity to improve efficiency and performance in several departments such as global procurement, finance, IT, U.S. sales force and R&D. We are in the midst of a detailed review of those particular areas.

47.     On March 24, 2009, Hospira issued a press release that provided, in pertinent part, as follows:

Hospira, Inc. (NYSE: HSP), a leading global specialty pharmaceutical and medication delivery company, today announced details regarding Project Fuel, a multi-phased initiative to improve the company's margins and fuel its growth. Project Fuel will capitalize on the company's potential to increase shareholder value and improve operational efficiency by optimizing its product line, evaluating non-strategic assets and streamlining its organizational structure.

In conjunction with these actions, which are slated to occur over the next 24 months, Hospira expects to reduce its global workforce by approximately 10 percent and deliver annual cost savings of approximately $110 million to $140 million.

"To maximize our opportunities for growth and sustainable shareholder value, Hospira is taking a number of important steps to simplify our business, strengthen our financial position and establish a strong foundation for our future," said Christopher B. Begley, chairman and chief executive officer, Hospira. "By reducing costs and improving efficiencies, we can free up more dollars to invest for profitable growth and shareholder returns. And with a streamlined, focused organization, we will reduce complexity, improve performance and be better positioned to advance our significant opportunities."

                          *   *   *

**Workforce impact**

The net projected reduction associated with these collective actions represents approximately 10 percent of the company's global workforce, with the majority of reductions occurring in the next 12 months. Hospira will help prepare employees for the transitions through the provision of assistance packages.

48.     As a result of this announcement, the price of Hospira's common stock increased by 7.4%.  The day after the Company issued the press release, Leerink Swann & Co. raised Hospira's rating to "outperform" and Hospira's stock price rose an additional 5.6% as the market reacted favorably to the positive news.

49.     On April 28, 2009, the Company issued a press release reporting its first quarter financial results for the three months ended March 31, 2009, touting "improved manufacturing efficiency."  The press release stated, in part:

"Hospira delivered on its commitments in the first quarter, generating solid sales and earnings growth in a period marked by continued economic uncertainty," said Christopher B. Begley, chairman and chief executive officer. "***Looking forward, we believe the results of our strategic investments and our focus on execution position us well to deliver our financial commitments for 2009. In addition, we are driving operational excellence through our optimization initiatives under Project Fuel, which will create long-term, sustainable growth and increased shareholder value***."

\* \* \*

***Driving the majority of the increase was improved manufacturing efficiency***, with a contribution from favorable volume/mix.

50.     The very next day, on April 29, 2009, Hospira's Clayton facility received a post-inspection Form 483 from the FDA with ten observations. The violations noted are of the types caused by severe understaffing, which leads to SOP violations. Sufficiently staffed facilities are able to comply with SOPs in a timely manner, and do not have problems of the magnitude discovered. The Form 483 report included an unusual five-page long description of product testing violations, lack of testing, delayed testing, and inadequate scientific validation of results. Sterilizers (which prevent microbial contamination) that were required to be inspected annually by Clayton personnel had not been; the inspection was not done for two years. Required written procedures to ensure drug safety were found to be non-existent. Problems noted by the inspectors were of long duration and not new. Based on the receipt of a Form 483 report of this nature, Project Fuel's plans for layoffs of quality control personnel should have been immediately discontinued.

51.     The violations the FDA noted at Clayton included, among other things, an absence of written procedures, the failure to follow responsibilities and procedures, and the failure to adequately control manufacturing processes, including the manufacturing of Propofol Injectable Emulsion. The specific observations in the Form 483 report included the following:

- There is a failure to thoroughly review any unexplained discrepancy and the failure of a batch or any of its components to meet any of its specifications whether or not the batch has been already distributed;

- ***Procedures designed to prevent microbiological contamination of drug products purporting to be sterile are not written and followed;***

- ***Master production and control records lack complete manufacturing and control instructions;***

- The production area air supply lacks an appropriate air filtration system;

- Appropriate controls are not exercised over computers or related systems to assure that changes in master production and control records or other records are instituted only by authorized personnel;

- ***The responsibilities and procedures applicable to the quality control unit are not fully followed***;

- ***Written procedures are not established and followed*** for evaluations conducted at least annually to review records associated with a representative number of batches, whether approved or rejected;

- ***Written procedures are not followed*** for evaluations done at least annually and including provisions for a review of returned or salvaged drug products and investigations conducted for each drug product;

- ***Control procedures are not established which validate the performance of those manufacturing processes that may be responsible for causing variability in the characteristics of in-process material and the drug product; and***

- ***Laboratory controls do not include the establishment of scientifically sound and appropriate specifications and test procedures designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity.***

52. Approximately two months later, on June 30, 2009, Hospira's Morgan Hill facility received a Form 483 from the FDA, noting that Hospira had failed to take sufficient corrective action in response to reports of faulty power cords that could lead to sparking. Specifically, the FDA faulted Hospira for failing to "correct devices that are in the field nor devices that are returned for service or serviced in the field, nor the inventory at the time that the correction was instituted."

53.     On July 29, 2009, the Company issued a press release reporting its second quarter financial results for the three months ended June 30, 2009. Despite the recent Form 483s received by Hospira's facilities, and the apparent lack of quality controls, defendant Begley touted that the Company was making "significant progress toward [its] Project Fuel initiatives." The press release stated, in part:

> "*Hospira delivered a very good second quarter, marked by strong sales and earnings, and significant progress toward our Project Fuel initiatives*," said Christopher B. Begley, chairman and chief executive officer. "*Based on our results for the first half of the year and our expectations for the remainder of 2009, we have increased our full-year adjusted earnings guidance. We remain committed to improving shareholder value through sustainable top- and bottom-line growth*."

54.     Also on July 29, 2009, the Company filed with the SEC its quarterly report on Form 10-Q for the three months ended June 30, 2009. The Company's Form 10-Q, which reiterated the Company's financial results, was signed by defendant Werner, and contained the required Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by defendants Werner and Begley. The Form 10-Q discussed Project Fuel and stated, in part:

> *In March 2009, Hospira announced details of a multi-stage restructuring and optimization plan ("Project Fuel") which will occur over the next two years*. *Project Fuel includes the following activities: optimizing the product portfolio, evaluating non-strategic assets, and streamlining the organizational structure.*

**B.      The Company Receives the FDA's August 2009 Warning Letter**

55.     On August 14, 2009, Hospira publicly filed a Form 8-K with the SEC announcing that the Company had received what would be the first of three Warning Letters from the FDA (the "August 2009 Warning Letter"). The August 2009 Warning Letter, which followed an April 2009 FDA investigation of Hospira's Morgan Hill facility, was summarized in the Form 8-K as follows:

> On August 13, 2009, the Company received a warning letter, dated August 12, 2009, from the FDA related to the Company's corrective action plans with respect

to the failure of certain AC power cords manufactured by a third party. The affected power cords are used on certain of the Company's infusion pumps and related products. The Company takes this matter seriously and intends to respond fully, and in a timely manner, to the FDA's warning letter. There can be no assurance that the FDA will be satisfied with the Company's response. The Company is initiating a voluntary recall of the affected power cords.

*The Company does not expect either of these events to adversely impact the Company's ability to achieve the 2009 financial projections communicated with the second quarter 2009 earnings release.*

56.     The August 2009 Warning Letter stated, among other things, that the FDA had inspected the Company's Morgan Hill facility between April 21, 2009 through May 22, 2009 and discovered "adulterated" infusion pumps and a "[f]ailure to identify the actions needed to correct and prevent the recurrence of nonconforming product and other quality problems." Despite the Company creating a "Correct and Preventative Action report" to "investigate reports of failing AC power cords," the Company "*continue[d] to distribute the old AC power cords as replacement parts*."

57.     The August 2009 Warning Letter, a summary of which the Company made publicly available, served as a red flag to the Individual Defendants that at least the Morgan Hill facility (and more than likely other plants as well) was producing adulterated goods in violation of FDA regulations, and was not staffed sufficiently to comply with FDA rules.

58.     At about the same time, the FDA made further observations about the state of the Company's manufacturing facilities in Rocky Mount and Clayton, which the Company chose not to disclose, including that Hospira's Clayton facility suffered from severe quality control issues, and that certain of the drugs produced there, such as Liposyn, Propofol, and Cleviprex emulsion products, were contaminated with stainless steel particles. The Individual Defendants, however, failed to take appropriate steps to rectify these problems. Rather, they continued Project Fuel, along with its layoffs of quality control personnel.

**C.** **Notwithstanding the August 2009 Warning Letter, the Individual Defendants Continue Project Fuel**

59.     On October 27, 2009, the Company issued a press release reporting its third quarter financial results for the three months ended September 30, 2009.  The press release once again touted progress toward the Company's Project Fuel initiatives.   In the press release, defendant Begley stated:

> "***Hospira delivered strong results in the third quarter, aided by the launch of the generic oncolytic oxaliplatin and additional progress toward our Project Fuel initiatives***," said Christopher B. Begley, chairman and chief executive officer. "***We continued to position Hospira for future success in this milestone quarter,*** during which we surpassed the billion dollar revenue mark for the first time and generated strong double-digit earnings per share growth.  We remain confident in our projections for full-year sales and are increasing our earnings per share guidance."

60.     Also on October 27, 2009, the Company filed with the SEC its quarterly report on Form 10-Q for the three months ended September 30, 2009.   The Company's Form 10-Q explained that the gross profit increase brought by manufacturing efficiency gains associated with Project Fuel were only partially offset by the impact of certain quality control costs.  The Form 10-Q was signed by defendant Werner and contained the required SOX certifications signed by defendants Werner and Begley.  The Form 10-Q stated, in part:

> *The gross profit increase is primarily the result of higher sales volume and favorable product mix including the U.S. product launch of generic oxaliplatin and manufacturing efficiency gains associated with Project Fuel, partially offset by the impact of certain product recall related costs* and changes in foreign exchange.

**D.**     **Hospira Recalls Lyposyn and Propofol**

61.     On November 6, 2009, Hospira issued a nationwide recall of certain lots of Liposyn and Propofol products because they were contaminated with particulate matter. In a press release to the market, ***which misleadingly claimed that Hospira had identified the*** "***root cause***" ***of the problem and implemented*** "***corrective actions***," the Company stated, in part:

Hospira, Inc. (NYSE: HSP), a global specialty pharmaceutical and medication delivery company, is voluntarily recalling 85 lots of Liposyn™ II 10%, Liposyn II 20%, Liposyn III 10%, Liposyn III 20%, Liposyn III 30% and 73 lots of Propofol Injectable Emulsion 1% products that begin with the lot numbers 79 and 80 because some of the containers may contain particulate matter. ***The source of the particulate matter has been identified as stainless steel equipment used in the manufacturing process. The affected lots were distributed between July 2009 and October 2009, and no other lots are affected by this recall***.

Hospira is undertaking this recall in consideration of the potential for safety issues if the products are administered to patients. Since these particulate contaminants do not dissolve in blood they could potentially act as emboli and impede blood flow. Particulates may also cause mechanical damage to the body and may escalate damage through the Systemic Inflammatory Response Syndrome (SIRS). Restriction in blood supply to tissues could lead to stroke, respiratory failure, kidney failure, liver failure, heart attack and/or death.

Hospira has not received any reports of adverse events related to this issue. ***Hospira has identified the root cause and corrective actions have been implemented.*** Hospira has made the U.S. Food and Drug Administration (FDA) aware of the situation.

Contrary to these representations, Hospira had not identified and corrected the root cause of its particulate contamination throughout its plants. The root cause was Project Fuel, its severe cost-cutting, and lack of resources necessary to conduct needed inspections. To correct the overall particulate issue, Hospira would need to stop running its production lines so quickly and permit time for properly trained personnel to conduct and verify visual inspections. But management and the Board refused to slow or dismantle Project Fuel. It was full speed ahead.

### E.    Bullish Statements on Project Fuel Continue Post-Recall

62.    On February 4, 2010, Hospira issued a press release entitled, "Hospira Reports Fourth-Quarter and Full-Year 2009 Results."[14]    The press release touted the Company's fourth quarter and full-year financial results for the three and twelve months ended December 31, 2009, crediting Project Fuel for the positive news. The press release stated, in part:

---

[14]   The Class Period in the Federal Securities Action runs from the date of this press release, February 4, 2010, and continues through October 17, 2011 ("Securities Action Class Period").

*"Driven by double-digit revenue and adjusted earnings growth, the fourth quarter concluded a year of transformation for Hospira.  In addition to our strong financial performance, we made significant progress on many fronts, including augmenting our biogenerics program, launching a generic version of a blockbuster oncology drug, and advancing Project Fuel, our corporate-wide optimization initiative,"* said Christopher B. Begley, chairman and chief executive officer.  *"Looking forward, we expect 2010 to be another good year of growth for Hospira.  Backed by our commitment to strong execution and focus on sustained operational improvement, we continue to position Hospira for sustainable, long-term growth and increased shareholder value.*"

\* \* \*

*Adjusted\* income from operations increased 8.5 percent to $204 million in the fourth quarter of 2009*, compared to $188 million in the fourth quarter of 2008.  *Driving the majority of the increase were* higher net sales, more favorable product mix and *improvements resulting from the company's Project Fuel optimization initiatives*.

\* \* \*

"The significant momentum we generated in 2009 has paved the way for continued progress in 2010," said Begley.  "With our robust product pipeline, *anticipated advancements in* both Specialty Injectable Pharmaceuticals and *Medication Management Systems, combined with our focus on operational optimization through Project Fuel, Hospira is on track for another good year*."

63.     During a conference call on February 4, 2010, to discuss the Company's financial results, defendant Begley touted the efficiencies achieved through Project Fuel:

We kicked off Project Fuel, a corporate wide optimization initiative to drive long-term profitable growth and increased shareholder value, and we met the commitments we set forth for 2009.

\* \* \*

We have met our Project Fuel commitments in 2009, aggressively driving transformation throughout the organization and building momentum going into 2010.

\* \* \*

*Efforts such as these will optimize our productivity and allow us to free up additional funds for investment in our business, driving even better execution of our longer-term financial targets and business goals*.

\* \* \*

- 40 -

Our strong performance in the fourth quarter brought to a close a very good year for Hospira, a year of significant transformation for the company. ***The far-reaching changes we've made with Project Fuel have not only improved our operations, they have significantly changed the profitability profile....*** In short, we've change[d] Hospira, for the better.

64.     On February 18, 2010, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2009.  In the Form 10-K,  defendants Begley, Werner, Bailey, Bowles, Curran, Hale, Matricaria, Sokolov, Staley, Wheeler, and von Prondzynski reiterated that the FDA investigation had not materially impacted Hospira's ability to market and sell its products.  In addition, the Form 10-K once again underplayed the significance and scope of the FDA's August 2009 Warning Letter, instead emphasizing the strength of the Company's quality control.  It provided, in pertinent part, as follows:

> Hospira has developed and implemented quality systems and concepts throughout its organization.  Hospira is actively involved in setting quality policies and managing internal and external quality performance.  ***Its quality assurance department provides quality leadership and supervises its quality systems.  An active audit program, utilizing both internal and external auditors, monitors compliance with applicable regulations, standards and internal policies.***  In addition, Hospira's facilities are subject to periodic inspection by the FDA and other regulatory authorities.  ***Hospira has received notices from regulatory authorities alleging violations of applicable regulations and standards, and Hospira has developed definitive action plans, implemented remedial programs and modified its practices to address these issues.***[15]  During 2009, Hospira received a warning letter from the FDA related to Hospira's corrective action plans with respect to the failure of certain AC power cords manufactured by a third party.  The affected power cords are used on certain infusion pumps and related products.  Hospira initiated a voluntary recall of the affected power cords in August 2009.  ***Hospira has responded to the warning letter and is working closely with the FDA to conclude this matter.  Hospira initiated other voluntary recalls of certain other products and initiated field corrections and other remedial actions with respect to those products.  Hospira continues to have an ongoing dialogue with the FDA.  These matters have not materially impacted Hospira's ability to market and sell its products***.

---

[15]  Given this language, Hospira's directors cannot plausibly deny knowledge of the various FDA "notices" discussed *supra.*

65.     On February 23, 2010, the FDA issued another Form 483 on Hospira's Clayton facility.  The Form 483 included eight observations, including repeat violations—a reflection of severe understaffing of CAPA Programs.  For instance, the FDA noted that Hospira "*has failed to control, monitor, and correct particulate matter contamination in the manufacturing processes* for Liposyn I.V. Fat Emulsion, Propofol Injectable Emulsion, and Cleviprex Injectable Emulsion.  *This is an ongoing issue.*"  The FDA further noted that Hospira failed to "validate the manufacturing process," and that when informed of this by an outside consultant, Hospira "did not notify their customer … or make any other corrective actions."  Issues identified went as far back as 2006.  Due to severe understaffing, necessary investigations were not performed. For example, a "floating particle" was seen in a Propofol Injectable Emulsion; it was identified as "black chunky matter"; no investigation ensued as was required—rather, the lot from which it was drawn was sent out for distribution and use in patients.  The specific observations in the Form 483 included the following deficiencies of long duration:

- *Control procedures are not established* which monitor the output and validate the performance of those manufacturing processes that may be responsible for causing variability in the characteristics of in-process material and the drug product;

- *Production processes were not developed and complete to ensure that a device conforms to its specifications;*

- There is a failure to thoroughly review any unexplained discrepancy whether or not the batch has been already distributed;

- *Acceptance criteria for the sampling and testing conducted by the quality control unit is not adequate to assure that batches of drug products meet each appropriate specification and appropriate statistical quality control criteria as a condition for their approval and release*;

- *Laboratory controls do not include the establishment of scientifically sound and appropriate sampling plans designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity*;

- ***The responsibilities and procedures applicable to the quality control unit are not in writing and fully followed***;

- Reserve samples from representative sample lots or batches of drug products selected by acceptable statistical procedures are not examined visually at least once a year for evidence of deterioration;[16] and

- An NDA-Field Alert Report was not submitted within three working days of receipt of information concerning significant chemical, physical, or other change or deterioration in a distributed drug product.

66.     Despite the FDA's ongoing scrutiny of Hospira's quality controls and legal compliance, defendant Werner hyped the Company's progress in its Project Fuel initiative during the Raymond James Institutional Investors Conference on March 9, 2010.   Specifically, defendant Werner claimed the initiative was "adopted to drive operational excellence and then drive and generate top quarter financial performance.  We believe it is really serving to transform the company."  Defendant Werner further claimed that Project Fuel would "support further long-term growth and hopefully support top quartile, consistent, sustainable shareholder value performance."   The initiative would also result in "increased efficiencies" and improved "productivity per employee."   What he meant (euphemisms aside) is that severe layoffs were underway.

67.     The following day, during the Cowen and Company Healthcare Conference, defendant Werner claimed that "Project Fuel continues to have us very focused on the base business and its health."  He continued, "and I think Project Fuel is what gives us the confidence that the base business will continue to fire on all cylinders."

---

[16]   Pursuant to Code of Federal Regulations, Title 21, Sections 211.170 and 600.13, Hospira is required to "retain" samples of "each lot of each product, sufficient for examination and testing for safety and potency…."  If the drug has deteriorated, those lots still in distribution must be recalled.    This observation, however, indicates that Hospira's Clayton facility was so understaffed that the Company failed to even review these retained samples on an annual basis.

**F.       The FDA Issues a Second Warning Letter Repeating Many of the Observations in Its First Warning Letter**

68.       On April 16, 2010, Hospira filed a Form 8-K with the SEC announcing that the Company had received a second Warning Letter from the FDA, dated April 12, 2010, "in connection with the FDA's inspection of the Company's pharmaceutical and device manufacturing facilities located in Rocky Mount, North Carolina and Clayton, North Carolina." ("April 2010 Warning Letter").   The April 2010 Warning Letter identified many of the same ***observations and violations that the FDA had informed Hospira about almost a year prior***, demonstrating that the Individual Defendants were on notice of the FDA violations at many of the Company's facilities but consciously disregarded them or failed to take sufficient steps to rectify them.   At the very least, the second Warning Letter's mention of unrectified violations told the Board that the SOP compliance and CAPA Programs were broken, and that this was due to insufficient personnel and resources, given the nature of the violations.   For instance, the April 2010 Warning Letter indicated that the Company's November 6, 2009, voluntary recall of Propofol and Liposyn products involved lots that contained "***visible particle contamination***" and that, while these batches were manufactured in 2007, Hospira failed to detect the problem until November 2009.   A failure to inspect is invariably attributable to lack of personnel to do the inspection.   The Form 8-K did not contain a copy of the April 2010 Warning Letter, but summarized the FDA's instruction as follows:

> On April 13, 2010, Hospira, Inc. (the "Company") received a warning letter, dated April 12, 2010, from the U.S. Food and Drug Administration (FDA) in connection with the FDA's inspection of the Company's pharmaceutical and device manufacturing facilities located in Rocky Mount, North Carolina and Clayton, North Carolina.
>
> In the warning letter, the FDA cites Current Good Manufacturing Practice deficiencies related to particulate in certain emulsion products at the Clayton facility and the failure to adequately validate the processes used to manufacture the Company's products at the Rocky Mount facility. The letter also asserts other

inadequacies, including the Company's procedures related to the Quality Control unit, investigations, and medical device reporting obligations. *The letter asserts that some of the deficiencies were repeat observations from a prior inspection conducted in April 2009, and include a similar violation cited in an August 12, 2009 warning letter to the Company's Morgan Hill, California facility*.

*The Company will be undertaking a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations.[17] The warning letter does not restrict production or shipment of the Company's products from these facilities, but the Company is holding shipment of certain products pending its further investigation and discussions with the FDA. The Company does not anticipate that these matters will adversely impact the Company's ability to achieve the 2010 financial projections communicated with the full year 2009 earnings release.[18]*

The Company takes this matter seriously and intends to respond fully, and in a timely manner, to the FDA's warning letter. Until the violations are corrected, the Company may be subject to additional regulatory action by the FDA, including the withholding of approval of new drug applications, seizure, injunction, and/or civil monetary penalties. Any such actions could significantly disrupt our ongoing business and operations and have a material adverse impact on our financial position and operating results. There can be no assurance that the FDA will be satisfied with the Company's response. The warning letter will be posted on the FDA's website at www.fda.gov and, once posted, will be available for viewing.

69.     Hospira's Form 8-K announcing the Company's receipt of the April 2010 Warning

Letter was also materially misleading and failed to disclose important information concerning

---

[17]   This statement constitutes a remarkable admission that the Company had not previously conducted a necessary compliance review, despite adopting Project Fuel. As noted, insiders did not await the outcome of this "comprehensive review" before dumping their shares. Even more shockingly, the Board did not refrain from its aggressive buy-back program until the results were in.

[18]   This last sentence, in retrospect, revealed the Board's true plans. Any "comprehensive review" would be "budget-limited" so as not to knock off-kilter the "2010 financial projections." This is blatant bad faith. It is absolutely impossible before a comprehensive review is underway to determine that it will not result in costs of tens of millions or even hundreds of millions of dollars in remedial costs. That the Board "knew" ahead of time that the comprehensive review would not involve such costs was nonsensical. What it meant is that the review would not be so comprehensive that it would undermine Project Fuel, as the Board would not allow it to do so. Sure enough, despite mounting unremediated issues, reported 2010 earnings per share fell in the range of the guidance that was in place at the time this statement was made. (Earnings of $3.31 per share were reported on February 2, 2011, as compared with guidance as of this time of $3.25-$3.35 per share that was conveyed in a February 4, 2010 conference call.).

Hospira's significant operational, manufacturing, and quality control deficiencies. In addition, the promised "comprehensive review of [Hospira's] manufacturing operations to ensure compliance with applicable regulations" was not even fully initiated until eighteen months later (the delay being "managed" so as not to affect projected earnings). The Individual Defendants consciously failed to insist upon this comprehensive review because such a review would threaten Project Fuel.

70. Further, the April 2010 Warning Letter indicated that there were additional problems with the Company's products involved in the November 2009 recall that were not disclosed to the public, and which were in addition to failures touched on in the FDA's August 2009 Warning Letter. The April 2010 Warning Letter provided as follows, in part:[19]

April 12, 2010
VIA FEDERAL EXPRESS
WARNING LETTER
Christopher B. Begley
Chief Executive Officer
Hospira, Inc.
275 N. Field Drive
Bldg. 2
Lake Forest, Illinois 60045

Dear Mr. Begley:

During our January 12 - 19 and January 26 - February 23, 2010 inspection of your pharmaceutical and device manufacturing facilities located at 4285 North Wesleyan Boulevard, Rocky Mount, North Carolina, and at 8484 U.S. Highway 70 West, Clayton, North Carolina, respectively, investigators from the Food and Drug Administration (FDA) identified significant violations of Current Good Manufacturing Practice (CGMP) regulations for Finished Pharmaceuticals, Title 21, Code of Federal Regulations, Parts 210 and 211. These violations cause your drug products to be adulterated within the meaning of section 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (the Act) [21 U.S.C. § 351(a)(2)(B)], in that the methods used in, or the facilities or controls used for, their manufacture,

---

[19]  The full text of the April 2010 Warning Letter is incorporated by reference herein, and may be viewed at: http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm208691.htm.

processing, packing, or holding do not conform to or are not operated or administered in conformity with, CGMP.

