**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LORI RAVENSCROFT GEARE and ROBERT CASEY, II, | ) ) ) | |
| Plaintiffs, | ) ) | No. 1:11-cv-9074 |
| v. | ) ) | |
| CHRISTOPHER B. BEGLEY, et al., | ) ) | Hon. John J. Tharp, Jr. |
| Defendants. | ) ) | |

**REPLY IN SUPPORT OF MOTION TO DISMISS**

Mark Filip
Robert J. Kopecky
Joshua Z. Rabinovitz
KIRKLAND & ELLIS LLP
300 North LaSalle Drive
Chicago, IL 60654
(312) 862-2000
(312) 862-2200 (fax)

*Counsel for Defendants*

**<u>Table Of Contents</u>**

Preliminary Statement.................................................................................................................1

Argument .....................................................................................................................................3

I.      Plaintiffs Have Not Pled With Particularity That The Board Approved Project
Fuel Conscious That It Was Acting Contrary To Hospira's Interest...................................3

II.     Plaintiffs Have Not Pled With Particularity That The Board Approved Hospira's
Stock Repurchase Plan Conscious It Was Acting Contrary To Hospira's Interest. ............7

III.    Plaintiffs Have Not Pled With Particularity That The Board Faces A Substantial
Threat Of Liability Regarding Alleged Misstatements......................................................11

IV.    Plaintiffs Have Not Pled With Particularity That The Board Knowingly
Disregarded Its Duties By Failing To Address Known FDA Compliance Issues. ............15

Conclusion .................................................................................................................................20

## Table of Authorities

**Cases**

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) .................................................................................. 14

*Central Laborers' Pension Fund v. Sirva, Inc.*,
No. 04 C 7644, 2006 WL 2787520 (N.D. Ill. Sept. 22, 2006) ................................... 14

*DiRienzo v. Lichtenstein*,
2013 WL 5503034 (Del. Ch. Sept. 30, 2013) ......................................................... 5, 6

*Donovan v. ABC-NACO Inc.*,
No. 02 C 1951, 2002 WL 1553259 (N.D. Ill. July 15, 2002) .................................... 14

*Harrell v. U.S.*,
13 F.3d 232 (7th Cir. 1993) .......................................................................................... 4

*Harrison v. Dean Witter Reynolds, Inc.*,
974 F.2d 873 (7th Cir. 1992) ..................................................................................... 14

*Howard v. Everex Systems, Inc.*,
228 F.3d 1057 (9th Cir. 2000) .................................................................................... 15

*In re Abbott Laboratories Deriv. S'holders Litig.*,
325 F.3d 795 (7th Cir. 2003) .................................................................................. 2, 18

*In re Citigroup Inc. Deriv. Litig.*,
964 A.2d 106 (Del. Ch. 2009) ....................................................................... 1, 3, 9, 10

*In re Countrywide Financial Corp. Deriv. Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ..................................................................... 13

*In re Finisar Corp. Deriv. Litig.*,
2012 WL 2873844 (N.D. Cal. July 12, 2012) ........................................................... 12

*In re Lear Corp. S'holder Litig.*,
967 A.2d 640 (Del. Ch. 2008) ................................................................................ 3, 19

*In re Maxim Integrated Prods.*,
574 F. Supp. 2d 1046 (N.D. Cal. 2008) ..................................................................... 12

*In re Veeco Instruments Inc. Sec. Litig.*,
434 F. Supp. 2d 267 (S.D.N.Y. 2006) .......................................................................... 6

*In re Walt Disney Co. Deriv. Litig.*,
906 A.2d 27 (Del. 2006) ........................................................................................ 3, 11

*In re Walt Disney Co.*,
   825 A.2d 275 (Del. Ch. 2003) ........................................................................... 10, 11

*Janus Capital Group, Inc. v. First Derivative Traders*,
   131 S. Ct. 2296 (2011) .......................................................................................... 13

*Johnson v. Tellabs, Inc.*,
   262 F. Supp. 2d 937 (N.D. Ill. 2003) .................................................................... 14

*Kaufman v. Motorola, Inc.*,
   No. 95 C 1069, 1999 WL 688780 (N.D. Ill April 16, 1999) .................................... 14

*Louisiana Mun. Police Emp. Ret. Sys. v. Pyott*,
   46 A.3d 313 (Del. Ch. 2012) .................................................................................... 6

*Pyott v. Louisiana Mun. Police Emp. Ret. Sys.*,
   74 A.3d 612 (Del. 2013) ........................................................................................... 6

*Smith v. Van Gorkom*,
   488 A.2d 858 (Del. 1985) ......................................................................................... 6

*Sommers v. Lewis*,
   641 F. Supp. 2d 1151 (D. Ore. 2009) ..................................................................... 13

*South v. Baker*,
   62 A.3d 1 (Del. Ch. 2012) ...................................................................................... 17

*Stone v. Ritter*,
   911 A.2d 362 (Del. 2006) .................................................................................. 19, 20

*Westmoreland Cnty. Emp. Ret. Sys. v. Parkinson* ("*Baxter*"),
   727 F.3d 719 (7th Cir. 2013) ........................................................................ 2, 17, 19

*Wood v. Baum*,
   953 A.2d 136 (Del. 2008) .......................................................................................... 3

*Wright v. Associated Ins. Companies, Inc.*,
   29 F.3d 1244 (7th Cir. 1994) .................................................................................. 16

*Zucker v. Andreessen*,
   2012 WL 2366448 (Del. Ch. June 21, 2012) ............................................................ 5

## Statutes

15 U.S.C. § 78t(a) .................................................................................................... 12

**<u>Rules</u>**

Fed. R. Civ. P. 23.1 ................................................................................................................. 3

Fed. R. Civ. P. 23.1(a) ........................................................................................................... 13

Fed. R. Civ. P. 23.1(b)(3).......................................................................................................... 14

**<u>Preliminary Statement</u>**

Plaintiffs concede that they must plead, *with particularity*, that a majority of Hospira's board faces a substantial threat of liability such that it cannot impartially consider a demand to bring this suit itself. Further, Plaintiffs concede that, because Hospira has adopted a § 102(b)(7) provision absolving its directors of liability for breaches of the duty of care, the threat of liability they must plead is a breach of the duty of loyalty, which includes a duty of good faith. A breach of the duty of good faith requires directors to have *knowingly* failed to fulfill their duties. The Delaware courts have described it as a "rare case" in which a plaintiff can meet this standard. *In re Citigroup Inc. Deriv. Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009).