We reviewed your firm's responses of February 9 and March 16, 2010, and note that they lack sufficient corrective actions.

Specific violations observed during the inspection include, but are not limited, to the following:

**CGMP Violations**

A. Clayton facility

1. ***Your firm does not have adequate written procedures for production and process controls designed to assure that the drug products you manufacture have the identity, strength, quality, and purity they purport or are represented to possess*** [21 C.F.R. § 211.100(a)].

***For example, your firm failed to assure adequate process design and control of Liposyn, Propofol, and Cleviprex emulsion products to prevent objectionable particulate contamination (primarily stainless steel). Such controls would include, but are not limited, to appropriate component controls, equipment suitability, equipment maintenance, and filtration.***

***This particulate contamination problem has been a persistent and serious issue at your firm for multiple years. For example, 16 lots of Propofol and Liposyn manufactured in 2007 contained visible particulate contamination. Your firm did not detect the particulate problem until November 2009 when you performed the second annual retain inspections, which were three to nine months overdue. By then, all 16 lots had expired. Further, substandard manufacturing practices led to three recent major recalls. These recalls were initiated due to excessive contamination with particulates (primarily stainless steel) and included 78 lots of Propofol, 121 lots of Liposyn, and 24 lots of Cleviprex. These lots were manufactured at your Clayton facility between January 2008 and February 2010.***

Your failure to follow written procedures, assure prompt investigation, determine root cause, and implement appropriate corrective action ***resulted in exposure of patients to objectionably contaminated drugs.***

Your March 26, 2010 response states that you will enhance your monitoring program for particulates and complete revalidation activities for all products manufactured at the Clayton facility. The manufacturing processes for Liposyn, Propofol, and Cleviprex will now include a [REDACTED] prior to filling. ***Your response is inadequate because it is unclear if your firm has determined the root cause of the problem and resolved it.*** In addition, you have not provided an interim plan to ensure the quality of drug products that you continue to

manufacture and distribute, prior to the completion of your corrective action and validation activities.

*This is a repeat observation from the April 2009 inspection.*

2. ***Your firm has failed to ensure the responsibilities and procedures applicable to your quality control unit are in writing and are followed*** [21 C.F.R. § 211.22(d)].

For example, your Quality Control Unit (QCD) failed to: (1) ensure that the manufacturing processes for your Liposyn, Propofol, and Cleviprex drug products are adequately designed, controlled, and monitored; (2) implement adequate corrective and preventive actions related to objectionable particulate contamination in Liposyn, Propofol, and Cleviprex drug products; and (3) complete and approve 178 manufacturing investigations within 30 days and issue NDA Field Alert Reports (FAR) in a timely manner.

Your March 16, 2010 response describes a number of improvements made to the QCU since the April 2009 inspection, including revising procedures and hiring personnel. However, the most recent inspection noted serious ongoing violations at this facility despite your efforts to address manufacturing inconsistencies, enhance the monitoring program for particulates, and improve your exception reporting practices.

*This is a repeat observation from the April 2009 inspection.*

3. Your firm has not thoroughly investigated the failure of a batch or any of its components to meet its specifications, whether or not the batch has already been distributed, or extend investigations to other batches of drug product that may have been associated with the specific failure or discrepancy [21 C.F.R. § 211.192].

*For example, you failed to conduct adequate investigations that result in your implementation of corrective actions to prevent recurrence of the problems and evaluate other potentially affected lots.* Specifically, particulates were identified during an inspection of retain samples for two partially distributed lots of Liposyn on January 21, 2010. Subsequently, an exception Report (ER) 1685 was opened on January 25, 2010, due to the particulate contamination. *Although your firm recently experienced multiple serious particulate issues leading to product recalls, you failed to: 1) conduct testing to identify the foreign particulates (which were primarily stainless steel) until February 4, 2010; 2) place the remaining product from the two affected Liposyn lots on distribution hold until February 5, 2010; and 3) inspect retain samples from associated lots until February 10, 2010.*

Your March 16, 2010 response outlines new and revised procedures for investigations and corrective and preventive actions. However, your response is inadequate because you do not address the failure of the Clayton site to follow

QAP-0012, "Exception Reports," or explain whether your review of the large number of open investigations indicates process related deficiencies.

*We also find your response inadequate because you have not explained why Liposyn and Propofol retain samples were not inspected (from the October 2009 corrective action implementation) to verify adequacy until January 2010. This verification was conducted three months after production resumed following the first of three recalls. Timely assessment of quality indicators, such as out-of-specification findings and complaints, is essential to detecting and determining the scope of product or process deficiencies.*

71.     This second Warning Letter was highly significant, as it displays the manner in which the Individual Defendants, in approving Project Fuel and continuing to adhere to its draconian cost-cutting measures, failed to fulfill their duty, in bad faith.  In sum the April 2010 Warning Letter reveals, among other things:

(a)     At the time of the adoption of Project Fuel, Hospira failed to perform required testing as scheduled so as to detect contamination by particulate matter.   The annual retain inspection, in which samples are "retained" and inspected for foreign matter, were three to nine months overdue;

(b)     In April 2009, the FDA told Hospira that it was required to adopt an interim quality control plan before distributing medications found to be unsafe.  For over a year, the Individual Defendants ignored this instruction;

(c)     Contaminated products were manufactured at the Clayton facility between January 2008 and February 2010. Particulates were found in a 2007 batch production. This means that, prior to and at the time Project Fuel was announced, and continuing thereafter, Hospira was producing contaminated medications.  The Individual Defendants consciously and in bad faith disregarded their duty to ensure that such compliance failures were not already occurring when they adopted the reckless cost-cutting plan, and thereby recklessly endangered the public health and safety; and

(d)     When particulate matter was found, the Individual Defendants failed to ensure that it was tested to determine what it was or immediately place the affected medications on distribution hold.

72.     All of these red flags, among others identified in the April 2010 Warning Letter, would have prompted any fiduciary acting in good faith to immediately concentrate on a full-scale remediation review, and a comprehensive remediation program (based upon an independent assessment and review).  Not only was this not done, but insiders were not halted from selling shares based upon what they knew regarding the true extent (and ultimate cost) of these problems.  The Board, although it had the authority to do so, imposed no "event-specific black out period" on stock sales pending a full review of the Company's legal compliance issues.  Instead, it allowed CEO defendant Begley and others to sell significant percentages of their personally held Hospira stock on the market for ill-gotten proceeds equaling tens of millions of dollars.

73.     Throughout this Relevant Period, the Individual Defendants made a conscious decision to adhere to Project Fuel despite the ramifications.  In fact, they did so even though they knew legal compliance and remediation needs had neither been adequately studied nor addressed, and that public safety was at risk.

### G.     Hospira Recalls Liposyn and Propofol for the Second Time

74.     Within weeks of receiving this second Warning Letter from the FDA, Hospira faced another blow to its production efforts. The Company was forced to recall two drugs – Propofol and Liposyn – for the second time in six months. Unsurprisingly, due to Hospira's poor manufacturing practices, the drugs had been contaminated by particulates during manufacturing.

75.     On April 27, 2010, Hospira filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2010.  Hospira's Form 10-Q reiterated the Company's Project Fuel initiatives, was signed by defendant Werner, and contained the required SOX certifications signed by defendants Werner and Begley.  The Form 10-Q discussed "Certain Quality and Product Related Matters," and revealed that Hospira had placed a "*voluntary hold*" on its line of Symbiq infusion pumps.  It also revealed, without providing specifics, that Hospira was now *withholding shipment of certain products* from its offending facilities but that the Company has "*completed a substantial portion of the field corrections and other remediation activities*."

76.     Also on April 27, 2010, Hospira hosted a conference call with analysts to discuss Hospira's first-quarter 2010 financial results.  During the call, defendant Werner claimed that Hospira was voluntarily taking actions in response to the April 2010 Warning Letter in order to "bring the issues identified to a positive resolution," and that Hospira was "in the process of implementing corrective actions."  Defendant Begley also made the following remarks regarding the April 2010 Warning Letter:

> We take these actions very seriously. *We are committed to following the FDA's regulations and Company operating procedures.*
>
>     \*   \*   \*
>
> *We are confident we can demonstrate to the agency our ability and commitment to not only implement these corrective actions, but also to ensure the global application of all improvements.*
>
>     \*   \*   \*
>
> [W]e [at Hospira] are raising our bar internally [and *working to*] *meet the highest level of compliance with both our pharmaceutical and device products*.[20]

---

[20]  Both defendant Begley and the Board were sophisticated enough to know that this statement was extremely disingenuous.  The FDA had no "levels" of compliance—there is merely "compliance" and "non-compliance."   The FDA issues stemmed from the fact that compliance was resource-starved, not from the fact that procedures had been set at some inadequate "level."

* * *

We are redoubling our commitment to quality, ***proactively addressing certain product issues to ensure they meet our high standards. We are working diligently and aggressively to resolve those issues, and are holistically addressing the concerns of the FDA. We are confident in our ability to address these challenges and emerge an even stronger Company. We are committed to delivering our increased full-year guidance for sales and adjusted EPS, and we are on track for another positive year.***

77.     On May 4, 2010, during the Deutsche Bank Securities Health Care Conference, defendant Begley characterized Project Fuel as "an aggressive enterprisewide optimization initiative ***we adopted to drive operational excellence and generate top financial performance***," and noted "the significant progress we are making with Project Fuel, ***which is transforming Hospira into an optimal performer***."  Defendant Begley further noted "increased efficiencies" and "operational excellence" driven by Project Fuel.

78.     On May 11, 2010, the Company responded to the SEC's April 13, 2010 letter.  In its response, the Company purported that it would, in the future, describe "the failures experienced by the AC power cords" and would "provide more detail as to the contents of the Warning Letter."  The Company's May 11, 2010 letter, provided additional details stating that Hospira was withholding shipments of Liposyn, Propofol, and Hospira's Symbiq infusion pump, but that the Company considered its remediation efforts to be "***part of the ordinary course of its business***."  The letter stated, in relevant part:

> Your comment further requests additional disclosure related to the recall costs that were recognized, the specific products subject to recall and the related remediation efforts.  The costs incurred in 2009 in connection with the AC power cord recall were not significant to the Company, and were approximately $6 million pre-tax, which included costs primarily related to quality assessment and testing, materials, labor, and freight.  The remediation activities related to the AC

---

There was no "bar" that needed to be raised; Hospira simply needed to devote the resources to adhering to its own SOPs.

power cords are substantially complete, and the related costs were fully reserved for in 2009. This was disclosed in the Company's 2010 First Quarter Form 10-Q.

*The other voluntary product recalls in 2009 were limited in scope and not related to the AC power cord warning letter. The Company considered these additional recalls to be part of the ordinary course of its business, namely the manufacture and sale of highly regulated pharmaceutical and device products.*

79. The next day, on May 12, 2010, defendant Werner participated in the Bank of America Merrill Lynch Healthcare conference, where he touted that Hospira was "very pleased with our [Project Fuel] progress to date," that Project Fuel was "very much on track," and that Project Fuel had "transformed our organization" … *driving operational excellence and freeing up capital to invest in areas for growth*."

80. Defendant Werner provided investors with a similar message on May 27, 2010, during the Citi Global Healthcare Conference. Defendant Werner claimed that "[w]e're doing very well on Project Fuel; we're on track, very pleased with our progress." Werner continued, "*[w]e have as a tailwind here, if you will, Project Fuel that allows us to really drive margin expansion as well as cash flow improvement…. So we think that, particularly with Project Fuel, that we've positioned the Company for sustained growth*." Defendant Begley also assured investors that regulatory issues were limited to Clayton and Rocky Mount: "*[N]either of those are systemic issues to Hospira, and neither of those are systemic issues to the two plants either*."

## H. The Individual Defendants Continue Project Fuel Despite Two Warning Letters and Ongoing Remediation Efforts

81. On July 28, 2010, Hospira issued a press release reporting the Company's second quarter 2010 financial results for the three months ended June 30, 2010. The press release touted the "*improved manufacturing efficiency from the company's Project Fuel optimization initiatives*" as one of the main forces driving growth, stating in pertinent part:

*"Hospira delivered another solid quarter, driven by strong performance in our Specialty Injectable Pharmaceuticals business and by continued momentum of our Project Fuel optimization initiatives,"* said Christopher B. Begley, chairman and chief executive officer. *"We made significant progress in advancing our business during the quarter,* launching our first product from Hospira India, commercializing our second biosimilar product in Europe and strengthening our position in acute-care proprietary pharmaceuticals. *We are highly focused on executing our strategy of investing for growth and improving margins and cash flow, as well as on driving quality improvements across our global manufacturing organization. We remain on track to achieve our full-year earnings projections*."

* * *

Adjusted* income from operations increased 20.6 percent to $213 million in the second quarter of 2010, compared to $177 million in the second quarter of 2009. *Driving the majority of the increase were more favorable product mix and improved manufacturing efficiency from the company's Project Fuel optimization initiatives, offset by charges associated with certain quality and product-related matters*.

82.     Also on July 28, 2010, Hospira filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2010. The Company's Form 10-Q reiterated the cost reductions and future benefits associated with Project Fuel initiatives, was signed by defendant Werner, and contained the required SOX certifications signed by defendants Werner and Begley. The Form 10-Q stated, in part:

Gross profit increased $23.0 million, or 6.6%, for the three months ended June 30, 2010, compared with the same period in 2009.

The gross profit increase was primarily the result of higher sales volume and favorable product mix including the impact of the U.S. oxaliplatin sales and continued higher sales of Precedex[TM]. *In addition, cost reductions associated with Project Fuel initiatives and the impact of foreign exchange contributed to the increase, partly offset by activities directly associated with the FDA's Warning Letter received in April 2010 and voluntary shipment holds on certain products, as previously described, as well as penalties for failure to supply customers and increased warranty charges on these and other products*.

83.     During a conference call later that same day, defendant Begley discussed Hospira's communications with the FDA and stated, *"We believe the FDA has [accepted] the*

*remediation plan we laid out. We are now dedicated to fulfilling the planned commitments, the bulk of which we expect to complete by year-end*." Defendant Begley explained that "I literally have a weekly meeting with management here reviewing the progress on the plan, not only for Clayton and Rocky Mount, but the status of our initiatives across all of our manufacturing plants," and that "then I have a larger monthly meeting. And so the ball is in our court clearly now to execute that plan." Defendant Begley made these statements even though he (and the Board) knew that no "comprehensive review" designed to identify Hospira's FDA violations, and announced only a few weeks before, had been undertaken, let alone completed. Defendant Begley further touted that "We remain on track with Project Fuel and we are pleased with our progress on this organization wide optimization program," and "*Project Fuel is designed to simplify our business and drive continuous improvement and operational excellence in order to obtain top tier financial performance*." Defendant Begley concluded, "*Despite several unanticipated challenges, we remain on track to achieve our sales and earnings projections for 2010. I attribute much of this to Project Fuel, which is [] driving improved operational performance*…."

84. On August 12, 2010, Hospira participated in the Bank of America Merrill Lynch Specialty Pharmaceuticals Conference, during which defendant Werner touted that Project Fuel "*really was about driving operational excellence, improving margins, driving additional cash flow.… We're on track, we're ahead of all of our goals*." Defendant Werner also claimed that Hospira was "*working across our operations to make sure that we meet the highest level of compliance and quality for both pharmaceutical and device products*."

85. Then, during the September 13, 2010 Morgan Stanley Global Healthcare Conference, defendant Werner claimed that Hospira would face a "calmer" regulatory

environment in 2011 and expressed optimism that "the quality issues we've seen and others have seen in the industry will be largely behind us."  Given that the promised comprehensive review had not been done, defendant Werner had no way of knowing this, yet the Board (which also knew the review had not been done) let him say it.

86.    On October 26, 2010, Hospira issued a press release reporting the Company's third quarter 2010 financial results for the three months ended September 30, 2010.  The press release discussed the "continued contributions from Project Fuel" in helping the Company gain momentum, stating in pertinent part:

> "*Hospira delivered a solid third quarter, despite difficult year-over-year comparisons from the temporary discontinuation of U.S. oxaliplatin sales and the impact of several divestitures*," said Christopher B. Begley, chairman and chief executive officer. "*During the quarter, we gained momentum on several of our existing and newly launched specialty pharmaceuticals; we saw continued contributions from Project Fuel, our companywide optimization initiative; and we made good progress on our quality-improvement efforts. We believe the efforts and advancements we are making this year position Hospira for another good year and continued growth going forward*."

87.    On October 26, 2010, Hospira filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2010.  The Company's Form 10-Q reiterated the Company's financial results, was signed by defendant Werner, and contained the required SOX certifications signed by defendants Werner and Begley.  The Form 10-Q further discussed "Certain Quality and Product Related Matters," and stated, in part:

> *Hospira has made significant progress on completing a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations.*
>
> Hospira has responded to the April 2010 Warning Letter and is working closely with the FDA to conclude these matters. As part of Hospira's response, Hospira took immediate actions to address the FDA's concerns, including recalling the propofol and liposyn products manufactured at the Clayton facility and the fosphenytoin sodium injection products manufactured at the Rocky Mount facility. *Hospira is also working with several third party experts to assist with the ongoing activities at both facilities. Hospira has implemented certain*

*interim controls, including third party oversight, to ensure products manufactured at both facilities meet their specifications prior to release. The Warning Letter does not restrict production or shipment of Hospira's products from these facilities but Hospira is holding shipment of certain products pending its further investigation and discussions with the FDA. Hospira resumed shipment of certain products placed on voluntary shipping hold, but cannot predict when all products on voluntary hold will be reintroduced to the market*.

88.　During a October 26, 2010, conference call with analysts, defendants Begley and Werner reassured the market that Hospira was financially sound, the quality initiatives at Rocky Mount were nearing completion, and Project Fuel was continuing to promote significant efficiencies:

> Defendant Begley: "Regarding the warning letter we received from the US FDA, related to the inspections of our manufacturing facility in Clayton and Rocky Mount, North Carolina, we continue to make good progress during the quarter. *We are on track to fulfill our plans commitment most of which we expect to complete by year-end.*"

>       *   *   *

> Defendant Werner: "*We continue to make significant progress year-to-date on project fuel and are on track to meet our estimate of $70 million to $80 million in cumulative savings this year and $110 million to $140 million in cumulative savings in 2011*."

>       *   *   *

> Defendant Begley: "With solid results for the third quarter, *Hospira is on track to deliver another great year. Bolstered by strong performance in our specialty injectable pharmaceutical business and continued contributions from project fuel.… We also made progress on our quality improvement initiatives working diligently to ensure we are delivering the highest quality products to our customers and patients. We believe the efforts and advancements we are making this your position us for continued growth going forward as well.*"

89.　Analysts responded positively to the Individual Defendants' statements. On October 26, 2010, analysts from JP Morgan Chase & Co. ("JP Morgan") stated that the Company was "[p]ositioned for [s]ignificant 2011 [g]rowth," pointing to Hospira's "good progress on the measures it is taking to improve manufacturing quality at its facilities in Clayton and Rocky

Mount, North Carolina which were the subject of an FDA Warning Letter earlier this year" and that the Company "remains on track to complete most of the improvements by year-end." On October 27, 2010, Morgan Stanley & Co. LLC analysts stated that Hospira "delivered a solid quarter" and that Project Fuel was producing clear benefits. On October 27, 2010, The Buckingham Research Group stated that Hospira's 2011 outlook "should benefit from some ongoing Project Fuel (optimization program) results with incremental year-year synergies."

90. During a November 30, 2010 Piper Jaffray Healthcare Conference, defendant Werner continued to tout Project Fuel, which he claimed was "***advancing operational excellence and sustainable shareholder value***" and provided for expected annual savings of $110 million to $140 million in 2011.

91. On January 11, 2011, defendant Werner attended the JP Morgan Healthcare Conference, during which defendant Werner highlighted the quality improvements from Project Fuel and claimed that Hospira's quality efforts at Rocky Mount were completed:

> ***Fuel has not only transformed our profitability profile,*** but it's optimized our operations and refined our culture further honing our focus on driving shareholder value.
>
> ***Results have been very impressive. The efforts have translated into impressive results on all fronts. We've significantly improved our financial performance in many metrics***, including sales, operating margins and EPS growth.
>
>         *   *   *
>
> ***Now, while Project Fuel is technically winding down this year, its benefits and effects will continue for a long time to come.***
>
>         *   *   *
>
> ***We think we have essentially completed all of the activities in the Clayton and Rocky Mount facilities that we outlined in our response to the warning letter from FDA. At some point they'll be back in the facilities. There's not an official***

*lifting of the warning letter as of – per se, but we fulfilled all of the things that we need to do essentially.*[21]

*And more importantly or as important, we're beginning to roll those changes out globally to all of our facilities so that when FDA shows up wherever and whenever, they should expect to see a very consistent approach to things across all Hospira facilities in the US and globally.*

92.     On February 2, 2011, Hospira issued a press release reporting the Company's fourth quarter and full-year 2010 financial results for the three and twelve months ended December 31, 2010.  The press release stated that the Company not only "made substantial progress" with its quality initiatives, but did so while meeting its "commitments with Project Fuel."  This was an improper statement because in actuality, Project Fuel's cost-cutting measures were to blame for the Company's quality control manufacturing deficiencies.  The press release stated in pertinent part:

"***2010 marked a year of progress for Hospira, despite several unanticipated challenges***," said Christopher B. Begley, chairman and chief executive officer. "We launched gemcitabine, a large oncology drug, in the United States during the fourth quarter, the first generic version of the drug in the market; we expanded both our operations and portfolio geographically; ***we made substantial progress with our quality initiatives; and we met our commitments with Project Fuel, our corporate-wide optimization initiative. Looking forward, we expect a year of good growth in 2011, as we remain committed to transforming challenges into opportunities and driving continuous improvement across the organization***."

\* \* \*

2011 Projections

***Hospira expects net sales growth for full-year 2011 to be approximately 5 to 7 percent*** on a constant-currency basis.  The company expects foreign exchange to provide a positive contribution of approximately 1 percent, based on current exchange rates.  The net sales projections assume U.S. launches during 2011 of two oncolytics, docetaxel and a solution presentation of gemcitabine.

---

[21]  Defendant Werner had no way of knowing this.  This statement was untrue, even more than two years later, as discussed *infra.*

*Adjusted\* diluted earnings per share for 2011 are expected to be in the range of $3.90 to $4.00, or year-over-year growth of 18 to 21 percent.*

93.     This same day, Hospira hosted a conference call for analysts to discuss the Company's fourth-quarter and full-year 2010 financial results.  During the call, defendant Begley continued to praise Project Fuel and the steps the Company had taken in response to the April 2010 Warning Letter:

*During the second half of 2010, we made substantial progress addressing the issues in the warning letter. We fulfilled our planned commitment outlined to the FDA, most of which were completed by year end*, and resumed delivery of propofol under the new manufacturing process.

\*   \*   \*

We're all over those issues.  In fact, every Thursday morning at 7 o'clock, there is a management meeting we have, and every plant manager and plant quality manager from around the world is on that phone call, along with our senior leadership team, and I attend that meeting on a regular basis, as well.  And we go through each issue that we have as it relates to backorders and what we're doing to fix those.

\*   \*   \*

*The optimized efficiencies we've achieved through Project Fuel and the focus it has instilled in the Company is driving us towards continual improvement and has enhanced our commitment to operational excellence.*

94.     On February 16, 2011, Hospira filed with the SEC its annual report on Form 10-K for the fiscal year ending December 31, 2010.  Defendants Begley, Werner, Bailey, Bowles, Curran, Hale, Sokolov, Staley, Wheeler, and von Prondzynski  stated in the Company's Form 10-K that the cost reductions associated with the Company's Project Fuel initiatives were only partly offset by issues relating to the April 2010 Warning Letter.  This was an uninformed and reckless statement because a comprehensive review had not been completed, and shortly thereafter, the Individual Defendants would admit that remediation would take as much as three years and $375 million to complete, substantially more than offsetting any gains achieved with Project Fuel.