Despite acknowledging that they must allege particularized facts suggesting that the directors face a substantial threat of liability, Plaintiffs allege almost nothing about the directors. Plaintiffs' claims of board action—the approval of Project Fuel and the approval of a stock repurchase plan—lack any supporting factual allegations whatsoever about what information the board considered in reaching its decisions.

And Plaintiffs' conclusory claim of board inaction—an alleged conscious disregard for non-compliance with FDA manufacturing regulations—is contradicted by specific facts alleged in the complaint *showing that the board did respond* to regulatory notices from the FDA. Specifically, Plaintiffs allege that only four days after receiving the April 2010 FDA warning letter asserting non-compliance at Hospira's Rocky Mount and Clayton facilities, Hospira announced that it would "be undertaking a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations." (Compl. ¶ 45) In August 2010, just months after Hospira received the warning letter, the board reorganized its Science & Technology Committee, making it the Science, Technology & Quality Committee. (*Id*. at ¶ 38(b)) Every director on the board then joined that committee, so that all could focus on Hospira's efforts to respond to the

1

FDA. (*Id*. at ¶ 198) The committee met five times in 2010 alone, and five times in each year that followed. (*Id*. at ¶ 199) Significantly, Plaintiffs concede that these actions got results: Hospira successfully addressed the FDA's concerns at the Clayton facility such that the FDA issued no observations when it reinspected the facility in January 2011. (*Id*. at ¶ 105) Over the longer term, according to Plaintiffs, Hospira placed "over 100 full-time employees" and "more than 150 consultants" and spent "tens of millions of dollars" to address the FDA's compliance concerns. (*Id*. at ¶¶ 137-38, 7 n.5) In short, the particularized facts that Plaintiffs do allege about the board's actions defeat an inference that the board consciously decided not to comply with FDA regulations.

For this reason, neither the *Baxter* nor *Abbott* decisions, on which Plaintiffs heavily rely, are similar to this case. In *Baxter*, the Seventh Circuit explained that the plaintiff alleged the directors made a conscious decision to halt the company's efforts to comply with an FDA consent decree. In *Abbott*, the plaintiffs alleged that the board failed to take any action in response to multiple FDA warnings and notices over a six-year period. Here, Plaintiffs' allegations are precisely the opposite of the allegations in *Baxter* and *Abbott*. Here, Plaintiffs allege that Hospira and its board were acting throughout the period at issue to address the FDA's concerns and that those actions escalated as the FDA's concerns grew.

Consequently, Plaintiffs are left with the conclusory assertion that whatever actions the board took to address the FDA compliance issues were not enough, because the FDA continued to send regulatory notices asserting non-compliance at certain facilities. But that is not a claim of inaction, it is at most a claim of *insufficient* action, which implicates the duty of care, and so cannot establish a substantial threat of liability against the directors. As a result, Plaintiffs have

not met the stiff requirements of Rule 23.1 and Delaware law for pleading demand futility, and the action should be dismissed.

**<u>Argument</u>**

To plead a breach of the duty of good faith, Plaintiffs must allege with particularity that the board's actions were either "motivated by an actual intent to do harm" or were an "*intentional* dereliction of duty, a *conscious* disregard for one's responsibilities." *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 64, 66 (Del. 2006) (emphasis added). Plaintiffs knock down a straw man, contending that Defendants have argued "that liability cannot attach unless the Director Defendants consciously intended to harm Hospira." Pl. Opp. at 3. This misstates Defendants' argument, which relies on Delaware precedent stating that Plaintiffs must allege with particularity "that the directors consciously acted in a manner contrary to the interests of [the corporation] and its stockholders." *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 (Del. Ch. 2008). Thus, Defendants' motion does not argue that Plaintiffs must allege the directors acted with the intent to *harm* Hospira, but that they must allege the directors acted with knowledge that they were not fulfilling their duties to Hospira.[1] Plaintiffs have not met this standard.

**I.     Plaintiffs Have Not Pled With Particularity That The Board Approved Project Fuel Conscious That It Was Acting Contrary To Hospira's Interest.**

Plaintiffs contend their allegation "[t]hat the Director Defendants approved Project Fuel without a comprehensive compliance review is sufficient to show bad faith, as job number one

---

[1] *See also Wood v. Baum*, 953 A.2d 136 (Del. 2008) (discussed in Def. Br. at 10). Plaintiffs argue that *Wood* is inapplicable because it was decided under the Delaware Limited Liability Company Act. *See* Pl. Opp. at 3 & n.4. But Defendants cited *Wood* for its description of Delaware's "good faith" standard, which is fully applicable to this case. Delaware courts routinely cite *Wood* in corporation cases for the same proposition. *See, e.g. Citigroup*, 964 A.2d at 125 n.56 (applying *Wood*'s discussion of exculpatory clauses to a corporation case).

3

for these directors is legal compliance." Pl. Opp. at 16. But Plaintiffs cite nothing—no factual allegations in the complaint and no Delaware law—in support of this bald proposition.