Discussing the Company's financial performance, Begley, Werner, Bailey, Bowles, Curran, Hale, Sokolov, Staley, Wheeler, and von Prondzynski stated, in relevant part:

> The [April 2010] Warning Letter also questioned whether Hospira's interim plans ensured the quality of products that were manufactured at the facilities while implementing the corrective actions and validation activities. ***Hospira has made significant progress on completing a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations.***[22]
>
>       \*    \*    \*
>
> ***Hospira has implemented certain interim controls, including third party oversight, to ensure products manufactured at both facilities meet their specifications prior to release.***
>
>       \*    \*    \*
>
> Net sales in the Americas segment increased 2.4%, or 1.5% excluding the impact of changes in foreign exchange rates. Net sales of Specialty Injectable Pharmaceuticals ("SIP") increased primarily due to increased volume for Precedex[TM], the launch of generic meropenem and gemcitabine and high-dose heparin introduced in late 2009. ***The increase was partially offset by a decrease in volume due to a voluntary hold on shipments of certain emulsion products***. Other Pharma net sales decreased primarily due to the dispositions noted above and lower volumes in nutritional products. ***Net sales in Medication Management were lower driven by decreased volumes related to the voluntary hold on shipments of Symbiq[TM] to new customers, decreased sales of Plum[TM]*** and the disposal of the critical care business, partly offset by increased sales of dedicated administration sets.
>
>       \*    \*    \*
>
> Gross profit increased $58.0 million, or 4.0%, in 2010, compared to 2009.
>
> The gross profit increase was the result of higher sales volume primarily driven by growth in Precedex[TM] and new product launches. ***In addition, cost reductions associated with Project Fuel initiatives*** and the impact of changes in foreign exchange rates contributed to the increase. ***These were partly offset by activities and related charges directly associated with the 2010 Warning Letter received from the FDA and voluntary shipment holds on certain products as well as***

---

[22] This was an admission that the review had ***not*** been completed. Indeed, even months later, a thirty-two-day inspection of the key Rocky Mount facility uncovered dozens of serious violations, detailed in the fourteen-page Form 483 report, which concluded that: "Procedures for quality audits have ***not*** been adequately established."

*penalties for failure to supply customers* and increased product correction charges on these and other products.

95.     On March 8, 2011, Hospira participated in the Raymond James Institutional Investors Conference, during which defendant Werner touted the "significant progress" made to address the FDA's concerns.  Defendant Werner claimed that the FDA warning letter was "an opportunity to raise our bar to match the FDA's new standards," and he promised to apply "the learnings and changes to our facilities around the world."  But there were no "new" standards being enforced. Hospira's issues related to a failure to meet standards that had been in place for many years, including standards set forth by the Company's own SOPs.

96.     On March 16, 2011, defendant Begley participated in the Barclays Capital Global Healthcare Conference, during which he boasted that the Company was "optimiz[ing its] operations and financial performance" through Project Fuel, and that the Company had made "significant progress" in remediating the Rocky Mount issues.

97.     On March 24, 2011, Hospira issued a press release updating its financial projections and *raising its outlook* as a result of strong demand for its recently-FDA-approved drug, Docetaxel.  The release also *confirmed the Company's full year 2011 guidance*.

98.     On April 26, 2011, Hospira filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2011.  The Company's Form 10-Q reiterated that remediation costs have not been significant for Hospira, was signed by defendant Werner, and contained the required SOX certifications signed by defendants Werner and Ball.  The Form 10-Q further discussed the Company's "Certain Quality and Product Related Matters," and stated in part:

> *Hospira has made significant progress on completing a comprehensive review of all its manufacturing operations to ensure compliance with applicable regulations.*

*       *       *

*Symbiq*[TM] *Infusion Pumps*

In April 2010, Hospira placed a voluntary hold on all shipments to new customers of Symbiq[TM], a large volume infusion device. Hospira initiated this hold after it received an unexplained increase in customer complaints related to the failure of the Symbiq[TM] to alarm at the end of infusion therapy under certain use conditions. In June 2010, Hospira notified customers on interim steps to be taken by customers to mitigate this issue and to avoid the use conditions that can lead to the failure of the Symbiq[TM] to alarm at the end of infusion therapy. In August 2010, Hospira initiated a set recall related to the issue. Additionally, Hospira notified customers of reports of unrestricted flow when the Symbiq[TM] infusion set cassette is improperly removed from the pump before the pump's cassette door is fully opened. Hospira cautioned customers to allow the pump's cassette door to fully open before removing the infusion set as the pump may not alarm when the infusion set is improperly removed. The FDA has classified each of these actions as a Class I recall and Hospira is working closely with the FDA to conclude these matters. Hospira has not asked customers to return or cease using their Symbiq[TM] pumps. ***Hospira has recognized charges in Cost of products sold for quality assessment and testing, materials, and labor to remediate these matters, which have not been significant to date to Hospira***.

99.    During a conference call with analysts on April 26, 2011, defendant Begley continued to praise Hospira's quality improvements.  When discussing the FDA's re-inspection of Rocky Mount, defendant Begley stated that "***[w]e have been diligently preparing for that inspection and look forward to the FDA's response***."  Defendant Begley further claimed that they were "***very confident about the quality changes that we have made in response to the initial warning letter***," and that the Company's new Head of Quality "is thinking it is looking very well for the FDA inspection.  So we are looking forward to the inspection…."  Defendant Begley further touted that "***what we have done is we have taken our learnings from both the Clayton facility and the Rocky Mount facility and have made those holistic changes that we are making across all of our manufacturing facilities***."

100.    Reacting positively to the Company's seemingly strong results and announced $1 billion stock repurchase program, analysts from JP Morgan issued a report titled "What a

Difference a Qtr Makes; Solid Results Across Pharma And Medication Mgmt." In the report, JP Morgan raised its yearend 2011 price target to $66 per share.

**I.** **Hospira's Facilities and Touted Corrections Are Shown Not to Be as Represented**

101. On April 27, 2011, the FDA issued a Form 483 on Hospira's facility in Austin, Texas ("Austin"), identifying eleven observations. The FDA specifically noted, among other things, that Hospira "***has not established an adequate training program for the identification of defects in materials, in-process drug products and containers, and finished drug products***." The FDA further recognized that Hospira "routinely 'reinspects' (reworks) in-process and finished drug products due to defects discovered in-process or post production," Hospira's "procedure for conducting investigations is not appropriate," and Hospira has inadequate written procedures and controls. The specific observations in the Form 483 included the following:

- ***The quality control unit lacks responsibility to approve and reject all procedures or specifications impacting on the identity, strength, quality, and purity of drug products;***

- ***Drug products failing to meet established quality control criteria are not rejected;***

- Employees engaged in the manufacture, processing, packing, and holding of a drug product ***lack the training required to perform their assigned functions***;

- Batch production and control records do not include the results of any investigation made into any unexplained discrepancy, whether or not the batch of drug product had already been distributed;

- ***Written procedures are not established and followed*** for the cleaning and maintenance of equipment, including utensils, used in the manufacture, processing, packing or holding of a drug product;

- Equipment used in the manufacture, processing, packing or holding of drug products is not of appropriate design to facilitate operations for its intended use;

- ***Appropriate controls are not exercised*** over computers or related systems to assure that changes in master production and control records or other records are instituted only by authorized personnel;

- ***There are no written procedures for production and process controls designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess;***

- ***Written procedures are not established*** that describe the examinations to be conducted on appropriate samples of in-process materials of each batch

- Each lot of drug product containers is not withheld from use until the lot has been sampled, tested, examined, and released by the quality control unit; and

- Procedures designed to prevent microbiological contamination of drug products purporting to be sterile are not.

102.    On June 2, 2011, once again despite mounting scrutiny from the FDA, defendant Begley praised the Company's quality initiatives that it was implementing across all its facilities. During the Sanford C. Bernstein & Co. Strategic Decisions Conference, defendant Begley claimed that "***[b]y applying the changes and learnings from our response to the FDA's comments to all of our facilities worldwide, we believe being a front-runner in this respect should position us from a competitive standpoint moving forward***."

103.    On June 17, 2011, after a re-inspection following the April 2010 Warning Letter, the FDA issued a Form 483 on Hospira's Rocky Mount facility, identifying eighteen observations.  The Form 483 identified, among other things, inadequate control procedures and training, insufficient written procedures, and a failure to follow procedures and responsibilities. The FDA also noted "a number of design and/or structural defects related to equipment or the location of equipment in the facility."  Moreover, the FDA discovered that "***[m]anagement is aware of [mechanical] malfunctions [that were leading to adulterated vials] and the need to replace or improve SVP production/equipment …, however, corrective actions have not been***

*implemented to improve the processes to decrease or prevent broken/cracked vials*." The specific observations in the Form 483 included the following:

- ***There is no written testing program designed to assess the stability characteristics of drug products;***

- ***The responsibilities and procedures applicable to the quality control unit are not fully followed;***

- There is a failure to thoroughly review any unexplained discrepancy and the failure of a batch or any of its components to meet any of its specifications whether or not the batch has been already distributed;

- Written records of investigations into unexplained discrepancies and the failure of a batch or any of its components to meet specifications do not always include the conclusions and follow-up;

- Deviations from written sampling plans and test procedures are not justified;

- An NDA-Field Alert Report was not submitted within three working days of receipt of information concerning a failure of one or more distributed batches of a drug to meet the specifications established for it in the application;

- Investigations of an unexplained discrepancy and a failure of a batch or any of its components to meet any of its specifications did not extend to other drug products that may have been associated with the specific failure or discrepancy;

- Control procedures are not established which validate the performance of those manufacturing processes that may be responsible for causing variability in the characteristics of in-process material and the drug product;

- Equipment used in the manufacture, processing, packing or holding of drug products is not of appropriate design and suitably located to facilitate operations for its intended use and cleaning and maintenance;

- Buildings used in the manufacture, processing, packing, or holding of a drug product do not have the suitable construction to facilitate cleaning, maintenance, and proper operations;

- ***The separate or defined areas and control systems necessary to prevent contamination or mix-ups are deficient;***

- ***Written procedures are not followed*** for the cleaning and maintenance of equipment, including utensils, used in the manufacture, processing, packing or holding of a drug product;

- ***Employees are not given training in the particular operations they perform as part of their function;***

- Corrective and preventive action activities and/or results have not been adequately documented;

- Process validation activities and results have not been adequately documented;

- Design plans that describe or reference the design and development activities and define responsibility for implementation have not been established;

- ***Management with executive responsibility has not reviewed the suitability and effectiveness of the quality system with sufficient frequency; and***

- ***Procedures for quality audits have not been adequately established.***

104.    On June 21, 2011, the FDA issued a Form 483 on Hospira's facility in Boulder, Colorado.  The Form 483 noted, among other things, that "***[e]quipment and utensils are not cleaned at appropriate intervals to prevent contamination that would alter the safety, identity, strength, quality or purity of the drug product***," and that several batches of product were released "without a validated process and were not put on a stability testing schedule." Consistent with the other Form 483s issued on other Hospira facilities, the FDA also identified a "[l]ack of adequate written procedures" and the failure to follow procedures.  The specific observations in the Form 483 included the following:

- The firm has released product without the documentation of a robust process that yields a high degree of assurance in the performance of the manufacturing process;

- ***Equipment and utensils are not cleaned at appropriate intervals to prevent contamination that would alter the safety, identity, strength, quality or purity of the drug product;***

- **Written procedures are not established** for the cleaning of equipment, including utensils, used in the manufacture, processing, packing or holding of a drug product;

- **Lack of adequate written procedures** for obtaining a homogeneous raw material sampling; and

- **The firm did not follow their Standard Operating Procedures.**

105.    On July 27, 2011, Hospira filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2011.  The Company's Form 10-Q reiterated the Company's financial results, was signed by defendant Werner, and contained the required SOX certifications signed by defendants Werner and Ball.  The Form 10-Q further discussed the Company's "Certain Quality and Product Related Matters," and stated in part:

> Hospira has responded to the April 2010 Warning Letter and is working closely with the FDA to conclude these matters. As part of Hospira's response, Hospira took immediate actions to address the FDA's concerns, including recalling certain products manufactured at the Clayton and Rocky Mount facilities. Hospira has worked with several third party experts to assist with the activities at both facilities. Hospira had implemented certain interim controls, including third party oversight, to ensure products manufactured at both facilities meet their specifications prior to release. ***Hospira has completed a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations, and continues to ensure compliance with new regulations.*** The Warning Letter does not restrict production or shipment of Hospira's products from these facilities but Hospira is holding shipment of certain products pending its further investigation and discussions with the FDA. Hospira resumed shipment of certain products placed on voluntary shipping hold, but cannot predict when all products on voluntary hold will be reintroduced to the market.

> In January 2011, the FDA conducted a follow-up inspection at the Clayton facility to evaluate Hospira's corrective actions in response to items raised in the April 2010 Warning Letter.  The FDA did not issue an Inspectional Observation ("Form 483") of any potentially objectionable conditions related to the Clayton inspection. ***The FDA conducted a follow-up inspection at the Rocky Mount facility in May 2011. The FDA issued a Form 483 for the Rocky Mount inspection listing their observations related to certain quality systems, facilities, and operating procedures. Hospira has submitted a response to the FDA, and continues to interact and work with the FDA to resolve the matters identified in the Form 483.***

*During 2010, Hospira incurred charges of $54.3 million related to the activities associated with the matters cited above for the Clayton and Rocky Mount facilities as well as Hospira's assessment of the status of its quality operations on a holistic basis throughout its global manufacturing facilities. During 2011, Hospira continued to invest in quality operations throughout its global manufacturing facilities including at the Clayton and Rocky Mount facilities. However, to remediate the specific matters cited above, charges incurred were not significant during the three and six months ended June 30, 2011.*

106. On this same day, Hospira hosted a conference call with analysts to discuss Hospira's second-quarter 2011 financial results and the FDA's inspection of Rocky Mount. During the call, defendant Werner responded to a question regarding the FDA's June 2011 Form 483 on the Rocky Mount facility, claiming that "[w]e're not expecting there to be a substantial amount of additional cost, it's just heavy lifting and working through it." Defendant Ball added:

We're taking all necessary steps in order to support Rocky Mount. We have sent down a team from Lake Forest -- what I described as the A team -- of quality specialists, lean specialists, process specialists in order to give them all the help they need. We have deployed consultants at the actual floor level, as well as higher-level consultants. We have increased the number of quality people in Rocky Mount by some 20 folks going to 30 more people. *So we are doing everything that can be done to ensure that we ramp things up as quickly as possible to get to the quality levels that both we want and the FDA wants, and I think at the end of the day when we get through this thing we'll have a vary [sic] high-quality plant making extremely high-quality products.*

107. Shortly thereafter, on August 4, 2011, Hospira's Rocky Mount facility received another Form 483 from the FDA. Among the FDA's observations were that Hospira's "quality control unit failed to conduct adequate manufacturing and laboratory investigations" in accordance with the Company's SOPs, and that as a result, Hospira "did not have data to support to release of" several lots of drugs. The FDA also documented that "[t]here were approximately 250 invalidation events (not related to system suitability failures) in the Analytical Services Laboratory from January 2009 to present," and that "[t]here have been over a thousand invalidation events (not related to system suitability failures) in the QC Laboratory from January 2009 to present." The FDA further noted that "[t]hese have been categorized as analyst error,

instrument failure, poor chromatography, method related, and other." The specific observations in the Form 483 included the following:

- There is a failure to thoroughly review the failure of a batch or any of its components to meet any of its specifications whether or not the batch has been already distributed;

- ***Laboratory controls do not include the establishment of scientifically sound and appropriate test procedures designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity; and***

- ***The responsibilities and procedures applicable to the quality control unit are not fully followed.***

108.   The true facts, which were known by defendants but concealed from the investing public, were as follows:

(a)   Hospira suffered from extensive quality control issues, which undermined both the viability of and the supposed financial savings that would be generated by Project Fuel;

(b)   Hospira failed to address and remedy problems identified in FDA Warning Letters related to Hospira's infusion pumps, quality control deficiencies, and manufacturing weaknesses; and

(c)   Hospira's revenue guidance for 2011 was misstated and lacked a reasonable basis when made.

109.   Project Fuel was, according to defendant Werner, designed to produce "operational excellence." In truth, it produced operational disaster.

110.   As detailed in the Federal Securities Action, the foregoing statements concerning the purported success of Project Fuel and the Company's financial stability were known to be false and misleading to Hospira's insiders for the following reasons:

(a)   Rocky Mount's manufacturing operations were nowhere near "operational excellence" but in fact suffered from serious issues with regard to quality control and the

deterioration of its facilities and equipment. By early 2010, for example, necessary quality control staff had been cut through Project Fuel, the plant's Standard Operating Procedures had been diminished and ignored, in-process quality sampling was eliminated, and pharmaceutical mixing processes were relying on unsound science and could not be validated. These problems were not being fixed but were actually worsening as a result of cost cutting pursuant to Project Fuel;

(b)     The Company's facilities and equipment were not in "good operating condition" or "well maintained"[23] because, as former Senior Vice President of Operations James Hardy, Jr. ("Hardy") would later admit, Hospira had inherited "aged" facilities that were in need of a "facelift" and modernization that would cost millions of dollars, and they were further plagued with mold, equipment failures, antiquated and unusable DOS-based documentation systems, and other operational deficiencies;

(c)     The deficiencies at Rocky Mount and beyond were so substantial that, beginning in 2010, they resulted in widespread manufacturing disruptions and delays that caused many of the Company's products to be on back order, which ultimately cost Hospira not only lost sales and revenues, but also tens of millions of dollars in hard costs each month as a result of "failure to supply" penalties;

(d)     Hospira was facing heightened scrutiny from the FDA as a result of its myriad production and quality control deficiencies, which scrutiny included an inspection of Rocky Mount in January 2010 that revealed problems so severe as to warrant the second April 2010 Warning Letter;

---

[23]  As stated in Hospira's February 18, 2010 Form 10-K for the year ending December 31, 2009.

(e)     No meaningful effort to address the FDA's concerns, particularly at Rocky Mount, had been undertaken as revealed by the issuance of the June 2011 and August 2011 Form 483s identifying even more problems at the plant;

(f)     The Company was not "actively involved in setting quality policies"[24] but actually had encouraged a shift in corporate culture to reward "quantity over quality," which would take significant time and effort to reverse; and

(g)     The devastating effects of Project Fuel on Hospira's manufacturing and quality assurance efforts were hidden from the market, particularly at Rocky Mount. Instead of driving "sustainable," "long-term" profitability, in reality, Project Fuel's short-term savings would be eclipsed by the long-term costs of the sacrifices in quality resulting from the initiative, which costs would include a remediation bill topping $460 million, the need to hire additional quality control personnel to ensure the safety of Hospira's products, and the eventual impacts to the Company's revenues as quality-related production slowdowns resulted in decreased sales.

111.     Accordingly, on February 13, 2013, the court denied the motion to dismiss the Federal Securities Action in large part, finding that the plaintiffs had satisfied the heightened pleading standard for securities fraud cases (as set forth by the PSLRA) with regard to several of the alleged false and misleading statements.  Specifically, the court found, among other things, that:

•     "Plaintiffs have alleged with sufficient particularity that **the alleged omissions regarding Project Fuel's impact on the Rocky Mount facility were misleading**."  Order at 35. Specifically, the following statements were found to be adequately pled as misleading: Project Fuel was "[a]n aggressive enterprisewide optimization initiative we adopted to drive operational

---

[24]  *See id.*

excellence and generate top financial performance," *see supra* at ¶77, "[w]e remain on track with Project Fuel and we are pleased with our progress on this organization wide optimization program … Project Fuel is designed to … drive continuous improvement and operational excellence in order to obtain top tier financial performance," *see supra* at ¶83, and that it "really was about driving operational excellence, improving margins, driving additional cash flow…," *see supra* at ¶84;  Order at 33-34.  In support of the court's finding, and as discussed above, the court found these statements were adequately pled to be false and misleading because specific facts showed that "Rocky Mount's manufacturing operations were nowhere near 'operational excellence' but in fact suffered from serious issues with regard to quality control and deterioration of its facilities and equipment."  Order at 34.  The Court further held that:

- "Plaintiffs have alleged with the requisite specificity that ***Defendants made false or misleading statements regarding the condition of Hospira's facilities***." Order at 37. Specifically, the court found the following statement, which was repeated in Hospira's Forms 10-K was false and misleading:  "Hospira believes that its facilities and equipment are in good operating condition and are well maintained."  Order at 36; *see also supra* at ¶110(b).  In support of the court's finding, and as discussed above, the court noted that Hospira's facilities were not in good operating condition or well maintained, but as finally admitted by Hardy during the September 7, 2011 "Investor Day" event, Hospira's facilities were actually "aged" and "in need of a facelift."  Order at 36;

- "Plaintiffs have sufficiently plead with particularity under the PSLRA that the ***statements [that Hospira's regulatory issues were not systemic] were false or misleading***." Order at 39.  Among the statements that were found actionably misleading were defendant Begley's assurance during the June 2, 2010 conference that, with respect to the FDA and

Hospira's regulatory issues, "[n]either of those are systemic issues to Hospira, and neither of those are systemic issues to the two plants either."  Order at 38; *see supra* at ¶80.  In support of the court's finding, and as discussed above, the court referenced, among other things, defendant Ball's admissions that the issues at Rocky Mount "had implications that were greater than anticipated," "[r]eceiving two 438s so close together was a clear signal that we were not making satisfactory progress to fully comply with the FDA's concerns and that we had to ramp up our remediation efforts," and that Hospira "did not anticipate the degree to which the production slowdown and resulting charges would impact performance through the rest of September" and lacked "visibility into the magnitude of the reversal in customer service levels."  Order at 38-39;

• "Plaintiffs have ***satisfied the particularity requirement with respect to []*** ***statements" concerning Hospira's efforts to comply with the FDA Warning Letters***, including statements that "Hospira will be undertaking a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations," *see supra* at ¶¶45, 68, "We think we have essentially completed all of the activities in the Clayton and Rocky Mount facilities that we outlined in our response to the warning letter…," *see supra* at ¶91; and "we're beginning to roll those changes out globally to all of our facilities so that when [the] FDA shows up wherever and whenever, they should expect to see a very consistent approach to things across all of Hospira facilities in the US and globally," *Id.*; Order at 39-40.  In support of the court's ruling, and as discussed above, the court noted that plaintiffs adequately alleged that the deficiencies in Hospira's Rocky Mount facility were well known within Hospira in 2010 and 2011, but that Hospira failed to make any effort to remediate the issues identified in the April 2010 Warning Letter until after it received the June 2011 Form 483 that identified eighteen additional problems at Rocky Mount.  Order at 40;

- Certain **additional statements did "not amount to puffery as a matter of law**," including the following two statements: (i) "Hospira believes that its facilities and equipment are in good operating condition and are well maintained," Order at 44; *see supra* at ¶110(b); and (ii) Hospira is "working across our operations to make sure that we meet the highest level of compliance and quality for both pharmaceutical and device products," Order at 46; *see supra* at ¶¶76, 84.

112. The court in the Federal Securities Action further noted that "[b]ecause of the alleged importance of Rocky Mount to Hospira, the inference is strong[] that if the Defendants omitted material facts with respect to Project Fuel's impact on Rocky Mount, they did so knowingly or with reckless disregard toward the risk." Order at 51. As such, and as fully set forth in the court's Order, the court found scienter, and denied the motion to dismiss, with regard to these statements:

> ***Plaintiffs have sufficiently alleged scienter under the PSLRA*** regarding Defendants' statements that Hospira's plants were "in good operating condition" and well-maintained," statements that Hospira's regulatory issues were not "systemic," those statements regarding Hospira's efforts to address the FDA Warning Letters that Plaintiffs have alleged with particularity, and the alleged failure to disclose Rocky Mount's facilities were "nowhere near operational excellence."

Order at 48-49.

113. It is evident that, during the Relevant Period, the Individual Defendants never revealed that Project Fuel was adopted without first conducting a sufficient operational study to determine the state of Hospira's compliance systems, and whether its cost-cutting measures would adversely affect Hospira and its internal and quality controls and legal compliance. Such an analysis would have been aimed first and foremost at safeguarding the public, and ensuring that Hospira was in compliance with FDA regulations and its own SOPs and CGMP requirements. Rather, as defendant Begley admitted in February 2009, the impetus for Project

Fuel was the Board's desire not to post operating results that were "average" for its industry. The Board members, being sophisticated business people, would have known that Hospira performed in line with its peers because all companies faced the same issues and costs. There was simply no "magic wand" they could wave that would allow Hospira to abruptly spend so much less than its peers on safety procedures, and still maintain adequate quality control.

## VI.    DISCLOSURE OF THE TRUTH

114.    The truth about Hospira's business and operations began to emerge on September 7, 2011, when the Company hosted its annual "Investor Day" event to discuss, among other things, the state of Hospira's operations. The Company finally revealed that the Individual Defendants affirmatively adopted, implemented, and condoned a business strategy that turned a blind eye to widespread deficient manufacturing practices and failed to implement adequate internal controls to assure safety and quality in the factories. As Hardy, Hospira's Senior Vice President of Operations admitted, "I believe *we got a little lazy*. I believe that the bar was changing, the puck was moving, you pick the analogy, *but we were kind of skating behind the puck*." The Company specifically disclosed that its "aged" facilities were in need of a "facelift" and extensive remediation, particularly at Rocky Mount, to bring the Company's operations up to FDA standards, and, as a result, Hospira would be spending *$200 million to $250 million* to improve operational efficiencies. During the presentation, Hardy stated, in part:

> Fixing the foundation is mission critical. Well, if there's two areas of fixing the foundation that are mission critical times two, it's the next two remediation areas that I'm going to talk to you about. The first is our Rocky Mount facility. And let me talk to you a little bit about Rocky Mount. Rocky Mount is a gem of a plant. It has been the crown jewel of Hospira and [the] hospital product division for many years.