*First*, there are no factual allegations demonstrating that the directors face a substantial threat of liability for approving Project Fuel. Plaintiffs imply in their brief that Project Fuel had an impact on Hospira's FDA compliance, but Plaintiffs do not allege that "fact." And they certainly do not allege that the board was aware when it approved Project Fuel that the endeavor would adversely affect FDA compliance.[2] If the board was unaware that Project Fuel would have an effect on FDA compliance, there is no basis for contending that the board *knew* it was not fulfilling its fiduciary duties by not having a third-party assess compliance before the board considered the project. Although these pleading failures were explained in Defendants' opening brief, Plaintiffs ignore them completely. *See* Def. Br. at 13.

Not only do Plaintiffs fail to plead that the board was aware Project Fuel might affect Hospira's FDA compliance, they also fail to plead that the board knew about any non-compliance before approving Project Fuel. As explained in Defendants' opening brief, Plaintiffs do not allege that the FDA had notified Hospira of any compliance issues before the announcement of Project Fuel in early 2009. *See* Def. Br. at 3. Rather, the first FDA notice alleged in the complaint is a Form 483 issued to the Clayton facility on April 29, 2009, more than two months *after* Project Fuel's initiation. (Compl. ¶¶ 46, 50) Plaintiffs' brief ignores this point.

---

[2] Implicitly conceding that their complaint lacks such allegations, Plaintiffs try to add them through their brief. They contend that "it is clear that the Board wished to see Project Fuel succeed at all costs and was quite willing to hold off on remedial measures until it was done." Pl. Opp. at 17. They contend that "Project Fuel would slash so many personnel, including quality control personnel…." *Id.* at 18. There are no citations accompanying these assertions in Plaintiffs' brief, and there are no allegations supporting the assertions in the complaint. "[A] plaintiff cannot amend his complaint by a brief that he files in the district court or the court of appeals." *Harrell v. U.S.*, 13 F.3d 232, 236 (7th Cir. 1993).

Finally, although Plaintiffs allege that the board did not obtain a third-party assessment of Hospira's compliance with FDA regulations before approving Project Fuel, they allege nothing about what the board did consider.[3]  Plaintiffs cannot meet the standard for pleading that the board's consideration of Project Fuel was so flawed as to be an intentional dereliction of duty without pleading what the consideration entailed.  *See, e.g.*, *DiRienzo v. Lichtenstein*, 2013 WL 5503034, at *14 (Del. Ch. Sept. 30, 2013) ("Before addressing what the Special Committee allegedly failed to do, I first note what actions the Special Committee did take.").  For instance, although Plaintiffs allege that the board did not obtain a *third-party* review of Hospira's FDA compliance, Plaintiffs do not say whether the board reviewed internal assessments of Hospira's FDA compliance.  Nor do Plaintiffs allege whether the board concluded that Project Fuel would not affect compliance, such that no assessment of compliance was needed.  Without such allegations, Plaintiffs have not pled with particularity that the board failed to consider all reasonably available material information when considering Project Fuel.  Plaintiffs had the ability to obtain such information through a § 220 books and records demand.  They chose not to.

**Second**, no precedent supports Plaintiffs' position that not obtaining a third-party assessment of FDA compliance before approving Project Fuel was bad faith.  Delaware law imposes no duty to commission such an assessment—or undertake any other specific action—before approving a corporate optimization project.  As a result, Hospira's board cannot have *knowingly* failed to fulfill such a duty.  *See Zucker v. Andreessen*, 2012 WL 2366448, at *11 (Del. Ch. June 21, 2012) (if the plaintiff "has not identified any case law or alleged any facts that suggest that

---

[3] Indeed, Plaintiffs do not even allege that the board approved Project Fuel.  In their brief, Plaintiffs contend that the board's approval can be inferred.  *See* Pl. Opp. at 17 n.53.  Regardless, the failure to allege such a key fact only underscores the other missing allegations—allegations regarding facts that cannot be inferred, such as what the board considered in approving Project Fuel and whether the board had any basis to believe that Project Fuel would affect FDA compliance.

5

directors have been or are on notice that such a failure is a breach of fiduciary duty," then "the Board could not have consciously disregarded a known duty to act sufficient to rise to the level of bad faith"); *DiRienzo*, 2013 WL 5503034, at *14 (similar).[4]  Moreover, "[t]he proper inquiry is not whether a director neglected to do all that they should have under the circumstances, which implicates the duty of care, but rather whether the director 'knowingly and completely failed to undertake their responsibilities.'"  *Id.* at *13; *see also Smith v. Van Gorkom*, 488 A.2d 858, 872-73 (Del. 1985) ("[A] director's duty to exercise an informed business judgment is in the nature of a duty of care, as distinguished from a duty of loyalty.").  Plaintiff's contention that the board did not consider one specific piece of information does not suggest a complete failure to undertake the directors' responsibilities.

Plaintiffs' citation to cases in which boards allegedly made affirmative decisions to violate the law does not help them.  *See* Pl. Opp. at 17-18 & n.54.[5]  Here, Plaintiffs have not alleged with particularity that the decision to approve Project Fuel violated any law, that any part of Project Fuel violated any law, or that the implementation of Project Fuel interfered with Hospira's

---

[4] *See also Lyondell Chemical Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) (discussed in Def. Br. at 11-12). Plaintiffs assert without further explanation that *Lyondell* applies only "in the unique context of a sale of the company." Pl. Opp. at 19.  This is inaccurate.  *Lyondell* explained that where there are multiple ways for a board to satisfy its fiduciary duties, an allegation of a failure to follow one particular path does not suggest a conscious disregard of duty.  *Lyondell*'s analysis is fully applicable to Hospira's board's approval of Project Fuel, where there are many ways the board might consider Hospira's FDA compliance status (if it even had reason to do so), but Plaintiffs have alleged only that the board did not take one specific step.