> *    *    *

> So what we don't – what we have in Rocky Mount isn't a problem with how to do this business. But I believe *we got a little lazy*. I believe that the bar was

changing, the puck was moving, you pick the analogy, *but we were kind of skating behind the puck and it was time for us to get caught up and it was time for us to take on a new mentality and a different approach*.

\* \* \*

Well, what happened in our past I think is pretty well known as we received a Warning Letter for our Rocky Clayton facilities, it happened in 2010. And when that Warning Letter was received we developed a very robust action plan. We kicked off a quality transformation effort across both Rocky Clayton and the rest of our pharmaceutical businesses as well as our MMS platforms. And that quality transformation plan was rolled throughout operations.

The robust action plans that were developed in Rocky and Clayton were tracked, as Mike likes to say, here at the Ivory Tower, we were measuring and reporting and had green, yellow and red graphs. But the proof's going to be in the pudding when you come to transformation. And what we saw was a mixed bag of results.

\* \* \*

We're fighting a different animal. It's a very complex plant. *We're trying to drive remediation at the same time we're trying to drive very robust cost-savings programs. And we found those things competing with each other. There was a lack of clear focus in Rocky Mount. And the FDA though, and we subsequently received, additional Form 483 observations in our most recent audit*.

\* \* \*

The next area is our comprehensive MMS remediation.... *And we see this as being a two to three-year process between our pharma remediation at Rocky Mount, as well as our MMC remediation, we think this will take us two to three years and be in the neighborhood of $200 million to $250 million*.

115. The Individual Defendants nevertheless attempted to offset this news by offering the market false assurances that they had "the right team in place" to fix the Company's operational issues, and that "Quality and operations" were on the same page "to accelerate our progress to fixing the foundation." In addition, the Individual Defendants further tempered the revelation by touting generally positive news throughout the rest of the day, including updates on Hospira's products in development and an overview of the Company's great potential for business development overseas.

116. Responding to the statements made during the Investor Day, on September 8, 2011, analysts from The Buckingham Research Group stated, "While Hospira indicated that it believes that the FDA is working on a collaborative basis with the Company, its remediation of Rocky Mount is a work in progress *and the Company did admit that Project Fuel cost-cutting priorities were partly responsible for taking focus off manufacturing quality issues."* Likewise, JP Morgan analysts stated:

> While some significant initial improvements will take place over the next 6 months, Hospira anticipates it will take 2-3 years to fully remediate the issues at Rocky Mount. From a cost perspective, between Rocky Mount and the MMS fixes, these improvements are expected to cost $200-$250 mm, of which roughly 70%-75% is expected to be one-time in nature. While this is clearly necessary spend and hopefully will address the company's manufacturing challenges, today's updates reflect a significant increase in cost and time associated with remediation.

117. The decline in Hospira's stock price by approximately 13% from September 7, 2011, through September 13, 2011,[25] was the direct result of the nature and extent of the revelations made to investors regarding the Company's extensive manufacturing deficiencies that had been concealed or misrepresented by the Individual Defendants. This decline would have been even more significant had the Individual Defendants disclosed the full truth of the remediation's impact on the Company's ongoing operations.

118. More details of significant problems at Hospira were disclosed beginning on October 18, 2011. On this date, Hospira issued a press release entitled, "Hospira Announces Certain Preliminary Third-Quarter 2011 Results." This press release and subsequent releases and press reports fully disclosed to the public for the first time that: (i) Hospira was experiencing long term and significant issues with regard to its manufacturing facilities and its quality

---

[25] Hospira's stock dropped $6.10 a share, or approximately 13%, from a close of $45.61 on September 7, 2011, to a close of $39.51 on September 13, 2011, on abnormally high trading volume.

controls; (ii) these issues were much more serious and wide-spread than Hospira had been representing; (iii) the issues could not be offset by the steps the Company was taking pursuant to its "Project Fuel"; (iv) the Company had already incurred over $90 million in expenses for the limited efforts that it had taken to make its facilities compliant with FDA regulations, and would have to spend over $300 million more in the next two to three years to order to take the appropriate steps; (v) the cost of remediation would materially impact the Company financially; and (vi) the steps the Company had taken up to that point were inadequate. The press release provided in pertinent part as follows:

> Hospira, Inc. (NYSE: HSP), the world's leading provider of injectable drugs and infusion technologies, today announced that its preliminary third-quarter 2011 net sales, adjusted* income from operations and adjusted* earnings per share are lower than anticipated primarily due to certain quality actions taken in response to a U.S. Food and Drug Administration (FDA) 2010 warning letter and subsequent observations related to the company's manufacturing facility in Rocky Mount, North Carolina, and device quality and supply-related issues.

> "While recently launched product sales continue to drive top-line growth, we were extremely disappointed in the third quarter by developments related to our quality-improvement initiatives that resulted in a significant slowdown of production and an associated impact on our operating performance," said F. Michael Ball, chief executive officer. "As I indicated at our Investor Day in early September, addressing these issues is Hospira's top priority, and our organization is committed to full resolution. I remain confident that Hospira will emerge from this process a stronger, more competitive global company that is optimally positioned to serve the needs of our customers and patients, and deliver strong value to our shareholders."

119.    On this news, the Company's stock price plummeted $7.85 per share to close at $29.51 on October 18, 2011 — a plunge of over 20% — on heavy trading volume. Analysts also reacted negatively as Citigroup and JP Morgan, among others, published negative recommendations on the stock.

120.    Market commentators also reacted to the Company's preliminary financial results. On October 18, 2011, the *Financial Times* published an article entitled "Hospira hit by

production disruption." The article, which discussed its surprise learning about the impact of the FDA's investigation on Hospira's business after relying on previous improper statements regarding improved service levels and higher productivity, explained that the turn of events raises "credibility issues for the management." The article stated, in relevant part:

> More than $1 [billion] was wiped off the market capitalization [sic] of pharmaceutical company Hospira on Tuesday, after the firm said [an FDA] investigation is affecting output from its main manufacturing plant.

> The Illinois-based firm, which provides hospitals with ready-made injections, saw shares fall 21 per cent to $29.51, after Hospira said "production slowed significantly" at its Rocky Mount, North Carolina plant.

> *On a specially arranged conference call, the company said its service level – the percentage of customer orders it meets – fell from the mid 90s to the high 80s during the quarter to the end of September, resulting in lost sales.*

> *As recently as September 7, Hospira had said service levels were improving as a result of higher productivity at the Rocky Mount site.*

> "*This raises significant new credibility issues for the management*," said Gregory Hertz, healthcare analyst at Citibank.

> &ast; &ast; &ast;

> Michael Ball, Hospira's chief executive, told analysts on Tuesday's call that he had changed management and hired consultants to resolve issues at the facility. But the resulting new production-line and final product checks have significantly slowed output, while several batches of output have been written off because of quality concerns.

> "Until there is more clarity around how big this issue is and when we might see a resolution, the share price will stay depressed and may even fall lower," said Matthew Taylor, healthcare analyst at Barclays Capital.

> &ast; &ast; &ast;

> But Mr. Hertz warned output may not recover to previous levels: "*My interpretation, having read the correspondence, is that the FDA thinks the Rocky Mount plant has reached the end of its useful life, which would have serious long-term consequences for Hospira.*"

> Analysts also warned that the firm's focus on the Rocky Mount plant has distracted from a multiyear efficiency drive across the company, which had delivered significant savings in the last two years.

The production problems mean revenue in the three months to the end of September is likely to be barely higher than the same quarter last year. Earnings per share are expected to fall 11 per cent from a year ago to 66 cents. Hospira also reduced guidance for full-year earnings to $3 from $3.95.

121.     Analysts reacted negatively as well. JP Morgan analysts pointed to the fact that the "[C]ompany offered little clarity on the timing of resolution of these issues" and stated "we are not expecting a near-term recovery in the stock." On October 25, 2011, Zacks Investment Research analysts downgraded Hospira to "underperform" from "neutral," stating:

Hospira's third quarter preliminary results were below expectations due to *continued manufacturing problems at the company's Rocky Mountain facility.* The facility is expected to continue functioning below full capacity through the remainder of 2011. The additional costs for manufacturing remediation resulted in lost sales, inventory loss and lower service levels. In addition, management cut its 2011 adjusted earnings guidance to $2.95-$3.05 from $3.90-$4.00. We have slashed our 2011 earnings estimate from $3.93 to $3.01 and our 2012 estimates from $4.47 to $2.85, in line with management's action. Moreover, the Symbiq and Plum pump issues remain matters of concern. We have, therefore, downgraded our rating on Hospira from Neutral to Underperform.

122.     The startling announcements concerning Hospira's true condition continued on October 26, 2011, when the Company issued a press release entitled, "Hospira Reports Third-Quarter 2011 Results." The press release provided, in pertinent part, as follows:

Hospira, Inc. (NYSE: HSP), the world's leading provider of injectable drugs and infusion technologies, today reported results for the third quarter ended Sept. 30, 2011. Net sales for the quarter were $977 million, and adjusted* diluted earnings per share were $0.66. (Adjusted* measures exclude certain specified items as described later in this press release and the attached schedules.)

"As we indicated in our Oct. 18 press release, despite the continued contribution of recently launched products to revenue growth, our third-quarter results were significantly impacted by developments related to our quality-improvement initiatives," said F. Michael Ball, chief executive officer. "Addressing these issues is Hospira's top priority, and our organization is committed to full resolution. I remain confident that Hospira will emerge from this process a stronger, more competitive global company that is optimally positioned to serve the needs of our customers and patients, and deliver strong value to our shareholders."

*   *   *

Net sales for the quarter were $977 million, an increase of 2.9 percent compared to $949 million in the third quarter of 2010, with the increase primarily driven by continued strong U.S. net sales of the oncolytic docetaxel. This was partially offset by the impact of certain quality actions taken in response to a U.S. Food and Drug Administration (FDA) 2010 warning letter and subsequent observations related to the company's manufacturing facility in Rocky Mount, N.C., and device quality and supply-related issues. On a constant-currency basis, third-quarter net sales increased slightly compared to the third quarter of 2010.

Adjusted* income from operations for the third quarter of 2011 was $142 million compared to $189 million in the third quarter of 2010. The decline is primarily due to charges and costs associated with certain quality actions and related inventory losses.

\* \* \*

**2011 Projections**

As a result of the lower-than-expected third-quarter results, the company now projects net sales for full-year 2011 to increase approximately 1 to 2 percent on a constant-currency basis. On a reported basis, the company expects full-year 2011 net sales growth of 2 to 3 percent.

As the company announced on Oct. 18, 2011, adjusted* diluted earnings per share for full-year 2011 are expected to range between $2.95 and $3.05.

\* \* \*

The company is revising its guidance for cash flow from operations, which is now projected to range between $350 million and $400 million. The company has also revised its projections for capital expenditures, which are now projected to range between $325 million and $350 million. Depreciation and amortization is projected to range between $230 million and $250 million.

123.    On this same date, Hospira filed its quarterly report on Form 10-Q with the SEC for the three months ended September 30, 2011, which included the financial results provided in the press release issued on October 26, 2011. The Form 10-Q was signed by defendant Werner, included SOX certifications signed by defendants Werner and Ball, and provided, in pertinent part, the issues identified in the FDA Warning Letters as follows:

*Warning Letter*

In April 2010, Hospira received a Warning Letter from the FDA (the FDA's Warning Letter is publicly available on the FDA's website) in connection with the

FDA's inspection of Hospira's pharmaceutical and device manufacturing facilities located in Clayton, North Carolina and Rocky Mount, North Carolina. In the Warning Letter, the FDA cited Current Good Manufacturing Practice deficiencies related to particulate in certain emulsion products at the Clayton facility and the failure to adequately validate the processes used to manufacture products at the Rocky Mount facility. The Warning Letter also asserts other inadequacies, including procedures related to the Quality Control unit, investigations, and medical reporting obligations. Hospira responded to the Warning Letter in 2010, and as part of its response, took immediate actions to address the FDA's concerns, including recalling certain products manufactured at the Clayton and Rocky Mount facilities.

In January 2011, the FDA completed a follow-up inspection at the Clayton facility to evaluate Hospira's corrective actions in response to items raised in the Warning Letter. The FDA did not issue a Form 483 of any potentially objectionable conditions related to the Clayton inspection. The FDA completed a follow-up inspection at the Rocky Mount facility in June 2011, and issued a Form 483 listing observations related to certain quality systems, facilities, and operating procedures. In August 2011, the FDA completed an additional inspection at the Rocky Mount facility, which resulted in additional Form 483 observations that identified further areas for remediation and improvement. Hospira is implementing a comprehensive remediation plan, including obtaining the assistance of third party subject matter experts to help Hospira address the FDA's concerns. Hospira has implemented certain interim oversight controls, including third party oversight; product assessments; retrospective reviews of laboratory results related to out of specification findings and investigations; and the development and implementation of a comprehensive laboratory action plan. Hospira also has implemented significant management changes to the Rocky Mount facility's leadership team.

\* \* \*

*Symbiq*[TM] *Infusion Pumps*

In April 2010, Hospira placed a voluntary hold on all shipments of Symbiq[TM] infusion pumps to new customers. Hospira initiated this hold after it received an unexplained increase in customer complaints under certain use conditions related to the failure of Symbiq[TM] to alarm at the end of infusion therapy. In June 2010, Hospira notified customers of interim steps to be taken by customers to mitigate this issue and to avoid the use conditions that can lead to the failure of Symbiq[TM] to alarm at the end of infusion therapy. In August 2010, Hospira initiated a set recall related to the issue. Additionally, Hospira notified customers of reports of unrestricted flow when the Symbiq[TM] infusion set cassette is improperly removed from the pump before the pump's cassette door is fully opened. Hospira cautioned customers to allow the pump's cassette door to fully open before removing the infusion set as the pump may not alarm when the infusion set is improperly removed. The FDA has classified each of these actions as a Class I

recall and Hospira is working closely with the FDA to conclude these matters. Hospira has not asked customers to return or cease using their Symbiq™ pumps. Hospira has recognized charges in Cost of products sold for quality assessment and testing, materials, and labor to remediate these matters, which were $5.0 million for the three and nine months ended September 30, 2010 and were $6.2 million in aggregate.

Hospira has submitted the appropriate applications for modifications to its Symbiq™ infusion system to regulatory agencies in various countries. On March 31, 2011, Hospira submitted a 510(k) application with the FDA, which included software updates to further enhance the reliability of the infusion system, and to correct the recall issues impacting the device. The FDA submitted questions on the 510(k) application. Hospira has responded to the first round of questions, and is preparing its response to the second round of questions received from the FDA. Hospira incurred charges of $1.7 million in the three months ended September 30, 2011 related to remediation actions associated with the application. New customer pump placements for Symbiq™ will remain on voluntary hold until Hospira receives the clearance from the applicable regulatory agencies. Hospira believes this 510(k) application is one of the first in the industry to be submitted under recent FDA draft guidance for 510(k) clearances of infusion pumps, which makes it difficult to project the prospects and timeline for FDA clearance.

### Plum™ Infusion Pumps

In December 2010, Hospira informed the FDA that it had received a number of customer reports associated with the Plum A+ ™ and XL family of infusion pumps regarding failure of the pump's audible alarm under certain conditions. Hospira notified customers of the corrective action plan to address this issue. For the Plum A+™ pumps, the alarm failures are associated with the alarm assembly. For the Plum XL™ pumps, the alarm failure is associated with fluid ingress and physical damage to the alarm assembly over time. Plum XL™ customers were instructed to follow the proper cleaning procedure and inspect the alarm assembly for physical damage during routine maintenance. The Plum A+™ and Plum XL™ actions have been classified as a Class II field recall and the FDA is not requiring Hospira to remove any Plum™ pumps from the market or halt production. Hospira recognized a charge of $26.0 million for the estimated costs of the field recall at the end of 2010. Hospira is in the process of finalizing its recall plan and beginning the replacement of components for the Plum A+™ in the fourth quarter of 2011 and expects the remediation to extend through 2012.

### Comprehensive Medication Management Product Review

In connection with the matters referenced above, Hospira committed to the FDA that it would engage in a comprehensive product review for each of Hospira's medication management products. The product reviews are designed to confirm compliance with current regulatory requirements and document safety and performance of the products. The product reviews will also include retrospective

assessments of customer experiences with these products over the preceding two years. The product reviews will provide Hospira with important information for enhancing the reliability of these products and future products. The product reviews, related investigations and remediation are ongoing, and the initial reviews are focused on Plum[TM], patient controlled analgesia (PCA) devices, and GemStar[TM]. Certain remediation actions, such as product recalls or corrective field actions, for Hospira's medication management products have been, and may be required upon finalization of the product reviews. Hospira expects that the product reviews will be completed by the end of 2012 and expects that the remediation actions resulting from these reviews could extend over the next two to three years.

In the three months ended September 30, 2011, Hospira incurred charges of $26.4 million for certain remediation actions, including recalls, related to outcomes of the product reviews and related investigations, primarily related to Plum[TM] products. As described in the section above captioned "Plum[TM] Infusion Pumps," this $26.4 million is in addition to a charge of $26.0 million recognized in 2010 for recall costs related to Plum[TM]. These remediation charges are based on management's best estimate of the committed corrective actions and consist primarily of development costs to address any identified issues and costs for the roll-out or deployment to the impacted customer base.

*Financial Related Impact*

**For the historical period from the beginning of these matters through the period ended June 30, 2011, Hospira had incurred approximately $90.7 million of charges for these quality and product related matters referenced above. In addition, beginning with the three months ended September 30 2011, Hospira expects to incur over the next two to three years, aggregate pre-tax charges related to these quality and product related matters in the range of $300 million to $375 million, of which Hospira incurred an aggregate of $52.4 million in the three months ended September 30, 2011.** The amount, timing and recognition of charges associated with these matters over this time period will be affected by the nature of spending and the occurrence of commitments and triggering events as defined under GAAP, among other factors. Further, costs for long-term solutions and product improvements will depend on various product development efforts and corresponding regulatory outcomes in connection therewith. **Also, capital expenditures to remediate and/or enhance Hospira's existing facilities and operations may be required. See matters discussed in section "Facilities Optimization and Capacity Expansion" in Item 2**.

124.    During a conference call held on this same day to discuss Hospira's financial results, the Company again disclosed that estimated costs for remediation are between $300 million and $375 million over the next three years. Hospira also revealed that the issues

identified in the FDA Warning Letters were far more widespread than had originally been revealed. Hospira disclosed that the FDA was withholding approval of products emanating from the Company's Austin facility, not just its Rocky Mount facility, and that the manufacturing issues were being looked at for all of its plants.

125. During the same conference, defendant Ball also discussed the efforts the Board was taking to finally take ownership over the Company's quality controls. Specifically, defendant Ball stated "from a Board governance standpoint, they already have what's called a ST&Q Committee. *So last year the Science and Technology Committee of the Board took on the additional responsibilities of reviewing quality*." Defendant Ball continued, "the ST&Q Committee actually encompasses all of the Board members. *So the Board members are getting a review of quality and at the December Board meeting, we will be having an in-depth discussion on quality*."[26]

## VII. SUBSEQUENT REVELATIONS AND DEVELOPMENTS

126. The scope of the Company's quality control and manufacturing deficiencies is wide-ranging, belying Hospira's optimistic statements during the Relevant Period concerning the Company's condition. On November 29, 2011, *Bloomberg* published an article entitled, "Hospira May Face 'Widespread Production' Delays." The article noted that Hospira faces "widespread" production breakdowns and manufacturing issues that are "far greater than investors realize," all of which "could take two to three years to correct." The article reported in pertinent part as follows:

---

[26] As will be discussed *infra*, the Science Technology & Quality Committee, despite the ever-increasing quality crisis at Hospira from 2010 to the present, has never increased the number of times it meets per year. In 2010, 2011, and 2012, it met exactly five times each year. *There have been no special meetings.* Thus, it may reasonably be inferred that the Committee (such as it is) provides a few hours of oversight per year, scarcely time to understand or oversee anything.

Hospira Inc., the maker of generic injectable drugs, may face "widespread" production breakdowns that could take two to three years to correct, an analyst at RBC Capital Markets LLC said.

Hospira, based in Lake Forest, Illinois, dropped 9.1 percent to $28.17 at the close of trading, the lowest price since March 23, 2009. The problems may indicate a systemic issue that will have to be rectified long term, Shibani Malhotra, an RBC analyst in New York, said in a note today. The shares' decline may leave the company vulnerable to a takeover, Malhotra said in an e-mail.

\* \* \*

Interviews with consultants working with companies that are regulated by the Food and Drug Administration suggest the federal agency may obtain a consent decree to ensure violations at Hospira are fixed, Malhotra said. Hospira has been working to correct flaws that led to recalls of two drugs in 2009 and 2010.

Hospira's manufacturing issues are "far greater than investors realize," Malhotra said in the note. While she did not detail the flaws, she did say the violations were across "multiple facilities; perhaps even globally."

127.   Due to these events, the credibility of Hospira management was called into question. "You feel a little duped, I guess," said Michael Meyer, an analyst and portfolio manager at Philadelphia-based investment firm Cooke & Bieler. On December 7, 2011, defendant Begley announced his retirement, with the Chairman position passing to defendant Staley.

128.   On January 1, 2012, new Hospira CEO, defendant Ball, spoke at a JPMorgan Global Healthcare Conference Breakout Session. Defendant Ball compared identifying Hospira's quality issues to draining a "swamp." He stated:

It's going to take resources and it's going to take some time and we will find the odd gator along the way. But I think we can deal with them. So that's why I want to – *but I also don't want to mislead anybody to say this is – the swamp is completely drained and I see the way forward*. I do see the way forward but it will have some bumps associated with it in the near term. But again, I am taking the long-term view of this Company in saying *if we get through – when we get through these manufacturing issues we've got great opportunities in front of us* which is why I want to keep the pedal to the metal on research and development and our remediation activities.

129.     Defendant Ball also admitted that third party comprehensive audits were just then being ordered (i.e., something that should have been done *before* Project Fuel was launched):  **"I am currently sending out third party to do an audit of our QA facilities across the United States.**  So I want to be able to say to the FDA that we are on top of these things and demonstrate not by our words but by our actions that we mean business."

130.     On January 4, 2012, Hospira's facility in McPherson, Kansas, received a Form 483 from the FDA.  Among the violations identified by the FDA was the failure to have adequate written procedures to ensure the quality of the Company's drug products.  The FDA further noted that Hospira failed to implement or follow necessary procedures to prevent contamination of its drug products.  The specific observations in the Form 483 included the following:

- **There are no written procedures for production and process controls designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess**;

- **Procedures designed to prevent microbiological contamination of drug products purporting to be sterile are not established and written;**

- **Establishment of the reliability of the container supplier's report of analyses is deficient in that the test results are not appropriately validated at appropriate intervals;**

- Test devices are deficient in that instruments, apparatus, gauges, and recording devices not meeting established specifications are used;

- Adequate exhaust systems or other systems to control contaminants are lacking in areas where air contamination occurs during production; and

- **Laboratory controls do not include the establishment of scientifically sound and appropriate specifications and test procedures designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity.**

131.     On February 13, 2012, Hospira announced that it had hired Zena Kaufman, former Vice President for Global Quality Systems at Abbott, to join the Company as Senior Vice President-Quality.  A press release issued that day stated:

"Zena is a recognized global expert in pharmaceutical quality systems, and her proven experience will help establish quality as a strategic, competitive advantage across our global operations," said Mr. Ball. "***Hospira remains fully dedicated to restoring our long-established reputation for the highest-quality products*** and best possible service for our customers, and I'm confident we now have the right team in place to deliver against these imperatives."

Under Ms. Kaufman's leadership, Hospira will advance its global quality and compliance strategies, ***drive the continuous improvement of established quality procedures to ensure that processes and products meet high internal standards and regulatory requirements, and ultimately deliver high-quality, cost-effective products to customers***.

132.     On February 14, 2012, Hospira held its annual conference call to discuss its 2011 fourth quarter results and results for the full calendar year.  CEO defendant Ball stated in his opening remarks:

The most recent update we provided on our quality transformation was at the JP Morgan conference on January 10. I said at that time, and will reiterate on our call today, that reinforcing the foundation is our number one priority. I continue to be personally involved in discussions with the FDA, and am closely monitoring our progress. At JPMorgan, as you may recall, we discussed our headway to date at Rocky Mount, including submitting our comprehensive remediation plan to the FDA, closing out documentation more quickly to be able to more expeditiously release product, ramping up third-party assistance and oversight, and bringing in a new team of leadership at Rocky Mount to drive sustainable cultural change.

* * *

So what has happened since our last update in January? Well, Rocky Mount completed its shutdown. In mid-January, the plant started producing product, and over the course of the following weeks began releasing product. Rocky's current production levels are returning to where they were prior to the shutdown, in the 60% to 70% range. We have continued our regular constructive dialogues with the agency regarding our current progress. We have not entered into any discussions with the agency regarding a consent decree. As we have mentioned numerous times in the past, we would tell you if this were to happen. We are scheduled to meet with the agency in the next couple of weeks, and expect that our remediation plan will be a topic of discussion at that meeting. In the interim, we are continuing to implement the remediation plan as submitted.