[5] The decisions Plaintiffs cite did not involve allegations that a board's consideration of a decision was incomplete, but rather allegations that the boards at issue made affirmative decisions to violate positive law or not to stop the company from doing so.  *See* Pl. Opp. at 18 n.54 (citing *Louisiana Mun. Police Emp. Ret. Sys. v. Pyott*, 46 A.3d 313, 355 (Del. Ch. 2012) (alleging that the board approved a business plan that "explicitly linked the number of sales representatives to increased off-label sales"); *In re Veeco Instruments Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 278 (S.D.N.Y. 2006) (alleging that the company failed to investigate after an employee brought violations of the law to its attention).  Additionally, *Pyott*, cited repeatedly by Plaintiffs, is not good law; it was reversed by the Delaware Supreme Court on appeal.  *See Pyott v. Louisiana Mun. Police Emp. Ret. Sys.*, 74 A.3d 612 (Del. 2013).

compliance with any law.  Consequently, Plaintiffs' authorities do not apply.  In the end, Plaintiffs have not pled facts to suggest that the board faces a substantial threat of liability for breach of its duty of loyalty based on the approval of Project Fuel.

## II.    Plaintiffs Have Not Pled With Particularity That The Board Approved Hospira's Stock Repurchase Plan Conscious It Was Acting Contrary To Hospira's Interest.

Plaintiffs next contend that Hospira's board faces a substantial threat of liability because it authorized a stock repurchase program in April 2011 without considering all reasonably available material information, and also because it supposedly authorized specific repurchases of Hospira stock in 2010.[6]  But Plaintiffs allege next to nothing about the board's consideration of the 2011 repurchase plan—not what information the board had available to it when it approved the plan, what considerations the board weighed, or what information the board received on potential valuations of Hospira's stock.  Plaintiffs allege even less about the board's supposed involvement with the repurchases in 2010.  And all of Plaintiffs' allegations would at most suggest a breach of the duty of care, not loyalty.

As to the 2011 stock repurchase plan, Plaintiffs argue that the approval of the plan was improper because the board did not wait for the ongoing comprehensive reviews of Hospira's manufacturing operations and medical management products to be completed before considering the repurchase plan.[7]  *See* Pl. Opp. at 20.  Plaintiffs' position, then, is that if a board is aware of any contingency that might be material to a company, it cannot make any decisions that might be

---

[6] Plaintiffs' complaint alleged that the board intended the stock repurchases to artificially inflate Hospira's stock price so that Hospira's executives could sell their personal holdings at inflated prices. (Compl. ¶ 181)  Defendants addressed this unsupported assertion in their opening brief, and in their response Plaintiffs have abandoned it.  *See* Def. Br. at 16-17.

[7] Plaintiffs contend that "[t]hese surveys, when completed, confirmed that hundreds of millions of dollars needed to be spent on remediation."  Pl. Opp. at 20.  There are no factual allegations in the complaint to support this assertion about the comprehensive reviews' conclusions.

affected by that contingency. That position does not reflect Delaware law. Rarely, if ever, do companies not have contingencies whose results are uncertain. If Plaintiffs were correct, these companies would never be permitted to approve a stock repurchase plan, sell their company, or make any other decision that might be affected by future changes in the company's stock price.

Further, Plaintiffs do not allege with particularity that the comprehensive review of Hospira's manufacturing operations had not been completed at the time the board approved the repurchase program. Plaintiffs allege that Hospira *disclosed* that it had completed the comprehensive review in its second quarter SEC Form 10-Q issued on July 27, 2011—only a few months after the April 25, 2011 approval of the plan. (Compl. ¶¶ 105, 180) Rule 23.1 requires plaintiffs to plead with particularity, not just make assertions. Without particularized factual allegations about when the comprehensive review was completed or what the board actually did consider in approving the stock repurchase plan, there is no basis for Plaintiffs' assertion that the board failed to consider all reasonably available information when approving the plan.

That is particularly true given what was occurring at Hospira in April 2011. By April 2011, the FDA had reinspected the Clayton facility to evaluate Hospira's response to the April 2010 warning letter, and the FDA did not note any objectionable conditions. (Compl. ¶ 105) Indeed, a year had elapsed since Hospira had received a notice of any type from the FDA asserting non-compliance. Thus, at the time the board approved the 2011 repurchase plan, Plaintiffs' own allegations suggest that the board had every reason to believe that Hospira had satisfied the FDA. Although Defendants detailed this timeline in their opening brief, Plaintiffs ignore it completely in their response. *See* Def. Br. at 15-16.

Plaintiffs allege even less about the stock repurchases in 2010. Most significantly, Plaintiffs do not allege that the board had any involvement in the specific decisions to repurchase

those shares.  As alleged in the complaint, the 2010 repurchases took place under a plan approved by the board *in 2006*.  (Compl. ¶ 180, Chart)  Yet Plaintiffs concede that the 2006 approval is not at issue in this case.  *See* Pl. Opp. at 20 n.57 ("What the Board did or approved in 2006 is not at issue here.").  Instead, they contend that "[i]t may be reasonably inferred that the dormant repurchase program was restarted in 2010 with Board approval, involving (as it did) material expenditures."  *Id*.  Plaintiffs cite no facts to support the inference that the board approved specific purchases made pursuant to the 2006 plan.  Indeed, the Company's SEC filing that announced the plan stated that "[t]he size and timing of any purchases *are at the discretion of company management*, based on factors such as price, business and market conditions."[8] (Ex. 3, 2/28/2006 SEC Form 8-K at Ex. 99.2 (emphasis added))  But, even if such an inference were warranted, Plaintiffs have not met their burden to plead with particularity that the board did not consider all reasonably available material information, because Plaintiffs plead absolutely nothing about the board's supposed consideration.