*At our Austin plant, you may recall we indicated that we had signed on a third-party consulting firm, Lachman, to verify the status of our 483 commitments*[27]. Lachman finished their audit, and concluded that 100% of the commitments we made in our action plan have been fully addressed. At our McPherson plant, we submitted our response to the FDA regarding the 483 observations from the inspection that closed out in early January of this year. We will be meeting with the FDA shortly to discuss our response and are proceeding to work through that plan.

Finally, we continue to advance our efforts proactively and holistically across our manufacturing footprint to assess our readiness for future FDA inspections. I will reiterate that I remain firmly committed to reinforcing our foundation, and instilling a culture of high quality throughout this organization. I'm confident that as a result of our initiatives, Hospira will be even better positioned as the world's leading provider of the highest quality injectable drugs and infusion technologies.

133.    On this same conference call, defendant Werner was asked about the possibility that Hospira would be saddled with an FDA Consent Decree. He responded: "All I know is that we are doing the best job possible of getting the situation fixed, continuing to dialogue with the FDA to ensure that they're on board, and know what when we are doing. And I think in that respect, moving forward, I like our chances. ***But again, I don't think anybody ever really knows***."

134.    Werner was also asked about the status of remediation efforts at Hospira's Austin facility. He stated:

Austin is quite a bit smaller than our Rocky Mount facility. And from my standpoint, as you look at the 483s, in my view, Rocky Mount had a lot more work to do than the Austin facility. ***Having said that, the Austin 483, as we mentioned before, was not great.*** And so I was very pleased that the plant went through the remediation process. They indicated to us that they'd completed all their commitments. As I mentioned before, a couple days later then we sent in Lachman to get a third-party verification on that. So I was extremely happy that everything is 100% A-okay from their standpoint. And we're looking and continuing to look at third parties reviewing our plants to ensure that, A, we're living up to our commitments. But also, B, that we have a state of FDA readiness, as the FDA comes through with another round of reviews and inspections.

---

[27]    Once again, Hospira acknowledged the type of independent consulting to verify compliance that should have been obtained by the Board prior to Project Fuel.

135.    Then, on March 9, 2012, the FDA issued another Form 483 on Hospira's Clayton facility, noting that "[t]here is a failure to thoroughly review any unexplained discrepancy and the failure of a batch or any of its components to meet any of its specifications whether or not the batch has been already distributed."  Specifically, the FDA noted that Hospira "failed to assess the potential of smaller particles being introduced into [Propofol]."

136.    On April 11, 2012, Hospira named a veteran pharma industry executive as its new Vice President Operations.  This new Vice President was expected to "advance its plant remediation strategies."

137.    On May 1, 2012, Hospira announced much diminished sales in profits for its first quarter as compared with the first quarter of the previous year.  It attributed these differences to ongoing remediation costs, and slowdowns.  As reported in the May 2, 2012 *Chicago Tribune*, Hospira was encountering "new" difficulties, while trying to address existing ones:

> *Hospira Inc. said Tuesday that its first-quarter net income fell 73.2 percent, to $40.2 million, a decline the company blamed on costs associated with continuing remediation efforts at its manufacturing plants and a lower supply of some key products.*
>
> The Lake Forest-based maker of generic injectable drugs and intravenous pumps, battered by a string of quality-control problems cited by the U.S. Food and Drug Administration, said sales dropped 3.6 percent, to $965.9 million.
>
> Adjusted for one-time charges, earnings dropped 49 percent, to $104 million, or 47 cents a share, down from $203 million, or 93 cents a share, in the same quarter of 2011.
>
> Analysts polled by Thomson Reuters expected earnings of 45 cents a share on revenue of $949.7 million.
>
> Hospira shares finished up 1.1 percent, at $35.50.
>
> The company, which has struggled with growing costs to address regulatory concerns at its giant Rocky Mount, N.C., plant, also said in a filing on Tuesday that it received additional FDA concerns about a another plant in Clayton, N.C.

In a call with analysts, Hospira Chief Executive F. Michael Ball said the company has spoken with the agency about its concerns at the Clayton plant and is making progress on addressing them.

Ball also said remediation efforts continue at the Rocky Mount plant, which has been under FDA scrutiny for more than two years for what the agency called subpar manufacturing processes.

The Rocky Mount plant, which manufactures injectable drugs, including anesthesia products, irrigation and intravenous solutions and renal and cardiovascular care products, produces nearly a quarter of Hospira's annual profit.

In response to the problems, the company has replaced several members of its management team, brought in teams of consultants and invested in manufacturing process improvements.

138.  On a May 1, 2012 conference call, defendant Ball provided an update which detailed Hospira's continuing struggles, which were so vast they required the attention of 150 consultants:

Let's start with Rocky Mount. First, we remain on track with our remediation efforts at the plant. As we indicated on our fourth-quarter earnings call in February, we are currently maintaining our production and release levels in the 60% to 70% range, and anticipate that we will remain at these levels through at least mid-year.

Second, we are also making progress with our hiring efforts at Rocky. *We have placed over 100 full-time employees at the plant since the beginning of the year. This is in addition to the more than 150 consultants we already have working on the plant floor with our employees, and assisting us with our remediation efforts. We expect these consultants to remain with us for most of the year, after which we expect to steadily ramp down as our internal staff takes over many of the roles and responsibilities the consultants have been performing for us*.

And finally, we have continued our regular constructive dialogues with the FDA regarding our current progress at Rocky, and continue to press forward with implementation of our remediation plan. The agency has told us they are willing to meet with us to discuss our plan, and we are communicating with them to finalize a date.

Moving to our other pharma facilities – at our Clayton plant, which is also cited under the warning letter with Rocky Mount, the FDA conducted an inspection in March. The inspection was not a full cGMP audit, but a limited inspection focused on a specific issue. The agency had one observation regarding how we

conduct investigations, which we did not deem to be critical in nature. We have already addressed and completed the corrective action for this observation.

***In addition, during the month of March, we encountered some manufacturing issues at the plant, and elected to shut down production to investigate. This has created a temporary shortage situation with Propofol,*** and has also impacted certain contract manufacturing customers. Last week we completed the corrective action, which we believe addresses the issue. We have restarted production, and will begin a staged release of quarantined product in the coming weeks.

At our Austin plant – we discussed on our fourth-quarter earnings call that we had retained Lachman, a third-party consulting firm, to audit the completion of the plant's corrective actions. They concluded that all of the commitments we made to the agency in our action plan had been fully completed. In March, we received, from the FDA, what is referred to as an untitled letter. The letter clarified the agency's expectations regarding the scope of some of our corrective actions we took to resolve the observations in the 483 they issued last year. We have responded to the letter with our plan to address their concerns. And with the additional corrective actions in place, we'll be better prepared for their next inspection.

139.    The "consultants" referenced by Hospira range from top-level compliance executives to those "working on the plant floor." In many cases such "consultants" are actually temporary replacement workers taking up the tasks of essential workers recklessly fired during Project Fuel.

140.    On May 11, 2012, Hospira's Boulder, Colorado, facility received another Form 483 from the FDA, this time with seven observations. The specific observations in the Form 483 included the following:

- ***Your firm has released product without the documentation of a robust process that yields a high degree of assurance in the performance of the manufacturing process (*This is a repeat observation from the June 21, 2011 FDA audit);***

- A Field Alert Report was not submitted within three working days of receipt of information concerning significant chemical, physical, or other change or deterioration in a distributed drug product;

- Laboratory controls do not include the establishment of scientifically sound and appropriate test procedures designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity;

- *Written procedures are not established for the cleaning of equipment, including utensils used in the manufacture, processing, packing or holding of a drug product…(*This is a repeat observation from the June 21, 2011 FDA audit);*

- *Your quality control unit lacks the responsibility for approving or rejecting all laboratory procedures impacting the identity, strength, quality, and purity of the drug product;*

- *There is no documentation of the thorough review of failures to meet specifications impacting the identity, strength, quality, and purity of the drug products; and*

- *Materials are not stored in a manner to prevent degradation, contamination and cross-contamination.*

141.    Approximately two months later, on July 13, 2012, Hospira's Lake Forest, Illinois ("Lake Forest"), facility received a Form 483 from the FDA with ten observations.  Some of the FDA's specific findings centered on the Company's failure to establish adequate procedures and the Company's inadequate documentation practices.  In addition, the FDA noted that, despite certain conclusions reached during an investigation that began in December 16, 2011, into adulterated products, as of June 29, 2012, "Hospira had yet to conduct a corrective and preventative action for all product and/or customers impacted on the US market."  The specific observations in the Form 483 included the following:

- An individual medical device manufacturer report submitted per FDA Form 3500A did not contain in Block B a description of the event or problem to include the nature of the problem;

- Complaints representing events that are MDR reportable were not promptly reviewed, evaluated, and investigated by a designated individual;

- *Complaints involving the possible failure of a device to meet any of its specifications were not evaluated and investigated where necessary;*

- *Procedures for corrective and preventive action have not been adequately established;*

- Requirements that must be met by suppliers have not been adequately established;

- The report to FDA of the correction or removal of a device did not identify the device's 510(k) status;

- Procedures for identifying valid statistical techniques required for establishing, controlling, and verifying the acceptability of process capability and product characteristics have not been adequately established;

- Changes to documents were not communicated to appropriate personnel in a timely manner;

- *Corrective and preventive action activities and/or results have not been adequately documented; and*

- *Complaint files are not adequately maintained.*

142.     Within weeks, on July 26, 2012, Hospira's Clayton facility received another Form 483 from the FDA, this time with six observations.  The specific observations in the Form 483 included the following:

- *The written stability program for drug products does not include meaningful test methods;*

- *Control procedures are not established which monitor the output and validate the performance of those manufacturing processes that may be responsible for causing variability in the characteristics of in-process material and the drug product;*

- *There are no written procedures for production and process controls designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess;*

- *Laboratory controls do not include the establishment of scientifically sound and appropriate sampling plans designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity;*

- An NDA-Field Alert Report was not submitted within three working days of receipt of information concerning a failure of one or more distributed batches of a drug to meet the specifications established for it in the application; and

- *Equipment and utensils are not maintained at appropriate intervals to prevent malfunctions that would alter the safety, identity, strength, quality or purity of the drug product.*

143.     On August 1, 2012, Hospira held a conference call to discuss second quarter 2012 results.  CEO defendant Ball again addressed persistent and difficult remediation issues:

> [W]e continue to progress with our remediation efforts at Rocky Mount, our annual preventative maintenance shutdown went as planned and we are bringing the lines back into production.
>
> *   *   *
>
> ***As our remediation program progresses across our plants, we have uprooted additional issues, some of which have unfortunately resulted in product recalls, inventory loss and production disruptions***. We are driving to root cause and implementing corrective actions. As we have said in the past, we believe identifying and resolving these issues signifies that we are moving in the right direction on our journey to achieving sustainable compliance.
>
> Let me provide additional details on some of these activities starting with Rocky Mount….we started the plant back up in a phased approach and are returning to the 60% to 70% production and release levels. We expect to remain at this level during the third quarter and then modestly increase through the end of the year.
>
> *   *   *
>
> [I] know many of you are looking forward to an update on our interactions with the FDA, we have continued to have constructive and productive dialogue with the agency including two meetings on Rocky Mount during which we discussed our comprehensive action plan and our progress to date. One of the meetings was at the FDA's headquarters, or the center, and included representatives from districts as well as the Office of Compliance and the Office of Drug Shortage. While final minutes in the meeting are circulating at the agency for comments, we believe the FDA has accepted the work plan that we previously submitted. ***The agency acknowledged that we were moving in the right direction with the right level of commitment, but indicated they needed to see continued progress.*** We realize that much work remains to be done, but left the meeting encouraged.
>
> As part of our continuing global quality efforts, we are reviewing our quality systems across all of our plants. ***Where there are gaps, we are bringing in third-party support on an interim basis as we improve the system. We've already started implementing this at Austin and Boulder and will be looking at the other plants as we proceed our assessments***.
>
> *   *   *
>
> ***At our Boulder plant, the FDA performed an inspection at the facility and issued seven observations. Boulder is a small oncolytic API plant and the observations centered around cleaning validation, process validation and laboratory investigations***.  We have responded to the FDA with our plan to

address the observations, and in a subsequent meeting, the agency did not object to the scope of our planned corrections.

* * *

At Austin, just this Monday, the FDA began both a follow-up inspection and a general cGMP inspection of this site. We recognize that we are receiving heightened scrutiny from the FDA as the agency is interested in monitoring our progress and ensuring compliance across our manufacturing facilities. We support this ongoing interaction with the agency as we believe it will not only help ensure that our remediation efforts meet their expectations, but it also supports the holistic improvement initiatives we're committed to making across our manufacturing footprint.

* * *

So as you can see, we had a very busy quarter and continue to move forward with both our pharma and device remediation efforts. I realize that some of you are concerned about the length of time this is taking and that additional issues keep bubbling up. However, from my perspective, we are making progress and we are seeing encouraging signs of improvement.

* * *

***Using the swamp analogy I've referenced over the past several quarters, we are draining the swamp and dealing with the gators we have uncovered***. As I've reiterated numerous times, I am committed to resolving our quality issue and getting as much done in 2012 as possible. I believe the FDA understands, and I know that our employees do as well, my commitment in this respect. ***But, it is not a quick fix, it's complex, it takes time and money and there may be additional gators yet to be uncovered along the way***. That said, I know we will get through this, it's a matter of when not if, and when we do, we will be in a much stronger competitive position.

144.    As CEO defendant Ball concedes, Hospira's problems are so severe and widespread that there is no assurance that can be given that they all have even been identified, let alone rectified. In fact, more and more issues keep coming to light. On July 16, 2012, Hospira was forced to recall four cancer drugs. As *Reuters* reported in an article titled, "Hospira Recalls Four Cancer Drugs For Glass Particles": "Hospira Inc said it has issued a nationwide recall of four of its injectable cancer drugs because of particles embedded in the glass at the neck of the vial…. Injury could result if the solution were injected into a patient, the FDA said. Signs and

symptoms might include bleeding, bruising, inflammation, itching, rash, chest pain and respiratory symptoms." On August 16, 2012, yet another drug was recalled due to an "overdose risk." And most recently, on August 26, 2012, Hospira received yet another Warning Letter, raising the possibility of an FDA Consent Decree.

145. On August 24, 2012, the FDA issued another Form 483 on Hospira's Austin facility, this time with sixteen observations. As with several of Hospira's other facilities, the FDA noted a lack of written procedures, inadequate training, and a failure to follow procedures and responsibilities. In addition, the FDA identified several instances where Hospira failed to either conduct a thorough investigation into contaminated products or any investigation at all. The FDA also noted Hospira's untimely investigations into complaints, stating that while "investigations should target 30 calendar days … for completion," Hospira had "[a]t least 11 complaints [that] have been open for longer than 1 year." For instance, Hospira received a complaint on February 3, 2011, that one of its drugs was contaminated by "a black particle," which was not caught until a majority of the product was already infused in the patient. Over sixteen months later, on June 14, 2012, Hospira finally evaluated the sample and discovered that the particle was stainless steel. As of the date of the Form 483, the investigation was still ongoing. The specific observations in the Form 483 included the following:

- An NDA-Field Alert Report, was not submitted within three working days of receipt of information concerning significant chemical, physical, or other change or deterioration in a distributed drug product;

- ***There is a failure to thoroughly review the failure of a batch or any of its components to meet any of its specifications whether or not the batch bas been already distributed;***

- ***Procedures describing the handling of all written and oral complaints regarding a drug product are not followed;***

• Drug products do not bear an expiration date determined by appropriate stability data to assure they meet applicable standards of identity, strength, quality and purity at the time of use;

• *Employees engaged in the manufacture, processing, packing, and holding of a drug product lack the training and experience required to perform their assigned functions;*

• *Laboratory controls do not include the establishment of scientifically sound and appropriate test procedures designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity;*

• *Each batch of drug product required to be free of objectionable microorganisms is not tested through appropriate laboratory testing;*

• *The calibration of instruments is not done at suitable intervals in accordance with an established written program;*

• *Reserve drug product samples are not representative of each lot or batch of drug product;*

• Each lot in each shipment received was not identified with a distinctive code for each container or grouping of containers for components;

• Representative samples are not taken of each shipment of each lot of components for testing or examination;

• Drug product container and closure test procedures are deficient in that closures are not tested for conformance in accordance with appropriate written procedures;

• *There are no written procedures for production and process controls designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess;*

• *Written procedures are not followed that describe the in-process controls, tests, and examinations to be conducted on appropriate samples of in-process materials of each batch;*

• *Procedures designed to prevent microbiological contamination of drug products purporting to be sterile are not established and followed; and*

• *Equipment and utensils are not cleaned, maintained, and sanitized at appropriate intervals to prevent contamination that would alter the safety, identity, strength, quality or purity of the drug product.*

**A.      The August 2012 Warning Letter**

146.      On August 28, 2012, Hospira filed a Form 8-K with the SEC announcing that the Company had received yet another Warning Letter from the FDA, dated August 23, 2012, in connection with an inspection of the Company's Costa Rica device manufacturing facility (the "August 2012 Warning Letter").  The August 2012 Warning Letter once again identified severe deficiencies in the Company's quality controls that had resulted in adulterated products. Tellingly, despite being forced to conduct a recall in January 2012 of injectables produced at Hospira Costa Rica facility due to the presence of "particulate matter," the Individual Defendants failed to take necessary steps to prevent the reoccurrence of severe quality issues.  The August 2012 Warning Letter was summarized in the Form 8-K as follows:

> On August 23, 2012, Hospira, Inc. (the "Company") received a warning letter from the U.S. Food and Drug Administration (FDA) related to an inspection of the Company's La Aurora de Heredia, Costa Rica device manufacturing facility from April 16, 2012 through April 19, 2012. The Costa Rica site manufactures most of the Company's infusion devices and sets. A copy of the FDA's warning letter is filed as Exhibit 99.1 to this Form 8-K and is incorporated herein by reference.

> The warning letter does not restrict production or shipment of the Company's products from this facility. The Company is still in the process of evaluating what corrective actions, and associated costs, are required to address the matters raised in this warning letter.

> The Company takes this matter seriously and intends to respond fully, and in a timely manner, to the FDA's warning letter. Until the violations are corrected, the Company may be subject to additional regulatory action by the FDA, including the withholding or delay of approval of applications, seizure, injunction, and/or civil monetary penalties. Any such actions could significantly disrupt our ongoing business and operations and have a material adverse impact on our financial position and operating results. There can be no assurance that the FDA will be satisfied with the Company's response.

147.      The August 2012 Warning Letter states in relevant part as follows:

During an inspection of your firm located in La Aurora de Heredia, Costa Rica, on April 16, 2012, through April 19, 2012, an investigator from the United States Food and Drug Administration (FDA) determined that your firm manufactures

Symbiq, Plum, Gemstar, and Lifecare PCA branded infusion pumps and intravascular administration sets. Under section 201(h) of the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. § 321(h), these products are devices because they are intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, or to affect the structure or function of the body.

This inspection revealed that these devices are adulterated within the meaning of section 501(h) of the Act, 21 U.S.C. § 351(h), in that the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation are not in conformity with the current good manufacturing practice requirements of the Quality System regulation found at Title 21, Code of Federal Regulations (CFR), Part 820.

We received a response from Messrs. Randall Obanda, Site Quality Director, and Pedro Castillo, Devices Serialized Plant Manager, dated May 8, 2012, concerning our investigator's observations noted on the Form FDA 483 (FDA 483), List of Inspectional Observations, which was issued to your firm. We address this response below, in relation to each of the noted violations. These violations include, but are not limited to, the following:

1. ***Failure to identify the actions needed to correct and prevent recurrence of nonconforming product and other quality problems,*** as required by 21 CFR 820.100(a)(3).

\* \* \*

2. ***Failure to implement and record changes in methods and procedures needed to correct and prevent identified quality problems,*** as required by 21 CFR 820.100(a)(5).

\* \* \*

3. ***Failure to evaluate suppliers, contractors, and consultants on the basis of their ability to meet specified requirements, including quality requirements.***

\* \* \*

4. ***Failure to establish adequate procedures for acceptance of incoming product***, as required by 820.80(b).

\* \* \*

5. ***Failure to maintain device history records*** (DHRs).

148. The August 2012 Warning Letter further demonstrates that even after being apprised and having knowledge of the problems identified by the FDA concerning the

Company's Costa Rica facility, as well as the two previous Warning Letters regarding the Company's other facilities, the Individual Defendants continue to fail to take appropriate steps to rectify the Company's serious internal control issues and ongoing FDA violations.

149. On September 11, 2012, Hospira attended a Morgan Stanley Healthcare Conference, during which defendant Ball responded to questions regarding the progress of remediation efforts at Rocky Mount, noting that remediation efforts included "total management changes … We employed a number of consultants … to provide us with not just oversight, but also provide our people with training all the way down to the shop floor."  Through this process, Ball admitted that "*[w]e've obviously uncovered a lot of issues … But I think this is important, because on the road to sustainable compliance, it is important to drive to find all of the issues, drive to root cause and get them fixed. So we are doing this once and for all*."  When asked about the FDA's anticipated re-inspection of Rocky Mount, Ball said, "*I have big hopes for this upcoming inspection and this is why we are putting such effort behind it* … But at the end of the day, we believe that Rocky Mount will get to a place of sustainable compliance, and I'm looking forward to the FDA coming in and verifying that."  Defendant Ball also stressed that "*what we need to strive for as a Company is to make sure that there is no repeat observations, that we ensure that we've lived up to our commitments*…," and that "*[w]here you get in trouble with the Agency [] is if you get repeat observations*…."

150. On September 20, 2012, Hospira attended a UBS 2012 Global Life Sciences Conference, during which defendant Werner discussed the Form 483 received by Hospira's Austin facility in August 2012.  When discussing whether to characterize the Form 483 as "a good one or a bad one, minor or major," defendant Werner explained that "I really would choose not to sort of be qualitative around it, except to say that we take all the observations seriously."

During the conference, defendant Werner also responded to a question regarding the status of remediation efforts at Rocky Mount and the FDA's anticipated re-inspection, claiming that "*we think we are well towards the end of completing the activities that we committed to complete*." Defendant Werner continued, "[w]e want to be ready for the FDA to show up sometime likely in the fourth quarter. *We will take steps to make sure that third parties have verified that we have done what we said we were going to do and be ready for them and be hopeful for a good outcome*." During the September 20, 2012, conference, defendant Werner also responded to a question regarding the impact of the Warning Letter received by Hospira's Costa Rica facility, claiming that "*[i]n terms of any restriction on shipments or anything, we don't see that there is going to be any issue there … We haven't cut back significantly at all and we don't expect to see any disruption at this point*." Defendant Werner also updated Hospira's expected remediation costs, indicating that the Company would likely spend at the "*high end*" of the anticipated range of $300 million to $375 million.

### B.     Hold on Shipments out of Costa Rica Facility

151.    Then, during a third-quarter 2012 earnings call on November 7, 2012, Hospira announced that it had placed a voluntary hold on all shipments of Symbiq infusion pumps, all of which were manufactured at its Costa Rica facility, to new U.S. customers. The very next day, the FDA issued an import alert that prohibited the importation of Symbiq[TM] infusion pumps into the U.S.

152.    On February 13, 2013, Hospira filed with the SEC its annual report on Form 10-K for the fiscal year ending December 31, 2012. In the Form 10-K, Hospira disclosed that it had submitted comprehensive remediation plans in response to the April 2010 and August 2012

Warning Letters, including facility-specific modifications.  The Form 10-K stated in pertinent part:

> Hospira takes these matters seriously and has responded fully, and in a timely manner, to the FDA's Warning Letters (the FDA's Warning Letters are publicly available on the FDA's website). ***Hospira has submitted comprehensive remediation plans to address the items raised in the 2010 Warning Letter and 2012 Warning Letter. The remediation plans involve commitments by Hospira to enhance its facilities, employee training, quality processes and procedures, and technology.*** Specific to Rocky Mount, under the remediation plan, Hospira is investing in capital improvements and facility modifications, including modernization of production lines, improvements to sterile process flow, a new quality control laboratory and the installation of additional automated visual inspection equipment. Hospira is also implementing information technology solutions to enhance its quality processes, including systems that manage batch documentation and release, and systems that track the training and qualification of our employees. Specific to Costa Rica, Hospira's remediation plan involves strengthening supplier controls, design controls, and its investigation and corrective action and preventative action procedures. For both remediation plans, Hospira has engaged third-party experts to assist with the remediation activities, established remediation project management teams, deployed new site leadership, and is hiring additional permanent employees in the manufacturing operations and quality organizations. Hospira will continue to work through the commitments made in its remediation plans or responses and interact and work closely with the FDA to ensure that all items noted in the Warning Letters and related subsequent Form 483s are appropriately addressed.

153.    On February 13, 2013, Hospira held a conference call to discuss fourth quarter 2012 results and 2013 guidance, during which the Company reported that Symbiq is off-market in the U.S. for 2013.