Plaintiffs' positions as to both the 2011 repurchase plan and the 2010 repurchases are foreclosed by *In re Citigroup*, 964 A.2d 106 (Del. Ch. 2009).  There, the plaintiffs made allegations substantively indistinguishable from Plaintiffs' allegations here, and the Delaware court held that they were insufficient to establish demand futility.  Specifically, the plaintiffs alleged that Citigroup's board faced a substantial threat of liability for authorizing stock repurchases "in spite of the Company's expanding losses and declining stock price."  *Id*. at 136-37.  According to

---

[8] Plaintiffs argue that the 2006 plan had been "dormant" since 2006, and so its "restart" would have required board approval.  *See* Pl. Opp. at 20 n.57.  There are no allegations in the complaint to support this assertion.  The 2006 plan was discussed as an active plan in each of Hospira's quarterly SEC filings from its approval through 2010.  (*See, e.g.,* Ex. 4, Hospira 3rd Quarter 2009 SEC Form 10-Q, at 18 ("Hospira has repurchased 7.6 million shares for $299.8 million in the aggregate under the 2006 board authorization, all of which were purchased during 2006. Hospira does not expect to repurchase any shares in 2009 under this program."))  Thus, there is no basis for inferring that the plan was "dormant" or had to be "restarted."

the plaintiffs, the board "recklessly failed to consider and account for the subprime lending crisis, the Company's exposure to falling CDO values by virtue of its liquidity puts, and the collective impact on the Company's billions in warehoused subprime loans." *Id.* As a result, the plaintiffs alleged, Citigroup repurchased "over $645 million worth of the Company's shares at artificially inflated prices." *Id.*

The Delaware Chancery Court rejected the sufficiency of the plaintiffs' allegations. The court reasoned that:

> Plaintiffs seem to completely ignore the standard governing corporate waste under Delaware law—a standard that requires that plaintiffs plead facts overcoming the presumption of good faith by showing 'an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.'

*Citigroup*, 964 A.2d at 137. The court then explained that the plaintiffs' allegation that the stock was purchased at the market price precluded any contention of a threat of substantial liability for the board, even though the price later fell:

> Other than a conclusory allegation, plaintiffs have alleged nothing that would explain how buying stock at the market price—the price at which presumably ordinary and rational businesspeople were trading the stock—could possibly be so one sided that no reasonable and ordinary person would consider it adequate consideration. Again, *plaintiffs merely allege 'red flags' and then conclude that the board is liable for waste because Citigroup repurchased its stock before the stock dropped* in price as a result of Citigroup's losses from exposure to the subprime market. In short, the Complaint states no particularized facts that would lead to any inference that the board's approval of the stock repurchase constituted corporate waste.

*Id.* (emphasis added). Although Defendants discussed *Citigroup* in detail in their opening brief, Plaintiffs fail to so much as cite it in their response. *See* Def. Br. at 15.

Instead, Plaintiffs contend that the Chancery Court's decision in *In re Walt Disney Co.*, 825 A.2d 275 (Del. Ch. 2003) shows how Delaware law applies "with regard to directors who also made major decisions without a full investigation of the facts." Pl. Opp. at 21. But *Disney*

is not applicable here, because it (1) was not about stock repurchases, (2) pre-dates *Citigroup* and was issued by the same judge, and (3) was superseded when the Delaware Supreme Court reviewed the case (*see In re Walt Disney Co.*, 906 A.2d 27 (Del. 2006)).

In any event, rather than supporting Plaintiffs' position, the allegations held to have met the standard for demand futility in *Disney* show by comparison that Plaintiffs have not met the standard in this case. Specifically, the *Disney* plaintiffs alleged that Disney's board approved an award to an executive of more than $140 million after barely one year of employment. *Disney*, 825 A.2d at 279. In making their allegations, the plaintiffs "used the 'tools at hand,' a request for books and records as authorized under 8 Del. C. § 220, to obtain information about the nature of the Disney Board's involvement in the decision to hire and, eventually, to terminate Ovitz." *Id.* As a result, the plaintiffs were able to allege that the Disney board's compensation committee approved the contract at issue after a single meeting that lasted less than an hour, of which the committee spent only a small portion discussing Ovitz's contract. *Id.* at 280.

In contrast to the detailed allegations about the board's consideration in *Disney*, Plaintiffs here allege no details about the Hospira board's approval of the 2011 stock repurchase plan other than that it occurred. And Plaintiffs do not even allege that the board approved the specific stock repurchases in 2010 under the 2006 repurchase plan. Thus, *Disney* provides no support for Plaintiffs' position.

## III.    Plaintiffs Have Not Pled With Particularity That The Board Faces A Substantial Threat Of Liability Regarding Alleged Misstatements.

Plaintiffs allege that Hospira's board faces a substantial threat of liability (1) for causing or permitting Hospira to commit securities fraud (Pl. Opp. at 23-24), and (2) under § 20(a) of the Securities Exchange Act as "control persons" of a primary violator (*id.* at 22-23). Neither of these claims is sufficiently pled.

11

*First*, Plaintiffs' brief makes only a half-hearted attempt to sustain their position that they have sufficiently alleged that Hospira's board faces a substantial threat of liability for causing Hospira to issue misstatements. Although Defendants' opening brief laid out and analyzed Delaware's standard for pleading demand futility for such a claim, Plaintiffs do not even cite the standard, let alone explain how they have met it. *See* Def. Br. at 18-21 (discussing *Citigroup*). Instead, Plaintiffs rely on Judge St. Eve's decision permitting a portion of a securities fraud claim to proceed past a motion to dismiss against three Hospira *executives*, apparently believing that is enough to sustain a claim against Hospira's *directors*. *See* Pl. Opp. at 24. But only one of Hospira's eleven-member board is a defendant in that lawsuit—hardly the majority of the board required to excuse the demand requirement.