154.    During the February 13, 2013, earnings call with analysts, defendant Ball also reported that the recently completed regulator inspection of the Lake Forest facility "was particularly rough."  "I'm disappointed at the outcome," Ball said.  "[W]hat it indicates is that … we've got a lot of work to do there."  Defendant Ball further explained that "***we are attacking it in both ways, which is backward-looking, which is cleaning up past practices, which really talks to quality systems***…."  Defendant Ball, however, seemed optimistic about the re-inspection of the Rocky Mount facility which began on February 12, 2013, explaining that "we have

prepared extremely hard. We have put new management teams in place … Literally used tens of thousands of consultant days to help us get ready. We have invested a ton of money, over $100 million into the Rocky Mount facility."

155. The next day, Hospira filed a Form 8-K, announcing that the FDA had expanded its import alert to not only prohibit the importation of Symbiq™ infusion pumps, but also prohibit the importation into the U.S. of the Plum™, GemStar™, and LifeCare PCA™ infusion pumps that are manufactured in the Costa Rica facility. As a result, Hospira withdrew its 2013 full-year financial projections communicated during the February 13, 2013, earnings call. Hospira expects the expansion of the import ban to adversely impact its 2013 net sales by $50 to $100 million. The Form 8-K stated in pertinent part:

> On February 13, 2013, after issuing the fourth-quarter and full-year 2012 earnings release, filing the Form 10-K for the year ended December 31, 2012, and holding the related earnings conference call, Hospira, Inc. ("Company") received written notification from the U.S. Food and Drug Administration ("FDA") that the FDA had expanded the Symbiq™ import alert issued on November 8, 2012. The alert prohibited the importation of Symbiq™ infusion pumps into the U.S. **The expansion received on February 13, 2013 prohibits the importation into the U.S. of the Plum™, GemStar™, and LifeCare PCA™ infusion pumps which are manufactured in our Costa Rica facility.**
>
> * * *
>
> **The Company is withdrawing the 2013 full-year financial projections communicated during the Company's earnings call on February 13, 2013.** Assuming that the import ban on Plum™, GemStar™, and LifeCare PCA™ remains in effect throughout 2013, **the Company's preliminary estimate is that the impact for this matter could be in the range of $50 to $100 million in decreased net sales and $0.10 to $0.20 reduction in U.S. GAAP earnings per share or an adjusted earnings per share impact of $0.05 to $0.15.** The Company will be refining these estimates and aggressively evaluating potential mitigation strategies. The Company plans on issuing new guidance at its first quarter 2013 earnings call.

156.     After the Company announced the FDA continued to raise questions concerning the quality of Hospira's medical devices, Hospira shares fell more than 7% for the biggest intraday decline since November 2011.

**C.     Regulatory Issues at Rocky Mount Continue**

157.     On March 5, 2013, Hospira filed a Form 8-K announcing that the FDA completed its three-week-long inspection of Hospira's Rocky Mount facility.  At the close of the inspection, the FDA issued a Form 483 with 20 observations, three of which were designated as repeat observations.  The Form 8-K stated in pertinent part:

> On March 1, 2013, the U.S. Food and Drug Administration ("FDA") completed an inspection of Hospira, Inc.'s ("the Company") facility located in Rocky Mount, North Carolina, which was conducted by five inspectors over a three week period. The Company is making this disclosure because the Rocky Mount facility has been subject to an FDA warning letter since April 2010. ***At the close of the inspection, the FDA issued a Form 483 with 20 observations, three of which were designated as repeat observations.*** A number of the observations deal with matters for which remediation was already underway but not yet complete or are matters previously self-identified for remediation by the Company that are scheduled to be addressed in the latter part of the Company's remediation and modernization plans. The Company will be seeking input from the FDA regarding the scope and timing of remediation efforts at the facility. Over the last few years, the Company has been working with the FDA to balance remediation efforts with the production of market critical drugs and will be dialoguing with the FDA as to whether this balance remains appropriate.

> The Company takes this matter seriously. Any actions by the FDA or the Company in response to this inspection could impact the Company's ability to increase supply of products to the market, could impact the Company's costs for remediation activities or have other adverse impacts on the Company's operations.

> The Company will evaluate whether there will be any financial impact from this matter and will include any such impact as part of its previously announced intention to issue 2013 guidance as part of its first quarter 2013 earnings call.

158.     While Hospira tried to dismiss the Form 483 by claiming that it largely addressed matters for which remediation was already underway but not yet completed or which were scheduled to be addressed later in the remediation process, the actual observations included

fundamental deficiencies that should have already been remedied – especially given the significant consulting time devoted to remediation and the hundreds of millions of dollars already incurred by the Company on remediation efforts. Of the twenty deficiencies identified in the Form 483, the following three were repeat violations: (i) "The responsibilities and procedures applicable to the quality control unit are not in writing and fully followed"; (ii) "There is a failure to thoroughly review any unexplained discrepancy and the failure of a batch or any of its components to meet any of its specifications whether or not the batch has been already distributed"; and (iii) "Laboratory records do not include complete data derived from all tests, examinations and assay necessary to assure compliance with established specifications and standards." The remaining deficiencies identified in the Form 483 include the following:

- There are no written procedures for production and process controls designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess.

- Procedures designed to prevent microbiological contamination of drug products purporting to be sterile are not established, written, and followed.

- Drug product production and control records, are not approved by the quality control unit to determine compliance with all established, approved written procedures before a batch is released or distributed.

- Aseptic processing areas are deficient regarding the system for monitoring environmental conditions.

- Equipment for adequate control over air pressure, humidity, and temperature is not provided when appropriate for the manufacture, processing, packing or holding of a drug product.

- Aseptic processing areas are deficient regarding humidity controls.

- Testing and release of drug product for distribution do not include appropriate laboratory determination of satisfactory conformance to the final specifications prior to release.

- Written specifications for laboratory controls do not include a description of the testing procedures used.

- Procedures designed to prevent microbiological contamination of drug products purporting to be sterile do not include adequate validation of the sterilization process.

- Rejected in-process materials are not identified and controlled under a quarantine system to prevent their use in manufacturing or processing operations for which they are unsuitable.

- Aseptic processing areas are deficient regarding the system for cleaning and disinfecting the room and equipment to produce aseptic conditions.

- Employees engaged in the manufacture and processing of a drug product lack the training required to perform their assigned functions.

- Laboratory controls do not include the establishment of scientifically sound and appropriate sampling plans and test procedures designed to assure that in-process materials and drug products conform to appropriate standards of identity, strength, quality and purity.

- Written production and process control procedures are not followed in the execution of production and process control functions.

- Equipment used in the manufacture, processing, packing or holding of drug products is not of appropriate design to facilitate operations for its intended use.

- Equipment and utensils are not cleaned, maintained, and sanitized at appropriate intervals to prevent malfunctions and contamination that would alter the safety, identity, strength, quality or purity of the drug product.

- Buildings used in the manufacturing and processing of a drug product are not maintained in a good state of repair.

159. Also on March 5, 2013, after the Company filed its Form 8-K, defendant Werner spoke at an investors' conference. Defendant Werner conceded that injectables – one of the Company's primary products – "require highly specialized manufacturing facilities and expertise. Much more difficult to manufacture than oral drugs …" Defendant Werner then identified the remediation steps the Company was finally taking to try and achieve those requisites:

Next I'll take you through our first area of focus which is reinforcing the foundation. We've been relentlessly driving towards operational and quality excellence, what we call reinforcing the foundation. Not just because it's the right thing to do but we believe it's going to support and sustain our growth initiatives

going forward. To support this priority, we've been strengthening our foundation while simultaneously preparing the organization for growth. ***We've been making sustainable change across our global manufacturing footprint, improving processes, adding talented expert people to the organization, strategically expanding our capacity, and implementing modernization initiatives in many of our facilities***.

We've also been working diligently as I mentioned earlier on for quality improvement and remediation to position us favorably for long-term success.

160. During Hospira's March 13, 2013, conference call, defendant Ball blamed the Form 483 on the fact that the Company had started its remediation efforts, but that there was still "a lot of work in front of us at Rocky Mount." Defendant Ball further claimed that 2012 was devoted to identifying the issues that had been plaguing the Company for years – issues that should have been at the very least identified prior to the adoption of Project Fuel. Specifically, defendant Ball stated, "***[w]e know at least what needs to be done. I mean, it's – 2012 was about identifying issues, getting the fixes in place by identifying issues. The bulk of the remediation should be completed by 2013, so I think what I'm looking for is getting that behind us***." Contrary to the message associated with the Company's cost-cutting initiative, Project Fuel, defendant Ball finally admitted that "***we can't confuse plants by saying to them on the one hand you've got to do everything you can to be efficient, while doing everything you can to remediate. So what we've chosen is to focus down on remediation and spend whatever it takes to get the remediation done***." Defendant Werner also conceded that the Company was finally "***invest[ing] to ensure compliance to the heightened regulatory standards of today***." When asked whether the significant costs spent on remediation would bring Rocky Mount up to a "state of the art" standard, Ball responded "[i]t will bring Rocky Mount into a state of sustainable compliance, and that's what were [sic] aiming for right now."

161. Defendant Ball also discussed its Austin facility during the March 13, 2013, conference call, claiming that the Form 483 received by the Austin plant "***was not a big***

*surprise*."  Specifically, defendant Ball claimed that just prior to the FDA's inspection, Hospira engaged an oversight consultant to review its Austin plant, and that the FDA inspector showed up on the same day as the oversight consultants.

162.    Then, during Hospira's May 1, 2013, earnings call, defendant Ball conceded that the Company was hit with another Form 483 after the FDA inspected its San Jose, California, device repair facility.   Defendant Ball reported that "in order to progress our remediation activities in the most efficient and timely fashion … *we have elected to maintain our investment in the use of consultants across our facilities*."  Defendant Ball further admitted that "while the bulk of the changes are behind us, *we do expect to incur about $25 million this year for device remediation and an approximately $75 million for pharma remediation*, which we expect to ramp down next year."  Although defendant Ball described the first quarter as "one of continued progress for Hospira," defendant Ball admitted that "we still have work to do on the remediation front…"  Defendant Ball explained that "we are now firmly into the execution stage for all of our quality improvement initiatives both for pharma and device businesses.  *Whereas last year at this time, we are just ramping up our pharma remediation and still assessing what needs to be done on the device side*."   Unlike the message given during Project Fuel, defendant Ball explained that the focus is now on remediation, not efficiency:   "We're saying the plants remediate is the #1 priority … As we get through that, then we can start to worry about the efficiency side."   Defendant Ball added, "*we've kind of doubled down on the consultants to make sure I'm covered on the remediation side*.  As we get the end in sight here, I don't want to drop the ball as the goal line's coming here."

### D.    Numerous Product Recalls

163.    In the meantime, during 2012 alone, Hospira was forced to conduct at least thirty-four recalls of different products produced at various facilities across the country, many of which were recalled due to the products being contaminated with visible particulate matter.  Moreover, in the first four months of 2013, Hospira has already conducted at least sixteen recalls of different products.  A substantial majority of these recalls could have been avoided had the Individual Defendants taken necessary steps to ensure that Hospira had sufficient internal and quality controls and that Project Fuel was not adversely affecting those controls and Hospira's legal compliance.

## VIII.   INSIDER SELLING

164.    The Individual Defendants' knowledge of the true health of Hospira's business and the extent of the manufacturing defects and deficiencies is also shown in certain Hospira officers' and directors' sales of personally-held stock.  The Insider Selling Defendants, Werner, Begley, Kearney, and Smith were privy to adverse, non-public information which they exploited for their own benefit, to the exclusion of other shareholders, by selling their Company stockholdings before the truth came to light.  While continuously making or causing the Company to make improper statements touting Hospira's purported manufacturing efficiency and positive growth, and effectively concealing the extent of remediation efforts needed to respond to the FDA investigations, certain officers and directors sold massive amounts of Company stock in order to capitalize on the Company's inflated stock price they had helped create.[28]

---

[28]    The period during which improper insider sales were made (the "Insider Selling Period") extends from the first insider sale on April 13, 2010 (a sale by defendant Smith) through the final sales on March 8, 2011 (sales by defendant Werner).  This Insider Selling Period falls within the Securities Action Class Period alleged in the Federal Securities Action.

165.    Hospira's susceptibility to insider trading stems from its compensation policies and lax insider trading restrictions.  Like many companies, Hospira grants incentive stock options to executives as part of its basic compensation package.  As stated in Hospira's Form DEF 14A filed on March 23, 2012, top executives are accorded annual salaries, but these are set "at or below" the median numbers paid by similar companies.  More compensation may be gained through the exercise of options issued at low strike prices, and the sale of acquired stock at higher prices, but this creates an incentive for insiders to artificially inflate the stock.  Most corporations attempt to prevent insider selling by imposing regularly scheduled "blackout periods," event-specific blackout periods, or "preclearance policies" (i.e., an insider must seek advance permission for sales from a compliance officer, who will determine if there is a peculiar risk of insider trading).  Experts in this area recommended that there be a time delay of at least one quarter between the initiation of a selling plan and actual selling, in order to prevent opportunism.

166.    In the spring of 2010, the Individual Defendants were aware that the Company had received two Warning Letters from the FDA discussing the Company's severe compliance and safety issues.  The receipt of such letters was unprecedented for Hospira — in its history as an independent Company it had never received a Warning Letter — and the Individual Defendants knew that these warnings coincided with the implementation of the aggressive Project Fuel cost-cutting program.  Instead of halting all insider sales pending an evaluation of the impact of this serious situation, the Insider Selling Defendants went on a post-Warning Letter selling spree, all while touting the purported efficiencies that Project Fuel was supposed to generate.  For example, CEO defendant Begley filed a "Rule 10b5-1" selling plan on June 4, 2010, scant weeks after the Company's receipt of the second Warning Letter, and soon thereafter

sold over $22 million worth of stock on June 21-22, 2010, his only sales during the Relevant Period. The insider selling spree abruptly ended in March 2011, roughly six months before revelation that Project Fuel had failed, and that Hospira faced staggering remediation costs. Commentators and regulators have identified short-lived 10b5-1 plans as a potential red flag for illicit trading.

167. As the CEO and a director of Hospira, defendant Begley was a member of the Company's management and Board. He was privy to material, non-public information about the extent of remediation efforts needed to respond to the FDA investigations. Defendant Begley was responsible for his statements in SEC financial statements, which included disclosures concerning Hospira's purported manufacturing efficiency and positive growth. Defendant Begley engaged in insider trading activity at a time when he knew adverse material, non-public information about the Company's impending costly remediation efforts.

168. While in possession of this knowledge, defendant Begley sold 386,112 shares of his personally held Hospira stock for proceeds of $22,008,384.[29] Defendant Begley's sales were timed to maximize profit from Hospira's then artificially inflated stock price. Defendant Begley's sales are suspicious given that his stock sales represented 58.50% of his holdings as demonstrated by the chart below. Further adding to the suspicion, defendant Begley did not sell any of his stock in the prior two-and-a-half years before the wrongdoing and the resulting inflated stock price. Defendant Begley's stock sales are detailed below:

---

[29] The cost basis of the shares sold by defendant Begley in June 2010 – based on the strike price of the stock options he exercised to obtain those shares – was $14,927,596.70; the total value defendant Begley realized on the exercise of those options was $17,889,469.30.

| | |
|---|---|
| Shares Sold During SP | 386,112 |
| Shares Remaining After Sales | 273,869 |
| Total Shares Before Sales | 659,981 |
| **Total Proceeds from Sales** | **$22,008,384.00** |
| **% of Total Ownership Sold During SP** | **58.50%** |

169.     As the Company's CFO and COO, defendant Kearney was a member of Company management.  He was privy to material, non-public information about the extent of remediation efforts needed to respond to the FDA investigations.  Defendant Kearney engaged in insider trading activity at a time when he knew adverse material, non-public information about the Company's impending costly remediation efforts.

170.     While in possession of this knowledge, defendant Kearney sold 300,640 shares of his personally held Hospira stock for proceeds of $17,197,411.42.[30]  Defendant Kearney's sales were timed to maximize profit from Hospira's then artificially inflated stock price.  Defendant Kearney's sales are suspicious given that his stock sales represented 85.44% of his holdings as demonstrated by the chart below.  Further adding to the suspicion, defendant Kearney only sold 11% of his stock in the prior two-and-a-half years before the wrongdoing and the resulting inflated stock price.  Defendant Kearney's stock sales are detailed below:

| | |
|---|---|
| Shares Sold During SP | 300,640 |

---

[30]   The cost basis of the shares sold by defendant Kearney in November 2009 – based on the strike price of the stock options he exercised to obtain those shares – was $99,907.80; the total value defendant Kearney realized on the exercise of those options was $5,018.20.  The cost basis of the shares sold by defendant Kearney in September 2010 – based on the strike price of the stock options he exercised to obtain those shares – was $3,523,116.57; the total value defendant Kearney realized on the exercise of those options was $4,234,412.43.  The cost basis of the shares sold by defendant Kearney in October 2010 – based on the strike price of the stock options he exercised to obtain those shares – was $4,142,333.90; the total value defendant Kearney realized on the exercise of those options was $730,389.17.  The cost basis of 70,000 shares sold by defendant Kearney in December 2010 – based on the strike price of the stock options he exercised to obtain those shares – was $2,272,900; the total value defendant Kearney realized on the exercise of those options was $1,717,100.  Defendant Kearney sold approximately 110,000 additional shares in December 2010, but the cost basis for those shares is not publicly available.

| | |
|---|---|
| Shares Remaining After Sales | 51,228 |
| Total Shares Before Sales | 351,868 |
| **Total Proceeds from Sales** | **$17,197,411.42** |
| **% of Total Ownership Sold During SP** | **85.44%** |

171. As the CFO, defendant Werner was a member of Company management. He was privy to material, non-public information about the extent of remediation efforts needed to respond to the FDA investigations. Defendant Werner was responsible for his statements in SEC financial statements, which included disclosures concerning Hospira's purported manufacturing efficiency and positive growth. Defendant Werner engaged in insider trading activity at a time when he knew adverse material, non-public information about the Company's impending costly remediation efforts.

172. While in possession of this knowledge, defendant Werner sold 85,849 shares of his personally held Hospira stock for proceeds of $4,901,269.76.[31] Defendant Werner's sales were timed to maximize profit from Hospira's then artificially inflated stock price. Defendant Werner's sales are suspicious given that his stock sales represented 86.66% of his holdings as demonstrated by the chart below. Further adding to the suspicion, defendant Werner did not sell any of his stock in the prior two and a half years before the wrongdoing and the resulting inflated stock price. Defendant Werner's sales are detailed below:

---

[31] The cost basis of the shares sold by defendant Werner in June 2009 – based on the strike price of the stock options he exercised to obtain those shares – was $659,715.60; the total value defendant Werner realized on the exercise of those options was $1,001,692.81. The cost basis of the shares sold by defendant Werner in September 2010 – based on the strike price of the stock options he exercised to obtain those shares – was $381,300; the total value Werner realized on the exercise of those options was $171,700. The cost basis of the shares sold by defendant Werner in November 2010 – based on the strike price of the stock options he exercised to obtain those shares – was $1,598,800; the total value defendant Werner realized on the exercise of those options was $781,000. Defendant Werner also sold approximately 15,181 shares in March 2011, but the cost basis for those shares is not publicly available.

| | |
|---|---|
| Shares Sold During SP | 85,849 |
| Shares Remaining After Sales | 13,216 |
| Total Shares Before Sales | 99,065 |
| **Total Proceeds from Sales** | **$4,901,269.76** |
| **% of Total Ownership Sold During SP** | **86.66%** |

173.    As the Company's General Counsel, defendant Smith was privy to material, non-public information about the extent of remediation efforts needed to respond to the FDA investigations.  Defendant Smith engaged in insider trading activity at a time when he knew adverse material, non-public information about the Company's impending costly remediation efforts.

174.    While in possession of this knowledge, defendant Smith sold 80,000 shares of his personally held Hospira stock for proceeds of $4.6 million.[32]  Defendant Smith's sales were timed to maximize profit from Hospira's then artificially inflated stock price.  Defendant Smith's sales are suspicious given that his stock sales represented 68.82% of his holdings as demonstrated by the chart below.  Further adding to the suspicion, defendant Smith did not sell any of his stock in the prior two-and-a-half years before the wrongdoing and the resulting inflated stock price.  Defendant Smith's sales are detailed below:

| | |
|---|---|
| Shares Sold During SP | 80,000 |
| Shares Remaining After Sales | 36,248 |
| Total Shares Before Sales | 116,248 |
| **Total Proceeds from Sales** | **$4,600,000.00** |
| **% of Total Ownership Sold During SP** | **68.82%** |

175.    Defendants Werner, Begley, Kearney, and Smith combined, sold over $48.7 million worth of their Company stock from the time the first improper statement was made by the Individual Defendants on March 24, 2009 to October 17, 2011, when the truth was fully

---

[32]  The cost basis of the shares sold by defendant Smith in April 2010 – based on the strike price of the stock options he exercised to obtain those shares – was $2,120,000; the total value defendant Smith realized on the exercise of those options was $2,480,000.

revealed. The following is a table showing the total insider sales that occurred during the Insider Selling Period:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **BEGLEY** | 6/21/2010 | 26,200 | $57.00 | $1,493,400.00 |
| | 6/22/2010 | 359,912 | $57.00 | $20,514,984.00 |
| | | **386,112** | | **$22,008,384.00** |
| | | | | |
| **KEARNEY** | 9/27/2010 | 91,334 | $57.00 | $5,206,038.00 |
| | 10/21/2010 | 29,306 | $59.00 | $1,729,054.00 |
| | 12/15/2010 | 70,000 | $57.00 | $3,990,000.00 |
| | 12/15/2010 | 35,357 | $57.07 | $2,017,668.42 |
| | 12/16/2010 | 74,643 | $57.00 | $4,254,651.00 |
| | | **300,640** | | **$17,197,411.42** |
| | | | | |
| **SMITH** | 4/13/2010 | 80,000 | $57.50 | $4,600,000.00 |
| | | **80,000** | | **$4,600,000.00** |
| | | | | |
| **WERNER** | 6/16/2010 | 14,853 | $55.79 | $828,669.66 |
| | 6/16/2010 | 6,431 | $55.75 | $358,523.75 |
| | 9/15/2010 | 9,384 | $55.30 | $518,935.20 |
| | 11/2/2010 | 40,000 | $59.50 | $2,379,800.00 |
| | 3/8/2011 | 15,181 | $53.71 | $815,341.15 |
| | | **85,849** | | **$4,901,269.76** |
| | | | | |
| **TOTAL** | | **852,601** | | **$48,707,065.18** |

176.    While defendants Werner, Begley, Kearney, and Smith sold their personally-held Company stock pursuant to 10b5-1 plans, these plans were adopted after the misconduct had already begun.  As such, defendants Werner, Begley, Kearney, and Smith knew that Hospira's stock was artificially inflated due to their improper statements when adopting the 10b5-1 plans and cannot avail themselves of any inference that they did not trade on the adverse material, non-public information.

177.    The insider selling coincided with the inflation in quarterly net operating income created by Project Fuel.  The effects of Project Fuel on operating profits (in millions) are shown below:

| Quarterly Net Operating Income by Year | | | | | |
|---|---|---|---|---|---|
| YEAR | Q1 | Q2 | Q3 | Q4 | TOTAL |
| 2008 | $145 | $152 | $162 | $188 | $647 |
| 2009 | $150 | $177 | $207 | $204 | $738 |
| 2010 | $240 | $213 | $189 | $142 | $864 |
| 2011 | $203 | $212 | $142 | $111 | $668 |

178.    Astoundingly, as late as the March 29, 2013 Proxy Statement, the Board asserted that Hospira's compensation policies, which allow for short bursts of unrestrained selling during periods of uncertainty, "do not encourage excessive risk taking and, thus, do not create risks that are reasonably likely to have a material adverse effect on the company."  It is unclear how the Board could credibly assert this in light of the Project Fuel debacle, and its attendant insider selling.  Tellingly, the Board has not announced the adoption of any policy which allows for a recoupment or "clawback" of profits made through insider sales, even if such sales were tainted by fraud.

## IX.    THE IMPROPER REPURCHASES

179.    While the Individual Defendants authorized improper statements that had the effect of inflating the Company stock, defendants Begley, Ball, Staley, Bailey, Curran, Sokolov, Hale, Wheeler, Bowles, and von Prondzynski authorized and implemented multiple repurchases of the Company's stock at these artificially inflated rates.  Despite knowingly or recklessly disregarding the fact that the value of the Company was inflated due to false, misleading, and

improper statements regarding the Company's health and remediation efforts, these defendants either directed or permitted the Company to materially overpay for its own stock through the repurchases detailed herein.