*Second*, § 20(a) creates liability for anyone who "controls any person liable under any provision of this chapter." 15 U.S.C. § 78t(a). Plaintiffs argue that the directors were control persons because they controlled Hospira. *See* Pl. Opp. at 23 ("In this Circuit, control person liability applies to any person exercising general control over *the company's* affairs.") (emphasis added). But alleging control over Hospira does not support a § 20(a) claim because Hospira, which would be the plaintiff in Plaintiffs' intended claim for securities fraud against the directors, cannot also be the primary violator. *See, e.g., In re Finisar Corp. Deriv. Litig.*, 2012 WL 2873844, at *19 (N.D. Cal. July 12, 2012) ("It is logically impossible for a corporation on whose behalf a derivative action is brought to be a primary violator."); *In re Maxim Integrated Prods.*, 574 F. Supp. 2d 1046, 1067 (N.D. Cal. 2008) (same).

Plaintiffs also allege that the directors controlled the individual defendants in the action pending before Judge St. Eve. (Compl. ¶ 227) This allegation also fails to establish demand fu-

12

tility.[9]  As a threshold matter, Plaintiffs cannot satisfy Federal Rule of Civil Procedure 23.1(a), which requires that shareholders bringing a derivative claim "fairly and adequately represent the interests of the shareholders."  In order to bring their § 20(a) claim against the board, Plaintiffs would have Hospira assert the very allegations against which it is defending itself in the securities fraud case (because Hospira is a defendant in that case, alleged to bear liability because of the individual defendants' supposed misstatements).  Asserting allegations in this case that would *create* liability for Hospira in the securities fraud case could not possibly be in Hospira's (and therefore its shareholders') interests.  Plaintiffs made no response to this argument, which was articulated in Defendants' opening brief.  *See* Def. Br. at 19.

Furthermore, in order for the board to face a substantial threat of liability on a claim *by Hospira*, Hospira would have to be able to claim that it relied on any misstatements made by its executives when it decided to repurchase Hospira stock.  *See Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2301 n.3 (2011) (one element of a securities fraud claim is "reliance upon the misrepresentation or omission").  But the complaint does not plead Hospira's reliance, let alone plead it with the particularity required by Rule 23.1.  Plaintiffs allege that Hospira's board authorized the repurchase of Hospira's stock, but they allege no facts about what the board considered in authorizing such purposes.  (Compl. ¶ 180)  Nor do Plaintiffs allege which Hospira executives (acting for Hospira) made the specific decisions to repurchase stock.  If the three executives who are alleged to have made the misstatements are also the ones who

---

[9] Plaintiffs assert that "[s]imilar derivative claims were upheld in *Countrywide* ... and in *Sommers*."  Pl. Opp. at 23.  But the § 20(a) claim *Sommers* was not upheld, it was dismissed.  *See Sommers v. Lewis*, 641 F. Supp. 2d 1151, 1163 (D. Ore. 2009).  And in *Countrywide*, the only issue raised was whether a primary violation had been pled.  *See In re Countrywide Financial Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1074-75 (C.D. Cal. 2008).

made the decisions to repurchase, Plaintiffs' § 20(a) claim would be dead on arrival, for those executives cannot possibly have relied on their own misstatements.

Finally, Plaintiffs do not sufficiently allege that the directors controlled the three executives who allegedly made misstatements. To establish a § 20(a) claim, Plaintiffs must plead that each director "actually participated in, that is, exercised control over, the operations of the person in general" and also that each director "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992). "The mere fact that Plaintiff alleges these Defendants are directors is not enough." *Donovan v. ABC-NACO Inc.*, No. 02 C 1951, 2002 WL 1553259, at *6 (N.D. Ill. July 15, 2002). Yet there are no particularized factual allegations in the complaint that the directors *individually* had the power to direct Hospira's CEO and CFO regarding the alleged misstatements they made. *See Johnson v. Tellabs, Inc*., 262 F. Supp. 2d 937, 958-59 (N.D. Ill. 2003) (allegations that the directors "had direct and supervisory involvement in the day-to-day operations of the Company" were "insufficient to establish control person liability").[10] The complaint does not even try to meet that standard.[11] *See Kaufman v. Motorola, Inc.*, No. 95 C 1069, 1999 WL 688780, at *16 (N.D. Ill April 16, 1999) (dismissing a § 20(a) claim regarding alleged misstatements where the plaintiffs alleged only that the director-defendant "attended management board meetings only

---

[10] *See also Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1108 (10th Cir. 2003) ("The assertion that a person was a member of a corporation's board of directors, without any allegation that the person individually exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that the person is a control person within the meaning of the Exchange Act.").

[11] Plaintiffs contend that they need not meet a heightened pleading standard for their intended § 20(a) claim, citing *Central Laborers' Pension Fund v. Sirva, Inc.*, No. 04 C 7644, 2006 WL 2787520 (N.D. Ill. Sept. 22, 2006). *See* Pl. Opp. at 23 n.63. But *Sirva* was a securities fraud case, not a derivative case. In this derivative action, Plaintiffs must plead with particularity that demand is futile. Fed. R. Civ. P. 23.1(b)(3). That standard does not change just because Plaintiffs attempt to plead a § 20(a) claim.

two to three times each year, went to an August 1994 board meeting and received monthly documents setting forth Motorola's operating results."); *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1067 (9th Cir. 2000) (rejecting a § 20(a) claim because "Plaintiff simply points to Wong's general level of control but provides no specific indication that Wong supervised or had any responsibility for the preparation of the financial statements."). As a result, Plaintiffs have not pled a § 20(a) claim.