180.  From August 2010 to September 2011, the Board caused the Company to repurchase approximately 5,472,028 shares of stock at a staggering aggregate cost to the Company of over $300 million.  Under defendants Begley, Ball, Staley, Bailey, Curran, Sokolov, Hale, Wheeler, Bowles, and von Prondzynski's purview, the Company bought back its shares at a weighted average price of $55.19.  Tellingly, the weighted average repurchase price was substantially higher than Hospira's share price of $29.51 when the truth about the production slowdown caused by the FDA investigations, and the attendant costs and expense, was fully revealed on October 18, 2011.  The following chart illustrates the average prices paid for the Company's common stock during the repurchase period:

| Date of Board Authorization Repurchase Program | Type of Program | Authorized Amount of Repurchase | Period | Repurchased Shares[1] | Average Price Per Share | Weighted Average Calculation | Approximate Aggregate Cost | Source | File Date |
|---|---|---|---|---|---|---|---|---|---|
| February 28, 2006 | Repurchase | $400 million | | | | | | | |
| | | | August 2010 | 725,058 | $51.70 | $6.85 | $37,485,499 | 10-Q | 10/26/2010 |
| | | | September 2010 | - | - | - | - | 10-Q | 10/26/2010 |
| | | | October 2010 | - | - | - | - | 10-K | 2/16/2011 |
| | | | November 2010 | 169,344 | $58.55 | $1.81 | $9,915,091 | 10-K | 2/16/2011 |
| | | | December 2010 | 680,704 | $56.92 | $7.08 | $38,745,672 | 10-K | 2/16/2011 |
| | | | January 2011 | - | - | - | - | 10-Q | 4/26/2011 |
| | | | February 2011 | 220,931 | $54.28 | $2.19 | $11,992,135 | 10-Q | 4/26/2011 |
| | | | March 2011 | - | - | - | - | 10-Q | 4/26/2011 |
| April 25, 2011 | Repurchase | $1 billion | No Expiration Date | | | | | | |
| | | | April 2011 | 1,322,052 | $56.73 | $13.71 | $75,000,010 | 10-Q | 7/27/2011 |
| | | | May 2011 | 1,364,035 | $54.99 | $13.71 | $75,008,285 | 10-Q | 7/27/2011 |
| | | | June 2011 | 504,562 | $54.75 | $5.05 | $27,624,770 | 10-Q | 7/27/2011 |
| | | | July 2011 | 485,342 | $54.07 | $4.80 | $26,242,442 | 10-Q | 10/26/2011 |
| | | | August 2011 | - | - | - | - | 10-Q | 10/26/2011 |
| | | | September 2011 | - | - | - | - | 10-Q | 10/26/2011 |
| Total: | | | | 5,472,028 | | $55.19 | $302,013,902 | | |

181.  The repurchases were suspiciously timed shortly before some of the key Insider Selling Defendants, such as CFO defendant Werner, unloaded their own personally held Hospira

stock into the market. The repurchases had the effect of boosting the price of Hospira stock just in time for these Insider Selling Defendants to capitalize on their artificially inflated stock.

## X.   DAMAGES TO HOSPIRA CAUSED BY THE INDIVIDUAL DEFENDANTS

182.   As a result of the Individual Defendants' reckless decisions and bad-conscious disregard of their duties, Hospira engaged in inadequate manufacturing practices, failed to correct existing violations, fired personnel needed to follow FDA rules,  and deceived the market.  As a direct and proximate result of the Individual Defendants' actions, Hospira has expended and will continue to expend significant sums of money which include, but are not limited to:

(a)   large remediation costs, much of which could have been avoided have not Project Fuel been initiated, which greatly exacerbated Hospira's existing deficiencies;

(b)   costs from shut downs, slow downs, and recalls, which can be traced to Project Fuel, and would not have occurred but for Project Fuel (or would have occurred much less frequently);

(c)   the waste of $300 million in reckless stock repurchase costs, which funds could have been better spent on productive projects;

(d)   costs incurred in cooperating and responding to the FDA investigations;

(e)   costs incurred in connection with failure to supply penalties (which defendant Ball admitted, during the January 8, 2013 JP Morgan Global Healthcare Conference, the Company has already incurred);

(f)   costs incurred from compensation and benefits paid to the defendants who have breached their duties to the Company; and

(g)     costs incurred in defending itself in the Federal Securities Action filed in the U.S. District Court for the Northern District of Illinois, and perhaps event settlement or verdict costs.

183.     Hospira's business, and its goodwill and reputation have been severely damaged by the Company's scheme to conceal the truth about its financial health and business prospects. For at least the foreseeable future, Hospira will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the public, such that Hospira's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## XI.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

184.     Plaintiffs bring this action derivatively in the right and for the benefit of Hospira to redress injuries suffered, and to be suffered, by Hospira as a direct result of violations of the securities laws, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment by the Individual Defendants.  Hospira is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

185.     Plaintiffs will fairly and adequately represent the interests of Hospira in enforcing and prosecuting its rights, and have retained competent counsel experienced in this type of litigation to prosecute this action.

186.     Plaintiffs were shareholders of Hospira at the time of the wrongdoing complained of, have continuously been shareholders since that time, and are current Hospira shareholders.

187.     The current Board of Hospira consists of the following eleven individuals: defendants Ball, Staley, Bailey, Curran, Wheeler, Sokolov, Bowles, Hale, von Prondzynski, and

non-defendants William G. Dempsey ("Dempsey") and Dennis M. Fenton. Plaintiffs have not made any demand on the Board because such a demand would be a futile and useless act, particularly for the reasons stated below.

**A.** **Demand Is Excused as to the Causes of Action Based on the Decisions to Approve Project Fuel and Continue It Because the Board's Decisions Were Uninformed, Irrational, Did Not Reflect a Valid Exercise of Business Judgment, and Present a Substantial Risk of Liability**

188. The Director Defendants knew that the existence of quality controls and systems to ensure legal compliance were crucial. Investors would not trust a company that did not have such controls in place. Indeed, in Hospira's annual report on Form 10-K filed on February 25, 2009 (just prior to the announcement of Project Fuel), the Company and its Board affirmatively assured the investing public that:

> Hospira has developed and implemented *quality systems* and concepts throughout its organization. Hospira is actively involved in setting quality policies and managing internal and external quality performance. Its *quality assurance department provides quality leadership and supervises its quality systems*. An *active audit program*, utilizing both internal and external auditors, monitors compliance with applicable regulations, standards and internal policies.
>
> \* \* \*
>
> Hospira believes that it is in material compliance with applicable laws and regulations, including those described below.

189. As shown above in great detail, Hospira and its directors lacked a basis to state that Hospira was "in material compliance with applicable laws and regulations," or that it had "quality systems" and an "active audit program." Indeed, Hospira was not even doing particulate testing on a scheduled basis; was manufacturing and shipping adulterated product; and had failed to document measures needed to ensure legal compliance. Further, the Board failed to ensure that the Company conducted a sufficient review of its quality control systems, and whether these

systems were adequate given Project Fuel's severe cost-cutting initiatives, and therefore had no reason to believe that these statements were true.

190.     Nonetheless, the Board: (i) adopted Project Fuel without sufficient information; (ii) consciously disregarded their fiduciary obligations and stubbornly pressed ahead with Project Fuel despite red flags as to its adverse effect on legal compliance and adverse effect on public health and safety; and (iii) made or caused the Company to make misleading public statements that concealed the true nature and extent of the compliance issues or, at best, consciously disregarded whether the public statements made were true or false.

191.     Hospira's Board is dominated by individuals with broad experience in FDA regulatory requirements.  They had the experience to know that insiders recommending stock enhancement projects were conflicted, and that their representations required stringent independent third-party verification.

192.     Project Fuel was a major corporate undertaking requiring the Board's closest attention, both at the time of its initiation and throughout its existence.  Prior to approving and implementing the cost-cutting initiatives of Project Fuel, these fiduciaries had a duty to obtain a sufficient independent third-party comprehensive review (via a "mock inspection" or its equivalent) of Hospira's current compliance with FDA rules, and any effects Project Fuel would have on the Company's compliance.  A desire to save money cannot trump compliance, especially in a company making medical products.  The defendants publicly admitted that no such comprehensive review was even begun until April 16, 2010 (one year into Project Fuel) and was not ostensibly completed until on or about July 27, 2011.  As shown by subsequent events, that review, spanning fifteen months, was still not sufficiently comprehensive.

193.    The Board should not have proceeded without independently verified assurance as to the adequacy of Hospira's SOPs including: (i) whether SOPs existed as to all necessary measures, and were documented in writing; (ii) whether those SOPs were sufficient to ensure FDA compliance if carefully followed; and (iii) whether SOPs were being followed in a competent and timely manner.  The inspection would also focus on finding violations, and the steps that were or could be taken to remediate them in a timely manner (along with an assessment of the resources need to do so adequately).

194.    Once FDA problems were detected and documented in the form of a Warning Letter, the Board should have immediately ordered a follow-up independent SOP review, as well as a review of Hospira's CAPA Programs.  These programs (which are not unique to Hospira) are usually triggered by complaints or the detection of violations and are collectively designed to address regulatory problems and avoid their recurrence.

195.    Given FDA findings as to multiple years of particulate contamination, lack of written SOP procedures, failures to review "retained" samples for problems, and failures to investigate violations, the Board could not have obtained a valid report that the SOPs were effectively followed before it launched Project Fuel, or a report as to the adequacy of CAPA Programs during the time the Board allowed Project Fuel to continue.[33]   Had the Board undertaken these obvious procedures (as noted, the Board is highly sophisticated regarding

---

[33]  That Hospira SOPs were not being followed as of the time of the initiation of Project Fuel is indisputable.  The FDA's inspection of the Clayton facility in April 2009 found continuing violations going back to June 2008; it also found that manufacturing error investigations that were required by Hospira's SOPs to be initiated within *one day* of an incident involving an error had taken up to *eighty-four days* to be initiated, indicating severe understaffing even prior to Project Fuel.  A January-February 2010 inspection of that same facility (at the mid-point of Project Fuel) showed egregious deterioration in FDA compliance, and numerous short-cuts being taken due to lack of resources.  A Warning Letter soon followed.  All of the harm that ensued was highly preventable by a Board carrying out its known obligations.

regulatory compliance), Project Fuel would never have been launched, or would have been undertaken only on a much smaller scale. Had these measures been taken, Hospira never would have wasted huge sums of money on stock buybacks that could have better gone to remediation efforts. Finally, these measures would have avoided the facility-level quality deterioration that accompanied Project Fuel, caused slow downs, shut downs, and recalls, and which led to the very costly and disruptive measures that have been required to address a series of alarming FDA reports.

196. Proof that the Board did not undertake these validation measures is shown by the very fact that it initiated Project Fuel (which contemplated material cutbacks in quality control personnel at a time when existing personnel were not sufficient to ensure SOP compliance) and by the fact that it did not apply sufficient remediation resources until well after Hospira was "caught out" by FDA inspectors.

197. In addition, as noted, the defendants publicly admitted not to ordering a comprehensive independent review of compliance until Project Fuel was well underway, and FDA violations had been detected. Indeed, the defendants admitted they did not do a pre-Project Fuel comprehensive review of compliance in an April 16, 2010 Form 8-K filing, stating that Hospira, after receiving two Warning letters finally: "***will be undertaking a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations.***" This comprehensive review was at least fifteen months too late. The Board did not halt all insider selling pending the results of this comprehensive review; rather, it permitted a selling spree by panicked and greedy insiders. Nor did the Board await the outcome of this crucial review to approve a stock-boosting repurchase program. The actions of the Board reflect a willful refusal to exercise independent oversight. The Board exhibited a stubborn refusal to reverse Board

decisions that had proven to be ill-considered. Regardless of whether the Board's refusal to reverse course was due to willful ignorance, or embarrassment, it could not have been the product of a reasonable exercise of business judgment, and is not protected by the business judgment rule. Unlike many other companies that have experienced FDA problems, Hospira is unique: its woes are directly traceable to reckless and unreasonable decisions of its Board.

198. The Board knowingly lacked a formal procedure for Board review of quality control and remediation at the time of the adoption of Project Fuel and throughout most of its existence. The Charter of the Science and Technology Committee, in existence until 2010, had no mention whatsoever of quality oversight, which was not a specified Board oversight function, Rather, this crucial duty was knowingly left to the conflicted CEO, who had an interest in selling his shares at the highest possible prices. It was not until about 2010 that quality review functions were added, and the Committee was renamed the Science, Technology and Quality Committee. This "Committee", however, consists of **all** directors, and thus is not a true committee, which can focus on quality issues. The Hospira directors are sophisticated, and must know that this structure conflicts with best practices of Board governance, and reflects the Board's continued refusal to devote sufficient time and resources to quality control at the Board level. As one compliance expert warned in the August 2011 publication of the Governance Institute:

> Don't make compliance a "stepchild" of a larger committee (i.e., where compliance matters are marginalized within the larger activities of the committee). ***To do so could give … regulators … a highly negative impression of the organization's commitment to compliance.***

199. The Science, Technology and Quality Committee has not, according to Hospira's filings, held even one special meeting during this period of crisis. It met exactly five times each year from 2010-2012, with such meetings coincident with Board meetings. Experienced Board

members know this is not sufficient time to review and oversee such complex problems, but have adopted such a lackadaisical attitude that they have not even scheduled one additional meeting in a three-year span to address FDA issues.

200.    A director is *not* reasonably exercising business judgment and acts recklessly and in bad faith when the director:  knowingly makes a harmful decision; consciously makes decisions based on partial or incomplete information where such information could be obtained with reasonable time and effort; or makes a decision or adopts a plan and refuses to reverse it once it becomes known to the director that:  (i) the decision was a wrong one that is harming the Company, or (ii) alternatively, that the decision or plan was reasonable when adopted, but has since become harmful due to changed circumstances or newly-discovered facts, and (due to these factors) the directors knew the decision or plan should have been reversed.

201.    Here, the Director Defendants acted recklessly and in bad faith with regard to the adoption of Project Fuel, and in continuing to pursue Project Fuel once Hospira's severe compliance issues were identified by the FDA in its Warning Letters, and made known to them. It had become clear that Project Fuel and compliance with the law were in "conflict," a conflict which the directors recklessly allowed.  As one Hospira executive, Senior Vice President of Operations Hardy, frankly conceded in September 2011:

> *We're trying to drive remediation at the same time we're trying to drive very robust cost-savings programs. And we found those things competing with each other*.

202.    Very robust cost savings operations may be needed at times but here: (i) no financial emergency required the Board to adopt Project Fuel when it did; and (ii) no time deadline prevented the Board from fully assessing the Company's quality controls and legal compliance prior to implementing Project Fuel and the affect such budget slashing would have on legal compliance and public safety.  The Board knew, even when adopting Project Fuel, that

it was acting without all the necessary facts. Despite Project Fuel's cost-cutting initiatives, no sufficient independent review of the Company's controls over product quality and safety or legal compliance had been done prior to the implementation of Project Fuel, or during the Relevant Period, as is evident from the extensive remediation efforts the Company has been forced to endure, including the hiring of more than 150 consultants to assist with remediation efforts.

203. Rather than fulfilling their fiduciary duties, the Director Defendants made a conscious decision to allow the Company and its various manufacturing facilities to violate FDA regulations.

204. The Director Defendants were aware, since at least the April 2009 FDA investigation, and because of the Warning Letters, that, among other things: (i) there was adulteration in the facilities that produced the Company's infusion pumps and that this adulteration, in the form of steel filings, could cause embolisms or immune diseases in patients using these infusion products; (ii) there was adulteration in the replacement of AC power cords used by certain of the infusion products, particularly in the Morgan Hill facility; (iii) the appropriate measures were not taken to update the Company's risk assessment in light of reports of injuries from the adulterated power cords; (iv) the processes for the manufacture, packing, storage, and installation of certain of the Company's infusion pumps (including the Plum Family and Symbiq lines) did not comport with and violated then CGMP requirements of the Quality System regulation at Title 21, Code of Federal Regulations, Part 820; (v) appropriate steps were not taken in response to the FDA's warnings, which placed the Company in the position of potentially being fined, penalized, or enjoined, and jeopardized the Company's applications for Class III devices; (vi) the Clayton facility failed to maintain adequate written internal controls over Liposyn, Propofol, and Clevipex emulsion products, and certain lots of these drugs were

seriously contaminated; (vii) the FDA did not believe that the Company had uncovered the root cause of this adulteration; (viii) the Clayton facility lacked quality controls since at least April 2009, and efforts to remedy these problems were insufficient; (ix) an adequate investigation was not conducted to determine whether any batches of Liposyn, Propofol or Clevipex were adulterated and failed to provide the FDA with certain required revised procedures; (x) the Company's Rocky Mount facility suffered from similar quality control deficiencies, including a lack of written procedures; (xi) the Company's Rocky Mount and Clayton facilities had failed to adopt procedures which would provide a sufficiently high degree of assurance that the process used to produce the Company's heparin lock flush solutions were sufficient; and (xii) the Company failed to sufficiently track and report adverse events with regard to the heparin lock flush.

205.    The Director Defendants were also aware that their efforts to implement global corrective actions in response to past regulatory actions by the FDA were inadequate, including failing to undertake a comprehensive evaluation of global manufacturing operations to ensure compliance with Good Manufacturing Practices and Quality System regulations, despite repeated warnings by the FDA.  In fact, despite receiving Warning Letters beginning in August 2009, which detailed the severely deficient quality controls and compliance systems at certain of Hospira's facilities, the Director Defendants failed to engage an outside consultant to even review certain of its facilities until 2011.  As a result, defendant Ball conceded that the Form 483 received by the Austin facility "was not a big surprise."

206.    In the face of this knowledge, however, the Director Defendants, among other things: (i) failed to ensure that the Company manufactured safe, quality drugs with integrity; (ii) consciously disregarded the systematic and sustained FDA violations occurring in at least three

of its facilities, including one of its main facilities at Rocky Mount; and (iii) failed to undertake appropriate steps to remedy the Company's severe quality control deficiencies. Even worse, instead of actively trying to solve the problems that they had a duty to avoid in the first place, the Individual Defendants caused the Company to issue improper statements regarding the Company's health and remediation efforts. Then, despite the fact that the Director Defendants knew the value of the Company was inflated due to these improper statements, they authorized the repurchase of 5.4 million shares from August 2010 through September 2011 at a cost of over $300 million to the Company. These actions were in conscious disregard of the Director Defendants' duties and responsibilities and were not the product of the valid exercise of business judgment.

207. Had the Board acted rationally and with reasonable business judgment, it would have abandoned or severely curtailed Project Fuel in response to repeated red flags and the Company's systematic and sustained violations of FDA regulations. For instance, the April 2010 Warning Letter's message was, in essence: *your systems have broken down; they broke down even prior to Project Fuel; you have no plan in place to fix them; public health and safety are in danger; written protocols do not exist; and complete and immediate action is required*. These warnings would have been treated by any Board, acting in good faith, as an emergency situation, requiring the highest level of attention.

208. Because the Board's decisions were not reasonable and rational, and were not taken on a fully informed basis, and they subject the Board members to a substantial likelihood of liability, they are not protected under the business judgment rule and demand is accordingly excused as futile.

209.     As alleged above, the Director Defendants breached their fiduciary duties of loyalty by: (i) failing to ensure that the Company took adequate steps to rectify its violations of FDA regulations and Good Manufacturing Standards, in light of repeated red flags and the Company's systematic and sustained violations of FDA regulations over the course of over two years; (ii) making or permitting improper statements concerning the Company's health and remediation efforts in financial statements; (iii) failing to provide adequate internal and quality controls over the Company's manufacturing practices; (iv) concealing the consequences of their mismanagement, the true extent of the FDA's investigation, and the remediation necessary to bring Hospira's business up to CGMP standards; (v) selling their personally held Hospira stock (or permitting such sales) on the basis of non–public information; and (vi) authorizing the Company's repurchase of hundreds of millions of dollars' worth of Hospira stock at artificially inflated prices.  The following is a summary of certain current directors' positions and the duties they failed to meet, exposing each of them to a substantial likelihood of liability:

(a)     ***Defendant Ball*** made or permitted improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in multiple quarterly statements, including those filed on April 26, 2011 and July 27, 2011.  Defendant Ball is on the Science, Technology and Quality Committee and has been since March 2011, and thus is subject to the Science, Technology and Quality Committee Charter. Importantly, defendant Ball is responsible for reviewing "the Company's overall quality strategy and internal quality processes; … the results of, and responses to, product quality and quality system assessments by the Company and external regulators (including the [FDA] and other national and international regulatory bodies); and … important product quality issues and field actions."  Defendant Ball

either knew or was reckless in not knowing of the true nature and extent of the FDA's investigation over the Company's manufacturing deficiencies when he made improper statements downplaying the Company's remediation efforts in public filings. The Science, Technology and Quality Committee's Charter also requires its members to ensure the Company's "product quality and safety." The production breakdowns show a conscious disregard for internal controls by this committee and defendant Ball, and as such, defendant Ball faces a substantial likelihood of liability for his breaches of fiduciary duty.

(b) ***Defendant Staley*** made or permitted improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in the Company's 2009 and 2010 Forms 10-K. Defendant Staley was a member of the Board when Hospira received both of its FDA Warning Letters, including the April 2010 Warning Letter apprising him of the previously mentioned inadequate internal controls. Defendant Staley is on the Science, Technology and Quality Committee and has been since March 2011, and thus is subject to the Science, Technology and Quality Committee Charter. Importantly, defendant Staley is responsible for reviewing "the Company's overall quality strategy and internal quality processes; … the results of, and responses to, product quality and quality system assessments by the Company and external regulators (including the [FDA] and other national and international regulatory bodies); and … important product quality issues and field actions." Defendant Staley either knew or was reckless in not knowing of the true nature and extent of the FDA's investigation over the Company's manufacturing deficiencies when he made improper statements downplaying the Company's remediation efforts in public filings. The Science, Technology and Quality Committee's Charter also requires its members to ensure the Company's "product quality and safety." The production breakdowns show a disregard for internal controls by this

committee and defendant Staley, and as such, defendant Staley faces a substantial likelihood of liability for his breach of fiduciary duty. Defendant Staley was a member of Hospira's Audit Committee from at least March 2008 to March 2011 and was Chairman of that committee from at least March 2008 to at least March 2010. As a member of the Audit Committee, defendant Staley had additional and heightened responsibility under its Charter to review "the integrity of the Company's financial statements" and "the Company's compliance with legal and regulatory requirements." Thus, defendant Staley violated the Audit Committee's Charter by knowingly, recklessly, or in conscious disregard of his duties reviewing and approving improper statements regarding the Company's business health and remediation efforts in response to the FDA investigation. Accordingly, defendant Staley breached his fiduciary duty of loyalty because he participated in the wrongdoing described herein.

(c) ***Defendant Bailey*** made or permitted improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in the Company's 2009 and 2010 Forms 10-K. Defendant Bailey was a member of the Board when Hospira received both of its FDA Warning Letters, including the April 2010 Warning Letter apprising him of the previously mentioned inadequate internal controls. Defendant Bailey is on the Science, Technology and Quality Committee and has been since March 2011, and thus is subject to the Science, Technology and Quality Committee Charter. Importantly, defendant Bailey is responsible for reviewing "the Company's overall quality strategy and internal quality processes; … the results of, and responses to, product quality and quality system assessments by the Company and external regulators (including the [FDA] and other national and international regulatory bodies); and … important product quality issues and field actions." Defendant Bailey either knew or was reckless in not knowing of the true nature and extent of the FDA's

investigation over the Company's manufacturing deficiencies when he made improper statements downplaying the Company's remediation efforts in public filings. The Science, Technology and Quality Committee's Charter also requires its members to ensure the Company's "product quality and safety." The production breakdowns show a conscious disregard for internal controls by this committee and defendant Bailey, and as such, defendant Bailey faces a substantial likelihood of liability for his breach of fiduciary duty. Defendant Bailey was also on the Governance and Public Policy Committee between March 2008 and March 2011, and thus was subject to its Charter. The Governance and Public Policy Committee was required to assist the Board with "compliance and government affairs matters that affect the Company." Defendant Bailey failed in implementing the adequate internal controls and necessary supervision to maintain the Company's manufacturing operations at CGMP standard and avoid manufacturing flaws.

(d)     ***Defendant Curran*** made or permitted improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in the Company's 2009 and 2010 Forms 10-K. Defendant Curran was a member of the Board when Hospira received both of its FDA Warning Letters, including the April 2010 Warning Letter apprising her of the previously mentioned inadequate internal controls. Defendant Curran is on the Science, Technology and Quality Committee and has been since March 2008, and thus is subject to the Science, Technology and Quality Committee Charter. Importantly, defendant Curran is responsible for reviewing "the Company's overall quality strategy and internal quality processes; … the results of, and responses to, product quality and quality system assessments by the Company and external regulators (including the [FDA] and other national and international regulatory bodies); and … important product quality issues field actions." Defendant Curran either knew or was reckless in not knowing of the true nature and extent of the FDA's

investigation over the Company's manufacturing deficiencies when she made improper statements downplaying the Company's remediation efforts in public filings. The Science, Technology and Quality Committee's Charter also requires its members to ensure the Company's "product quality and safety." The production breakdowns show a disregard for internal controls by this committee and defendant Curran, and as such, defendant Curran faces a substantial likelihood of liability for her breach of fiduciary duty. Defendant Curran was also on the Audit Committee from at least March 2008 to at least March 2011. As a member of the Audit Committee, defendant Curran had additional and heightened responsibility under its Charter to review "the integrity of the Company's financial statements" and "the Company's compliance with legal and regulatory requirements." Thus, defendant Curran violated the Audit Committee Charter by knowingly, recklessly, or in conscious disregard of her duties reviewing and approving improper statements regarding the Company's business health and remediation efforts in response to the FDA investigation. Accordingly, defendant Curran breached her fiduciary duty of loyalty because she participated in the wrongdoing described herein. Defendant Curran is also Chair of the Governance and Public Policy Committee and has been since March 2008. The Governance and Public Policy Committee is required to assist the Board with "compliance and government affairs matters that affect the Company." Defendant Curran failed in implementing the adequate internal controls and necessary supervision to maintain the Company's manufacturing operations at CGMP standard and avoid manufacturing flaws.