## IV.   Plaintiffs Have Not Pled With Particularity That The Board Knowingly Disregarded Its Duties By Failing To Address Known FDA Compliance Issues.

Finally, Plaintiffs contend that Hospira's board violated its duty of good faith by conscious inaction in the face of a known duty to "ensure legal compliance." Pl. Opp. at 25. But Plaintiffs do not allege anything about what the board did (or did not do) with regard to compliance, such as what meetings the board held on the issue or what actions the board took or decided not to take in response to the FDA's assertions of non-compliance. Rather, Plaintiffs contend that the Court should *infer* that the board knew Hospira was not in compliance with FDA regulations and *infer* that the board consciously decided not to bring Hospira into compliance.

The fundamental problem with Plaintiffs' proposed inference is that it is contradicted by Plaintiffs' own allegations: The complaint alleges multiple ways in which Hospira and the board acted in response to FDA concerns. First, Plaintiffs allege that only four days after receiving the April 2010 FDA warning letter, Hospira announced it would "be undertaking a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations." (Compl. ¶ 45)[12] Second, at the time of the warning letter, the board's Governance Committee

---

[12] Plaintiffs' brief contends that the comprehensive review "was still not fully initiated eighteen months after the 2010 Warning Letter." Pl. Opp. at 32. This is inconsistent with their own allegation that the comprehensive review was completed by July 2011. (Compl. ¶ 105 (quoting Hospira's SEC Form 10-Q))

had responsibility for overseeing "[t]he Company's quality control and regulatory compliance programs." (Ex. 5, Governance Committee Charter at 3)[13]  Plaintiffs allege that in the wake of the warning letter the Governance Committee met more often in 2010 (seven times) than in any other year, which suggests attention to the compliance issues. (Compl. ¶ 38(d))  Third, Plaintiffs allege that in August 2010, less than four months after the April 2010 warning letter, Hospira's board reorganized its Science & Technology Committee to become the Science, Technology & Quality Committee, which assumed responsibility for oversight of compliance issues. (*Id.* at ¶ 38(b))[14]  Fourth, Plaintiffs allege that Hospira successfully addressed the FDA's concerns regarding the Clayton facility. Although Plaintiffs do not allege what actions Hospira took to do that, they allege that when the FDA reinspected the Clayton facility in January 2011, it did not identify any objectionable conditions. (*Id.* at ¶ 105)

Moreover, Plaintiffs affirmatively allege that Hospira's actions to address the FDA's concerns continued *and increased* as the FDA asserted additional concerns. Thus, Plaintiffs allege that by May 2012 Hospira had "placed over 100 full-time employees" at Rocky Mount, hired "more than 150 consultants," and "replaced several members of its management team." (Compl. ¶¶ 137-38)  By March 2013, according to Plaintiffs, Hospira had spent "tens of millions of dollars" on addressing the FDA's concerns. (*Id.* at ¶ 7 n.5)  In sum, the complaint itself alleg-

---

[13] Plaintiffs' complaint quotes from the Governance Committee charter and therefore the Court may consider the charter in full. *See Wright v. Associated Ins. Companies, Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) (courts may consider documents "if they are referred to in the plaintiff's complaint and are central to his claim."). The charter also demonstrates the inaccuracy of Plaintiffs' allegation that prior to the formation of the Science, Technology & Quality Committee, compliance oversight "was knowingly left to the conflicted CEO." (Compl. ¶ 38(b) n.10)

[14] Plaintiffs contend that the fact that all eleven board members joined the committee shows that it "is not a true committee which can focus on quality issues." (Compl. ¶ 38(b) n.10)  There is no basis for this assertion. Plaintiffs concede that the committee met separately from the board. (*Id.* at ¶ 38(b) (five committee meetings each year))  And Delaware law does not provide that committees comprised of the full board are somehow compromised or should be disregarded in assessing the directors' compliance with their fiduciary duties.

16

es conduct from the first days after the April 2010 warning letter until the time Plaintiffs' complaint was filed in May 2013 that conclusively refutes an inference that Hospira's board consciously decided not to comply with FDA regulations.[15]

Therefore, Plaintiffs' own allegations establish a clear difference between this case and the allegations on which the Seventh Circuit relied in *Baxter* and *Abbott*. In *Baxter*, the Seventh Circuit concluded that the plaintiff adequately alleged the board made "a conscious decision to halt" its efforts to address FDA compliance issues "despite clear and specific guidance from the FDA that additional action from Baxter was needed." *Westmoreland Cnty. Emp. Ret. Sys. v. Parkinson* ("*Baxter*"), 727 F.3d 719, 728 (7th Cir. 2013). According to the court, the plaintiff alleged Baxter stopped spending money on remediation mandated by an FDA consent decree. *Id.* at 723 ("[I]n the fourth quarter of 2008, Baxter did not record any charges related to the Pumps, and in 2009, the company spent a relatively modest $27 million."). *Baxter* was not a case where the court inferred inaction. Rather, the court explained that "no such inference is necessary, since the complaint alleges particularized facts (*e.g.*, meeting dates and minutes) indicating that the directors were intimately involved in overseeing the remedial effort." *Id.* at 728.

The allegations here are nothing like those in *Baxter*. Here, Plaintiffs allege nothing about what the board did at its meetings or whether it was involved overseeing Hospira's FDA compliance. Nor do Plaintiffs allege that Hospira ever ceased its efforts to comply with FDA regulations; precisely the opposite, Plaintiffs allege that throughout the period at issue Hospira

---

[15] Plaintiffs' attempt to include the period before the April 2010 warning letter in any analysis should be rejected. *See*, *e.g.*, Pl. Opp. at 8. Prior to April 2010, Plaintiffs allege, Hospira had received a warning letter in August 2009 related to power cords manufactured by a third party. (Compl. ¶ 55) Plaintiffs do not allege any connection between the issues raised in that letter and any issues subsequently asserted by the FDA at any other facility. Further, as Plaintiffs allege, the issue identified in the August 2009 warning letter was a relatively minor one. *See* Def. Br. at 5; *South v. Baker*, 62 A.3d 1, 16 (Del. Ch. 2012) ("Each of the illustrative violations references a day-to-day operational issue in the Lucky Friday mine. None suggest a Board-level decision.").