(e)     ***Defendant Wheeler*** made or permitted improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in the Company's 2009 and 2010 Forms 10-K. Defendant Wheeler was a member of the Board when Hospira received both of its FDA Warning Letters, including the April 2010 Warning Letter

apprising him of the previously mentioned inadequate internal controls. Defendant Wheeler is Chairman of Hospira's Science, Technology and Quality Committee and has been since at least March 2011 and a member of that committee and has been since at least March 2008, and thus is subject to the Science, Technology and Quality Committee Charter. Importantly, defendant Wheeler is responsible for reviewing "the Company's overall quality strategy and internal quality processes; … the results of, and responses to, product quality and quality system assessments by the Company and external regulators (including the [FDA] and other national and international regulatory bodies); and … important product quality issues and field actions." Defendant Wheeler either knew or was reckless in not knowing of the true nature and extent of the FDA's investigation over the Company's manufacturing deficiencies when he made improper statements downplaying the Company's remediation efforts in public filings. The Science, Technology and Quality Committee's Charter also requires its members to ensure the Company's "product quality and safety." The production breakdowns show a disregard for internal controls by this committee and defendant Wheeler, and as such, defendant Wheeler faces a substantial likelihood of liability for his breach of fiduciary duty. Defendant Wheeler is also on the Audit Committee and has been since March 2008, and thus is subject to its Charter. As a member of the Audit Committee, defendant Wheeler had additional and heightened responsibility under its Charter to review "the integrity of the Company's financial statements" and "the Company's compliance with legal and regulatory requirements." Thus, defendant Wheeler violated the Audit Committee's Charter by knowingly or in conscious disregard of his duties reviewing and approving improper statements regarding the Company's business health and remediation efforts in response to the FDA investigation. Accordingly, defendant Wheeler breached his fiduciary duty of loyalty because he participated in the wrongdoing described herein.

(f)     ***Defendant Sokolov*** made or permitted improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in the Company's 2009 and 2010 Forms 10-K.  Defendant Sokolov was a member of the Board when Hospira received both of its FDA Warning Letters, including the April 2010 Warning Letter apprising him of the previously mentioned inadequate internal controls.  Defendant Sokolov is on the Science, Technology and Quality Committee and has been since March 2008 and was Chairman of that committee from at least March 2008 to at least March 2010, and thus is subject to the Science, Technology and Quality Committee Charter.  Importantly, defendant Sokolov is responsible for reviewing "the Company's overall quality strategy and internal quality processes; … the results of, and responses to, product quality and quality system assessments by the Company and external regulators (including the [FDA] and other national and international regulatory bodies); and … important product quality issues and field actions."  Defendant Sokolov either knew or was reckless in not knowing of the true nature and extent of the FDA's investigation over the Company's manufacturing deficiencies when he made improper statements downplaying the Company's remediation efforts in public filings.  The Science, Technology and Quality Committee's Charter also requires its members to ensure the Company's "product quality and safety."  The production breakdowns show disregard for internal controls by this committee and defendant Sokolov, and as such, defendant Sokolov faces a substantial likelihood of liability for his breach of fiduciary duty.

(g)     ***Defendant Bowles*** made or permitted improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in the Company's 2009 and 2010 Forms 10-K.  Defendant Bowles was a member of the Board when Hospira received both of its FDA Warning Letters, including the April 2010 Warning Letter

apprising her of the previously mentioned inadequate internal controls. Defendant Bowles is on the Science, Technology and Quality Committee and has been since March 2011, and thus is subject to the Science, Technology and Quality Committee Charter. Importantly, defendant Bowles is responsible for reviewing "the Company's overall quality strategy and internal quality processes; … the results of, and responses to, product quality and quality system assessments by the Company and external regulators (including the [FDA] and other national and international regulatory bodies); and … important product quality issues and field actions." Defendant Bowles either knew or was reckless in not knowing of the true nature and extent of the FDA's investigation over the Company's manufacturing deficiencies when she made improper statements downplaying the Company's remediation efforts in public filings. The Science, Technology and Quality Committee's Charter also requires its members to ensure the Company's "product quality and safety." The production breakdowns show a lack of internal controls by this committee and defendant Bowles, and as such, defendant Bowles faces a substantial likelihood of liability for her breach of fiduciary duty. Defendant Bowles is also Chair of Hospira's Audit Committee and has been since at least March 2011 and a member of that committee since at least March 2009. As a member of the Audit Committee, defendant Bowles has additional and heightened responsibility under its Charter to review "the integrity of the Company's financial statements" and "the Company's compliance with legal and regulatory requirements." Thus, defendant Bowles violated the Audit Committee Charter by knowingly, recklessly, or in conscious disregard of her duties reviewing and approving improper statements regarding the Company's business health and remediation efforts in response to the FDA investigation. Accordingly, defendant Bowles breached her fiduciary duty of loyalty because she participated in the wrongdoing described herein. Defendant Bowles is also on the Governance and Public

Policy Committee and has been since March 2011, and thus is subject to its Charter. The Governance and Public Policy Committee is required to assist the Board with "compliance and government affairs matters that affect the Company." Defendant Bowles consciously failed in implementing adequate internal controls and necessary supervision to maintain the Company's manufacturing operations at CGMP standard and avoid manufacturing flaws.

(h)     ***Defendant Hale*** made or permitted improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in the Company's 2009 and 2010 Forms 10-K. Defendant Hale was a member of the Board when Hospira received both of its FDA Warning Letters, including the April 2010 Warning Letter apprising him of the previously mentioned inadequate internal controls. Defendant Hale is on the Science, Technology and Quality Committee and has been since March 2011, and thus is subject to the Science, Technology and Quality Committee Charter. Importantly, defendant Hale is responsible for reviewing "the Company's overall quality strategy and internal quality processes; … the results of, and responses to, product quality and quality system assessments by the Company and external regulators (including the [FDA] and other national and international regulatory bodies); and … important product quality issues and field actions." Defendant Hale either knew or was reckless in not knowing of the true nature and extent of the FDA's investigation over the Company's manufacturing deficiencies when he made improper statements downplaying the Company's remediation efforts in public filings. The Science, Technology and Quality Committee's Charter also requires its members to ensure the Company's "product quality and safety." The production breakdowns show a disregard for internal controls by this committee and defendant Hale, and as such, defendant Hale faces a substantial likelihood of liability for his breach of fiduciary duty. Defendant Hale is also on the Governance and Public

Policy Committee and has been since March 2008. The Governance and Public Policy Committee is required to assist the Board with "compliance and government affairs matters that affect the Company." Defendant Hale failed in implementing the adequate internal controls and necessary supervision to maintain the Company's manufacturing operations at CGMP standard and avoid manufacturing flaws.

(i) ***Defendant von Prondzynski*** made or permitted improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in the Company's 2009 and 2010 Forms 10-K. Defendant von Prondzynski was a member of the Board when Hospira received both of its FDA Warning Letters, including the April 2010 Warning Letter apprising him of the previously mentioned inadequate internal controls. Defendant von Prondzynski is on the Science, Technology and Quality Committee and has been since March 2009, and thus is subject to the Science, Technology and Quality Committee Charter. Importantly, defendant von Prondzynski is responsible for reviewing "the Company's overall quality strategy and internal quality processes; … the results of, and responses to, product quality and quality system assessments by the Company and external regulators (including the [FDA] and other national and international regulatory bodies); and … important product quality issues and field actions." Defendant von Prondzynski either knew or was reckless in not knowing of the true nature and extent of the FDA's investigation over the Company's manufacturing deficiencies when he made improper statements downplaying the Company's remediation efforts in public filings. The Science, Technology and Quality Committee's Charter also requires its members to ensure the Company's "product quality and safety." The production breakdowns show a disregard for internal controls by this committee and defendant von

Prondzynski, and as such, defendant von Prondzynski faces a substantial likelihood of liability for his breach of fiduciary duty.

210. Each of the Director Defendants of Hospira authorized and/or permitted the improper statements to endure and is a principal beneficiary of the wrongdoing alleged herein and thus could not fairly and fully prosecute such a suit even if such suit was instituted.

211. Plaintiffs have not made any demand on the other shareholders of Hospira to institute this action since such demand would be a futile and useless act for at least the following reasons: (i) Hospira is a publicly held company with over 165 million shares outstanding and thousands of shareholders; (ii) making demand on such a number of shareholders would be impossible for Plaintiffs who have no way of finding out the names, addresses, or phone numbers of shareholders; and (iii) making demand on all shareholders would force Plaintiffs to incur excessive expenses, assuming all shareholders could be individually identified.

## XII. FURTHER DUTIES OWED BY THE INDIVIDUAL DEFENDANTS

212. Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the implementation of internal controls over the management and administration of the affairs of the Company, the use and preservation of its property and assets, the Company's manufacturing practices, and the truth of the Company's public disclosures. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Hospira, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or consciously disregarded and posed a risk of serious injury to the Company. Certain of the Individual Defendants' failure to maintain honest public disclosures is especially damaging not only

because it was illegal but also because it was specifically against the Company's own Code. The Code states that the Company expects these individuals to "provide full, accurate, fair, timely and understandable disclosures when making public communications or in reports and documents filed with government agencies, such as the [SEC] and the [FDA]." More, the conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively made up Hospira's Board. Thus, each Individual Defendant faces a substantial likelihood of liability for the breach of fiduciary duties so any demand upon any of them is futile.

213.    The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or that of a company or entity with which they are associated.

214.    Each director and officer of the Company owes to Hospira and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

215.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over Hospira and its policies, and were able to effect the wrongful acts complained of herein.

216.    Because of their advisory, executive, managerial, and directorial positions with Hospira, each of the Individual Defendants had access to material, non-public information

regarding the Company which they were obligated not to use for their personal benefit, and which they were required to use in the best interests of the Company.

217. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Hospira, and was at all times acting within the course and scope of such agency.

218. To discharge their duties, the officers and directors of Hospira were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Hospira were required to, among other things:

(a) Exercise good faith, to consciously adhere to their obligations and known duties to act, and to ensure that the affairs of the Company were conducted in an efficient, business-like and legal manner so as to make it possible to provide the highest quality performance of their business;

(b) Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, internal policies and standards set by the Company, and all contractual obligations, including acting only within the scope of its legal authority;

(c) Refrain from selling stock based upon insider information;

(d) Properly, fairly, and accurately guide investors and analysts as to the true financial condition of the Company at any given time; and

(e) When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate and necessary action to correct the misconduct and prevent its recurrence.

## COUNT I

**(Derivatively Against Defendants Ball, Begley, and Werner for Violations of Section 10(b) of the Exchange Act Relating to the Share Repurchases)**

219.     Plaintiffs repeat and reallege all previous allegations, set forth above, as though fully set forth herein.

220.     During the Relevant Period, Class Action Individual Defendants Ball, Begley, and Werner at a minimum, knowingly and willfully made and caused the publication of misleading statements, and knowingly, willfully, and acting with scienter, caused Hospira to repurchase approximately 5,472,028 shares of its own stock at a weighted average price per share of $55.19, for a total cost to Hospira of over $300 million, when they knew that Hospira's stock price was substantially artificially inflated due to their misleading statements.

221.     These Class Action Individual Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

       (a)     employed devices, schemes, and artifices to defraud;

       (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

       (c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Hospira in connection with the purchases of Hospira common stock during the Relevant Period.

222.     As a direct and proximate result of the wrongful conduct of the Class Action Individual Defendants, Hospira has and will suffer damages in connection with its Relevant Period purchases of Hospira common stock at prices that the Class Action Individual Defendants knew to be artificially inflated.

223. But for the misconduct of the Class Action Individual Defendants, Hospira would not have repurchased its stock at artificially inflated prices. Hospira reasonably relied on the diligence, loyalty, and good faith of the Class Action Individual Defendants in repurchasing its stock.

224. The Class Action Individual Defendants' conduct proximately caused Hospira's loss. Hospira's stock price fell in a series of drops following the publication of disclosures that revealed the truth about Hospira's health and the extent of its remediation efforts. After the truth was revealed, Hospira's shares ultimately fell approximately 40%.

225. The Class Action Individual Defendants are therefore liable to Hospira for damages in an amount to be determined at trial pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### (Derivatively Against All Director Defendants for Violation of Section 20(a) of the Exchange Act and Against the Class Action Individual Defendants Under Sections 10(b) and 21D of the Exchange Act)

226. Plaintiffs repeat and reallege all previous allegations set forth above, as though fully set forth herein.

227. The Director Defendants, as directors and as members of the Audit Committee, Science, Technology and Compliance Committee, and/or Governance and Public Policy Committee, had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public statements about Hospira and the timing and amount of stock repurchases, and had the power and/or ability directly or indirectly to control or influence the Class Action Individual Defendants in connection with the specific corporate policies and conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

228. Each of the Director Defendants is jointly and severally liable under section 20(a) of the Exchange Act to the same extent as the Class Action Individual Defendants for the primary violations of section 10(b) and Rule 10b-5 promulgated thereunder, as set forth herein. The Director Defendants did not act in good faith. In addition, the Class Action Individual Defendants are liable under 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

## COUNT III

### (Against the Individual Defendants for Breach of Fiduciary Duty)

229. Plaintiffs repeat and reallege all previous allegations set forth above, as though fully set forth herein.

230. As alleged in detail herein, the Individual Defendants, by reason of their positions as officers and directors of Hospira and because of their ability to control the business and corporate affairs of Hospira, owed the Company fiduciary obligations of due care, good faith, and loyalty, and were and are required to use their utmost ability to control and manage Hospira in a fair, just, honest, and equitable manner.

231. The Individual Defendants approved Project Fuel without first obtaining an adequate independent, and comprehensive report on the state of Hospira's compliance systems, and the adverse effect Project Fuel would have on legal compliance, quality assurance, and safety. The Individual Defendants also failed to ensure through the Relevant Period that Hospira was in compliance with all applicable laws needed to protect the health and welfare of the public. In fact, the Individual Defendants caused the Company to continue Project Fuel, even after it became clear that Hospira was blatantly in violation of its legal obligations; did not understand the full and complete nature of all of its compliance issues; lacked appropriate written procedures

needed to comply with the law; and had no idea of what remediation efforts would cost. Accordingly, the Individual Defendants breached their duty of care and loyalty to the Company.

232.    The Officer Defendants knowingly, recklessly, or with gross negligence caused or allowed the Company to engage in inadequate manufacturing practices and then made improper statements about the health of the Company and its remediation efforts.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) Hospira suffered from extensive quality control issues, which undermined both the viability of and the supposed financial savings that would be generated by Project Fuel; (ii) the extent of the Company's inability to comply with problems identified in FDA Warning Letters related to Hospira's infusion pumps, quality control deficiencies, and manufacturing weaknesses; and (iii) as a result of the foregoing, defendants' statements regarding the Company's financial performance and expected earnings were improper and lacked a reasonable basis when made.   Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

233.    The Director Defendants owed Hospira the highest duty of loyalty, and breached this duty when they made improper statements regarding the nature of the Company's remediation efforts in response to the FDA investigation in the Company's 2009 and 2010 Forms 10-K.  These defendants knowingly or in conscious disregard of their duties, caused, authorized, or allowed Hospira to have inadequate manufacturing practices and attempted to cover up their mismanagement by approving improper statements about the health of the Company and its remediation efforts.   The Director Defendants knew or were reckless in not knowing that: (i) Hospira suffered from extensive quality control issues, which undermined both the viability of and the supposed financial savings that would be generated by Project Fuel; (ii) the extent of the Company's inability to comply with problems identified in FDA Warning Letters related to

Hospira's infusion pumps, quality control deficiencies, and manufacturing weaknesses; and (iii) as a result of the foregoing, defendants' statements regarding the Company's financial performance and expected earnings were improper and lacked a reasonable basis when made. Accordingly, the Director Defendants breached their duty of loyalty to the Company.

234.     The Science, Technology and Quality Committee Defendants breached their fiduciary duty of loyalty.  Not only did they fail to implement adequate internal controls of the Company's "product quality and safety," they succeeded in concealing the extent of that mismanagement for ten financial quarters by knowingly or in conscious disregard of their duties allowing the Company to publicly disclose improper statements regarding the Company's business health and remediation efforts in response to the ongoing FDA investigation.

235.     The Audit Committee Defendants breached their fiduciary duty of loyalty by knowingly or in conscious disregard of their duties allowing the Company to publicly disclose improper statements regarding the Company's business health and remediation efforts in response to the FDA investigation.  As such, the Company violated various federal securities laws, including the Exchange Act.  Additionally, this constituted a violation of the heightened and specialized duties of the members of the Audit Committee under its Charter.

236.     The Governance and Public Policy Committee Defendants breached their fiduciary duty of loyalty by knowingly or in conscious disregard of their duties allowing the Company to publicly disclose improper statements regarding the Company's business health and remediation efforts in response to the FDA investigation. The wrongdoing was extensive and widespread, and implicated the highest-levels of the Company's management.  These defendants had heightened and specialized duties to identify and address regulatory and compliance risks present at the Company.  This they did not do, as they failed to detect or prevent the continuous

and pervasive misconduct for ten consecutive financial quarters.  Additionally, this constituted a violation of the duties of the members of the Governance and Public Policy Committee.

237.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.  Such damages may be recovered derivatively for the benefit of Hospira.

238.    Plaintiffs, on behalf of Hospira, have no adequate remedy at law.

## COUNT IV

### (Against the Individual Defendants for Breach of Fiduciary Duty Relating to the Share Repurchases)

239.    Plaintiffs repeat and reallege all previous allegations set forth above, as though fully set forth herein.

240.    An authorization by a Board to repurchase upwards of $300 million worth of stock must be made with due care, and by a Board that is thoroughly certain it is in possession of all material information regarding the Company's value.

241.    The Director Defendants authorized share repurchases while fully aware, post the April 2010 Warning Letter, that Hospira was concealing adverse facts or, alternatively, that they did not have full and complete information to determine the full extent of Hospira's regulatory issues, the costs to remediate the problems sure to be uncovered, and the effects this would have on manufacturing and distribution.

242.    As a result of these actions, the Director Defendants breached their duties, caused Hospira to suffer damages, and wasted its assets.   These Defendants are accordingly liable to the Company.

243.    Plaintiffs, on behalf of Hospira, have no adequate remedy at law.

## COUNT V

### (Against Defendants Begley, Werner, Kearney, and Smith
### for Disgorgement of Insider Trading Profits)

244.    Plaintiffs repeat and reallege all previous allegations set forth above, as though fully set forth herein.

245.    Corporate insiders, when in possession of material, non-public information, have a duty to disclose what they know, or abstain from trading.

246.    Here, following the receipt of non-public information regarding Hospira's true state of affairs, Insiders Selling Defendants Begley, Werner, Kearney, and Smith seized the opportunity to sell of most of their shares at grossly inflated prices.  To the extent any such sales were made under SEC Rule 10b5-1 automatic trading plans, such plans provide no safe harbor as they were adopted in bad faith and with advance knowledge of adverse, non-public information. Under the circumstances, these Insider Selling Defendants are not entitled to retain, and must disgorge, all trading profits to Hospira.

247.    Plaintiffs, on behalf of Hospira, have no adequate remedy at law.

## COUNT VI

### (Against the Individual Defendants for Waste of Corporate Assets)

248.    Plaintiffs repeat and reallege all previous allegations set forth above, as though fully set forth herein.

249.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in purchasing artificially inflated Hospira stock and defending itself in the Federal Securities Action that they brought on with their improper statements.  In addition, due to the Individual Defendants' mismanagement, the Company has been forced to interrupt production and dedicate it resources

and attention to the FDA-mandated remediation efforts to comply with proper manufacturing practices. Finally, by failing to conduct proper supervision, the Individual Defendants have caused Hospira to waste its assets by paying improper compensation to certain of its executive officers and directors that breached their fiduciary duty.

250. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

251. Plaintiffs, on behalf of Hospira, have no adequate remedy at law.

## COUNT VII

### (Against the Individual Defendants for Unjust Enrichment)

252. Plaintiffs repeat and reallege all previous allegations set forth above, as though fully set forth herein.

253. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Hospira. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Hospira.

254. The Insider Selling Defendants used their knowledge of Hospira's material, non-public information to sell their personal holdings while the Company's stock was artificially inflated.

255. Plaintiffs, as shareholders and representatives of Hospira, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

256. Plaintiffs, on behalf of Hospira, have no adequate remedy at law.

**COUNT VIII**

**(Against the Individual Defendants for Indemnification and Contribution)**

257.    Plaintiffs repeat and reallege all previous allegations set forth above, as though fully set forth herein.

258.    The conduct of the Individual Defendants described above has exposed Hospira to significant liability under various federal and state laws by their disloyal acts.

259.    Hospira is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein.

260.    The Individual Defendants have caused Hospira to suffer substantial harm through their disloyal acts.

261.    Hospira is entitled to contribution and indemnification from the Individual Defendants in connection with all such claims that have been, are, or may be asserted against Hospira by virtue of the Class Action Individual Defendants' wrongdoing.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Declaring that the Class Action Individual Defendants are liable under section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and that the Director Defendants are jointly and severally liable under section 20(a) of the Exchange Act, and awarding Hospira damages on these counts;

C.    Directing Hospira and the Board to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to

protect Hospira and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following proposals for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

      1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2.      a provision to permit the shareholders of Hospira to nominate at least three candidates for election to the Board;

      3.      a proposal to control insider sales;

      4.      a proposal to ensure the establishment, maintenance, and internal controls of the Company's compliance with applicable federal and state laws and regulations concerning the manufacture of its products;

      5.      a proposal to form a committee with the sole goal of assuring compliance with CGMP; and

      6.      a proposal to strengthen the Company's controls over the accuracy of its public disclosures;

      D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting defendants' assets so as to assure that Plaintiffs on behalf of Hospira have an effective remedy;

      E.      Awarding to Hospira restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by defendants;

F.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

## XIV.  JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:  Chicago, Illinois
          May 1, 2013

**ROBBINS ARROYO LLP**

By:  ___/s/ George C. Aguilar_____

George C. Aguilar
Brian J. Robbins
Ashley R. Palmer
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
gaguilar@robbinsarroyo.com
brobbins@robbinsarroyo.com
apalmer@robbinsaarroyo.com

**THE PASKOWITZ LAW FIRM, P.C.**
Laurence D. Paskowitz
208 East 51st Street, Suite 380
New York, New York 10022
Telephone: (212) 685-0969
Facsimile: (212) 685-2306
lpaskowitz@pasklaw.com

**Co-Lead Counsel for Plaintiffs**

--and--

**LASKY & RIFKIND, LTD**.
Norman Rifkind
Leigh Lasky
Amelia S. Newton
351 West Hubbard Street, Suite 401
Chicago, IL 60654
Telephone: (312) 634-0057
Facsimile: (312) 634-0059
rifkind@laskyrifkind.com
newton@laskyrifkind.com

**THE LAW OFFICES OF EDWARD T.
JOYCE & ASSOCIATES, P.C.**
Edward T. Joyce
Rowena T. Parma
135 South LaSalle Street
Suite 2200
Chicago, IL 60603
Telephone: (312) 641-2600
Facsimile: (312) 641-0360
rparma@joycelaw.com

**Co-Liaison Counsel for Plaintiffs**

**Additional Counsel:**

**THE GRANT LAW FIRM, PLLC**
Lynda Grant
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone: (212) 292-4441
Facsimile: (212) 292-4442
lgrant@grantfirm.com

**ROY JACOBS & ASSOCIATES**
Roy L. Jacobs
60 East 42nd Street
46th Floor
New York, New York 10165
Telephone: (212) 867-1156
Facsimile: (212) 504-8343
jacobs@jacobsclasslaw.com

**Additional Counsel for Plaintiff Lori
Ravenscroft Geare**

**LAW OFFICE OF ALFRED
G. YATES, JR., P.C.**
Alfred G. Yates, Jr.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone: (412) 391-5164
Facsimile: (412) 471-1033
yateslaw@aol.com

**Additional Counsel for Plaintiff Robert J.
Casey**

859205

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 1, 2013.

s/ George C. Aguilar
GEORGE C. AGUILAR

ROBBINS ARROYO LLP
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
gaguilar@robbinsarroyo.com

<u>VERIFICATION</u>

I, Robert J. Casey, II, hereby declare as follows:

I am a plaintiff in the within entitled action. I have read the Amended Consolidated Verified Shareholder Derivative Complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Amended Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _April 29, 2013_

_Robert J Casey II_
ROBERT J. CASEY, II