17

continued actively trying to address the FDA's concerns and was escalating its efforts, not slowing them.

*Abbott* is similarly off-point. As explained in Defendants' opening brief, the *Abbott* court inferred board knowledge of non-compliance with FDA regulations because of the seriousness and longevity of the violations—seriousness and longevity that are not present in Plaintiffs' allegations here. *See* Def. Br. at 25-26. In addition to that inference of board knowledge, the court also inferred that the board "*ignored* repeated red flags raised by the FDA and in media reports and *chose* not to bring a prompt halt to the improper conduct causing the noncompliance." *In re Abbott Laboratories Deriv. S'holders Litig.*, 325 F.3d 795, 802 (7th Cir. 2003) (emphasis added).

Here, in stark contrast to *Abbott*, even if one could infer board *knowledge* of FDA issues, Plaintiffs have pled facts that *contradict* the second inference drawn in *Abbott*—that the board consciously chose to do nothing to address FDA compliance issues. The facts alleged here are that Hospira's board *did* act to address the FDA's concerns, spending tens of millions of dollars and dedicating more than 250 people to its effort to address the FDA's concerns. Still, despite these efforts, the FDA sent additional regulatory notices with respect to some Hospira facilities (although the complaint conceded that the Clayton facility was successfully remediated through Hospira's efforts). *See* Def. Br. at 28-29. Thus, whereas in *Abbott* the court could adopt the inference that subsequent FDA assertions of non-compliance meant a failure to try to comply, here the complaint's factual allegations foreclose any such inference.

Perhaps knowing that their complaint prevents any assertion that Hospira and its board ignored FDA compliance issues, Plaintiffs' brief takes a different tack than the plaintiffs in *Baxter* and *Abbott*. Rather than contend that Hospira and its board wholly ignored the issues asserted by the FDA, Plaintiffs assert that the board "took *insufficient* action to ensure legal

compliance." Pl. Opp. at 25 (emphasis added). But *insufficient* action is not enough to plead a breach of the duty of good faith. It is black-letter Delaware law that directors do not face liability for a company's violations of the law unless "the fiduciary acts with the intent to violate applicable positive law." *Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006). Insufficient action in the face of a known duty to act cannot be equated with intent to violate applicable law. There are many ways in which actions to address FDA compliance might later prove to be insufficient— directors could misunderstand what the FDA desires, directors' instructions could be ignored by company management, directors could be negligent or even grossly negligent or reckless. None of these would constitute acts with intent to violate the law. *See*, *e.g.*, *Lear*, 967 A.2d at 652 (a plaintiff's position "cannot rest on facts that simply support the notion that the directors made an unreasonable or even grossly unreasonable judgment").

Plaintiffs cite only the Seventh Circuit's *Baxter* decision for their proposition that they can allege demand futility by alleging that the board's response to the FDA notices was insufficient. *See* Pl. Opp. at 25, 32-33. But *Baxter* says no such thing. Rather, it explained that "[n]othing we have said should be taken as a suggestion that officers and directors in these industries forfeit the protection of the business judgment rule simply because some initiatives fail." *Baxter*, 727 F.3d at 729-30. Further, as explained above, the allegations in *Baxter* were that the directors made a conscious decision to stop addressing the FDA compliance issues—"that company officials improperly 'threw in the towel.'" *Id.* at 726. Thus, *Baxter* did not hold that insufficient compliance efforts constitute bad faith, but that the complete cessation of efforts to comply with an FDA consent decree could be bad faith. As a result, *Baxter* does not support Plaintiffs' position. If Plaintiffs were correct, it would create a form of strict liability for corporate directors: If ever they became aware of FDA compliance concerns, but were unable to fix

19

them (or to fix them quickly enough), a shareholder derivative suit would lie against them. That is definitely *not* Delaware law.

At base, Plaintiffs equate a bad outcome with bad intent. They contend that if the board failed to sufficiently address Hospira's compliance issues, then the board must have intended not to address them. But the Delaware Supreme Court rejects this faulty logic: "The lacuna in the plaintiffs' argument is a failure to recognize that the directors' good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability, or both." *Stone*, 911 A.2d at 373. Simply put, a failed result does not mean there was no good faith attempt. Here, the FDA may have continued to assert compliance issues at specific Hospira facilities, but—particularly when combined with Plaintiffs' allegations showing that Hospira and its board *were taking action to respond to the FDA's concerns*—the lack of complete success does not support the bad faith necessary to plead with particularity that the board faces a substantial threat of liability.

## Conclusion

For the foregoing reasons and in Defendants' opening brief, the Court should dismiss this lawsuit for failure to plead demand futility under Federal Rule of Civil Procedure 23.1.

Dated: January 13, 2014          Respectfully submitted,

         */s/ Joshua Z. Rabinovitz*
         Mark Filip
         Robert J. Kopecky
         Joshua Z. Rabinovitz
         KIRKLAND & ELLIS LLP
         300 North LaSalle Drive
         Chicago, IL 60654
         (312) 862-2000
         (312) 862-2200 (fax)

         *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I, Joshua Z. Rabinovitz, hereby certify that on this 13th day of January 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the parties listed on the electronic service list:

                                        */s/ Joshua Z. Rabinovitz*
                                        Joshua Z. Rabinovitz